Michael A. Bliven
Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
mike@blivenlawfirm.com

Robert F. Dwyer, III
Oregon State Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman, OR 97818
Telephone: (406) 755-6828
rdwyer@blivenlawfirm.com

John Heenan
(to be admitted *pro hac vice*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
john@lawmontana.com

Steve W. Berman
(to be admitted *pro hac vice*)
Meredith S. Simons
(to be admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98134
Telephone: (206) 623-7292
steve@hbsslaw.com
merediths@hbsslaw.com

Abigail D. Pershing
(to be admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISON

| | |
|---|---|
| MICHAEL PEARSON, MICHAEL BRANDT, VIRGINIA BRANDT, JAMES SUTER, and SILVIA SUTER, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br> v.<br><br>PORT OF MORROW, LAMB WESTON HOLDINGS, INC., MADISON RANCHES, INC., THREEMILE CANYON FARMS, LLC, BEEF NORTHWEST FEEDERS, LLC, and JOHN DOES 1-10,<br><br>        Defendants. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   PARTIES .......................................................................................................... 6

    A.    Plaintiffs ................................................................................................. 6

        1.    Michael Pearson ...................................................................... 6

        2.    Michael and Virginia Brandt ................................................... 8

        3.    James and Silvia Suter ............................................................. 9

    B.    Defendants ............................................................................................ 10

III.  JURISDICTION AND VENUE ........................................................................ 11

IV.   STATEMENT OF FACTS ................................................................................ 12

    A.    Exposure to high levels of nitrates is dangerous. ................................. 12

    B.    Groundwater in the Lower Umatilla Basin, which supplies both
        private well water and public water, is highly contaminated with
        nitrates. ................................................................................................. 13

    C.    Defendants' actions have caused this nitrate contamination. ............... 18

        1.    Defendant Farms have contaminated the groundwater in the
            Umatilla GMA. ...................................................................... 18

        2.    Defendant BNW Feeders has contaminated the
            groundwater in the Umatilla GMA. ........................................ 20

        3.    Defendant Wastewater Management Facilities have
            contaminated the groundwater in the GMA. ........................... 21

    D.    The Port and Lamb Weston routinely violate their wastewater
        processing permits. ............................................................................. 24

    C.    Plaintiffs and Class members will require professional assistance to
        redress the harm defendants have caused. ........................................... 29

        1.    Plaintiffs and other Class members need professional
            assistance to clean up the contaminated Umatilla aquifer
            and to mitigate the pollution's impact by drilling deep wells
            or by connecting to the Port's clean water system. ................. 30

2. Appropriate diagnosis and treatment of nitrate-related illnesses among Plaintiffs and other Class members will require ongoing medical monitoring by healthcare professionals. ........................................................................ 31

V.    CLASS ALLEGATIONS ...................................................................... 31

    A.    All requirements of FRCP 23(a) are met. ............................................ 32

    B.    All requirements of FRCP 23(b)(3) are met. ....................................... 33

COUNT I: RESOURCE CONSERVATION AND RECOVERY ACT,  42 U.S.C. § 6972(a)(1)(B) ....................................................................................... 34

COUNT II: NEGLIGENCE.......................................................................... 37

COUNT III:  NEGLIGENCE *PER SE*.......................................................... 39

COUNT IV: TRESPASS ............................................................................... 40

COUNT V: PRIVATE NUISANCE ............................................................... 41

COUNT VI: PUBLIC NUISANCE ............................................................... 42

COUNT VII: INVERSE CONDEMNATION.................................................. 42

PRAYER FOR RELIEF ................................................................................ 43

JURY DEMAND .......................................................................................... 44

Plaintiffs Michael Pearson, Michael Brandt, Virginia Brandt, James Suter, and Silvia Suter (hereinafter "Plaintiffs"), on behalf of themselves and all others similarly situated, allege as follows:

## I.  INTRODUCTION

1.  Easy and cheap access to clean drinking water is part of the fabric of life in the United States. Most Americans expect, when they turn on the kitchen tap, that they are getting clean water. But for tens of thousands of people who live in Oregon's Morrow and Umatilla counties, including Plaintiffs and other Class members, accessing potable water is not so simple. For many in these communities who draw their water from private wells, the tap water in their homes is so polluted with nitrates that it is unsafe to drink, and they must rely on bottled water for all drinking, cooking, and other household purposes. For others in these communities who rely on public water, they must pay inflated water bills or higher taxes to cover public water departments' outlays on pollution mitigation. Even so, those who rely on public systems are not guaranteed nitrate-free water: nearly half of all the public water systems that serve these communities have tested positive for dangerous levels of nitrates. And the problem is only getting worse and the risk to public health keeps increasing.

2.  The cause of all this pollution? Defendants have dumped, and continue to dump, millions of pounds of nitrogen onto land in Morrow and Umatilla counties. Nitrogen in the ground converts into nitrates, which then percolate down to the water table in the Lower Umatilla Basin, polluting the subterranean aquifer on which Plaintiffs and Class members rely for their water. Nitrates are invisible, tasteless, and odorless pollutants, but they can cause miscarriage, thyroid disease, cancer, and methemoglobinemia. Infants are particularly vulnerable to ill effects.

3.  Groundwater in the Lower Umatilla Basin is now so polluted with nitrates that the Oregon Department of Environmental Quality ("DEQ") has declared it a "Groundwater

Management Area" (or "GMA"). The Umatilla GMA encompasses approximately 562 square miles of land in northern Morrow and Umatilla counties and includes the cities of Boardman, Hermiston, Irrigon, Stanfield, and Echo. In all, over 45,000 people, including more than 10,000 children, live within the bounds of the Umatilla GMA. Many Umatilla GMA residents are Latino or indigenous. And many live below the federal poverty line.

*Figure 1. Lower Umatilla Basin Groundwater Management Area*



4.      The Oregon DEQ applies the GMA designation to a region only when nitrate concentrations in groundwater samples approach or exceed the federal safe drinking water standard. The federal safety threshold, established by the Environmental Protection Agency ("EPA"), is set at 10 milligrams per liter ("mg/L"); Oregon's own threshold for establishing a GMA is 7 mg/L. Nitrate levels in the Umatilla GMA easily blow past these safety limits: water samples taken from wells in the area have indicated nitrate concentrations of over 40 mg/L, more

than *four times* the federal safety threshold and more than *five times* Oregon's GMA trigger threshold.

5.      According to the Oregon DEQ, 95% of the nitrate pollution in the Umatilla GMA is attributable to irrigated agriculture, concentrated animal feeding operations ("CAFOs"), and industrial wastewater treatment and disposal facilities operating in the area. Plaintiffs now seek to hold accountable entities that have caused this pollution. Defendants Lamb Weston Holdings, Inc., Madison Ranches, Inc., and Threemile Canyon Farms, LLC (the "Defendant Farms") engage in widespread irrigated agriculture operations in the Umatilla GMA. Defendant Beef Northwest Feeders, LLC is a CAFO that operates a large beef feedlot in the GMA. And Defendants Lamb Weston Holdings, Inc. and the Port of Morrow operate the only two industrial wastewater treatment and disposal facilities in the GMA.

6.      Each of these Defendants is responsible for dumping significant quantities of nitrogen onto land in Umatilla and Morrow counties, which leaches into groundwater in the form of nitrates and contaminates the aquifers from which Plaintiffs and the Class draw their water. Although all Defendants have contributed to the contamination, the actions of the Port of Morrow and Lamb Weston are particularly egregious. The Port and Lamb Weston hold permits that limit the amount of nitrogen-heavy water they can legally dump, but each has regularly violated these permits. The Port of Morrow, for example, racked up at least 395 permit violations in the two-month span between November 1, 2023, and January 11, 2024, including by applying wastewater to empty fields and by failing to fix leaky pipes, allowing nitrogen-heavy wastewater to pool. What's more, the Port has indicated it has no intention of changing its behavior: the Port's executive director, Lisa Mittelsdorf, has indicated the Port will likely continue to violate its permit

because "there is no alternative short of closing processing plants."[1] The dumping is depicted below:

*Image 1. The Port discarding nitrogen-heavy water onto an empty field in the Umatilla GMA in December 2023.*



*Image 2. Pools of nitrogen-heavy wastewater caused by a leak in a Port of Morrow pipeline.*



---

[1] Monica Samayoa, *Port of Morrow Continues to Apply Excess Nitrates on Farmland, Misses Payment Deadline*, OR. PUB. BROADCASTING (Jan. 27, 2024), https://www.opb.org/article/2024/01/26/nitrate-pollution-port-of-morrow-groundwater-environment-drinking-oregon-boardman.

7.      Allowing Defendants to continue contaminating the water in the GMA is an environmental and social injustice. Plaintiffs and other Class members should not be required to tolerate continued exposure to contaminated water or to bear the cost of obtaining non-polluted water. Plaintiffs and all Classes thus bring this case seeking injunctive relief and compensatory damages against Defendants under federal and Oregon law.

8.      Plaintiffs bring a citizen suit against the Port of Morrow, Lamb Weston, Madison Ranches, Beef Northwest Feeders, and Threemile Canyon Farms under the Resource Conservation and Recovery Act to compel these Defendants to conduct the assessment and remediation activities necessary to abate the nitrate contamination they have caused.

9.      Plaintiffs bring negligence and negligence per se claims against all Defendants on behalf of themselves and a proposed Class of residents who currently live within the GMA boundaries. Among other forms of relief, Plaintiffs seek the creation of a medical monitoring program to help ensure early diagnosis and treatment of illness caused by nitrate exposure.

10.      Plaintiffs bring trespass, private nuisance, and public nuisance claims against all Defendants on behalf of themselves and a proposed Subclass of people who rent or own property in the Umatilla GMA that is supplied with drinking water either via a private well or via a public water system.

11.      Finally, with respect to the Port of Morrow only, Plaintiffs bring an inverse condemnation claim against the Port on behalf of themselves and a proposed Subclass of people who rent or own private property in the Umatilla GMA that is supplied with drinking water either via a private well or via a public water system.

## II.   PARTIES

**A.   Plaintiffs**

**1.   Michael Pearson**

12.   Plaintiff Michael Pearson is a resident of Morrow County, Oregon.

13.   Mr. Pearson owns a home located at 70159 Summit Lane, Boardman, Oregon, 97818, which he purchased in 1997. His home draws its water from the Umatilla Basin through a private well. Mr. Pearson and his family depend on their home's well to provide water for drinking, cooking, bathing, and other domestic purposes.

*Image 3. Mr. Pearson's residential well.*



14.   In June 2022, Mr. Pearson learned that the Morrow County Commission had declared a local state of emergency over groundwater nitrate pollution that compromised drinking water for many Morrow County residents.

15.   Concerned for his family's safety, Mr. Pearson decided to have his well tested for nitrates. Oregon Rural Action ("ORA") performed a test of Mr. Pearson's well; test results showed

nitrate levels of 46.8 mg/L—over four times the safe limit of 10 mg/L established by EPA, and more than six times the Oregon GMA trigger threshold of 7 mg/L.

16.     In an effort to protect his family from further exposure to unsafe levels of nitrates, Mr. Pearson installed a reverse osmosis filtration system in his well. Local taxpayers paid for Mr. Pearson's filtration system, which was provided to him by Morrow County.

17.     However, the filtration system was unable to bring nitrate levels in his well down to safe levels. After installing the filtration system, Mr. Pearson again had water from his kitchen tested. The results from this testing revealed that the treated water had a nitrate concentration of 16.4 mg/L—still more than one-and-a-half times the EPA's safety threshold, and more than twice Oregon's GMA trigger threshold.

18.     To ensure his family has access to clean water, Mr. Pearson has now resorted to using bottled water. Every week, Mr. Pearson and his wife use between six and eight five-gallon water bottles for drinking and cooking. Relying on bottled water is inconvenient for Mr. Pearson and his family. For example, when brewing a pot of coffee, Mr. Pearson cannot simply turn on the tap to fill a pot. Instead, he must lift and carry a five-gallon bottle of water weighing 41 pounds from storage, bring the bottle to his kitchen, open the bottle, and pour it into the coffee pot. What's more, the delivery of water has not been on schedule and has been inadequate. Because the delivery driver does not keep a schedule, empty bottles that Mr. Pearson exchanges for full bottles blow off Mr. Pearson's porch and into his yard; occasionally, these empty bottles also blow into the road. Mr. Pearson has had to call the delivery company on several occasions because they have not brought water as scheduled, or have not brought enough water to satisfy his family's regular household use.

19.     Defendants' actions, which have contaminated Mr. Pearson's well with nitrates, have directly and proximately caused all the expenses and inconveniences that Mr. Pearson and his family have endured and continue to endure. This contamination has diminished the value of Mr. Pearson's property, unreasonably interfered with his quiet enjoyment of the property, and unreasonably exposed Mr. Pearson and his family to an increased risk of disease. Mr. Pearson is exposed to contaminated water when he drinks public water either at restaurants or at the homes of friends whose properties are connected to public water.

**2.     Michael and Virginia Brandt**

20.     Plaintiffs Michael and Virginia Brandt are residents of Morrow County, Oregon.

21.     Mr. and Mrs. Brandt own a home located at 70088 Kunze Lane, Boardman, Oregon, 97818. The Brandts purchased their home in 1999. The Brandts' home is not connected to any public water system; their home is dependent on water from a private well. The Brandts rely on their home's well to provide water for drinking, cooking, bathing, and other domestic purposes.

22.     The Brandts' well water is not safe to drink. In October 2023, following reports of Port of Morrow's permit violations and wastewater dumping and the local state of emergency in response to nitrate pollution, the Brandts had their well tested for nitrates. The Brandts' well water is polluted with nitrates at a concentration of 30.9 mg/L—more than three times the federal safety threshold, and more than four times the Oregon GMA trigger threshold.

23.     The Brandts have investigated adding a reverse osmosis filtration system to treat their contaminated well water, but the cost to purchase, install, and maintain such a filtration system is prohibitive. And even if the Brandts were able to purchase and install a reverse osmosis system, the filter likely would not reduce nitrate levels in the Brandts' well water enough to make the water safe to drink or produce sufficient supplies of treated water for household use, as

evidenced by the experience of other residents (including Mr. Pearson) who have tried reverse osmosis systems to no avail.

24.     To have safe water to drink and cook with, the Brandts have resorted to using bottled water. Every week, the Brandts use between 6 and 8 five-gallon bottles of water. The Brandts are exposed to contaminated water when they drink public water either at restaurants or at the homes of friends whose properties are connected to public water.

**3.     James and Silvia Suter**

25.     Plaintiffs James and Silvia Suter are residents of Morrow County, Oregon.

26.     Mr. and Mrs. Suter own a home located at 74777 Toms Camp Road, Boardman, Oregon, 97818. Mr. Suter purchased the home in 1999. The Suters's home is not connected to any public water system. The Suters rely on their home's private well to provide water for drinking, cooking, bathing, and other domestic purposes.

27.     Mr. Suter had his private well drilled after moving into the home in 1999. In 1999, the water in Mr. Suter's well tested at a nitrate concentration of less than 7 mg/L.

28.     After reports surfaced of water contamination in the area, a neighbor recommended that the Suters have their well tested for nitrates. The Suters followed their neighbor's advice and had their well tested for nitrates. The test revealed that the Suters's well water is polluted with nitrates at a concentration of 37.7 mg/L—almost four times higher than the federal safety threshold, and more than five times higher than Oregon's GMA trigger threshold.

29.     Seeking safe water, the Suters have investigated drilling a deeper well to access water from a deeper, and hopefully less contaminated, aquifer. Mr. Suter contacted Waterwell Developing & Surveys, LLC to get a quote on the cost to drill a well deep enough to access water not contaminated with nitrates. The company told Mr. Suter that his well would need to be at least 300 feet deep. Drilling such a well would cost $24,000.

30.     Mr. and Mrs. Suter currently rely on bottled water for drinking and cooking. They use between three and four 5-gallon bottles of water each week. The Suters are exposed to contaminated water when they drink public water either at restaurants or at the homes of friends whose properties are connected to public water.

**B.     Defendants**

31.     Defendant Port of Morrow ("the Port") is an Oregon public entity engaged in governmental and commercial activities. The Port operates an industrial wastewater treatment and disposal system in Morrow County; this system is the largest industrial wastewater land application system in the state of Oregon. The Port reports annual revenues of more than $6 million from its wastewater discharge contracts. The Port also owns three farms: Portview ("Farm 1"), Southport ("Farm 2"), and Eastport ("Farm 3"). Aside from its wastewater treatment and disposal system, the Port also operates and maintains drinking water infrastructure. It uses this infrastructure to provide clean water to its tenants (most notably Amazon).

32.     Defendant Lamb Weston Holdings, Inc. ("Lamb Weston") is a corporation incorporated in Delaware with its principal place of business in Idaho. Lamb Weston conducts business in Oregon and maintains an agent for service of process in Oregon. Lamb Weston owns approximately 1,180 acres of farmland in Umatilla County, which it uses to produce and process potatoes for commercial use. Lamb Weston also operates an industrial wastewater treatment and disposal system in Umatilla County.

33.     Defendant Madison Ranches, Inc. ("Madison Ranches") is a corporation incorporated in the state of Oregon with its principal place of business in Oregon. Madison Ranches owns approximately 21,300 acres of farmland in Umatilla and Morrow Counties, which it uses to produce onions, corn, and other agricultural products.

34.     Defendant Threemile Canyon Farms, LLC ("Threemile Farms") is a corporation incorporated in Oregon with its principal place of business in Oregon. Threemile Farms owns approximately 88,000 acres of land in Morrow County, Oregon. Of this acreage, 29,000 acres are devoted to range land and other open spaces; 39,500 acres are irrigated farmland. Its irrigated farmland produced alfalfa, corn, onions, and other produce. Threemile Farms also maintains concentrated animal feeding operations ("CAFOs").

35.     Beef Northwest Feeders, LLC ("BNW Feeders") is a concentrated animal feeding operation ("CAFO") incorporated in Oregon with its principal place of business in Oregon. BNW Feeders has an active CAFO General Permit issued by the Oregon Department of Agriculture.

*Figure 2. Defendants' property in the Umatilla Groundwater Management Area.*

### III.    JURISDICTION AND VENUE

36.     This Court has jurisdiction over this action under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331 ("RCRA"). This Court has supplemental

jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a). Plaintiffs' state law claims derive from the same common nucleus of operative fact as their RCRA claims, *i.e.*, their federal and state claims all arise from the fact that Defendants' conduct has contaminated the groundwater in the Umatilla GMA.

37.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 6972(a) because the events giving rise to the claims in this Complaint occurred in Oregon.

38.    In addition, all Defendants in this case, as well as the Oregon DEQ and the EPA Regional Administrator, were served with notice of intent to file this action more than 90 days prior to the filing of this Complaint, as required by 42 U.S.C. § 6972(b)(2)(A). The Port, Madison Ranches, and the DEQ were served on November 3, 2023. The EPA Regional Administrator was served on November 6, 2023. Lamb Weston was served on November 7, 2023. Threemile Farms and BNW Feeders were served on November 27, 2023. Further, the Oregon Department of Agriculture ("DOA"), the Oregon Health Authority ("OHA"), and the Lower Umatilla Basin Groundwater Management Area Committee ("GMA Committee") were served with notice of intent to file this action more than 60 days prior to the filing of this Complaint.

## IV.    STATEMENT OF FACTS

### A.    Exposure to high levels of nitrates is dangerous.

39.    According to the EPA, water is unsafe for human consumption when it contains nitrates at a concentration of 10 mg/L or greater. Nitrate contamination at levels of 7 mg/L or above (70% of the EPA Maximum Contaminant Level) triggers Oregon's DEQ to designate a Groundwater Management Area, which works to reduce groundwater contamination in the affected area.

40.    Both the EPA and the Oregon DEQ have established nitrate-related safety guidelines for good reason: ingesting water contaminated with excess nitrates can cause significant

health problems. Among the most serious issues, high doses of nitrates can prevent red blood cells from carrying adequate levels of oxygen throughout the body, resulting in cyanosis and asphyxia. Low blood-oxygen levels are particularly dangerous for infants, who may develop Blue Baby Syndrome (infant methemoglobinemia), which can be fatal. Babies with this syndrome may turn a blue or grey color as their bodies become starved of oxygen. The condition can progress rapidly to cause coma or death if not treated promptly. Bottle-fed infants are especially susceptible to Blue Baby Syndrome if the water used to make their infant formula is high in nitrates.

41.     Nitrate-heavy water is also harmful to older children and adults. Excess nitrates can cause reproductive complications, including spontaneous miscarriage and birth defects. Numerous studies link nitrate consumption to cancers, especially colon, kidney, stomach, thyroid, and ovarian cancer. And people exposed to high levels of nitrates through drinking water may also develop kidney and spleen disorders as well as respiratory diseases. Anyone who has ingested unsafe levels of nitrates in water is at risk for potential adverse health effects.

42.     According to census estimates for the Lower Umatilla Basin region, significant populations that are especially sensitive to nitrates—infants and pregnant and nursing women— reside in the area. Census data show that 12.3% of women between the age of 15 and 50 living in Morrow County gave birth to a child from 2016 to 2017. Six-and-a-half percent of the same demographic living in Umatilla County gave birth to a child between 2017 and 2018.

**B.     Groundwater in the Lower Umatilla Basin, which supplies both private well water and public water, is highly contaminated with nitrates.**

43.     Groundwater in the Lower Umatilla Basin, on which Plaintiffs and other Class members rely for their water, has been plagued with high nitrate concentrations for decades. And the problem is getting worse.

44.     As far back as the mid-1990s, groundwater samples from monitoring wells in the area showed high levels of nitrate contamination. Nearly 30% of groundwater samples showed nitrate levels that exceeded Oregon's GMA trigger threshold of 7 mg/L, and 23% of groundwater samples showed nitrate levels that exceed the EPA limit of 10 mg/L. Samples from areas dominated by irrigated agriculture and CAFOs showed nitrate levels that in some cases exceeded 70 mg/L—seven times the federal government's 10 mg/L limit for nitrate.

45.     Recognizing the nitrate issue, the Oregon DEQ declared a Groundwater Management Area in 2001 to address the area's nitrate problem. A Committee was charged with taking the necessary measures to address the contamination. As one of its first acts, the Committee compiled data comparing nitrate test results at 113 monitoring wells to earlier results from those same wells; 72 of the monitoring wells showed higher concentrations of nitrates in the later testing.

46.     Similar findings emerged in a 2003 study led by Oregon's DEQ. In that study, the DEQ tested 135 monitoring wells in the area for nitrates. It found that 58% tested above 7 mg/L, and 37% exceeded 10 mg/L. Of the 135 wells, 125 had been previously tested in 1992. Comparing the data clearly indicated that the nitrate problem was worsening: of the wells tested both years, 82 had higher nitrate concentrations in 2003 than in 1992. The DEQ's official findings were that nitrate concentrations in the area had increased between 1992 and 2003.

47.     More recent figures suggest that groundwater quality in the Umatilla GMA has continued to deteriorate. In another study led by the Umatilla GMA Committee, nearly half (48%) of the 255 wells tested between 2015 and 2016 exceeded the 10 mg/L federal limit and nearly two thirds (60%) exceeded the 7 mg/L state trigger level. In a separate survey examining only private domestic wells, the Committee found that 42% of the region's domestic wells contained nitrate levels exceeding the safe drinking water standard.

48.    Since January 10, 2022, state and local officials have encouraged Morrow and Umatilla County residents who rely on private wells to have their wells tested for nitrates. State and federal funding has been approved in the past year for residents' well testing.

49.    As of this filing, about half of the residential wells in the Umatilla GMA have been tested. Approximately 18 percent of the wells tested in Umatilla County and 30 percent of the wells tested in Morrow County have nitrate levels above 10 mg/L. In total, at least 450 of the residential wells in the area have tested positive for nitrate concentrations above the 10 mg/L limit established by the EPA, and more are above the state 7 mg/L level.

50.    The state of Oregon has installed filtration systems at about 40 homes whose wells are above the EPA's 10 mg/L limit. At the remaining 400 homes, nitrate levels are so high that filtration systems are not sufficient to bring nitrate concentrations to within safe levels. The state is providing those homes with bottled water.

51.    In addition to private domestic wells, public water systems have also been affected. Of the 59 active public water systems in the Umatilla GMA, 58 rely exclusively on groundwater. The 59th public water system, which serves the City of Hermiston, is also almost entirely supplied by groundwater except for one food processing operation that uses surface water.

52.    The Oregon DEQ has determined that the following public water systems in the Umatilla GMA are at "substantial nitrate risk," defined as either having a nitrate-N measurement at or above 10 mg/L or by having the 90th percentile of the nitrate-N measurements greater than 5 mg/L:

*Table 1. Umatilla GMA Public Water Systems at "Substantial Nitrate Risk"*

| Public Water System Name | Population | Location | County |
|---|---|---|---|
| Boardman, City of | 3,921 | Boardman, OR 97818 | Morrow |
| Country Garden Estates MHP | 175 | Irrigon, OR 97844 | Morrow |
| Hat Rock Mobile Court | 60 | Hermiston, OR 97838 | Umatilla |

| Hat Rock Water Company | 96 | Hermiston, OR 97838 | Umatilla |
| Hermiston, City of | 19,455 | Hermiston, OR 97838 | Umatilla |
| Irrigon, City of | 2,019 | Irrigon, OR 97844 | Morrow |
| North Hill Water Corp. | 100 | Hermiston, OR 97838 | Umatilla |
| Port of Morrow | 1,350 | Boardman, OR 97818 | Morrow |
| River Point Farms LLC | 250 | Hermiston, OR 97838 | Umatilla |
| Conagra Lamb Weston | 500 | Hermiston, OR 97838 | Umatilla |

53.     Many of these public water systems, including those in Boardman, Irrigon, and Hermiston, have tested above the 10 mg/L maximum contamination limit ("MCL") or the 7 mg/L trigger level ("TL") of nitrate at least once—and in most cases, have done so repeatedly.

54.     Contaminated public water affects everyone in the area. Although its effects are felt most acutely by residents who rely on public water systems every day, even residents who use well water at home are affected when they drink public water at restaurants or at friends' or families' homes.

*Table 2. Umatilla GMA Nitrate Exceedances, 2002 to 2019*

| Public Water System Name | Population | Highest Recorded Nitrate Level | Contamination Frequency | County |
|---|---|---|---|---|
| Alive and Well | 50 | 10.2 mg/L | 1 sample > MCL | Umatilla |
| Bellinger Produce | 100 | 60.8 mg/L | 32 samples > MCL 44 samples > TL | Umatilla |
| Boardman, City of | 3,921 | 7.5 mg/L | 1 sample > TL | Morrow |
| Comfort Inn & Suites – Hermiston | 100 | 37 mg/L | 16 samples > MCL 63 samples > TL | Umatilla |
| Lamb Weston | 500 | 12 mg/L | 2 samples > MCL 5 samples > TL | Umatilla |
| Country Garden Estates MHP | 175 | 9.8 mg/L | 4 samples > TL | Morrow |
| Hat Rock Mobile Court | 60 | 10 mg/L | 2 samples = MCL 5 samples > TL | Umatilla |
| Hat Rock Water Company | 96 | 14 mg/L | 11 samples > MCL 26 samples > TL | Umatilla |
| Herreras Park | 20 | 8.9 mg/L | 6 samples > TL | Morrow |

| Irrigon, City of | 2,019 | 18 mg/L | 26 samples > MCL 42 samples > TL | Morrow |
| JR Simplot/Calpine | 22 | 9.9 mg/L | 9 samples > TL | Umatilla |
| North Hill Water Corp. | 100 | 9 mg/L | 1 sample > TL | Umatilla |
| ODF/WL Irrigon Fish Hatchery | 18 | 40.9 mg/L | 21 samples > MCL 48 samples > TL | Morrow |
| OPRD Hat Rock State Park | 500 | 19.4 mg/L | 9 samples > MCL 15 samples > TL | Umatilla |
| Port of Morrow | 1,350 | 10.4 mg/L | 2 samples > MCL 47 samples > TL | Morrow |
| River Point Farms LLC | 250 | 28.5 mg/L | 16 samples > MCL 23 samples > TL | Umatilla |
| Short Stop #1 | 200 | 9.2 mg/L | 5 samples > TL | Umatilla |
| Space Age Fuel | 950 | 28.5 mg/L | 11 samples > MCL 17 samples > TL | Umatilla |
| Sunridge Water Inc. | 200 | 14 mg/L | 1 sample > MCL 31 samples > TL | Umatilla |
| Upper Columbia Mill | 70 | 14 mg/L | 14 samples > MCL 18 samples > TL | Umatilla |

55.    The map below shows officially documented nitrate contamination in both public water systems and in private drinking wells on which Umatilla GMA residents rely.

*Figure 3. Drinking water sources with documented nitrate exceedances.*



**C.    Defendants' actions have caused this nitrate contamination.**

56.    The nitrate contamination in Plaintiff's and the Class's water is a direct result of Defendants' actions.

**1.    Defendant Farms have contaminated the groundwater in the Umatilla GMA.**

57.    According to the DEQ, nearly 70% of nitrate contamination in the Umatilla GMA groundwater is from irrigated farmland. Together, Defendant Farms control nearly 107,000 acres of irrigated agricultural land in Umatilla and Morrow counties.

58.    Farmers, including Defendants, use nitrogen fertilizer to help increase crop yields. But there is an upper limit to the amount of nitrogen that crops can recover (this is known as the "agronomic rate"). Beyond that limit, any excess nitrogen leaches into the soil, where it converts into nitrates that contaminate groundwater. Farmers exercising reasonable care to avoid contaminating groundwater would not apply nitrogen to crops beyond the agronomic rate.

59.    Nevertheless, Defendants regularly and intentionally over-use nitrogen to ensure maximized yield and profit potential from crops, either for rare-optimal growing conditions where

extra nitrogen provides a key boost or as a risk-management approach for sub-optimal conditions when nitrogen losses occur and would otherwise reduce yields. Within the Umatilla GMA, the DEQ estimates that 10% of nitrogen that farms apply leaches to groundwater.

60.    In total, farms (including Defendants, as well as others to be named in the future) apply nearly 23 million pounds of nitrogen to fields in the Umatilla GMA each year. Relying on the DEQ's 10% leaching estimate—which is significantly more conservative than other estimates—this means farms in the area, including Defendant Farms, cause almost 2.3 million pounds of nitrogen to leach into the soil every year. Much of this nitrogen is then converted to nitrates that contaminate GMA groundwater.

61.    Once nitrates have made their way into the soil, hydrogeologic conditions in the Umatilla GMA promote rapid movement. The soil in the area is largely coarse-grained and highly permeable, facilitating rapid percolation to the water table. In addition, although the Umatilla GMA receives relatively low levels of rainfall (only 8 to 10 inches annually), widespread irrigation of agricultural lands increases the soil's moisture content and promotes rapid water movement. Under these conditions, excess nitrates find their way to the water table in a matter of days; 88% of the Umatilla GMA has high or moderately high nitrate leaching potential under irrigated conditions.

*Figure 4. Nitrate leaching potential in the Umatilla GMA.*



62.    The Oregon DEQ itself has noted the vulnerability of the shallow aquifer to contamination.

**2.    Defendant BNW Feeders has contaminated the groundwater in the Umatilla GMA.**

63.    CAFOs are another significant contributor to nitrate contamination in Umatilla GMA groundwater. In total, CAFOs within the GMA house over 148,000 animals across multiple dairies and animal feedlots that, together, excrete more than 9,000 tons of nitrogen per year.

64.    Managing and disposing of large quantities of nitrogen-laden animal waste is an unavoidable part of a CAFO's everyday operating procedures, including for BNW Feeders. CAFOs typically manage the enormous amounts of animal waste they produce by storing it in "lagoons" or other facilities and then applying it to nearby agricultural lands as fertilizer. In addition to leaching after the waste is applied to nearby farms, nitrates also leach directly from CAFO manure lagoons and other waste storage facilities. In fact, even when "properly" constructed according to standards set by the U.S. Department of Agriculture's Natural Resources

Conservation Service and in compliance with Oregon requirements for storage of CAFO wastes, lagoons are actually *designed* to leak. Finally, CAFOs, including BNW Feeders, may cause nitrate contamination when animal waste is spilled or otherwise leaks during handling.

65.    Such practices have resulted in widespread nitrate contamination in the Umatilla GMA. The Oregon DEQ has found the greatest increases in nitrate contamination on lands subjected to CAFO manure land applications. And well samples taken in 2015 and 2016 on CAFO lands show nitrate levels over 60 mg/L.

### 3.    Defendant Wastewater Management Facilities have contaminated the groundwater in the GMA.

66.    Finally, industrial wastewater processing operations are also responsible for significant nitrate contamination in the Umatilla GMA. The Port and Lamb Weston are the only two entities licensed to recycle wastewater in the area. Every year, these entities contract with local food processors to collect and dispose of millions of gallons of nitrogen-heavy wastewater. Without first fully removing the nitrogen from this wastewater, the Port and Lamb Weston "recycle" the wastewater by pumping it to local farms, where it is sprayed out onto the land. The wastewater is transported via pipes that can measure close to six feet in diameter.

67.    In the map below, the Port of Morrow's Boardman Industrial Park property, which it rents out to various industrial enterprises (including Lamb Weston, the Oregon Potato Company, Boardman Foods, and Calbee) is outlined in light blue. The dark blue lines on the map indicate the location of the pipes which the Port uses to transport nitrogen-heavy wastewater from the Industrial Park out to various farms. The Port itself owns Farms 1, 2, and 3 outlined on the map below; Madison Ranches owns Farms 4 and 5.

*Figure 5. Map of Port's pipe system carrying nitrogen-heavy wastewater to local farms.*



*Images 3, 4, 5. Pipes used by the Port to transport nitrogen-rich wastewater to local farms.[2]*





---

[2] The Port also transports clean water to its tenants, including Amazon, through similar pipes. Clean water pipes are distinguishable from wastewater pipes by their green color.

68.     The Port and Lamb Weston pump nitrogen-rich wastewater to nearby farms year-round, including during the winter, when most fields lie fallow and no crops benefit from the nitrogen.

69.     The Port and Lamb Weston have failed to install adequate digesters or other technology to process the wastewater to reduce nitrogen appropriately. Nor have these Defendants paid for water filtration systems and equipment for their water production or provided such technology to the City of Boardman and other local water systems affected and at risk.

70.     Excess nitrogen from this wastewater, once sprayed onto fields, leaches into the soil. Much of this nitrogen converts into nitrates, which then contaminate the groundwater throughout the Umatilla GMA.

**D.      The Port and Lamb Weston routinely violate their wastewater processing permits.**

71.     Given concerns regarding nitrate pollution, wastewater processing facilities, like those operated by the Port and Lamb Weston, are governed by permits that cap the total amount of nitrogen-heavy wastewater that may be discharged onto nearby farmland.

72.     The Port's current DEQ permit is Water Pollution Control Facilities Permit No. 102325, as modified by a November 2022 amendment. This permit, effective until November 30, 2027, allows it to store and discharge up to 3.6 billion gallons of industrial wastewater per year, of which no more than ten million gallons may be discharged per day. The permit also restricts the Port's discharge to a bounded geographic area of 10,140 acres across five farms in Morrow County: Madison Ranches, Mader-Rust Farm, and three farms owned by the Port itself (Farms 1, 2, and 3).  Furthermore, the Port's permit limits the volume of wastewater the Port can apply to fields on each farm according to those fields' capacity to absorb nitrogen (this capacity is largely a function of the crops planted on each field). Pursuant to its current permit, the Port is required to

comply with these discharge limitations and to affirmatively monitor its facilities and discharges to prevent pollution.

73.     Lamb Weston's current DEQ permit is Water Pollution Control Facilities Permit No. 101326. This permit allows Lamb Weston to operate a wastewater treatment facility at 78153 Westland Road, Hermiston, Oregon 97838. Lamb Weston has constructed large wastewater ponds at this facility in which it stores millions of gallons of industrial wastewater, including its own wastewater as well as wastewater produced by other nearby industrial entities. A system of pumps and pipes then transports this wastewater from the storage ponds to two farms—one owned by Lamb Weston itself and the other owned by Madison Ranches[3]—where Lamb Weston disposes of the wastewater via land application. Lamb Weston's wastewater permit requires compliance with nitrogen discharge limitations and also requires Lamb Weston to affirmatively monitor its facilities and discharges to prevent pollution.

74.     Both Lamb Weston and the Port have routinely violated the terms of their permits. Since 2015, Lamb Weston has violated its permit at least 90 times: 11 times in 2015, 20 times in 2016, 6 times in 2017, 14 times in 2018, 18 times in 2019, 18 times in 2020, and 3 times in 2021.

75.     The Port's transgressions have been even more brazen. Between 2007 and 2011, the Port violated its permit 40 times: 9 times in 2007, 14 times in 2008, and 17 times in 2009. In 2011, the Oregon DEQ issued a Notice of Permit Violation to the Port, informing it that the "violations are of particular concern to the Department because the Port's land application sites

---

[3] Madison Ranches does not pay for the wastewater that either Lamb Weston or the Port of Morrow sprays onto its fields. Madison Farm has saved hundreds of thousands of dollars or more in fertilizer and water costs by allowing the Port and Lamb Weston to use its farms as a dumping ground for nitrogen-laden wastewater.

are within the Lower Umatilla Basin Groundwater Management Area, which was established because of the nitrate-nitrogen pollution."[4]

76.    Despite this warning, the Port did not change its behavior, and in fact grew more reckless. From 2012 through 2014, the Port violated its permit 158 times: 57 times in 2012, 46 times in 2013, and 55 times in 2014.

77.    In 2015, the Oregon DEQ fined Port of Morrow $279,400.00 for its wastewater permit violations between 2012 and 2014. The Notice of Civil Penalty Assessment and Order informed the Port that its permit "allows you to dispose of wastewater by applying it to land on the condition that nitrogen is not applied in excess of the agronomic loading rate in order to prevent nitrogen from entering the groundwater." The Notice further explained:

> Your land application sites are located in a Groundwater Management Area so designated by DEQ because of nitrogen contamination. DEQ issued this penalty because discharging more nitrogen than allowed by your permit in a groundwater below the root zone and enter groundwater. Groundwater with high nitrogen concentration is a human health concern when used as drinking water.[5]

78.    But yet again, the Port was undeterred and continued its illegal dumping. Between 2015 and 2017, the Port discarded at least 526,000 pounds of nitrogen in excess of its permit. Additionally, in 2016, the Port violated its wastewater permit by constructing a waste storage lagoon without submitting plans or receiving approval from the Oregon DEQ. The DEQ fined the Port $8,400 for this violation.

---

[4] Linda Hayes-Gorman, Or. Dep't of Envtl. Quality, *Notice of Permit Violation* at 1, No. WQ/I-ER-10-263, Permit No. 102325 (Feb. 2, 2011).

[5] Leah K. Feldon, Or. Dep't of Envtl. Quality, *Notice of Civil Penalty Assessment and Order* at 1, Case No. WQ/I-ER-15-105 (Nov. 4, 2015).

79.    Between 2018 and 2021, the Port violated its permit at least 1,532 times by discarding excess nitrogen totaling 331,085 pounds. Also between 2018 and 2020, the Port violated its permit at least 363 times by failing to monitor crops at harvest for nitrogen removal.

80.    On January 10, 2022, the Oregon DEQ issued the Port another fine, this time of $1,291,551.00, for its violations from 2018 through 2021. The Notice of Civil Penalty Assessment and Order informed the Port that:

> DEQ issued this penalty because groundwater adversely impacted by the Port of Morrow's wintertime land application of nitrogen containing wastewater is used as drinking water by residents of the [Umatilla GMA]. High nitrate concentrations in drinking water are linked with serious health concerns for infants and pregnant or nursing women. Relative to the state average, the population in the [Umatilla GMA] has a high percentage of people who meet factors related to environmental justice, as defined by the U.S. Environmental Protection Agency (EPA). This includes race, income, education, language, and age.

81.    On January 28, 2022, the Port filed a Request for Contested Hearing and Answer to Port of Morrow's January 10, 2023, Notice of Civil Penalty Assessment and Order (the "Answer"). In its Answer, the Port stated that it did "not dispute" that it violated the permit by discarding wastewater on prohibited non-growing season dates and by failing to monitor crops at harvest for nitrogen removal. The Port further admitted that "the applications of wastewater described in paragraph 11.7 of the [DEQ's January 10, 2022, Notice] to fields where soil nitrate exceeded 30 pounds per acre in the fourth and fifth foot of soil were inconsistent with condition A(13)(C)(ii) of the Permit."

82.    And still, the Port remained undeterred from committing future violations. Between November 2021 and February 2022, the Port violated its permit at least 258 additional times by discarding nitrogen onto land at Farms 1, 2, and 3 and Madison Ranches in excess of its permit. In 2022, the Port discarded at least 192,000 pounds of nitrate onto land at Farms 1, 2, and 3 and

Madison Farm in excess of its Permit. It also violated Schedule A, Condition 8 of the Permit on 18 separate occasions by discarding nitrogen-containing wastewater onto fields after the nitrogen from all sources exceeded the agronomic rate for the crop grown.

83. On June 17, 2022, the Oregon DEQ revised its January 10, 2022, fine upwards from $1,291,551.00 to $2,100,351.00 due to the Port's additional violations in 2022 and additional cited violations between 2018 and 2021. The DEQ determined the Port's conduct rose to the level of Class 1 violations—the most severe violations the DEQ can assess.

84. Between May of 2022 and January of 2023, the Port continuously violated its permit by failing to report a leak from one of its wastewater pipes onto land at the corner of Lewis and Clark Drive and Oscar Peterson Drive in Boardman, Oregon. The Port was aware the wastewater pipe was discarding wastewater onto land, but the Port failed to report the leak to the DEQ for several months, until January 19, 2023—even though the Port's permit required it to report wastewater leaks within 24 hours. In a letter the Port wrote to the DEQ on January 19, 2023, the Port conceded that the leak discarded 25 to 50 gallons of industrial wastewater per minute onto the surrounding land.

85. In November 2022, the Port violated Schedule B, Condition 5 of its permit by failing to conduct effluent monitoring for total suspended solids.

86. Between November 2022 and January 2023, the Port violated its permit at least 748 times by discarding excess nitrogen onto land at Farms 1, 2, and 3 and Madison Ranches. During that same timeframe, the Port also violated its permit at least 41 times by allowing moisture and nutrients from its applied industrial wastewater to leach beyond the 5th foot of the soil column at these farms.

87.     Throughout 2023, the Port has violated Schedule A, Condition 7 of its permit by improperly discarding wastewater via leaks in several wastewater pipelines, including: the wastewater pipeline from the South Lift Station to Pond 41; the wastewater pipeline passing through Circle 319; the wastewater feeder pipeline serving Circle 320; two separate leaks in the Sand Dune wastewater pipeline; a pump leak at the Digest #3 cell; a leak in the south lift line; an irrigation mainline break at Farm 3, Circle 330; and a leak in the south lift line near the pump station.

88.     Most recently, between November 1, 2023, and January 11, 2024, the Port has accrued at least 395 additional violations.

89.     The Port remains unrepentant about its ongoing violations and has made it clear that it has no intention of modifying its behavior voluntarily. The Port's executive director, Lisa Mittelsdorf, has said the Port will continue to apply wastewater to farmland during the winter because "there is no alternative short of closing processing plants."  And the DEQ has said that it "expects the port will commit more violations."

90.     The nitrogen that both the Port and Lamb Weston have discarded onto land in Morrow and Umatilla Counties in excess of their wastewater permits has caused nitrate contamination of the alluvial aquifer underlying the Port's agricultural dumping sites, leaching lagoons, and leaking pipes. This contamination, in turn, has contaminated Plaintiffs' and the Class's water, making it unsafe to drink.

**C.     Plaintiffs and Class members will require professional assistance to redress the harm defendants have caused.**

91.     The nitrates contaminating the Umatilla GMA have caused and will continue to cause substantial harm to Plaintiffs and the Class. Redressing this harm will require professional assistance.

1.    **Plaintiffs and other Class members need professional assistance to clean up the contaminated Umatilla aquifer and to mitigate the pollution's impact by drilling deep wells or by connecting to the Port's clean water system.**

92.    The best way to ensure Plaintiffs and Class members will not suffer the consequences of nitrate pollution is to remove nitrates from the Umatilla aquifer entirely. But nitrate removal from groundwater requires either a bacterially mediated denitrification process or employing chemically or physically based technologies, highly specialized processes that Plaintiffs and Class members are not equipped to handle on their own.

93.    Particularly if the denitrification process proves unsuccessful, Plaintiffs and Class members might also require professional assistance to mitigate the pollution Defendants have caused, either by gaining access to deeper wells or by becoming connected to the Port's clean water system.[6] Of these options, the preferred solution for many Plaintiffs and Class members is to drill deeper wells that draw water from uncontaminated basalt aquifers rather than the nitrate-contaminated alluvial aquifer. But digging these wells requires specialized equipment and skills and costs tens of thousands of dollars. Furthermore, some deep wells experience salt infiltration and would therefore also need to be equipped with desalinators, adding to the cost.

94.    Other Plaintiffs and Class members may prefer, as an alternative, to become connected to the Port of Morrow's drinking water infrastructure. The Port currently ships clean, filtered water to its various customers, including Amazon and Tillamook Cheese, through a large network of green pipes. Many of these pipes run straight past Class members' homes and could

---

[6] Installing commercially available water filters is an inadequate solution. Nitrate levels in the aquifer are so high that water from contaminated wells often tests above 10 mg/L even after filters are installed. Even homes whose wells tested below 10 mg/L in 2023 are at risk of being exposed to unsafe nitrate levels in the near future. Nitrate levels can vary over time, so testing below 10 mg/L in 2024 is not a guarantee that the well will test below 10 mg/L in 2025 or beyond, especially given that Defendants continue to dump nitrate-heavy wastewater, fertilizer, and animal waste on Umatilla GMA land every day.

offer an alternative source of clean drinking water. But this solution, too, would require professional help: Plaintiffs are unable to themselves link their homes to the Port's established infrastructure.

> **2.    Appropriate diagnosis and treatment of nitrate-related illnesses among Plaintiffs and other Class members will require ongoing medical monitoring by healthcare professionals.**

95.    Some of the harm Plaintiffs and Class members have already suffered as a result of their exposure to contamination caused by the Defendants can be mitigated by early treatment of resulting illnesses. For example, treating cancer early in the course of disease progression can prolong survival and increase the chances of complete remission. Diagnosing and treating thyroid disorders early can prevent serious complications. And ensuring access to prenatal care reduces preterm births.

96.    For people to benefit most from medical treatment for these health conditions, they must be diagnosed near the onset of their disease (or receive appropriate prenatal care), which requires regular screening and medical monitoring by trained healthcare professionals.

## V.    CLASS ALLEGATIONS

97.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of the following Class and Subclasses:

- **Resident Class**: All persons who currently reside in the Umatilla GMA.

- **Well-Reliant Subclass**: All persons who currently reside in the Umatilla GMA and rely on private wells to supply their drinking water.

- **Renter/Owner Subclass**: All persons who currently rent or own property in the Umatilla GMA that is supplied with drinking water via either private wells or via a public water system.

98.     Excluded from the Class and Subclass are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the district judge(s) presiding over this matter and the clerks of said judge(s).

## A.     All requirements of Fed. R. Civ. P. 23(a) are met.

99.     A class action is warranted in this case because the Class and Subclasses are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Class and Subclasses; the claims of the representative parties are typical of the claims of the Class and Subclasses; and the Plaintiffs named in this Complaint will fairly and adequately protect the interests of the Class and Subclasses.

100.    **Numerosity**: Class members are so numerous (over 45,000 in total) that joinder of all Class members in a single proceeding would be impracticable. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

101.    **Commonality**: Plaintiffs' claims common to all members of the Class and Subclasses, and individual complaints otherwise may result in inconsistent or varying adjudications.

102.    **Typicality**: The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

103.    **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class and Subclasses in that Plaintiffs have no interests adverse to, or that conflict with, the Class and Subclasses which Plaintiffs seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

**B.**    **All requirements of Fed. R. Civ. P. 23(b)(3) are met.**

104.    In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), this case qualifies for class action treatment because questions of law or fact common to the Class and Subclasses predominate over any questions affecting only individual Class members, and because a class action suit is superior to other available methods for adjudicating the controversy.

105.    **Predominance**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, but are not limited to:

(a)  Whether nitrate contaminates the groundwater in the Umatilla GMA;

(b)  Whether Defendants' operations have caused nitrate to contaminate the groundwater in the Umatilla GMA;

(c)  Whether the measures Defendants have implemented (if any) to prevent nitrate from contaminating the groundwater in the Umatilla GMA are effective and sufficient;

(d)  Whether Defendants Port of Morrow, Lamb Weston, Madison Ranches, BNW Feeders, and Threemile Farms have violated the Resource Conservation and Recovery Act;

(e)  Whether Defendants breached a duty of reasonable care in their operations by allowing nitrates to contaminate the groundwater in the Umatilla GMA;

(f)  Whether Defendants trespassed on Plaintiffs' and other Class members' property;

(g)  Whether Defendants created a nuisance by unreasonably interfering with Plaintiffs' and Class members' use and enjoyment of their properties;

(h)  Whether Plaintiffs and the Class and Subclass members are entitled to equitable relief, including, but not limited to, injunctive relief and medical monitoring; and

(i)  Whether Plaintiffs and other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

106.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members, while substantial, are small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. And, even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

107.    In the alternative, Plaintiffs seek class certification as to particular issues permitted under Fed. R. Civ. P. 23(c)(4). Plaintiffs seek certification as to common questions of the risks of nitrates released by Defendants, and Defendants' individual and collective responsibility for those releases.

**COUNT I**
**RESOURCE CONSERVATION AND RECOVERY ACT,**
**42 U.S.C. § 6972(A)(1)(B)**

**(Brought by Mike Pearson, on behalf of the Well-Reliant Subclass, against all Defendants)[7]**

---

[7] On February 7, 2024, Plaintiffs sent additional RCRA notices, expanding their RCRA claim to encompass issues affecting Public Water Class members. If, after the expiration of the RCRA 90-day notice period, these issues have not been addressed, Plaintiffs intend to amend their Complaint to include these additional claims.

108.     Plaintiffs reallege and incorporates by reference the above paragraphs.

109.     42 U.S.C. § 6972(a)(l)(B), under which Plaintiffs bring this claim, is RCRA's citizen enforcement provision. Section 6972(a)(l)(B) authorizes "any person" to seek redress in federal court for risks posed to public health and the environment by "hazardous wastes" and "solid wastes," so long as the defendant falls within one of the categories of entities that Congress declared liable under § 7002(a)(l)(B). Included in § 7002(a)(l)(B) are entities that generated; transported; owned or operated a treatment, storage, or disposal facility; or contributed to "past or present handling, storage, treatment, transportation, or disposal" of the "solid wastes" at issue.

110.     Defendants' industrial wastewater, excess nitrogen fertilizer, and animal waste are solid wastes within the meaning of 42 U.S.C. § 6903(27) because they constitute discarded materials resulting from Defendants' industrial, commercial, and agricultural operations. Defendants' industrial wastewater, excess nitrogen fertilizer, and animal waste are also hazardous wastes within the meaning of 42 U.S.C. §6093(5) because they contain high levels of nitrogen, which, when converted to nitrates, pose a substantial hazard to the health of residents of the Umatilla GMA.

111.     Defendants have all either generated, transported, stored, or disposed of nitrogen-heavy industrial wastewater, excess fertilizer, and animal waste—all solid wastes and hazards as those terms are defined under RCRA, 42 U.S.C. § 6901, et seq., as well as under Oregon state solid and hazardous waste laws and regulations.

112.     Defendants' improper handling, transportation, storage, and disposal of the waste has eliminated its usefulness to fertilize or irrigate crops, and it therefore is properly considered a "solid waste."

(a) When Defendants allowed industrial waste, wastewater, and other industrial effluent containing nitrogen to leach from Defendants' waste lagoons into the soil, Defendants did so without regard to the fertilization and/or irrigation needs of crops. By allowing waste to leach from their lagoons in violation of their wastewater permits, Defendants discarded the waste, and the waste is properly characterized as a solid waste under RCRA.

(b) When Defendants allowed wastewater to spill onto land and into the waters of Morrow and Umatilla counties via leaks from their wastewater pipes, Defendants did so without regard to the fertilization and/or irrigation needs of crops. By allowing millions of gallons of industrial wastewater containing nitrogen to spill onto uncultivated land and waters in violation of their wastewater permits, Defendants discarded the waste, and the waste is properly characterized as a solid waste under RCRA.

(c) When Defendants over-applied wastewater, fertilizer, and animal waste to agricultural fields at rates of millions of excess gallons of wastewater per year, they did so without regard to the fertilization and/or irrigation needs of crops. By overapplying nitrogen-laden waste to land and the waters of Morrow and Umatilla counties, Defendants discarded the waste, and the waste is properly characterized as a solid waste under RCRA.

113.    The presence of hazardous substances and wastes causing nitrate concentrations above the levels and standards allowed by the Oregon DEQ constitutes an imminent and substantial endangerment to human health and the environment and threatens ground water quality in the Umatilla GMA.

114.    Pursuant to 42 U.S.C. § 6972(b)(2)(A), Plaintiffs notified Defendants, the Administrator of the United States Environmental Protection Agency (the "Administrator"), and the State of Oregon of the endangerment more than 90 days in advance of filing this action. Plaintiffs also provided a copy of this Complaint to the Administrator. To Plaintiffs' knowledge, neither the Administrator nor the state of Oregon has commenced any of the actions set forth under 42 U.S.C. § 6972(b)(2)(B), (b)(2)(C).

115.    Under 42 U.S.C. § 6972(a)(1)(B), Defendants are individually and jointly liable pursuant to 42 U.S.C. § 6972, et seq., for conducting such action as is necessary to abate the endangerment and to remediate the hazardous substances on their property, or that migrated off their property, to DEQ standards because they are past and/or present generators, transporters, and/or owners or operators of a storage facility who contributed to the handling, storage, and/or transportation of solid or hazardous waste that now presents an imminent and substantial endangerment to health or the environment.

116.    Plaintiffs seek an order of the court compelling Defendants to conduct assessment and remedial action activities necessary to eliminate the endangerment, which at a minimum would include remediating the soil and ground water to those cleanup standards described under Oregon law and regulations, and to obtain a government certification from the Oregon DEQ and any other government agency with jurisdiction over the contaminants certifying that the assessment and remedial action satisfy applicable standards.

117.    Under 42 U.S.C. § 6972(e), Plaintiffs are entitled to recover costs incurred in bringing this action, including reasonable attorney fees and expert witness fees.

## COUNT II
## NEGLIGENCE

**(Brought by all Plaintiffs on behalf of the Class and Subclasses, against all Defendants)**

118.    Plaintiffs reallege and incorporate by reference the above paragraphs.

119.    Defendants have breached their duty to exercise ordinary care, and that breach proximately caused Plaintiffs' and other Class members' property damage as well as increased Plaintiffs' and Class members' risk of developing life-threatening illnesses.

120.    A reasonably careful wastewater treatment/recycling facility would not allow nitrogen-heavy wastewater from its facility to be sprayed onto nearby fields in quantities that cause nitrate contamination of a local aquifer upon which people rely for clean drinking water. Similarly, a reasonably careful farmer would not apply nitrogen-heavy fertilizer to their fields in such quantities that it causes nitrate contamination of a local aquifer upon which people rely for clean drinking water. And finally, a reasonably careful CAFO would not allow animal waste generated by its operations to be discarded in a manner that causes nitrate contamination of a local aquifer upon which people rely for clean drinking water.

121.    Defendants knew that their operations were causing and continue to cause nitrate contamination in the Umatilla GMA, upon which Plaintiffs and the Class and Subclasses rely for clean drinking water.

122.    Defendants also know that nitrates are hazardous to human health.

123.    Despite this knowledge, Defendants continued to overapply wastewater, fertilizer, and animal waste to Umatilla GMA land, causing further nitrate contamination of GMA groundwater.

124.    Defendants' decision to engage in activities that they knew or should have known would harm people living in the Umatilla GMA constitutes a breach of Defendants' ordinary duty of care. Defendants' breach continues daily.

125.    As a direct and proximate result of Defendants' breach, Plaintiffs and the Classes have suffered injury and will continue to suffer injury, including property damage in an amount to be proven at trial. Defendants' conduct has also placed Plaintiffs and the Class at a heightened risk of developing serious illnesses, including cancer.

**COUNT III**
**NEGLIGENCE *PER SE***

**(Brought by all Plaintiffs on behalf of the Class and Subclasses, against all Defendants)**

126.    Plaintiffs reallege and incorporate by reference the above paragraphs.

127.    Plaintiffs are members of the class intended to be protected by ORS chapter 468B.005 to 468B.035, the Oregon Water Pollution Control law, which sets a standard of conduct and due care applicable to Defendants.

128.    Defendants violated the Oregon Water Pollution Control law by causing pollution of Oregon groundwater, placing or cause to be placed wastes in locations where such wastes were likely to escape or be carried into Oregon waters, and/or discharging wastes into the waters of the state and thereby reducing the quality of such waters below the water quality standards established by the Environmental Quality Commission.

129.    Defendants' violations of the Oregon Water Pollution Control law directly caused Plaintiffs and Class members personal and property damage in an amount to be proven at trial. Defendants' conduct has also placed Plaintiffs and Class members at a heightened risk of developing serious illnesses, including cancer.

130.    The harm suffered by Plaintiffs and Class members as a result of Defendants' conduct, including property damage, increased water costs, and increased risk of serious illness, is foreseeable harm of the type that ORS chapter 468B.005 to 468B.035 is intended to prevent.

**COUNT IV**
**TRESPASS**

**(Brought by all Plaintiffs on behalf of the Renter/Owner Subclass against all Defendants)**

131.    Plaintiffs reallege and incorporate by reference the above paragraphs.

132.    Defendants have caused, and continue to cause, pollutants to enter onto real property owned by Plaintiffs and Class members. This trespass was intentional because Defendants knew that the entry of pollutants onto Plaintiffs' and Class members' property was certain, or substantially certain, to result from their operations. Despite this substantial certainty, Defendants still went ahead with their operations.

133.    Such intrusions re-occur many times each day as additional nitrate particles enter onto Plaintiffs' and Class members' property.

134.    The Umatilla GMA Committee's regular reports, as well as Defendants' own awareness of the nitrate contamination issues in the Umatilla GMA, put Defendants on notice that their operations were causing nitrates to pollute Plaintiffs' and Class members' properties. It was therefore reasonably foreseeable that their operations would disturb Plaintiffs' and Class members' possessory interests.

135.    Defendants' trespass is without right or license and violates the exclusive property rights of Plaintiffs and Class members. The pollutants that Defendants cause to spread through Umatilla GMA groundwater and to contaminate Plaintiffs' and Class members' well water constitute an unreasonable interference with possessory use of their respective properties.

136.    Defendants' intentional trespass has resulted in actual and substantial damages to the real property owned by Plaintiffs and Class members because this property is now contaminated with pollutants in concentrations that are hazardous to human health. Abating this

damage will require decontaminating Plaintiffs' and Class members' property, including their well water, through expensive cleanup efforts.

## COUNT V
## PRIVATE NUISANCE

**(Brought by all Plaintiffs on behalf of the Renter/Owner Subclass against all Defendants)**

137.    Plaintiffs reallege and incorporate by reference the above paragraphs.

138.    Defendants' disposal of wastewater has substantially and unreasonably interfered with Plaintiffs' and the Class's use and enjoyment of their land.

139.    Defendants knew or had reason to know, particularly given regular reports issued by the Umatilla GMA Committee, that their actions were causing nitrate contamination of the Umatilla GMA, thereby interfering with Plaintiffs' and the Class's use and enjoyment of their properties.

140.    Defendants' actions have in fact interfered with Plaintiffs' and the Class's use and enjoyment of their properties. Because the Umatilla GMA groundwater is contaminated with nitrates, Plaintiffs are unable to rely on their wells to provide safe drinking water.

141.    The utility of excess wastewater dumping and the burden of reducing the amount of nitrogen and nitrates in Defendants' soil and water was slight compared with the risk that Defendants' conduct would contaminate Plaintiffs' and the Class's wells and substantially interfere with their use and enjoyment of their property.

142.    Defendants failed to exercise due care to eliminate the risk of nitrates contaminating the Umatilla GMA.

143.    Defendants' excess dumping of wastewater, fertilizer, and animal waste caused Plaintiffs and the Class personal and property damage in an amount to be proven at trial. Defendants' conduct has rendered private wells unfit for use, forcing Plaintiffs and Class members

who rely on private wells to either continually expose themselves to an unacceptably high risk of severe illness or rely on expensive and/or cumbersome alternative drinking water sources. Defendants' conduct has also placed Plaintiffs and the Class at a heightened risk of developing serious illnesses, including cancer.

## COUNT VI
## PUBLIC NUISANCE

**(Brought by all Plaintiffs on behalf of the Class and Subclasses against all Defendants)**

144.    Plaintiffs reallege and incorporate by reference the above paragraphs.

145.    Defendants' unlawful contamination of the Umatilla GMA groundwater constitutes a public nuisance because this conduct significantly interferes with the public health, safety, peace, comfort, and convenience and is of a continuing nature that the Defendants know, or have reason to know, is of a type that has a significant detrimental effect upon these public rights.

146.    Defendants' unreasonable interference with these common rights of the general public directly results from the public nuisances emanating from Defendants' properties, including those of water pollution and land pollution as more fully set forth above.

147.    Plaintiffs and the Class have suffered harms different in kind from those suffered by the general public, including interference with their right to use and enjoy their property and increased risk of physical harm as a result of exposure to excess nitrates.

## COUNT VII
## INVERSE CONDEMNATION

**(Brought by all Plaintiffs on behalf of the Renter/Owner Subclass, against Defendant Port of Morrow)**

148.    Plaintiffs reallege and incorporates by reference the above paragraphs.

149.    Pursuant to Or. Const. art. 1, § 18, the state may not take private property for public use without just compensation.

150.    To support operations at Port of Morrow, the Port, a public entity, has dumped contaminated water in the Umatilla GMA in excess of its permits, causing contamination of Plaintiffs' wells.

151.    When the government takes property interests through its actions without first initiating condemnation proceedings, the property owner can bring an inverse condemnation action to obtain just compensation.

152.    By dumping wastewater in excess of its permits, Defendant Port of Morrow has appropriated Plaintiffs' properties for public use.

153.    Defendant Port of Morrow's excess wastewater dumping has substantially interfered with Plaintiffs' and the **Renter/Owner Subclass'** use and enjoyment of their properties. As a result of Defendant Port of Morrow's appropriation of these properties, the beneficial uses and economic viability of the properties are destroyed or substantially reduced.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendants as follows:

A.    For a declaratory judgment that Defendants have violated and continue to be in violation of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B);

B.    For an order of the court compelling Defendants to conduct any assessment and remedial action activities necessary to eliminate the endangerment, which at a minimum would include remediating the soil and ground water to those cleanup standards described under Oregon law and regulations, and to obtain a government certification from DEQ and any other government agency with jurisdiction over the contaminants certifying that the assessment and remedial action satisfy applicable standards;

C.    For an order of the court compelling Defendants to provide clean, potable water to Plaintiffs and all Class members by, in the short term, supplying Plaintiffs and Class members with

regular deliveries of sufficient bottled water and, in the long term, paying for the construction of wells deep enough to provide clean, potable water to Plaintiffs and all Class members, or connection of subject properties to the nearest of the Port's clean water pipe systems;

D.    For an order of the court compelling Defendants to conduct and pay for medical monitoring to address the public health concerns raised by their conduct;

E.    For all general and compensatory damages proved and awarded by the jury or court;

F.    For punitive damages to punish and deter those Defendants subject to Or. Rev. Stat. § 31.730;

G.    For all other damages allowed by law and awarded by the jury;

H.    For Plaintiffs' litigation costs, including attorney and expert witness fees and other costs, under 42 U.S.C. § 6972(e) or as otherwise allowable by law; and

I.    For such other and further relief as the Court deems just and equitable under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all claims triable by right.

DATED:  February 28, 2024                   Respectfully submitted,

By /s/_____
        Michael A. Bliven, Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
mike@blivenlawfirm.com

Robert F. Dwyer, III, Oregon State Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman OR 97818
Telephone: (406) 755-6828
Facsimile: (406) 755-6829

rdwyer@blivenlawfirm.com

John Heenan (to be admitted *pro hac vice*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
john@lawmontana.com

Steve W. Berman (to be admitted *pro hac vice*)
Meredith S. Simons (to be admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98134
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
merediths@hbsslaw.com

Abigail D. Pershing (to be admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*