Michael A. Bliven (OR Bar No. 942510)
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
mike@blivenlawfirm.com

Robert F. Dwyer, III (OR Bar No. 984197)
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman, OR 97818
Telephone: (406) 755-6828
rdwyer@blivenlawfirm.com

John Heenan (*pro hac vice*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
john@lawmontana.com

Steve W. Berman (*pro hac vice*)
Meredith S. Simons (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98134
Telephone: (206) 623-7292
steve@hbsslaw.com
merediths@hbsslaw.com

Abigail D. Pershing (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| MICHAEL PEARSON, JAMES SUTER, SILVIA SUTER, and JEANNIE STRANGE, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PORT OF MORROW, LAMB WESTON HOLDINGS, INC., MADISON RANCHES, INC., THREEMILE CANYON FARMS, LLC, BEEF NORTHWEST FEEDERS, LLC, and JOHN DOES 1-10, <br><br> Defendants. | Case No. 2:24-cv-00362-HL <br><br> **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................1

II. FACTUAL BACKGROUND ................................................................................4

III. DEFENDANTS' 12(B)(1) CHALLENGES FAIL ................................................8

    A. LEGAL STANDARD ON 12(B)(1) MOTIONS TO DISMISS..............................8

    B. THIS COURT IS THE PROPER FORUM TO ADDRESS GROUNDWATER
       CONTAMINATION IN THE UMATILLA GMA. ................................................9

         1. The Court should not defer to administrative processes
           under the primary jurisdiction doctrine......................................10

             a. Adjudicating this case does not require special
                expertise that would justify applying the primary
                jurisdiction doctrine. ....................................................11

             b. No uniformity concerns justify invoking the
                primary jurisdiction doctrine..........................................14

             c. Efficiency considerations counsel against applying
                the primary jurisdiction doctrine.....................................16

         2. The Court should not defer to administrative processes
           under the *Burford* abstention doctrine. ....................................21

             a. No state court offers timely and adequate review of
                challenged agency actions...............................................23

             b. The legal issues here are predominantly federal law
                issues. ....................................................................24

             c. Federal review will not disrupt state efforts to
                establish a coherent policy. ...........................................25

IV. DEFENDANTS' 12(B)(6) CHALLENGES FAIL ..............................................27

    A. LEGAL STANDARD ON 12(B)(6) MOTIONS TO DISMISS..........................27

    B. PLAINTIFFS' COMPLAINT CONTAINS A PLAIN STATEMENT OF THEIR
       CLAIMS SO IS NOT AN IMPERMISSIBLE SHOTGUN PLEADING. ............27

    C. PLAINTIFFS HAVE ADEQUATELY PLEADED THEIR CLAIM UNDER
       RCRA....................................................................................30

1.     Plaintiffs plead that the nitrogen-containing substances at issue are "solid waste" within the meaning of RCRA. ..............................31

     a.     The "returned to the soil as fertilizer" exception does not apply. ..............................................................32

     b.     The "intended use" exception does not apply...............................34

     c.     The "point source" exception does not apply. ..............................35

     d.     The "anti-duplication" exception does not apply..........................37

     e.     The "irrigation return flow" exception does not apply........................................................................38

2.     Plaintiffs have pleaded that each Defendant has contributed to handling, storing, transporting, or disposal of solid waste. ...................................................................................40

3.     Plaintiffs have pleaded that the solid wastes at issue present an imminent and substantial endangerment to health or the environment. .....................................................................43

     a.     Some individual awareness of nitrate contamination does not mitigate the danger to other residents of the Umatilla GMA. ......................................................46

     b.     Nitrates are an imminent and substantial endangerment to residents of the Umatilla GMA despite DEQ's ineffective involvement. ........................47

     c.     The Complaint alleges an imminent and substantial endangerment to the environment.................................48

D.     PLAINTIFFS HAVE ADEQUATELY PLEADED THEIR STATE LAW TORT CLAIMS. ......................................................................49

1.     Plaintiffs adequately pleaded a negligence claim. .....................................49

     a.     Plaintiffs alleged that their injuries were reasonably foreseeable. ......................................................50

     b.     Plaintiffs allege that Defendants' conduct was unreasonable. ......................................................52

     c.     Plaintiffs allege that Defendants' conduct has injured them. ......................................................55

2.  Plaintiffs have adequately pleaded a negligence per se claim...................................................................57

3.  Plaintiffs have adequately pleaded a trespass claim. ................................61

4.  Plaintiffs have adequately pleaded private nuisance claims. ....................65

   a.  Plaintiffs allege that Defendants caused an interference with Plaintiffs' properties. .........................................65

   b.  Plaintiffs allege that the interference with their property is substantial and unreasonable. ......................................65

   c.  Plaintiffs allege that Defendants' conduct was intentional, reckless, or negligent. .................................67

5.  Plaintiffs have adequately pleaded public nuisance claims. .....................68

6.  Plaintiffs have adequately pleaded an inverse condemnation claim...................................................................72

   a.  Plaintiffs have sufficiently pleaded that the Port's taking was intentional. .................................................72

   b.  Plaintiffs have sufficiently pleaded that their property was taken for public use. .................................73

   c.  Plaintiffs have sufficiently pleaded substantial interference. ................................................74

E.  PLAINTIFFS' OREGON TORT CLAIMS ACT NOTICE TO THE PORT OF MORROW WAS TIMELY. ...............................................76

F.  PLAINTIFFS' REQUESTED RELIEF FOR MEDICAL MONITORING IS NOT SUBJECT TO DISMISSAL. ...............................................78

V.  CONCLUSION.................................................................80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Or. State Police*,
611 P.2d 1153 (Or. 1980) ...................................................................................76

*Adkins v. VIM Recycling, Inc.*,
644 F.3d 483 (7th Cir. 2011) ..............................................................................22

*Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Jewel Tea Co.*,
381 U.S. 676 (1965)............................................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................56, 57, 61

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) .................................................................10, 11, 13

*Autobidmaster, LLC v. Alpine Auto Gallery, LLC*,
2015 WL 2381611 (D. Or. May 19, 2015) ........................................27, 29, 30, 41

*Barnes v. Am. Tobacco Co.*,
989 F.Supp. 661 (E.D. Pa. Oct. 17, 1997) ..........................................................79

*Barth v. Firestone Tire & Rubber Co.*,
661 F.Supp. 193 (N.D. Cal.1987) .......................................................................78

*Baykeeper v. NL Indus., Inc.*,
660 F.3d 686 (3d Cir. 2011)................................................................................22

*Bennett v. City of Centreville*,
2024 WL 68682 (S.D. Ill. Jan. 5, 2024)........................................................11, 16

*Blue Legs v. U.S. Bureau of Indian Affairs*,
867 F.2d 1094 (8th Cir. 1989) ............................................................................22

*Blumenkron v. Multnomah Cnty.*,
91 F.4th 1303 (9th Cir. 2024) .............................................................................23

*Boyes v. Shell Oil Products Co.*,
199 F.3d 1260 (11th Cir. 2000) ..........................................................................22

*Buchwalter-Drumm v. State ex rel. Dep't of Hum. Servs.*,
404 P.3d. 959 (Or. App. 2017).......................................................................76, 77

*Burlington N. & Santa Fe Ry. Co. (BNSF) v. Grant*,
   505 F.3d 1013 (10th Cir. 2007) ...................................................................43

*Burnam v. Garon Dev. Corp.*,
   690 P.2d 1090 (Or. App. 1984)....................................................................63

*Ca. Sportfishing Prot. All. v. City of W. Sacramento*,
   905 F.Supp. 792 (E.D. Cal. 1995)...........................................................13, 26

*Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*,
   633 F.3d 20 (1st Cir. 2011)........................................................10, 22, 24, 25

*Chicot County v. Sherwood*,
   148 U.S. 529 (1893)........................................................................................9

*City of Fresno v. United States*,
   709 F.Supp.2d 888 (E.D. Cal. 2010)......................................................18, 45

*City of Fresno v. United States*,
   709 F.Supp.2d 934 (E.D. Cal. 2010)..............................................................45

*City of Portland v. Boeing Co.*,
   179 F.Supp.2d 1190 (D. Or. 2001) .................................................................69

*City of W. Sacramento v. R & L Bus. Mgmt.*,
   2020 WL 4042942 (E.D. Cal. July 17, 2020) ...................................13, 15, 16, 18

*Clark v. Time Warner Cable*,
   523 F.3d 1110 (9th Cir. 2008) .......................................................................10

*Cmty. Ass'n for Restoration of Env't Inc. v. Wash. Dairy Holdings LLC*,
   2019 WL 13117758 (E.D. Wash. Oct. 24, 2019) .......................................36, 37

*Cmty. Ass'n for Restoration of the Env't v. Cow Palace, LLC*,
   80 F.Supp.3d. 1180 (E.D. Wash. 2015).....................................................33, 44

*Cmty. Ass'n for Restoration of the Env't v. Cow Palace, LLC*,
   2013 WL 3179575 (E.D. Wash. June 21, 2013) ..............................................33

*Cmty. Assoc. for Restoration of the Env't v. Henry Bosma Dairy*,
   305 F.3d 943 (9th Cir. 2002) .........................................................................36

*Cnty. of Suffolk v. Long Island Lighting Co.*,
   907 F.2d 1295 (2d Cir. 1990)..........................................................................25

*Coalition For Health Concern v. LWD, Inc.*,
   60 F.3d 1188 (6th Cir. 1995) .........................................................................26

*Coldani v. Hamm*,
2007 WL 2345016 (E.D. Cal. Aug. 16, 2007) ......................................................36

*College Park Holdings, LLC v. Racetrac Petroleum, Inc.*,
239 F.Supp.2d 1322 (N.D. Ga. 2002) ...........................................................13, 22

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976).......................................................................................9

*Cook v. Rockwell Int'l Corp.*,
181 F.R.D. 473 (D. Colo. 1998) ..........................................................................79

*Craft v. Vanderbilt Univ.*,
174 F.R.D. 396 (M.D. Tenn. 1996) ......................................................................79

*Craig Lyle Limited P'ship v. Land O'Lakes, Inc.*,
877 F.Supp. 476 (D. Minn. 1995) ................................................................13, 22

*Daniels–Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010) .............................................................................27

*Daniels v. Johnson*,
473 P.3d 1133 (Or. App. 2020).........................................................................65

*Davel Commc'ns, Inc. v. Qwest Corp.*,
460 F.3d 1075 (9th Cir. 2006) ...........................................................................10

*Davies v. Nat'l Co-op. Refinery Ass'n*,
963 F.Supp. 990 (D. Kan. 1997)..................................................................17, 46

*Derby v. Columbia Cnty.*,
2022 WL 1090531 (D. Or. Feb. 8, 2022).............................................................29

*Donovan v. Philip Morris USA, Inc.*,
268 F.R.D. 1 (D. Mass. June 24, 2010) ...............................................................79

*Dowers Farms, Inc. v. Lake Cnty.*,
607 P.2d 1361 (Or. 1980) ..................................................................................76

*Dulcio v. United States EPA*,
2023 WL 3496474 (S.D. Fl. May 17, 2023)...........................................................29

*Dunn v. City of Milwaukie*,
328 P.3d 1261 (Or. 2014) .....................................................................72, 74, 75

*Easler v. Hoechst Celanese Corp.*,
2014 WL 3868022 (D.S.C. Aug. 5, 2014) .............................................................78

*Easterday Dairy, LLC v. Fall Line Cap., LLC,*
2022 WL 17104572 (D. Or. Nov. 22, 2022).....................................................14, 21

*Ecological Rights Found. v. Pac. Gas & Elec. Co.,*
874 F.3d 1083 (9th Cir. 2017) ................................................................. *passim*

*Ecological Rights Found. v. Pac. Gas & Elec. Co.,*
713 F.3d 502 (9th Cir. 2013) .............................................................................35

*Ellis v. Trib. Television Co.,*
443 F.3d 71 (2d Cir. 2006).................................................................................14

*Fishermen Against Destruction of the Env't v. Closter Farms,*
300 F.3d 1294 (11th Cir. 2002) .........................................................................39

*Foeller v. Hous. Auth. of Portland,*
256 P.2d 752 (Or. 1953) ....................................................................................73

*Foster v. United States,*
922 F.Supp. 642 (D.D.C. 1996) .........................................................................45

*Frady v. Portland Gen. Elec. Co.,*
637 P.2d 1345 (Or. App. 1981)............................................................... *passim*

*Friends of Santa Fe Cnty. v. LAC Mins., Inc.,*
892 F.Supp. 1333 (D.N.M. 1995) ......................................................................18

*Garrison v. New Fashion Pork,*
2020 WL 1811373, (N.D. Iowa, Jan. 9, 2020).................................................34

*Gibbs v. E.I. DuPont De Nemours & Co.,*
876 F.Supp. 475 (W.D.N.Y. 1995) ....................................................................79

*Goldingay v. Progressive Cas. Ins. Co.,*
306 F.Supp.3d 1259 (D. Or. 2018) ....................................................................62

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,*
484 U.S. 49 (1987)..............................................................................................25

*Hawkins v. City of La Grande,*
843 P.2d 400 (Or. 1992) ....................................................................................75

*Hiebenthal v. Meduri Farms,*
242 F.Supp.3d 885 (D. Or. 2002) ................................................................39, 40

*Hinds Invs., L.P. v. Angioli,*
654 F.3d 846 (9th Cir. 2011) .............................................................................42

*Humboldt Baykeeper v. Union Pac. R.R. Co.*,
   2006 WL 3411877 (N.D. Cal. Nov. 27, 2006) .......................................................36

*Interfaith Cmty. Org. Inc. v. PPG Indus., Inc.*,
   702 F.Supp.2d 295 (D.N.J. 2010) ..................................................................13, 22

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
   399 F.3d 248 (3d Cir. 2005).............................................................................44

*Jacobson v. Crown Zellerback Corp.*,
   539 P.2d 641 (Or. 1975) ...................................................................................66

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) .............................................................................8

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024)......................................................................................12

*Los Angeles Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*,
   506 F.Supp.3d 1018 (C.D. Cal. 2020) ..............................................................12

*Los Angeles Waterkeeper v. SSA Terminals, LLC*,
   2023 WL 7960773 (C.D. Cal. Nov. 14, 2023)...................................................36

*Lowe v. Philip Morris USA Inc.*,
   183 P.3d 181 (Or. 2008) ...................................................................................79

*Lunda v. Matthews*,
   613 P.2d 63 (Or. App. 1980)............................................................................63

*K-7 Enters., L.P. v. Jester*,
   562 F.Supp.2d 819 (E.D. Tex. 2007) ................................................................22

*Mark v. State Dept. of Fish and Wildlife*,
   974 P.2d 716 (Or. App. 1999)..........................................................................69

*Mark v. State ex rel Dep't of Fish and Wildlife*,
   84 P. 3d 155 (Or. App. 2004)...........................................................................65

*Martin v. Hannu*,
   2024 WL 1097625 (D. Or. Feb. 26, 2024)................................................ *passim*

*Martin v. Reynolds Metals Co.*,
   342 P.2d 790 (Or. 1959) ...................................................................................62

*Martin v. Union Pac. R.R. Co.*,
   474 P.2d 739 (Or. 1970) .........................................................................61, 62, 64

*McCormick v. Halliburton Co.*,
   2012 WL 1119493 (W.D. Okla. Apr. 3, 2012) ..........................................2, 11, 16

*McGregor v. Barton Sand & Gravel, Inc.*,
   660 P.2d 175 (Or. App. 1983).................................................................................63

*Me. People's Alliance v. Mallinckrodt, Inc.*,
   471 F.3d 277 (1st Cir. 2006) ..................................................................................12

*Meghrig v. KFC Western, Inc.*,
   516 U.S. 479 (1996).........................................................................................49, 78

*Merry v. Westinghouse Elec. Corp.*,
   697 F.Supp. 180 (M.D. Pa. 1988) ..........................................................................13

*Moody v. Oregon Community Credit Union*,
   542 P.3d 24, 41 (Or. 2023) ....................................................................................60

*Morales v. Walt's Wholesale Meats Inc.*,
   2024 WL 2701807 (W.D. Wash. May 24, 2024)....................................................29

*Morrison v. Clackamas Cnty.*,
   18 P.2d 814 (Or. 1933) ....................................................................................73, 74

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
   491 U.S. 350 (1989)..................................................................................................9

*Newcal Indus. Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ...............................................................................27

*Nicholson v. REI Energy, LLC*,
   370 F.Supp.3d 1199 (D. Or. 2019) ........................................................................16

*O'Hare v. Valley Utils., Inc.*,
   547 P.2d 1147 (N.M. Ct. App.) ..............................................................................18

*Oklahoma v. Tyson Foods*,
   2010 WL 653032 (N.D. Okla. Feb. 17, 2010) .......................................................33

*O'Leary v. Moyer's Landfill, Inc.*,
   523 F.Supp. 659 (E.D. Pa. 1981) ...........................................................................16

*Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*,
   192 F.3d 778 (8th Cir. 1999) ..................................................................................21

*Pac. Coast Fed. of Fishermen's Ass'ns v. Glaser*,
   945 F.3d 1076 (9th Cir. 2019) ..........................................................................38, 39

*Pac. Coast Fed'n of Fishermen's Associations v. Conant*,
657 F.Supp.3d 1341 (E.D. Cal. 2023) .......................................................................39

*Palumbo v. Waste Techs. Indus.*,
989 F.2d 156 (4th Cir. 1993) .................................................................................27

*Pickens v. United States*,
750 F.Supp.2d 1243 (D. Or. 2010) ...................................................................50, 54

*Port of Portland v. Monsanto Co.*,
2017 WL 9098079 (D. Or. Apr. 18, 2017) ...............................................51, 52, 56, 64

*Portland Gen. Elec. Co. v. Hick*,
227 P.3d 1213 (Or. App. 2010)..............................................................................63

*Prantil v. Arkema France S.A.*,
2022 WL 1570022 (S.D. Tex. May 18, 2022) .........................................................78

*Radiant Servs. Corp. v. Allegheny Techs. Inc.*,
2013 WL 12377686 (C.D. Cal. Mar. 19, 2013).......................................................15

*Raymond v. S. Pac. Co.*,
488 P.2d 460 (Or. 1971) ......................................................................................68

*Rehab. Support Servs., Inc. v. Town of Esopus, N. Y.*,
226 F.Supp.3d 113 (N.D.N.Y. 2016)........................................................................2

*Reid v. Johnson & Johnson*,
780 F.3d 952 (9th Cir. 2015) ...............................................................................10

*Reiter v. Cooper*,
507 U.S. 258 (1993)...........................................................................................11

*Robles v. Domino's Pizza, LLC*,
913 F.3d 898 (9th Cir. 2019) ...........................................................................12, 16

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) .............................................................................33

*San Diego Coastkeeper v. Pick-Your-Part Auto Wrecking*,
2023 WL 4879832 (S.D. Cal. July 31, 2023) .........................................................36

*Santa Clarita Valley Water Agency v. Whittaker Corp.*,
99 F.4th 458 (9th Cir. 2024) ..........................................................43, 44, 45, 47

*Savage v. Glendale Union High Sch.*,
343 F.3d 1036 (9th Cir. 2003) ...............................................................................8

*SEC v. Aequitas Mgm't, LLC,*
2017 WL 1206691 (D. Or. Jan. 9, 2017) ..............................................29

*Space Age Fuels, Inc. v. Standard Oil Co. of Ca.*,
1996 WL 160741 (D. Or. Feb. 29, 1996).......................................26, 27

*Starr v. Baca,*
652 F.3d 1202 (9th Cir. 2011) .....................................................27

*Syntek Semiconductor Co. v. Microchip Tech. Inc.*,
307 F.3d 775 (9th Cir. 2002) ......................................................10

*TC Rich, LLC v. Shaikh,*
2021 WL 1254359 (C.D. Cal. Feb. 22, 2021).............................43

*United States v. Gen. Dynamics Corp.*,
828 F.2d 1356 (9th Cir. 1987) ....................................................10

*United States v. W. Pac. R.R. Co.*,
352 U.S. 59 (1956).......................................................................11

*Vokoun v. City of Lake Oswego,*
56 P.3d 396 (Or. 2002) ........................................................73, 74

*Wai Ola All. v. United States Dep't of the Navy,*
2024 WL 2214557 (D. Haw. May 14, 2024) ...........................22

*In re Welding Fume Prods. Liab. Litig.*,
245 F.R.D. 279 (N.D. Ohio Sept. 14, 2007) ...........................79

*Werlein v. United States,*
746 F.Supp. 887 (D. Minn. 1990) .............................................78

*White & Brewer Trucking, Inc. v. Donley,*
952 F.Supp. 1306 (C.D. Ill. 1997) ............................................22

*Williams v. Alabama Dep't of Transp.*,
119 F.Supp.2d 1249 (M.D. Ala. 2000) ...................................13

*Wilson v. Amoco Corp.*,
989 F.Supp. 1159 (D. Wyo. 1998)...........................13, 15, 16

*Wilson v. Hewlett–Packard Co.*,
668 F.3d 1136 (9th Cir. 2012) ..........................................27, 67

*Yslava v. Hughes Aircraft Co.*,
845 F.Supp. 705 (D. Ariz. 1993) .............................................79

**Statutes**

28 U.S.C. § 1331 ................................................................................................9

28 U.S.C. 1367(a) ...............................................................................................9

33 U.S.C. 1342(l)(1) ..........................................................................................38

33 U.S.C. § 1251(a)(1) .......................................................................................36

33 U.S.C. § 1362 (14) ........................................................................................36

33 U.S.C. 1365 ...................................................................................................37

42 U.S.C. § 6972(a)(1)(B) ..................................................................................43

42 U.S.C. § 6903(27) ....................................................................................31, 39

42 U.S.C. § 6972(a) .....................................................................................22, 78

42 U.S.C. § 6972(b)(2)(D) .................................................................................27

Clean Water Act ................................................................................14, 36, 37, 38

Oregon Tort Claims Act ..................................................................................4, 76

O.R.S. 30.275(1)-(2) ..........................................................................................76

O.R.S. 468B.005(9) ............................................................................................58

O.R.S. 468B.005(10).f .......................................................................................58

O.R.S. 468B.005 *et. seq.* ....................................................................................57

O.R.S. 468B.025(1)(a) ..................................................................................58, 59

O.R.S. 468B.025(1)(b) .......................................................................................58

O.R.S. 468B.025(1)–(2) .....................................................................................69

O.R.S. 468B.025(2) ............................................................................................60

O.R.S. 468B.025(3) ......................................................................................59, 69

O.R.S. 468B.050 ...........................................................................................58, 60

O.R.S. 746.230(1) ..............................................................................................60

Resource Conservation and Recovery Act, 42 U.S.C. § 6972(A)(1)(B)
.................................................................................................................. *passim*

**Other Authorities**

S. Rep. 92–414, 92nd Cong., 2d Sess. ................................................................14

S.Rep. No. 95–370 (1977) ....................................................................38, 39

H.R. Rep. No. 94–1491 (1976). ..................................................................32

Fed. R. Civ P. 8 ..................................................................................56

Fed. R. Civ P. 12(b)(1)........................................................................2, 3, 8

Fed. R. Civ P. 12(b)(6)......................................................................2, 3, 27

Ore. Const. Art. I, § 18........................................................................72

# I.     INTRODUCTION

Residents of Morrow and Umatilla counties are living through a public emergency.[1] The water they rely on is drawn from groundwater in the Lower Umatilla Basin. But groundwater in the Basin is so heavily contaminated with nitrates that drinking it can cause cancer, cyanosis, and even death.[2]

Defendants in this case—the Port of Morrow (the "Port"), Lamb Weston Holdings, Inc. ("Lamb Weston"), Madison Ranches, Inc. ("Madison Ranches"), Threemile Canyon Farms, LLC ("Threemile"), and Beef Northwest Feeders, LLC ("Beef Northwest")—are responsible for much of this nitrate contamination. Every year, these Defendants dump millions of pounds of nitrogen onto land in the Lower Umatilla Basin.[3] The nitrogen percolates down to groundwater and becomes dangerously concentrated.[4] Plaintiffs, along with 45,000 other people who live in Morrow and Umatilla counties and rely on groundwater in the Umatilla Basin,[5] are now living with the consequences of Defendants' conduct.

Despite being aware of the nitrate contamination for years, Defendants have not changed their behavior to prevent their activities from causing further nitrate contamination.[6] Nor have state agencies been effective in limiting Defendants' destructive actions.[7] In fact, two Defendants, the Port of Morrow and Lamb Weston, have regularly flouted state-issued discharge permits intended

---

[1] *See* Plaintiffs' Amended Class Action Complaint, ECF No. 17 ("Complaint") ¶14 (noting that "the Morrow County Commission had declared a local state of emergency over groundwater nitrate pollution.").

[2] *Id.* ¶43.

[3] *Id.* ¶2.

[4] *Id.*

[5] *Id.* ¶3.

[6] *Id.* ¶¶59-93.

[7] *Id.* ¶¶74-93.

to protect groundwater from contamination.[8] The other three Defendants have not been subject to water-related enforcement actions by state agencies at all. Plaintiffs now bring this case to force Defendants to account for the damage they have caused and obtain relief for the harm Plaintiffs have suffered.

Through their various motions to dismiss, Defendants continue to try to evade any oversight or responsibility.[9] Defendants seek to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(1) (challenges to the Court's subject-matter jurisdiction under the primary jurisdiction doctrine and the *Burford* abstention doctrine)[10] and Rule 12(b)(6) (challenges to the adequacy of Plaintiffs' pleadings on the merits). Plaintiffs treat each set of arguments separately.

Plaintiffs respond to Defendants' Rule 12(b)(1) challenges in **Section III**. Plaintiffs explain the absurdity of Defendants' argument that this Court should defer to state agencies—which have proven themselves incapable of or unwilling to regulate nitrate contamination in the Umatilla GMA over the past 30 years[11]—under the doctrines of primary jurisdiction (Section III.B.1) and *Burford* abstention (Section III.B.2). Invoking primary jurisdiction is unwarranted because this case does not depend on special expertise,[12] and there is little risk that any order from this Court

---

[8] *Id.* ¶¶74-93.

[9] *See* Motion to Dismiss, ECF No. 51 ("Beef Northwest MTD"); Defendant Lamb Weston Holdings, Inc.'s Motion to Dismiss Plaintiffs' Amended Complaint, ECF No. 54 ("Lamb Weston MTD"); Port of Morrow and Threemile Canyon Farms, LLC's Motion to Dismiss Plaintiffs' Amended Class Action Complaint, ECF No. 56 ("POM/Threemile MTD"); Defendant Madison Ranches, Inc.'s Motion to Dismiss and Memorandum in Support, ECF No. 59 ("Madison Ranches MTD").

[10] Motions to dismiss based on abstention and primary jurisdiction are considered motions under Rule 12(b)(1). *See Rehab. Support Servs., Inc. v. Town of Esopus, N. Y.*, 226 F.Supp.3d 113, 125 (N.D.N.Y. 2016); *McCormick v. Halliburton Co.*, 2012 WL 1119493, at *3 (W.D. Okla. Apr. 3, 2012).

[11] Complaint ¶¶48-52; *see also* Beef Northwest MTD at 3.

[12] *See infra*, Sec. III.B.1.a.

would actually conflict with the orders of a state agency.[13] Furthermore, deferring to state agencies would needlessly delay the resolution of Plaintiffs' claims.[14]

*Burford* abstention is similarly unwarranted because deferring to an agency in the context of a RCRA citizen suit risks impermissibly "substitut[ing the court's] judgment for that of Congress."[15] Defendants have also failed to show that any state court offers timely and adequate review of the issues here,[16] that the relevant federal law questions are inextricably intertwined with state law questions,[17] or that federal review will disrupt state efforts to establish a coherent policy[18]—all necessary conditions for *Burford* abstention to apply.

After responding to Defendants' Rule 12(b)(1) challenges, Plaintiffs address Defendants' Rule 12(b)(6) arguments in **Section IV**. Plaintiffs explain their Complaint is not, contrary to Defendants' assertions, a "shotgun pleading," because it contains a plain statement of Plaintiffs' claims and is explicit about each Defendant's impermissible conduct (Section IV.B). Defendants may disagree with Plaintiffs' allegations, but there is no question that they know what these allegations are.

Plaintiffs then walk through the elements of each of their causes of action, demonstrating that Plaintiffs have adequately pled the necessary facts to support their claims under RCRA's citizen suit provision (Section IV.C), as well as their state law tort claims of negligence, negligence per se, trespass, private nuisance, public nuisance, and inverse condemnation (Section IV.D).

---

[13] *See infra*, Sec. III.B.1.b.

[14] *See infra*, Sec. III.B.1.c.

[15] *See infra*, Sec. III.B.2 (quoting *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 31 (1st Cir. 2011)).

[16] *See infra*, Sec. III.B.2.a.

[17] *See infra*, Sec. III.B.2.b.

[18] *See infra*, Sec. III.B.2.c.

Plaintiffs then dispatch the Port of Morrow's argument that Plaintiffs have not timely filed their Oregon Tort Claims Act notice (Section IV.E). Plaintiffs allege that they filed the requisite notice fewer than 180 days after learning of the Port of Morrow's involvement in contaminating their water, within the limitations period imposed by the Act.

Finally, Plaintiffs explain that they are entitled to relief in the form of medical monitoring, despite Madison Ranches and Lamb Weston's claims to the contrary (Section IV.F). Courts regularly deem medical monitoring an appropriate form of injunctive relief under RCRA and various state tort law claims,[19] and the Court should do the same here.

Because Defendants have not stated any ground on which Plaintiffs' Complaint should be dismissed, Plaintiffs respectfully request that Defendants' motions be denied. Alternatively, to the extent the Court concludes that Plaintiffs' pleadings are insufficiently specific or otherwise lack a factual basis, Plaintiffs request leave to amend their Complaint.

## II.     FACTUAL BACKGROUND

By constantly dumping nitrogen-heavy wastewater, fertilizer, and other materials on land in Morrow and Umatilla counties,[20] Defendants have polluted the groundwater in the Lower Umatilla Basin with dangerously high levels of nitrates.[21] As a result, more than 45,000 people (including10,000 children) no longer have the same access to potable water they once enjoyed.[22]

All Defendants have contributed to the nitrate contamination crisis, though the exact mechanism of that contribution varies. Three Defendants (Madison Ranches, Lamb Weston, and Threemile) contribute to the problem by over-applying fertilizer and high-nitrogen wastewater to

---

[19] *See infra*, Sec. IV.F.
[20] Complaint ¶¶6, 59-73.
[21] *Id.* ¶¶2, 3, 5, 59-73.
[22] *Id.* ¶3.

their crops.[23] As a result of this over-application, approximately 10% of the nitrogen these Defendants use leaches into groundwater.[24] One Defendant (Beef Northwest) is a concentrated animal feeding operation ("CAFO") that contributes to the nitrate problem by improperly disposing of the manure from its 148,000 cattle, which together excrete more than 9,000 tons of nitrogen per year.[25] Two Defendants (the Port of Morrow and Lamb Weston) pump millions of gallons of nitrogen-heavy wastewater every year to local farms, where it is sprayed onto the land,[26] causing excess nitrate to percolate down to the water table.[27] And one Defendant (the Port of Morrow) allows millions of gallons of nitrogen-heavy wastewater to leak from its pipes and leach from its lagoons, further contaminating Umatilla GMA groundwater.[28]

Regardless of the exact mechanism of each Defendant's contribution, the outcome is the same: they have polluted the Lower Umatilla Basin with nitrates.[29] As a result, many residents who used to draw their water from private wells connected to Lower Umatilla Basin groundwater must now rely on bottled water for all their drinking, cooking, and other household needs.[30] Other residents who rely on public water systems must pay inflated water bills or higher taxes to cover public water departments' outlays on pollution mitigation.[31] Even so, those who rely on public systems are not guaranteed nitrate-free water; nearly half of all the public water systems that serve

---

[23] *Id.* ¶¶61-62.

[24] *Id.* ¶62.

[25] *Id.* ¶¶66-67.

[26] *Id.* ¶69.

[27] *Id.* ¶69; *see also id.* ¶2.

[28] *Id.* ¶¶ 87, 90; *see also id.* ¶¶6, 93.

[29] *Id.* ¶¶2, 5, 59-73.

[30] *Id.* ¶1, 13-18,23,25

[31] *Id.* ¶27-33.

these communities have tested positive for dangerous levels of nitrates.[32] Nitrate contamination has also damaged Plaintiffs' property and caused declines in their property values.[33]

Plaintiffs and other members of the putative Class have had little choice but to suffer these inconveniences and financial burdens. The alternative is to continue drinking water contaminated with unsafe levels of nitrates, risking potentially disastrous health consequences. Ingesting water contaminated with excess nitrates prevents red blood cells from carrying oxygen.[34] At high doses of nitrates, enough red blood cells become impaired that the body cannot properly circulate oxygen, resulting in cyanosis and asphyxia.[35] Babies under six months old are particularly vulnerable to this danger. In severe cases, infants may develop so-called "Blue Baby Syndrome," which can be fatal.[36] Exposure to high levels of nitrates can also cause cancers, especially colon, stomach, thyroid, and kidney cancer.[37] People exposed to high levels of nitrates may develop kidney, spleen, and respiratory disorders, and may suffer from reproductive complications.[38]

Recognizing that nitrate contamination in the Lower Umatilla Basin is a significant problem, the Oregon Department of Environmental Quality ("DEQ") declared the Lower Umatilla Basin to be a Groundwater Management Area in 1990 (the "Umatilla GMA").[39] But since gaining control over the Umatilla GMA, DEQ has been largely incapable of addressing the nitrate problem

---

[32] *Id.* ¶55-57.

[33] *Id.* ¶139.

[34] *Id.* ¶43.

[35] *Id.*

[36] *Id.*

[37] *Id.* ¶44.

[38] *Id.*

[39] *See* Beef Northwest MTD at 3. Plaintiffs alleged in their Complaint that the Umatilla GMA was declared in 2001, Complaint ¶48, but Beef Northwest is correct that the actual date was significantly earlier. Plaintiffs would revise this allegation in an amended Complaint.

it has been tasked with remedying.[40] DEQ has mostly asked Defendants to take certain remedial or preventative measures on a voluntary basis,[41] requests they have largely ignored. And in the few instances where DEQ has issued mandatory orders—including issuing permits to limit dumping of nitrogen—Defendants have routinely flouted them.[42] For example, Lamb Weston has violated its permit at least 90 times since 2015,[43] and the Port of Morrow has violated its permit 395 times since November 1, 2023.[44] Absent a Court order, there is no indication Defendants will change their behavior. The Port's executive director, Lisa Mittelsdorf, has publicly stated the Port will likely continue to violate its permit despite the fines DEQ has levied against it.[45] For these Defendants, permit violation fines are just a cost of doing business.

Because Defendants have refused to take responsibility for their actions, and because Oregon state agencies have been ineffective in curing the nitrate contamination crisis, Plaintiffs now turn to this Court for help. Plaintiffs bring claims under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(A)(1)(B) ("RCRA"), against all Defendants.[46] They also bring state law tort claims including negligence, negligence per se, trespass, and private and public nuisance against all Defendants.[47] Additionally, Plaintiffs bring an inverse condemnation claim against the Port.[48]

---

[40] *Id*. ¶¶48-52.

[41] *See* Groves Decl., Ex. 1.

[42] *Id*. ¶¶74-93.

[43] *Id*. ¶77.

[44] *Id*. ¶6.

[45] *Id*. (quoting Monica Samayoa, *Port of Morrow Continues to Apply Excess Nitrates on Farmland, Misses Payment Deadline*, OR. PUB. BROADCASTING (Jan. 27, 2024), https://www.opb.org/article/2024/ 01/26/nitrate-pollution-port-of-morrow-groundwater-environment-drinking-oregon-boardman).

[46] *Id*. ¶¶111-120.

[47] *Id*. ¶¶121-150.

[48] *Id*. ¶¶151-156.

The relief Plaintiffs ask for in their Complaint is tailored to redress the harms they have suffered and continue to suffer. Specifically, Plaintiffs ask for: (1) a declaratory judgment that Defendants have violated RCRA; (2) an order compelling Defendants to remediate the soil and groundwater to bring nitrate levels below the EPA limit of 10 mg/L in the Lower Umatilla Basin; (3) an order compelling Defendants to pay for Plaintiffs to dig deeper wells to reach uncontaminated water or to pay for Plaintiffs to become connected to a clean water supply; (4) an order compelling Defendants to support a medical monitoring program to address the public health concerns raised by their conduct; and (5) compensatory and punitive damages.[49]

## III.    DEFENDANTS' 12(B)(1) CHALLENGES FAIL

## A.    LEGAL STANDARD ON 12(B)(1) MOTIONS TO DISMISS

Under Rule 12(b)(1), a defendant may challenge a plaintiff's jurisdictional allegations through either a "facial" or "factual" attack.[50] "Factual" attacks challenge a plaintiff's factual allegations regarding a court's jurisdiction.[51] Defendants bring factual attacks here, citing to evidence beyond the Complaint to argue that the Court does not have subject matter jurisdiction to hear this case and should instead defer to state agencies to resolve the matter.[52] The Court may review this extrinsic evidence "without converting the motion to dismiss into a motion for summary judgment."[53] But even considering this additional evidence, Defendants' factual attacks fail because this Court is the proper forum to address Plaintiffs' Complaint.

---

[49] *Id.*, Prayer for Relief A-F.

[50] *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014).

[51] *Id.* (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)).

[52] *See* Beef Northwest MTD at 15; Lamb Weston MTD at 13; Port of Morrow and Threemile MTD at 7; Madison Ranches MTD at 1, 4 (incorporating by reference the arguments and authorities in the Lamb Weston, Port of Morrow, and Beef Northwest Motions to Dismiss on primary jurisdiction and *Burford* abstention grounds).

[53] *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

**B.    THIS COURT IS THE PROPER FORUM TO ADDRESS GROUNDWATER CONTAMINATION IN THE UMATILLA GMA.**

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."[54] The Supreme Court has emphasized: "When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction."[55] A party that rightfully chooses to avail itself of a federal court cannot have that choice abrogated.[56]

Here, Plaintiffs have a clear right to bring their case before this Court. The Court has jurisdiction pursuant to RCRA and 28 U.S.C. § 1331.[57] The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because those claims derive from the same common nucleus of operative fact as their RCRA claims.[58] No Defendant disputes these basic jurisdictional facts.

Nevertheless, Defendants urge this Court to abdicate its constitutional responsibility to hear Plaintiffs' claims. All Defendants argue, *first*, that the Court should stay or dismiss the case under the primary jurisdiction doctrine,[59] and *second*, that the Court should dismiss the case under the *Burford* abstention doctrine.[60] But the majority of courts that have considered both doctrines have

---

[54] *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

[55] *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 358–59 (1989) (quoting *Willcox v. Consol. Gas Co.*, 212 U.S. 19, 40 (1909)).

[56] *Id.*; *see also Chicot County v. Sherwood*, 148 U.S. 529, 534 (1893) ("[T]he courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of another jurisdiction.") (quotations omitted).

[57] Complaint ¶39.

[58] *Id.*

[59] *See* Madison Ranches MTD at 4-5; Beef Northwest MTD at 17-20; Lamb Weston MTD at 14-22; POM/Threemile MTD at 8-14.

[60] *See* Beef Northwest MTD at 21-23; Lamb Weston MTD at 22-23; Port of Morrow and Threemile MTD at 14-17; Madison Ranches MTD at 5.

found abstention improper, particularly in RCRA cases, and have declined to apply them. This Court should do the same.[61]

> **1. The Court should not defer to administrative processes under the primary jurisdiction doctrine.**

The doctrine of primary jurisdiction permits courts to determine, in certain exceptional circumstances, that an otherwise properly filed claim should first be resolved by a regulatory agency.[62] Deciding whether to invoke the primary jurisdiction doctrine is left to the "discretion of the district court."[63] There is "no fixed formula" for applying the doctrine,[64] but the Ninth Circuit has traditionally held that courts may apply it in cases where there is "a need to resolve an issue" that, among other things, requires "expertise" beyond the court's competency or requires "uniformity in administration" that a court cannot ensure.[65] As discussed below, resolving Plaintiffs' claims will not require technical expertise beyond the Court's competence. There is also little risk that any order from this Court will interfere with "uniformity in administration" or will actually conflict with the orders of an Oregon agency.

Even if the Court concludes that "expertise" and "uniformity in administration" are particular concerns here, Ninth Circuit precedent requires courts to additionally consider whether

---

[61] *Chico Serv. Station,* 633 F.3d at 30 n.14 (collecting cases).

[62] *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015). Turning a cognizable claim over to an agency under this doctrine is the exception, not the rule. *See Reid v. Johnson & Johnson*, 780 F.3d 952, 966 (9th Cir. 2015) (noting that primary jurisdiction applies in only "limited circumstances").

[63] *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1091 (9th Cir. 2006); *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002) ("[T]he doctrine of primary jurisdiction is committed to the sound discretion of the court."). The Port of Morrow and Threemile are therefore wrong when they write that "the primary jurisdiction doctrine *requires* the Court to defer to the Agencies." POM/Threemile MTD at 8 (emphasis added).

[64] *Syntek Semiconductor*, 307 F.3d at 781.

[65] *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008). The requirements of "expertise" and "uniformity" are "uniformly present" in cases where the doctrine is properly invoked. *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987).

invoking primary jurisdiction would "needlessly delay the resolution of [] claims."[66] This final

consideration—efficiency—is "the deciding factor in whether to invoke primary jurisdiction."[67]

Thus, courts should not invoke primary jurisdiction when an agency has not been "diligent" in

pursuing resolution of the issue,[68] or when a plaintiff seeks a remedy beyond that contemplated in

the agency's action.[69] Here, DEQ has not been sufficiently diligent, and the limited action it has

begun will not fully encompass the relief Plaintiffs have requested.[70] As such, efficiency interests

are best served by proceeding with Plaintiffs' claims in this Court.

a.     *Adjudicating this case does not require special expertise that would justify applying the primary jurisdiction doctrine.*

Despite Defendants' protests, adjudicating this case does not depend on special expertise

that would require this Court to abdicate in favor of a state administrative process. On some of

Plaintiffs' claims, no expertise is required at all: for example, ample evidence shows that

Defendants Port of Morrow and Lamb Weston have violated permits issued by DEQ.[71] The Court

need not understand the science of groundwater contamination to decide whether, by violating

their permits, these Defendants are liable under RCRA. And pursuant to the Supreme Court's

---

[66] *Astiana*, 783 F.3d at 760 (citing *Reid*, 780 F.3d at 967–68).

[67] *Id*. (citing *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1165 (9th Cir. 2007)). The Supreme Court has also discussed judicial economy in several of its primary jurisdiction opinions. *See, e.g.*, *Reiter v. Cooper*, 507 U.S. 258, 270 (1993) (expressing concern that invoking primary jurisdiction "could produce substantial delay"); *Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Jewel Tea Co.*, 381 U.S. 676, 686 (1965) ("[Primary jurisdiction] does not require resort to an expensive and merely delaying administrative proceeding."). The "superordinate question" governing the primary jurisdiction doctrine is "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956).

[68] *See, e.g.*, *Bennett v. City of Centreville*, 2024 WL 68682, at *5 (S.D. Ill. Jan. 5, 2024); *McCormick*, 2012 WL 1119493, at *3.

[69] *See McCormick*, 2012 WL 1119493, at *2.

[70] *See infra*, Sec. IV.A.1.c.

[71] Complaint ¶¶74-93.

recent decision in *Loper Bright Enterprises v. Raimondo*, the Court "may not defer to an agency interpretation of the law" even if it finds that Defendants' liability under RCRA is ambiguous.[72]

Although Plaintiffs recognize that the Court likely will need to consider technical issues to adjudicate some of their other claims, federal courts are often "called upon to make evaluative judgments in highly technical areas."[73] In these situations, "it is incumbent upon the parties to provide the Court with sufficient information to make those decisions."[74] Plaintiffs have already retained experts who will be able to assist the Court in understanding technical aspects of the case that may require expertise.[75] If the case moves forward, Defendants will no doubt retain experts to offer additional opinions. The Court will not be stranded without information on which to base its decision.

Plaintiffs do not deny that DEQ, the Oregon Department of Agriculture ("ODA"), and the Oregon Health Authority ("OHA") have expertise "relevant to addressing elevated nitrates" in the Umatilla GMA.[76] But merely establishing that these agencies have expertise "does not suffice to

---

[72] 144 S. Ct. 2244, 2247 (2024).

[73] *Me. People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 293–94 (1st Cir. 2006); *see also id.* ("[F]ederal courts have proven, over time, that they are equipped to adjudicate individual cases, regardless of the complexity involved.").

[74] *Los Angeles Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*, 506 F.Supp.3d 1018, 1026 (C.D. Cal. 2020); *see also Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 911 (9th Cir. 2019) ("[I]f the court requires specialized or technical knowledge to understand [the plaintiff's] assertions, the parties can submit expert testimony.").

[75] *See* Declaration of Steve Berman in Support of Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss ("Berman Decl.") ¶2.

[76] *See* Port of Morrow and Threemile MTD at 9; *see also* Lamb Weston MTD at 17 (identifying technical issues including a determining of what soil and groundwater may need remediation, determining how to avoid future excess nitrates from penetrating the soil, and monitoring compliance); Beef Northwest MTD at 20 ("DEQ has the expertise and specialized knowledge to address these issues."); Madison Ranches MTD at 5 (noting "the issues raised by the Amended Complaint [are] within the domain and competence of the State").

apply the doctrine" of primary jurisdiction.[77] To succeed on this expertise point, Defendants must show that "courts in general *lack* the competence to efficiently and effectively resolve the issue."[78] Were it otherwise, courts would be hard pressed to find any cases to adjudicate at all: "[i]t will almost always be the case that the agency will have more experience" on the relevant issues than the court.[79]

Defendants have not shown that the Court lacks the competence to adjudicate this case. Nor can they. Multiple courts have concluded that cases brought under RCRA and other environmental claims "are not so esoteric or complex as to foreclose their consideration by the judiciary."[80] Courts frequently adjudicate RCRA cases and other cases involving water and soil pollution;[81] the sheer volume of such cases belies Defendants' claims that courts are incompetent in this area. And Congress itself clearly contemplated that the environmental issues raised in conjunction with RCRA are within the competency of the courts when it created a citizen suit provision.[82]

_____

[77] *City of W. Sacramento v. R & L Bus. Mgmt.*, 2020 WL 4042942, at *3 (E.D. Cal. July 17, 2020).

[78] *Id.* (emphasis added); *see also Astiana*, 783 F.3d at 760 (emphasizing court competence).

[79] *Id.*

[80] *College Park Holdings, LLC v. Racetrac Petroleum, Inc.*, 239 F.Supp.2d 1322, 1328 (N.D. Ga. 2002); *Wilson v. Amoco Corp.*, 989 F.Supp. 1159, 1170 (D. Wyo. 1998); *Merry v. Westinghouse Elec. Corp.*, 697 F.Supp. 180, 183 (M.D. Pa. 1988).

[81] For example, a Westlaw search indicates that district courts in the Ninth Circuit alone have adjudicated hundreds of cases involving RCRA over the past 30 years. Berman Decl. at 3.

[82] *Interfaith Cmty. Org. Inc. v. PPG Indus., Inc.*, 702 F.Supp.2d 295, 311 (D.N.J. 2010); *see also Williams v. Alabama Dep't of Transp.*, 119 F.Supp.2d 1249, 1257 (M.D. Ala. 2000) (rejecting defendant's argument that RCRA claims required special expertise beyond the court's grasp); *Wilson*, 989 F.Supp. at 1170 ("This Court could not in good faith unilaterally strip United States citizens of rights given them by their government [by declining to exercise jurisdiction in a citizen suit case]."); *Ca. Sportfishing Prot. All. v. City of W. Sacramento*, 905 F.Supp. 792, 807 n.21 (E.D. Cal. 1995); *Craig Lyle Limited P'ship v. Land O'Lakes, Inc.*, 877 F.Supp. 476, 483 (D. Minn. 1995); *Merry*, 697 F.Supp. at 182.

Because the Court is competent to adjudicate Plaintiffs' claims, and particularly given Congress's express intent that courts address environmental issues (including under RCRA citizen suit provisions), the reality that the Court will be asked to consider some technical information is not a reason for the Court to invoke the primary jurisdiction doctrine.

      b.    *No uniformity concerns justify invoking the primary jurisdiction doctrine.*

Defendants also protest that the Court should not retain its jurisdiction in this case because doing so raises the prospect that Defendants will become targets of "conflicting directives" from the Court and from various agencies "as to how the contamination should be remediated."[83] This argument is similarly unavailing.

As to Madison Ranches, Threemile, and Beef Northwest Feeders, such concerns are ill-founded because those Defendants are not current targets of agency action concerning nitrate contamination in the Umatilla GMA. Because no agency action exists, there is correspondingly no "danger of inconsistent rulings."[84] The Court should not decline to hear the case against these Defendants merely because an Oregon agency might, at some indeterminate future time, decide to commence an as-yet unforeseen action against them.[85] Were that the standard, no defendant

---

Congress has also noted, in conjunction with the Clean Water Act, that "[e]nforcement of pollution regulations is not a technical matter beyond the competence of the courts." S. Rep. 92-414, 92nd Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Admin. News 3668, 3747.

[83] Beef Northwest MTD at 19; *see also* Lamb Weston MTD at 20 ("[A] competing order from this Court could easily create inconsistent obligations on the part of Lamb Weston, jeopardizing its ability to comply with the MAO and compromising uniformity."); Port of Morrow and Threemile MTD at 12 ("[A] court is not equipped to enforce any remedies in any consistent or equitable system."); Madison Ranches MTD at 5 (stating that "an injunction" issued by the Court could "contradict requirements of the permits").

[84] *Ellis v. Trib. Television Co.*, 443 F.3d 71, 83 (2d Cir. 2006).

[85] *See Easterday Dairy, LLC v. Fall Line Cap., LLC*, 2022 WL 17104572, at *7 (D. Or. Nov. 22, 2022) ("[P]rimary jurisdiction is not a doctrine of futility.") (citing *Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc*., 192 F.3d 778, 786 (8th Cir. 1999), for the proposition that a court could not continue refusing to hear a case because the agency had not brought an initial enforcement action).

subject to agency regulation or oversight could ever be properly sued in court. That is not the intended consequence of the primary jurisdiction doctrine.

Even for Defendants Port of Morrow and Lamb Weston, against whom DEQ has issued various directives, conflict concerns are not dispositive. Many courts, when faced with similar concerns, have concluded that the parties can easily prevent conflicts by "present[ing] evidence to the Court as to any prior or pending" rulings from the relevant agencies.[86] Courts can rely on this evidence to "determine whether any requested . . . relief would impede the regulatory process or have the potential to subject any party to conflicting orders."[87] Here, in particular, there is ample documentation of DEQ's "institutional attitudes and remediation expectations" regarding the Port and Lamb Weston, which will permit the Court to "fashion appropriate and non-conflicting relief."[88]

Nor would an order from this Court come as a shock to DEQ, the EPA Regional Administrator, ODA, or OHA. DEQ and the EPA Regional Administrator were served with Plaintiffs' notice of intent to file this suit in November 2023.[89] ODA and OHA received notice shortly thereafter.[90] Having been on notice of this case for over seven months, each of these agencies is aware that it may need to tailor any future orders to prevent conflicts. Given the Port of Morrow and Lamb Weston's unwillingness to abide by agency directives, any relief this Court orders "might even be characterized as welcome" by those agencies.[91]

---

[86] *Radiant Servs. Corp. v. Allegheny Techs. Inc.*, 2013 WL 12377686, at *3 (C.D. Cal. Mar. 19, 2013).

[87] *Id.*

[88] *Wilson.*, 989 F.Supp. at 1170.

[89] Complaint ¶41.

[90] *Id.*

[91] *City of W. Sacramento*, 2020 WL 4042942, at *3.

This tag-team approach between federal courts and state agencies has worked elsewhere. The case *O'Leary v. Moyer's Landfill, Inc.*,[92] is one such example. In that RCRA action, the court permanently enjoined the defendants from discharging certain materials and ordered remedial actions,[93] but only after directing the parties to solicit the views of the EPA on the proposed order and inviting agency comment.[94] This is an example of a court "eliciting the expertise of the involved agencies while maintaining the court's substantial enforcement powers."[95] Other courts have approved this approach.[96] The Court here could easily do the same, securing Plaintiffs' right to have their case heard in federal court without interfering with Oregon agencies' efforts in the Umatilla GMA.[97]

      c.    *Efficiency considerations counsel against applying the primary jurisdiction doctrine.*

The third and most important consideration in whether to invoke the primary jurisdiction doctrine is if doing so would promote efficiency or instead cause "needless[] delay."[98] Courts are more likely to defer on efficiency grounds to agencies that have been "diligent" in their efforts.[99] Courts are also more likely to defer where the relief a plaintiff seeks overlaps with the relief the agency itself is pursuing, thereby avoiding duplicated effort.[100] But in this case, DEQ has been

---

[92] 523 F.Supp. 659 (E.D. Pa. 1981).

[93] *Id*. at 659.

[94] *Id*.

[95] *Wilson*, 989 F.Supp. at 1170.

[96] *See, e.g.*, *City of W. Sacramento*, 2020 WL 4042942, at *3; *Wilson*, 989 F.Supp. at 1170.

[97] *Cf*. Beef Northwest MTD at 19 (noting concern that this Court's involvement will necessarily "interfere with" or "effectively override" state agencies).

[98] *Robles,* 913 F.3d at 910–11; *see also Nicholson v. REI Energy, LLC*, 370 F.Supp.3d 1199, 1205 (D. Or. 2019) (citing *Astiana*, 783 F.3d at 760).

[99] *See, e.g.*, *Bennett*, 2024 WL 68682, at *5; *McCormick*, 2012 WL 1119493, at *3.

[100] *See McCormick*, 2012 WL 1119493, at *2 ("It is axiomatic that the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency.") (citing

unreasonably indolent in its approach. Furthermore, Plaintiffs seek relief beyond the scope of the few actions DEQ has taken. For both these reasons, invoking primary jurisdiction will not promote efficiency, so the court should not stay or dismiss Plaintiffs' case.

First, Plaintiffs' Complaint supports the conclusion that DEQ has not been "diligent" in addressing nitrate contamination in the Umatilla GMA. For more than 30 years, the DEQ has had primary responsibility for remedying nitrate contamination in the GMA.[101] But since the DEQ took on these responsibilities in 2001, nitrate levels in the area have gone *up*, not down.[102] The DEQ—whether through joint efforts with other agencies, through the Lower Umatilla Basin Groundwater Management Area Committee, or otherwise—has failed for decades to actually resolve the nitrate contamination problem it has been charged with addressing.[103]

Given this history of inaction even in the face of ongoing permit violations, Defendants urge the Court to "allow Oregon and its agencies to continue their investigation, supervision, and remediation of groundwater impacts in the Lower Umatilla Basin."[104] Plaintiffs ask: To what end? DEQ has had *over 30 years* to investigate, supervise, and remediate groundwater impacts. In that time, DEQ has not resolved the issue, and nitrate contamination in the Umatilla GMA—caused in part by Defendants—has steadily worsened. There is no reason to think that continuing to defer to

---

*Friends of Santa Fe Cnty.*, 892 F.Supp. at 1350); *Davies v. Nat'l Co-op. Refinery Ass'n*, 963 F.Supp. 990, 997 (D. Kan. 1997).

[101] Complaint ¶48.

[102] *Id*. ¶50.

[103] *Id*.

[104] Beef Northwest MTD at 19; *see also* Port and Threemile MTD at 12 (claiming "ongoing efforts by agency actors to address the alleged harms" require delegation to the agencies).

DEQ will produce different or better results. Indeed, agency inaction is precisely why Defendants urge deference and maintaining the status quo.[105]

Second, the Court should hear the case because there is no DEQ enforcement action in progress against any Defendant that, even if successful, would secure to Plaintiffs all the relief they have requested. In deciding whether to defer to an agency under the primary jurisdiction doctrine, courts consider whether the relief a plaintiff seeks through the judicial branch is duplicative of the relief they may obtain through an agency's actions.[106] In their Prayer for Relief, Plaintiffs request, among other things, orders compelling Defendants to (1) remediate the contaminated groundwater; (2) pay for the construction of wells deep enough to provide clean, potable water to Plaintiffs and all Class members, or alternatively to connect Plaintiffs and all Class members to the nearest clean water system; (3) conduct and pay for medical monitoring for Plaintiffs and Class members; (4) pay compensatory damages; and (5) pay punitive damages.[107] Plaintiffs will not obtain this relief through agency action alone.

As to Beef Northwest, Threemile, and Madison Ranches, these entities are not the subject of *any* nitrate-related DEQ enforcement action, let alone an action that would secure the specific relief Plaintiffs have requested. And although the Port of Morrow and Lamb Weston are subject

---

[105] *See City of W. Sacramento*, 2020 WL 4042942, at *3 ("Defendant's insistence that the agency should take over the matter and simultaneous refusal to follow the agency's Order suggests that defendant's push to refer this case is an attempt to delay resolution of this matter.").

[106] *See Friends of Santa Fe Cnty. v. LAC Mins., Inc.*, 892 F.Supp. 1333, 1350 (D.N.M. 1995) (noting that a court "should consider the type of relief" a plaintiff requests when deciding whether to defer jurisdiction); *O'Hare v. Valley Utils., Inc.*, 547 P.2d 1147, 1153 (N.M. Ct. App.) (deferring to an agency because the relief sought was "identical to the relief which the agency could have granted"), *rev'd in part on other grounds*, 550 P.2d 274 (1976); *City of Fresno v. United States*, 709 F.Supp.2d 888, 907 (E.D. Cal. 2010) (noting the remedy of injunctive relief sought by the plaintiff under RCRA was "moot" because the defendant had already agreed to the relief plaintiffs sought).

[107] Complaint, Prayer for Relief, ¶¶B-F.

to various DEQ enforcement actions, these actions—even if diligently prosecuted and eventually successful—do not fully cover Plaintiffs' requested relief.

Turning first to the actions DEQ has taken against the Port of Morrow, the Mutual Agreement and Final Order ("Port MAO") that the Port and DEQ executed does not cover these demands. Rather, the Port MAO merely imposes a civil penalty on the Port, requires the Port to replace a wastewater pipeline, and subjects the Port to a Compliance Plan.[108] The Compliance Plan directs the Port to implement new wastewater management projects and delineates a supplemental environmental project that has, as its stated goal, "public health protection."[109] But nothing in the MAO or the Compliance plan requires the Port to remediate the contaminated aquifer, pay for the construction of deeper wells, set up a medical monitoring system, or pay damages to people who have been affected by the nitrate contamination the Port has caused. And Defendants have not contested the above.

DEQ's actions against Lamb Weston similarly fail to cover Plaintiffs' requested relief. Lamb Weston summarized some of Plaintiffs' requested relief compared to the relief under the Mutual Agreement and Order that it entered into with the DEQ ("Lamb Weston MAO") as follows[110]:

---

[108] Isaak Decl., Ex. 1 at 8.
[109] *Id.* at 19.
[110] Lamb Weston MTD at 20; *see also* Groves Decl., Ex. 5, Attachment A.

| Plaintiffs' Requested Relief | Relief Under MAO |
|---|---|
| Compl., Prayer for Relief ¶ B (compelling Lamb Weston to "conduct any assessment and remedial action activities," including "remediating the soil and ground water to those cleanup standards described under Oregon law and regulations") | Groves Decl., Ex. 5 ¶ 2 (a), (d) (requiring remedial investigation and feasibility study regarding the practicalities of remediation and the approval of all plans by the Oregon DEQ) |
| Id. ¶ C (compelling Lamb Weston to provide "potable water" and to "pay[] for the construction of wells deep enough to provide clean, potable water") | Id. at 6 (requiring Lamb Weston to "determine improvements/changes that can be implemented to reduce both the volume and concentration of the wastewater being land applied")<br><br>Id. at 6 (requiring Lamb Weston to evaluate "potable use of shallow groundwater") |

As Lamb Weston notes, Plaintiffs requested that Lamb Weston "remediat[e] the soil and groundwater" to conform with standards set by the State of Oregon and its agencies, including the DEQ.[111] Lamb Weston lamely suggests that this is equivalent to an obligation it has assumed under the MAO to produce a DEQ-approved "remedial investigation and feasibility study."[112] But drafting a study of what *could* be done to remediate the contaminated soil and water is not equivalent to *actually performing* that remediation—and nothing in the MAO or the Scope of Work requires the company to engage in remediation efforts.

Plaintiffs also request that Lamb Weston provide "potable water" and "pay[] for the construction of wells deep enough to provide clean, potable water."[113] Here again, Lamb Weston's commitment under the MAO does not correspond to this request. Instead, under the MAO, Lamb Weston will "determine improvements/changes that can be implemented to reduce both the

---

[111] Complaint, Prayer for Relief ¶B.

[112] Lamb Weston MTD at 20.

[113] Complaint, Prayer for Relief ¶C.

volume and concentration of the wastewater being land applied" or evaluate "potable use of shallow groundwater."[114] There is no requirement in the MAO, the SOW, or elsewhere that Lamb Weston provide new wells or potable water to Plaintiffs. Nor is Lamb Weston required to remediate polluted public water systems or provide clean water to residents who rely on those systems.

Finally, Lamb Weston entirely ignores that Plaintiffs requested Lamb Weston conduct and pay for medical monitoring and pay compensatory and punitive damages. Nothing in the Lamb Weston MAO addresses these requests for relief. Contrary to Lamb Weston's claims, "[t]he relief contemplated under the MAO" is *not* "the same relief Plaintiffs request."[115] Plaintiffs' requested relief goes beyond what DEQ has required in its action against Lamb Weston.

Because the relief Plaintiffs request from the Court will not be mooted by any DEQ action against any of the Defendants, the Court should not defer jurisdiction on this ground.[116]

## 2. The Court should not defer to administrative processes under the *Burford* abstention doctrine.

*Burford* abstention, which all Defendants urge,[117] is an "extraordinary and narrow exception to the general rule that a federal court should adjudicate cases otherwise properly before it."[118] *Burford* abstention is not appropriate here for two reasons. *First*, this is a RCRA case, so abstention is particularly disfavored. *Second*, Defendants have failed to show that any of the rationales courts typically give for abstaining under *Burford* apply.

---

[114] Lamb Weston MTD at 20.

[115] *Id.*

[116] *Owner-Operator Indep. Drivers*, 192 F.3d at 785-86 (when an agency has not "commence[d] a proceeding that might obviate the need for judicial action," district courts should "exercise [their] jurisdiction"); *see also Easterday Dairy,* 2022 WL 17104572, at *7.

[117] *See* Beef Northwest MTD at 21-23; Lamb Weston MTD at 22-23; Port of Morrow and Threemile MTD at 14-17; Madison Ranches MTD at 5.

[118] *Id.* at 1311–12 (quoting *Colo. River Water Conservation*, 424 U.S. at 813).

*Burford* abstention is particularly disfavored in the RCRA context because it can be used as an "end run around RCRA."[119] A court that declines to hear a RCRA case for any reason not specifically enumerated in the statute risks impermissibly "substitut[ing its own] judgment for that of Congress."[120] What's more, because federal courts have exclusive jurisdiction over RCRA citizen suit claims,[121] abstention would leave Plaintiffs without recourse to vindicate rights expressly granted to them by Congress.[122] Mindful of these issues, the majority of courts addressing *Burford* in the RCRA context have refused to abstain.[123] This Court can and should decline to abstain on these grounds alone.

But there is more. In the Ninth Circuit, courts only apply *Burford* abstention in cases where: (1) the state "concentrates suits challenging the actions of the agency involved in a particular court," and this court offers "timely and adequate" review; (2) federal issues implicated in the case cannot "be separated easily from complicated state law issues with respect to which the state courts

---

[119] *See, e.g.*, *Chico Serv. Station,* 633 F.3d at 31; *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 505 (7th Cir. 2011); *Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 694–95 (3d Cir. 2011).

[120] *Chico Serv. Station*, 633 F.3d at 31.

[121] Title 42 U.S.C. section 6972(a) states that any RCRA citizen suit "*shall* be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur." 42 U.S.C. § 6972(a) (emphasis added). *See also Chico Serv. Station,* 633 F.3d at 31; *Blue Legs v. U.S. Bureau of Indian Affairs*, 867 F.2d 1094, 1098 (8th Cir. 1989). Defendants appear to recognize this, as well. *See, e.g.*, Beef Northwest MTD at 22-23 ("Oregon's courts do not have jurisdiction over RCRA citizen suit claims.").

[122] As one court put it, "congressional policy choices reflected in the RCRA citizen-suit provisions remove the abstention options from the district court's toolbox." *Adkins*, 644 F.3d at 506–07.

[123] *See, e.g.*, *Adkins*, 644 F.3d at 505; *Chico Serv. Station*, 633 F.3d at 31–34; *see also Boyes v. Shell Oil Products Co.*, 199 F.3d 1260, 1270 (11th Cir. 2000) (finding that district court's abstention from exercising its jurisdiction to hear a RCRA suit under Burford and primary jurisdiction doctrines was improper because RCRA preempted state law); *Wai Ola All. v. United States Dep't of the Navy*, 2024 WL 2214557, at *9–10 (D. Haw. May 14, 2024); *Interfaith Cmty. Org. v. PPG Indus. Inc.*, 702 F.Supp.2d 295, 307–10 (D.N.J. 2010); *K-7 Enters., L.P. v. Jester*, 562 F.Supp.2d 819, 826-28 (E.D. Tex. 2007); *College Park Holdings*, 239 F.Supp.2d at 1326–29; *White & Brewer Trucking, Inc. v. Donley*, 952 F.Supp. 1306, 1311–14 (C.D. Ill. 1997); *Craig Lyle Ltd.*, 877 F.Supp. at 483–84.

might have special competence;" and (3) "federal review might disrupt state efforts to establish a coherent policy."[124] Despite Defendants' claims to the contrary, none of these requirements is met here.

>    a.    *No state court offers timely and adequate review of challenged agency actions.*

Defendants first insist that "timely and adequate state court review is available."[125] Under Oregon law, anyone adversely affected by an agency order is entitled to seek judicial review in an administrative forum, but this review is hardly the "timely and adequate" review required under *Burford*. As Plaintiffs explain in their Complaint and reiterate above, DEQ, among other state authorities, has been aware of—and charged with addressing—the nitrate contamination at the heart of Plaintiffs' case for *decades*. Yet, DEQ has done little more than suggest various entities should take voluntary measures to reduce nitrate contamination in the area.[126] Unsurprisingly, these efforts have been almost completely ineffectual. In fact, nitrate contamination has *worsened* in the Umatilla GMA since DEQ began its oversight.[127]

Some entities responsible for nitrate contamination in the Umatilla GMA (including Defendants Madison Ranches, Beef Northwest, and Threemile) have never been subject to any mandatory order from *any* Oregon agency whatsoever seeking to remediate nitrate contamination in the area. For these entities, there is no agency order for Plaintiffs to challenge at all.

---

[124] *Blumenkron v. Multnomah Cnty.*, 91 F.4th 1303, 1312 (9th Cir. 2024).

[125] Beef Northwest MTD at 22; *see also* POM/Threemile MTD at 15 ("Oregon has concentrated disputes regarding groundwater pollution in proceedings before the DEQ and the EQC."); Lamb Weston MTD at 22 (incorporating by reference arguments brought by Beef Northwest, the Port of Morrow, and Threemile).

[126] Complaint ¶41.

[127] *Id.* ¶41.

And even for Lamb Weston and the Port of Morrow, which are subject to limited DEQ orders, it can hardly be said that there was a "timely and adequate" judicial review process available when it took more than 30 years for DEQ to issue these orders.[128] At least one Circuit court, under similar circumstances, concluded that *Burford* abstention could not apply.[129]

        b.      *The legal issues here are predominantly federal law issues.*

Defendants next improperly claim that "the federal issues cannot be separated from the state law issues."[130] Although the substantive laws relevant to Plaintiffs' suit are state laws, they "rest heavily on a framework of federal law."[131] RCRA largely "dictates the content and standards" of Oregon's water contamination laws, leaving Oregon "only the discretion to enact regulations that are no less stringent than those developed by the EPA."[132] The questions of law are therefore only "marginally questions of [state] law, with a strong federal cast."[133] And the questions of law here are not particularly complex. Federal courts regularly interpret EPA regulations substantively identical to those here and "have an affirmative interest in ensuring that corresponding state regulations are interpreted in a consistent manner."[134]

In enacting RCRA, Congress expressly determined that "a coherent *national* policy was necessary to address the serious, jurisdiction-spanning problems of solid and hazardous waste,

---

[128] *See Chico Serv. Station,* 633 F.3d at 32.

[129] *See id.* (noting "significant concerns" where an agency takes "decades to issue a reviewable final order").

[130] POM/Threemile MTD at 15; *see also* Beef Northwest MTD at 21; Lamb Weston MTD at 22 (incorporating by reference arguments brought by Beef Northwest, the Port of Morrow, and Threemile).

[131] *Id.* at 33.

[132] *Id.*

[133] *Id.*

[134] *Id.*

inherently privileging the consistency of federal regulation over local control."[135] By design, RCRA intentionally interferes with states' efforts to establish their own hazardous and solid waste policies, both by subjecting state regulations to federal review and by mandating that they adhere to a federal framework.[136] It would "fly in the face of Congress's unmistakable attention to the coherency of national policy" for this Court to defer to DEQ, ODA, or OHA.[137] Such deference "might well result in review by fifty different state agencies with fifty different charters," which would all but "ensure non-uniformity" in interpretation and enforcement.[138] Under these circumstances, *Burford* abstention is ill-advised.

      c.      *Federal review will not disrupt state efforts to establish a coherent policy.*

Finally, despite Defendants' protests,[139] federal review will not disrupt Oregon's efforts to establish a coherent policy regarding nitrate contamination in the Umatilla GMA. Citizen suits are meant "to supplement rather than to supplant governmental action,"[140] and that is all Plaintiffs ask for here. None of the relief Plaintiffs request requires overturning any DEQ decision or otherwise undermining work the agency has done to date. In any event, the fact that DEQ has taken so little action over the past 30 years suggests that conflict with DEQ's proceedings is unlikely.[141] And, should the threat of conflict arise, relief from the Court could be structured "to avoid interference with the [DEQ] proceeding."[142]

---

[135] *Chico Serv. Station,* 633 F.3d at 33 (citing 42 U.S.C. § 6901(a)(4)).

[136] *Id.*

[137] *Id.*

[138] *Cnty. of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1310 (2d Cir. 1990).

[139] *See, e.g.*, Port MTD at 16; Beef Northwest MTD at 22-23; Lamb Weston MTD at 22 (incorporating by reference arguments brought by Beef Northwest, the Port of Morrow, and Threemile).

[140] *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc*., 484 U.S. 49, 60 (1987).

[141] *See Chico Serv. Station,* 633 F.3d at 34.

[142] *Id.*

Several Defendants point to the case *Space Age Fuels, Inc. v. Standard Oil Co. of California*, in which a District of Oregon court abstained in a RCRA case, to argue in favor of *Burford* abstention here.[143] But *Space Age* actually hurts Defendants' argument as its factual predicate augers in favor of abstention. Those facts are far different here. In *Space Age*, the Oregon DEQ had ordered the plaintiff, Space Age, to take remedial action to clean up petroleum contamination in soil and groundwater on its property.[144] Space Age failed to comply with DEQ's order, whereupon DEQ fined it $20,000.[145] In an attempt to neutralize DEQ's directive, *Space Age* filed suit in federal court, seeking an order requiring Standard Oil (a previous tenant on the contaminated property) to remediate the soil and groundwater instead.[146] For the court to grant the relief Space Age sought, it would have had to supplant DEQ's judgment about appropriate cleanup efforts and allocation of responsibility with the court's own views on those exact same questions. To avoid this direct conflict, the court declined to hear the case under *Burford*.[147]

Although *Space Age* was brought under RCRA, nothing in the case supports the proposition that *all* RCRA actions filed in the District of Oregon must be dismissed pursuant to *Burford*. Instead, the specific and distinguishable facts of *Space Age*, where the target of DEQ action sought relief that would have put a federal court in direct conflict with a state agency, was the key factor motivating abstention.[148] Here, there is no similar conflict. Plaintiffs seek an order

---

[143] *See* Beef Northwest MTD at 21-23; Lamb Weston MTD at 22-23. Madison Ranches incorporates these same arguments by reference. Madison Ranches MTD at 4.

[144] *Space Age Fuels, Inc. v. Standard Oil Co. of Ca.*, 1996 WL 160741, at *2 (D. Or. Feb. 29, 1996).

[145] *Id.*

[146] *Id.*

[147] *Id.* at *2-3.

[148] *Id.* at *3-4. This case is similar to others where courts abstained under *Burford* when RCRA claims amounted to improper "collateral attacks" on permitting decisions. *See, e.g.*, *Coalition For Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1195 (6th Cir. 1995), (finding the

requiring Defendants to remediate the nitrate contamination they have caused in the Umatilla GMA. To date, no state agency has issued an order requiring any party—named Defendants in this case or otherwise—to remediate the contamination at issue here. Unlike in *Space Age*, federal review will not disrupt the state's regulatory efforts. Abstention under *Burford* is not warranted.

## IV. DEFENDANTS' 12(B)(6) CHALLENGES FAIL

### A. LEGAL STANDARD ON 12(B)(6) MOTIONS TO DISMISS

Under Rule 12(b)(6), courts must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the plaintiff.[149] All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff.[150] The complaint's factual allegations, taken as true, must "plausibly suggest an entitlement to relief."[151]

### B. PLAINTIFFS' COMPLAINT CONTAINS A PLAIN STATEMENT OF THEIR CLAIMS SO IS NOT AN IMPERMISSIBLE SHOTGUN PLEADING.

A "shotgun pleading" is one that "overwhelm[s] defendants with an unclear mass of allegations and make[s] it difficult or impossible for defendants to make informed responses to the plaintiff's allegations."[152] Lamb Weston, Madison Ranches, and Beef Northwest assert that

---

district court should have abstained from hearing a RCRA citizen suit that challenged the hazardous waste permits issued under Kentucky's regulatory system); *Palumbo v. Waste Techs. Indus.*, 989 F.2d 156, 159–60 (4th Cir. 1993) (*Burford* abstention warranted in a RCRA citizen suit that was a collateral attack on operating permits issued by the state of Ohio); *see also* 42 U.S.C. § 6972(b)(2)(D) (prohibiting use of § 6972(a)(1)(B) to challenge permitting decisions). No collateral attack issues arise here.

[149] *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

[150] *Newcal Indus. Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).

[151] *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011).

[152] *Autobidmaster, LLC v. Alpine Auto Gallery, LLC*, 2015 WL 2381611 (D. Or. May 19, 2015).

Plaintiffs' Amended Complaint is a shotgun pleading because it contains "[g]eneralized allegations" against all defendants.[153] This is a baseless assertion.

While Plaintiffs do make high-level statements about the ways in which all Defendants have contaminated the Umatilla GMA and have thereby harmed Plaintiffs, they also specify each Defendant's actions giving rise to liability. For example, although the Complaint uses the defined term "Defendant Farms," it is specific about which entities constitute Defendant Farms: Lamb Weston, Madison Ranches, and Threemile.[154] It is explicit that each of these Defendants engaged in common conduct including "regularly and intentionally over-us[ing] nitrogen" fertilizer.[155] It also makes Defendant-specific allegations where appropriate. For example, Plaintiffs allege that Threemile operates CAFOs,[156] that Lamb Weston has repeatedly violated its DEQ permit and "stores millions of gallons of industrial wastewater" at its facilities that it land-applies to two farms,[157] and that Madison Ranches stores industrial wastewater on its property and cooperates with Lamb Weston and the Port of Morrow in the application of excessive wastewater to its land.[158]

Beef Northwest further complains about Plaintiffs' use of the "omnibus term 'defendants.'"[159] But in addition to its general statements applicable to all Defendants, the complaint makes clear allegations regarding Beef Northwest: in a separately-titled subsection, it alleges that, as a CAFO, Beef Northwest handles and disposes of "large quantities of nitrogen-

---

[153] Lamb Weston MTD at 23; *see also* Madison Ranches MTD at 17–19, Beef Northwest MTD at 15, 26, 29.

[154] Complaint ¶5.

[155] *Id.* ¶¶60–65.

[156] *Id.* ¶37.

[157] *Id.* ¶¶76-77.

[158] *Id.* ¶¶70 & Fig. 5, 75–76 & n.3, 85, 89.

[159] Beef Northwest MTD at 15–16.

laden animal waste" by "storing it in 'lagoons' or other facilities and then applying it to nearby agricultural lands," both of which cause nitrogen to leach into groundwater.[160]

Defendants' cases on shotgun pleading are distinguishable. The plaintiffs in the cases Defendants cite failed to "specify the defendant responsible for each act at issue,"[161] did not "make *any* distinctions as to which Defendants were responsible for the alleged acts or omissions,"[162] and did not "specify how each Defendant contributed to any alleged contamination or *any* actions any Defendant took, or did not take."[163] By contrast, Plaintiffs here have spelled out each Defendant's specific conduct that has caused nitrate contamination in the Umatilla GMA.[164]

Ultimately, the clearest sign that the Amended Complaint is not a shotgun pleading is that Defendants filed coherent motions to dismiss. Defendants understand the claims against them and have marshalled multiple arguments to attack those claims.[165] Defendants may disagree with Plaintiffs' allegations, but they know what these allegations are.

---

[160] *Id.* ¶¶67–68.

[161] *Autobidmaster,* 2015 WL 2381611 at *15.

[162] *Derby v. Columbia Cnty.*, 2022 WL 1090531, at *6 (D. Or. Feb. 8, 2022) (emphasis added).

[163] *Dulcio v. United States EPA*, 2023 WL 3496474, at *5 (S.D. Fl. May 17, 2023) (emphasis added). *Dulcio* is also unpersuasive because it is a Southern District of Florida case, and while the "Eleventh Circuit has created strict rules against so-called shotgun pleadings," the "Ninth Circuit has not mandated that aggressive approach." *Morales v. Walt's Wholesale Meats Inc.*, 2024 WL 2701807, at *2 (W.D. Wash. May 24, 2024) (quotations omitted).

[164] *See* Complaint ¶¶5, 60–63 (Threemile, Lamb Weston, and Madison Ranches); ¶¶66–68 (Beef Northwest); ¶¶69–75, 78–93 & Fig. 5 (Port of Morrow) ¶¶69, 71–74, 76–77 (Lamb Weston).

[165] *See SEC v. Aequitas Mgm't, LLC*, 2017 WL 1206691, at *8 (D. Or. Jan. 9, 2017) (holding that a complaint was not an impermissible shotgun pleading where the defendant's "own filings in support of his motion to dismiss tend to establish clearly that [he] had no substantial difficulty in understanding the gravamen of the complaint's averments of fraud").

If the Court does believe that Plaintiffs' claims constitute a shotgun pleading, Plaintiffs can and will make more specific allegations as to each Defendant, and they respectfully request leave to do so. *See Morales*, 2024 WL 2701807, at *2 (noting that dismissals for shotgun pleading are

## C.    PLAINTIFFS HAVE ADEQUATELY PLEADED THEIR CLAIM UNDER RCRA.

Contrary to Defendants' assertions, Plaintiffs have adequately pleaded their RCRA claim.

RCRA's citizen suit provision provides a cause of action:

> [A]gainst any person…including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.[166]

As a preliminary matter, Plaintiffs sufficiently allege that the high-nitrogen substances Defendants have discharged or otherwise handled is a "solid waste" within the meaning of RCRA. Plaintiffs also allege facts sufficient to show the other elements of their RCRA claim: (1) each Defendant has generated, transported, or disposed of high-nitrogen substances, or has operated a facility that handles and treats such substances; (2) each Defendant "has contributed" or "is contributing to" the "handling, storage, treatment, transportation, or disposal" of high-nitrogen substances; and (3) these substances "may present an imminent and substantial endangerment to health or the environment."[167] Because no Defendant disputes that Plaintiffs have adequately alleged the second of these factors—that Defendants generate or transport solid waste, or operate solid waste treatment, storage, or disposal facilities[168]—Plaintiffs focus here on the other elements of their RCRA claim.

---

typically made with leave to amend); *Autobidmaster,* 2015 WL 2381611, at *15 (recommending dismissal of shotgun pleading without prejudice).

[166] 42 U.S.C. § 6972(a)(1)(B).

[167] *Ecological Rights*, 713 F.3d at 514.

[168] *See generally* POM/Threemile MTD at 17–23, Lamb Weston MTD at 27–33, Madison Ranches MTD at 6–16, Beef Northwest MTD at 23–28.

1.      **Plaintiffs plead that the nitrogen-containing substances at issue are "solid waste" within the meaning of RCRA.**

High-nitrate wastewater, fertilizer, and animal waste—the substances Plaintiffs allege Defendants have dumped on Umatilla GMA land[169]—are all "solid waste" under RCRA because they are "discarded material" resulting from "industrial" or "agricultural" activities.[170]

Defendants do not deny that these materials are the result of industrial and agricultural operations. Instead, they argue these materials cannot be considered "discarded" within the meaning of the statute,[171] and so cannot be "solid wastes" as a matter of law. But Defendants are wrong. Under RCRA, a substance is "discarded" when it is "disposed of."[172] And Plaintiffs have pleaded that Defendants "disposed of" high-nitrogen materials when they applied them in excess of the agronomic rate and dumped them on fields in the winter when no crops were growing at all.[173] Defendants also "disposed of" these materials by discharging, dumping, spilling, and leaking them onto the land of the Umatilla GMA.[174]

Furthermore, Plaintiffs allege facts sufficient to show that none of the exceptions Defendants raise—the "returned to the soil as fertilizer" exception, the "intended use" exception, the "point source" exception, the "anti-duplication" exception, or the "irrigation return flow"

---

[169] Complaint ¶96 n.6.

[170] 42 U.S.C. § 6903(27) (defining solid waste as "garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material . . . resulting from industrial, commercial, mining and agricultural operations, and from community activities").

[171] The Port of Morrow does not contest that its industrial wastewater constitutes solid waste. *See generally* POM/Threemile MTD at 17–22.

[172] *Ecological Rights*, 713 F.3d at 514 (quoting *Am. Mining Cong. v. U.S. EPA*, 824 F.2d 1177, 1184 (D.C. Cir. 1987)).

[173] *See* Complaint ¶¶61–63, 67–73 & Image 1.

[174] *Id.* ¶¶2, 6, 62–63, 67, 76, 81–83, 87, 90.

exception—apply here. As such, the high-nitrogen substances at issue in this case must be considered "solid waste" within the meaning of RCRA.

      a.     *The "returned to the soil as fertilizer" exception does not apply.*

Madison Ranches, Threemile, and Lamb Weston argue that the high-nitrogen materials they apply to land in the Umatilla GMA are not "solid wastes" within the meaning of RCRA because of an exception that states: "agricultural wastes which are returned to the soil as fertilizers or soil conditioners are not considered discarded materials in the sense of this litigation." [175] But this exception does not apply because Plaintiffs allege that the Port of Morrow and Lamb Weston, apply *industrial* wastewater to Umatilla GMA land (including Madison Ranches's land).[176] The exception Defendants point to is limited to "agricultural wastes,"[177] and so does not help Defendants here.

Furthermore, even if these wastes were "agricultural wastes," the exception is limited to wastes "returned to the soil *as fertilizers or soil conditioners*."[178] Defendants land-apply the wastes at issue here beyond the agronomic rate for their crops,[179] and sometimes land-apply wastes in winter, when there are no crops growing at all.[180] When a nutrient is applied beyond the agronomic rate or onto an empty field, it has no potential to act as a fertilizer; it is being abandoned to leach into the soil and eventually the groundwater.[181] It cannot be considered a "fertilizer" or "soil conditioner" under such circumstances.

---

[175] Lamb Weston MTD at 28 (quoting H.R. Rep. No. 94–1491, at 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 6239–41); *see also* Madison Ranches MTD at 12–17, POM/Threemile MTD at 20–21).

[176] Complaint ¶¶69–70.

[177] H.R. Rep. No. 94–1491, at 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 6239–41.

[178] *Id.* (emphasis added).

[179] Complaint ¶¶5, 61–63.

[180] *Id.* ¶¶70, 75–76 & n.3, 85, 89 & Image 1.

[181] *See id.*

The recent case *Community Association for Restoration of the Environment v. Cow Palace, LLC*, is instructive. There, the plaintiffs brought a RCRA claim against dairies that managed cow manure by applying it "to agricultural fields at above-agronomic levels."[182] On summary judgment, the court held that "excessive application of manure onto agricultural fields, untethered to . . . the fertilization needs of the crops," transformed the manure "into a discarded material and thus a RCRA solid waste."[183] That is exactly what Plaintiffs allege is happening here: Defendants apply wastewater, manure, and other high-nitrate substances to land in the Umatilla GMA far in excess of agronomic rates,[184] and in so doing transform those substances into discarded material.

The cases on which Defendants rely are distinguishable. In *Safe Air for Everyone v. Meyer*, there was no argument that nutrients from bluegrass residue, which plaintiffs had argued was "solid waste," were being released into the soil beyond the agronomic rate.[185] Furthermore, the *Safe Air* decision came *after* an evidentiary hearing with extensive testimony as to the purpose and benefits of burning bluegrass residue.[186] This case is at the pleadings stage. Plaintiffs' allegations that Defendants are discarding high-nitrogen substances to fields by applying them beyond the agronomic rate must be treated as true, and Defendants cannot dodge the allegations simply by asserting that all the substances at issue have been used as fertilizer.

Defendants also rely on *Oklahoma v. Tyson Foods*, where a court held that poultry litter was not "discarded" and therefore not "solid waste" under RCRA.[187] But again, the differences in procedural posture are critical: the *Tyson Foods* decision followed a trial where the plaintiff had

---

[182] 2013 WL 3179575, at *1 (E.D. Wash. June 21, 2013).
[183] *Cmty. Ass'n for Restoration of the Env't v. Cow Palace, LLC,* 80 F.Supp.3d. 1180, 1225 (E.D. Wash. 2015).
[184] Complaint ¶¶61, 66–68, 74-93; Lamb Weston Ex. 2.
[185] 373 F.3d 1035 (9th Cir. 2004).
[186] *Id.* at 1038, 1043.
[187] 2010 WL 653032, at *11 (N.D. Okla. Feb. 17, 2010).

presented evidence about the defendants' use of poultry litter.[188] What's more, the court indicated that the outcome would have been different if the plaintiffs *had* offered evidence that poultry growers "are applying (or have applied) poultry litter to the land simply to be rid of it."[189]

Finally, *Garrison v. New Fashion Pork*, on which Defendants rely, actually supports Plaintiffs' position.[190] In *Garrison*, the court found that because "plaintiff has alleged that defendants spread the manure at a time and under conditions indicating that defendants were discarding the manure, not reusing it in the agricultural process," they had "sufficiently allege[d] that the manure was 'solid waste.'"[191] Plaintiffs here have similarly alleged that defendants have applied nitrogen-heavy materials at times and under conditions indicating an intent to discard those materials.[192] This is enough at the pleadings stage to find that Plaintiffs sufficiently allege these materials are solid wastes.

### b. The "intended use" exception does not apply.

Madison Ranches and Lamb Weston argue that fertilizer and wastewater are not "solid waste" when applied to fields because they are being put to their "intended use" as fertilizers. But Plaintiffs allege that Madison Ranches cooperates with Lamb Weston in the application of high-nitrogen substances to their fields for purposes of disposal rather than fertilization. Specifically, Plaintiffs allege that Lamb Weston applies industrial wastewater in the winter, when no crops are growing and the only possible purpose of the application is disposal.[193] They also allege that Madison Ranches and Lamb Weston knowingly apply high-nitrogen fertilizer beyond the

---

[188] *Id.* at *1.

[189] *Id.* at *10.

[190] 2020 WL 1811373, at *6 (N.D. Iowa, Jan. 9, 2020).

[191] *Id.* at *11.

[192] Complaint ¶¶61, 66–68, 74-93; Lamb Weston Ex. 2.

[193] Complaint ¶¶71, 83, 85, 89, 91.

agronomic rate.[194] Defendants may disagree with these statements of fact, but those are questions that cannot be resolved at this stage.

*Ecological Rights Foundation v. Pacific Gas & Electric Co.* does not change this analysis.[195] In *Ecological Rights*, the plaintiffs argued that some portion of a preservative that defendants used to protect utility poles escaped from the poles, and this escaped portion was a solid waste for RCRA purposes.[196] The plaintiffs did *not* contend that the defendants had applied so much wood preservative that it was no longer useful as a preservative (and was virtually guaranteed to contaminate its surroundings), merely that the run-off was an unacceptable byproduct of the preservative's use. Under those circumstances, the court found in the defendants' favor because some escape was "an expected consequence *of the preservative's intended use*."[197] But here, Plaintiffs allege that Defendants spray wastewater onto empty fields in the winter and apply more nitrogen than crops can possibly absorb.[198] In these circumstances, nitrogen is not being put toward its "intended use" as a fertilizer; it is merely being discarded.

      c.    *The "point source" exception does not apply.*

Beef Northwest and Threemile argue that any output from their CAFOs is outside the reach of RCRA because RCRA's definition of solid waste excludes "industrial discharges which are point sources subject to" National Pollutant Discharge Elimination System ("NPDES") permits

---

[194] *Id.* ¶¶5, 61–63.

[195] Madison Ranches MTD at 13, Lamb Weston MTD at 29 (citing 713 F.3d 502, 505 (9th Cir. 2013)).

[196] *Ecological Rights*, 713 F.3d at 505.

[197] *Id.* at 516 (emphasis added).

[198] Complaint ¶¶71, 83, 85, 89, 91 & Image 1.

under the Clean Water Act ("CWA").[199] Because CAFOs are point sources under the CWA,[200] Beef Northwest and Threemile argue that their waste is definitionally excluded from RCRA liability.

But the CWA regulates only discharges into the "navigable waters" of the United States. It does not regulate groundwater.[201] Because Plaintiffs' Complaint "does not allege discharges of manure into navigable waters" but rather "discharges into the ground and groundwater," the discharges "are not excluded from RCRA's definition of solid waste."[202] Defendants' cases are consistent with this conclusion; all involve defendants that were alleged to be discharging pollutants into navigable waters.[203]

To the extent Threemile and Beef Northwest argue that all of their waste-related activities are covered by an NPDES permit, such a conclusion is premature. Making this determination

---

[199] *See* Beef Northwest MTD at 23–25, POM/Threemile MTD at 21–22 (citing 42 U.S.C. § 6903(27)).

[200] 33 U.S.C. § 1362 (14).

[201] 33 U.S.C. § 1251(a)(1).

[202] *Cmty. Ass'n for Restoration of Env't Inc. v. Wash. Dairy Holdings LLC*, 2019 WL 13117758, at *7 (E.D. Wash. Oct. 24, 2019) (holding that "[s]ince NPDES authorizes discharges to surface water but not to groundwater, the alleged groundwater discharges at issue in this case are not necessarily excluded from RCRA liability"); *see also Humboldt Baykeeper v. Union Pac. R.R. Co.*, 2006 WL 3411877, at *6 (N.D. Cal. Nov. 27, 2006) (denying motion to dismiss RCRA claim on the basis of the point-source-discharge exception because plaintiff alleged *non*-point-source discharges, i.e., that substances had "been allowed to leak, spill, or be poured into the ground, contaminating the soil, groundwater, and surface waters throughout the site"); *San Diego Coastkeeper v. Pick-Your-Part Auto Wrecking*, 2023 WL 4879832, at *16 (S.D. Cal. July 31, 2023) ("Because the CWA requirements involve discharges from point sources to navigable waters, Plaintiffs' allegations regarding discharges to the various land areas are sufficient to allege that some of the discharges from Defendants' facilities are not excluded from RCRA liability and fall within the definition of solid waste.").

[203] *Coldani v. Hamm*, 2007 WL 2345016, at *10 (E.D. Cal. Aug. 16, 2007) (alleging that defendants were "discharging solid waste (i.e., animal waste) into navigable waters"); *Los Angeles Waterkeeper v. SSA Terminals, LLC*, 2023 WL 7960773, at *2 (C.D. Cal. Nov. 14, 2023) (alleging defendants discharged water "directly into the Los Angeles Harbor, the Long Beach Harbor, San Pedro Bay, and the Pacific Ocean"); *Cmty. Assoc. for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002) (defendant discharged water into drains or canals that "eventually drain[ed] into the Yakima River").

would require a detailed analysis of Plaintiffs' allegations and Defendant CAFOs' NPDES permits. Threemile's NPDES permits are not proper subjects of judicial notice for the reasons explained in Plaintiffs' opposition to Threemile's request for judicial notice[204]; Beef Northwest has not requested judicial notice of its permit in the first place.

d. *The "anti-duplication" exception does not apply.*

Threemile and Beef Northwest also argue that they cannot be liable because of RCRA's anti-duplication provision, which states that RCRA does not apply to "any activity or substance which is subject to" certain environmental statutes, including the Clean Water Act, "except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts."[205] But the anti-duplication provision does not categorically bar application of RCRA to activities regulated by the CWA. Its exception for applications that are "not inconsistent" with the CWA means that it only bars RCRA's application when "that application contradicts a specific mandate imposed under the CWA."[206] Neither Threemile nor Beef Northwest has argued that the relief Plaintiffs seek would contradict a specific mandate imposed under the CWA,[207] so their anti-duplication argument fails.[208]

However, if the Court does find that RCRA claims against Threemile and BNW are foreclosed by RCRA's anti-duplication provision, Plaintiffs respectfully request leave to amend their complaint to add claims under the Clean Water Act's citizen suit provision.[209]

---

[204] *See* Opposition to RJN at 5-9.

[205] *See* POM/Threemile MTD at 22, Beef Northwest MTD at 24 (citing 42 U.S.C. § 6905(a)).

[206] *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1095 (9th Cir. 2017); *see also Wash. Dairy*, 2019 WL 13117758, at *5–6.

[207] *See* POM/Threemile MTD at 22, Beef Northwest MTD at 24.

[208] *Wash. Dairy*, 2019 WL 13117758, at *5–6.

[209] 33 U.S.C. § 1365.

e. *The "irrigation return flow" exception does not apply.*

Madison Ranches and Lamb Weston argue that the nitrogen they apply in the Umatilla GMA is not "solid waste" because RCRA's definition of "solid waste" does not include "solid or dissolved materials in irrigation return flows."[210] Both Defendants concede that RCRA does not define "irritation return flows," and there is no caselaw interpreting the phrase in the RCRA context.[211]

Because there is no caselaw interpreting the phrase "irrigation return flows" in the RCRA context, Madison Ranches and Lamb Weston rely on cases interpreting the CWA, which exempts "return flows from irrigated agriculture" from NPDES permit requirements. 33 U.S.C. 1342(l)(1). The legislative history indicates that when Congress exempted irrigation return flows from permit requirements, it was referring only to discreet conveyances of irrigation water such as drains, canals, or ditches. A Senate report noted that "return flows from irrigated agriculture" had "been defined by the Environmental Protection Agency as *conveyances* carrying surface irrigation return."[212] A senator explained that the amendment establishing the exception "promotes equity of treatment among farmers who depend on rainfall to irrigate their crops and those who depend on surface irrigation *which is returned to a stream in discrete conveyances*."[213]

---

[210] *See* Madison Ranches MTD at 8; Lamb Weston MTD at 31. (citing 42 U.S.C. § 6903(27)).

[211] Madison Ranches MTD at 8; Lamb Weston MTD at 31. Madison Ranches attempts to supply its own definition, asking the Court to take judicial notice of two reports from 1969 and 1971 that contain expansive definitions of "irrigation return flow." The definitions in these reports are not proper subjects of judicial notice for the reasons explained in Plaintiffs' concurrently-filed Opposition to Defendants' Requests for Judicial Notice. *See* Opposition to RJN at 3–5. Moreover, the definitions in the reports can only explain how the term "irrigation return flow" was used in the reports—not what was intended by Congress when it enacted RCRA.

[212] S.Rep. No. 95–370 (1977) *reprinted in* 1977 U.S.C.C.A.N. 4326, 4360 (emphasis added).

[213] *Pac. Coast Fed. of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1084 (9th Cir. 2019) (quoting 123 Cong. Rec. 26,702 (Aug. 4, 1977)) (emphasis added).

This interpretation is consistent with each of the cases Defendants cite. In *Pacific Coast Federation of Fishermen's Associations v. Glaser*, the potential "return flow from irrigated agriculture" at issue was a tile drainage system that conveyed irrigation water to surrounding navigable waters.[214] In *Fishermen Against Destruction of the Environment v. Closter Farms*, it was an irrigation canal that pumped water into a lake.[215] And in *Hiebenthal v. Meduri Farms*, the plaintiffs complained about the water in the defendant's "drainage ditches."[216]

Lamb Weston argues that a broad interpretation of "irrigation return flows" is appropriate because "the point of the [CWA's] exemption was to support farmers who engaged in irrigated agriculture."[217] But this statement of the purpose of the exemption does not shed any light on the definition of "return flow."

Lamb Weston also argues that in *Pacific Coast*, the Ninth Circuit held that "discharges composed entirely of return flows from irrigated agriculture" meant "discharges from activities related to crop production."[218] But the *Pacific Coast* court was interpreting the meaning of the phrase "irrigated agriculture," not the phrase "return flows."[219] Plaintiffs do not dispute that Lamb Weston and Madison Ranches engage in irrigated agriculture. But that fact alone does not put them outside the reach of RCRA. For the definitional exception to apply here, their excess nitrogen must be "in irrigation return flows."[220]

---

[214] *Id.* at 1080–81; *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. Conant,* 657 F.Supp.3d 1341, 1348 (E.D. Cal. 2023) (same).

[215] 300 F.3d 1294, 1296 (11th Cir. 2002).

[216] 242 F.Supp.3d 885, 886 (D. Or. 2002).

[217] Lamb Weston MTD at 32.

[218] *Id.*

[219] 945 F.3d at 1083–85.

[220] 42 U.S.C. § 6903(27).

Finally, the Defendants' winter application of industrial wastewater[221] does not fall within RCRA's exception for "irrigation return flows." The plain meaning of "irrigation" is "the watering of land by artificial means to foster plant growth."[222] In other words, irrigation requires plants. Applying water to land with no plants is not irrigation; it is disposal. This is another key difference between this case and *Hiebenthal*. In *Hiebenthal*, the defendant only applied its wastewater to fields from April through October—i.e., during the growing season.[223] Here, Plaintiffs allege that Madison Ranches, Lamb Weston, and the Port of Morrow cooperate to discharge wastewater in the winter, when no crops are growing.[224] Defendants' winter wastewater application is not implicated by RCRA's return flow exception.

### 2. Plaintiffs have pleaded that each Defendant has contributed to handling, storing, transporting, or disposal of solid waste.

Plaintiffs have made specific allegations that each Defendant has contributed to the management of solid waste, including that each Defendant "had a measure of control over the waste" or "was otherwise actively involved" in the handling, storage, treatment, transportation, or disposal of the waste.[225]

**Beef Northwest** says Plaintiffs did not allege that it contributed to the disposal of solid waste.[226] To make this argument, Beef Northwest takes a cramped view of the Complaint, analyzing only the paragraphs in the RCRA cause of action section.[227] But Plaintiffs incorporate

---

[221] Complaint ¶¶71, 75–76, 85, 89 & Image 1.

[222] MERRIAM WEBSTER, *Irrigation*, https://www.merriam-webster.com/dictionary/irrigation (last accessed Aug. 1, 2024).

[223] 242 F.Supp. at 886.

[224] Complaint ¶¶71, 83, 85, 89 & Image 1.

[225] *Id.* at 852.

[226] Beef Northwest MTD at 26.

[227] Complaint ¶¶112–120.

all the preceding paragraphs of their complaint into their RCRA count.[228] Earlier in the Complaint, they allege that Beef Northwest is a CAFO, that as a CAFO it manages the enormous amounts of animal waste it produces "by storing it in 'lagoons' or other facilities and then applying it to nearby agricultural lands," and that "nitrates leach directly from CAFO manure lagoons."[229] In other words, Plaintiffs explicitly allege that Beef Northwest handles and stores waste. And they implicitly allege that it transports and disposes of that waste by conveying it to "nearby agricultural lands" for application.[230]

**Madison Ranches** acknowledges that Plaintiffs allege that it "engages in irrigated agriculture and applies nitrogen to its fields in excess of agronomic rates," and that "by allegedly 'over-applying' nitrogen to its fields, Madison Ranches 'discarded' and 'disposed' [of] the nitrogen."[231] Applying nitrogen to fields requires handling, storing, and transporting that nitrogen.

The Complaint also alleges that Madison Ranches has a measure of control over the disposal of the Port of Morrow and Lamb Weston's industrial wastewater. It alleges that Madison Ranches owns Farms 4 and 5, where it allows the Port of Morrow and Lamb Weston to dump— *i.e.*, dispose of—wastewater,[232] and that it allows the Port of Morrow to dump wastewater in the winter, in violation of the Port's permit.[233] The Complaint also shows that Madison Farms stores industrial wastewater in a storage pond located on Farm 4.[234] Madison Ranches does not just

---

[228] Courts in this district have observed that it "is not an uncommon practice for plaintiffs to incorporate by reference allegations made earlier in a complaint." *Autobidmaster*, 2015 WL 2381611, at *15.

[229] Complaint ¶¶38, 67.

[230] *Id.* ¶67.

[231] Madison Ranches MTD at 6.

[232] *Id.* ¶¶70, 75–76 & n.3, 85.

[233] *Id.* ¶¶85, 89.

[234] *Id.* Fig. 5.

passively allow the Port of Morrow and Lamb Weston to use its land; given the size and scale of the Defendants' wastewater operations, the disposal of wastewater on Madison Ranches's land could not happen without Madison Ranches's active involvement.[235] These allegations establish that Madison Farms "had a measure of control over the waste at the time of its disposal" and therefore contributed to the storage and disposal of solid waste within the meaning of RCRA.[236]

**Lamb Weston** acknowledges that "Plaintiffs allege that both the industrial process water Lamb Weston land applies and the nitrogen fertilizer allegedly used by Lamb Weston constitute 'solid waste' under RCRA."[237] In addition, the Complaint alleges that Lamb Weston stores millions of gallons of wastewater and transports that wastewater to farms for disposal.[238]

The **Port of Morrow** and **Threemile** do not dispute that Plaintiffs allege they contribute to the handling, transportation, storage, or disposal of solid waste.[239] Instead, they assert that Plaintiffs have not alleged contribution "to the alleged endangerment" because Plaintiffs have not "alleged ultimate facts to suggest that any discharges from Threemile or the Port reached the Plaintiffs' properties or drinking water supply, or were likely to do so based on location, gradient or other reason," and that this failure is somehow "fatal to Plaintiffs' RCRA claim."[240] But the Port and Threemile cite no authority for the proposition that a RCRA claim requires a plaintiff to allege that the defendants' conduct harmed the plaintiff's property,[241] and Plaintiffs are aware of none. By alleging that Plaintiffs reside in "the area affected by the challenged activity," and

---

[235] *See, e.g.*, Complaint ¶¶70, 75 & Images 3–5.
[236] *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 852 (9th Cir. 2011).
[237] Lamb Weston MTD at 28.
[238] Complaint ¶76.
[239] *See* POM/Threemile MTD at 17–19.
[240] POM/Threemile MTD at 19.
[241] *Id.*

everything from their use of residential tap water to their ability to safely eat out in restaurants has been affected by the activity,[242] Plaintiffs allege an adequate connection between themselves and Defendants' conduct.[243]

Further, Plaintiffs *do* allege that discharges from Threemile and the Port reach Plaintiffs' drinking water supply. They allege that the Port and Threemile have discharged nitrogen onto the soil of the Umatilla GMA, that given the hydrogeology of the area, nitrogen quickly percolates into the groundwater, and as a result the Port and Threemile have "contaminate[d] the groundwater throughout the Umatilla GMA," from which Plaintiffs draw their drinking water.[244]

3.      **Plaintiffs have pleaded that the solid wastes at issue present an imminent and substantial endangerment to health or the environment.**

RCRA allows citizen suits against any entity whose management of solid waste "may present an imminent and substantial endangerment to health or the environment."[245] The "imminent and substantial endangerment" standard is not particularly onerous; in fact, courts have repeatedly held that the operative word in the analysis is "may."[246]

The Ninth Circuit recently confirmed that "[t]he imminent and substantial endangerment element should be construed broadly to allow for affirmative equitable relief." [247]An imminent endangerment finding "does not require a showing that actual harm will occur immediately so long

---

[242] Complaint ¶¶12–33.

[243] *Ecological Rights Found.*, 874 F.3d at 1093–94 (emphasis omitted).

[244] Complaint ¶¶6, 13, 21, 27, 46, 60–64, 69–73.

[245] 42 U.S.C. 6972(a)(1)(B).

[246] *Burlington N. & Santa Fe Ry. Co. (BNSF) v. Grant*, 505 F.3d 1013, 1020 (10th Cir. 2007) (collecting cases); *TC Rich, LLC v. Shaikh*, 2021 WL 1254359, at *5 (C.D. Cal. Feb. 22, 2021) ("Courts construe this standard expansively, with 'emphasis on the statute's use of the word 'may.'") (cleaned up).

[247] *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 475 (9th Cir. 2024).

as the *risk of threatened harm* is present."[248] An endangerment is substantial "if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken."[249]

Plaintiffs allege that the nitrogen-laden wastes at issue may cause imminent and substantial endangerment to health or the environment. The complaint explains that nitrogen converts into nitrates,[250] and exposure to unsafe levels of nitrates can cause serious health problems including cancer, miscarriages, birth defects, and infant methemoglobinemia, or "Blue Baby Syndrome," which can rapidly cause coma or death in infants.[251] It is hard to imagine clearer allegations of a potential risk to human health. Indeed, courts have found that evidence of nitrate-contaminated water establishes imminent and substantial endangerment to health as a matter of law.[252]

The Port and Threemile fault the Complaint for not "specify[ing] at what levels" of nitrate exposure "those health risks occur" or "for how long a person must be exposed for those risks to present."[253] But they cite no authority for the assertion that this level of specificity is required at the pleadings stage.[254] And they are simply incorrect: Plaintiffs allege that according to the EPA, "water is unsafe for human consumption when it contains nitrates at a concentration of 10 mg/L or greater."[255] They allege that "[a]nyone who has ingested unsafe levels of nitrates in water is at risk for potential adverse health effects," and that water throughout the Umatilla GMA—including

---

[248] *Id.* (quoting *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)) (emphasis added).

[249] *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 259 (3d Cir. 2005).

[250] Complaint ¶¶2, 61,

[251] *Id.* ¶¶43–44.

[252] *Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F.Supp.3d 1180, 1227–28 (E.D. Wash. Jan. 14, 2015).

[253] POM/Threemile MTD at 22–23.

[254] *See id.*

[255] Complaint ¶¶4, 42.

the water in their homes—has already tested higher than 10 mg/L.[256] That means the threat of health problems resulting from nitrate exposure is "present *now*."[257] Finally, the explicit allegation that nitrates can cause miscarriages and infant deaths gives rise to a reasonable inference that even short-term exposure to excessive nitrates presents a risk of serious health problems.[258]

The cases the Port and Threemile *do* cite on this issue are inapt for several reasons. First, they do not speak to the RCRA pleading standard; they are decisions on summary judgment or appeals from judgments.[259] Second, they involve very different factual allegations. In *City of Fresno v. United States*, a case involving the contaminant TCP, the court granted summary judgment to the defendants on endangerment because the plaintiffs failed to "provide any evidence that anyone was subject to long-term exposure to TCP contamination" or that there were even "realistic pathways of exposure" at the site in question.[260] Similarly, in *Foster v. United States*, the contaminant at issue would only pose a risk if it migrated into groundwater, but the plaintiffs' own consultants concluded that "there is no evidence [that] the contamination is migrating and percolating through the soil, [and] [t]hus the groundwater is not a pathway for exposure to contaminants from the Site."[261]

Here, by contrast, Plaintiffs allege that the alluvial aquifer in the Umatilla GMA is contaminated with nitrates, thousands of people get their drinking water from that aquifer, and thousands of them *are currently* exposed and *will continue to be* exposed to dangerous levels of

[256] *Id.* ¶¶4, 15–17, 23, 44, 47–52.

[257] *Santa Clarita*, 99 F.4th at 475 (quotation omitted).

[258] *See* Complaint ¶¶43–44.

[259] *See Foster v. United States*, 922 F.Supp. 642, 646 (D.D.C. 1996) (summary judgment); *City of Fresno v. United States*, 709 F.Supp.2d 934, 938 (E.D. Cal. 2010) (summary judgment); *Santa Clarita Valley*, 99 F.4th at 466 (cross-appeal of a judgment entered following a combined jury and bench trial).

[260] *Fresno*, 709 F.Supp.2d at 941.

[261] *Foster*, 922 F.Supp. at 662.

nitrates.[262] They further allege that nitrate levels in some wells are so high that even reverse osmosis filtration does not bring them down to safe levels, public water systems are providing residents with nitrate-contaminated water, and many public water systems have repeatedly tested above nitrate's maximum contamination level of 10 mg/L.[263] These are crystal-clear allegations of both a pathway of exposure and a present threat of harm to health.

a. *Some individual awareness of nitrate contamination does not mitigate the danger to other residents of the Umatilla GMA.*

Beef Northwest argues that nitrate contamination in the Umatilla GMA is not an endangerment to health because Plaintiffs are aware of the danger posed by their water and can mitigate it by using bottled water, citing *Davies v. National Co-op Refinery Association*.[264] *Davies* is another summary judgment opinion; it was decided after the had taken discovery and developed evidence regarding water contamination in the relevant area.[265] Perhaps more importantly, *Davies* did not involve residential properties and was not a class action. Rather, the plaintiffs in that case brought suit on behalf of themselves and limited their complaint to contaminated groundwater that sat below their radio station (not their home).[266] The court concluded that there was no imminent danger to health because the plaintiffs had not "shown that any other persons might be exposed to or ingest the contaminated water."[267]

Here, the named Plaintiffs seek to represent tens of thousands of people.[268] Plaintiffs plead that everyone in the area relies on the alluvial aquifer underlying the Umatilla GMA for their

---

[262] Complaint ¶¶1–3, 46–57.

[263] *Id.* ¶¶16–17, 27–29, 55–56 & Tables 1–2.

[264] 963 F.Supp. 990 (D. Kan. 1997). Beef Northwest MTD at 28–29.

[265] *See* 963 F.Supp. at 991–92.

[266] *Id.* at 993.

[267] *Id.* at 999.

[268] Complaint ¶¶1–3.

drinking water,[269] and that only half of private wells in the area have been tested.[270] That means

hundreds, if not thousands, of people are drinking nitrate-contaminated water on a daily basis.

Further, at least ten public water systems in the Umatilla GMA, which together supply tens of

thousands of people with drinking water, have been deemed "at substantial nitrate" risk by DEQ.[271]

Many of those systems' water has tested above the 10 mg/L maximum contamination limit for

nitrate at least once, and some have done so repeatedly.[272]

> b.   *Nitrates are an imminent and substantial endangerment to residents of the Umatilla GMA despite DEQ's ineffective involvement.*

Beef Northwest, the Port of Morrow, and Threemile argue that Plaintiffs have failed to

plead an imminent and substantial endangerment because state officials are attempting to address

water contamination in the area.[273] The Port of Morrow and Threemile point out that "multiple

agencies have been studying" the contamination in the Umatilla GMA "for decades"[274] and cite

*Santa Clarita*, a Ninth Circuit decision affirming a judgment after trial.[275] But *Santa Clarita* says

nothing about the standard for evaluating a RCRA claim on a motion to dismiss. Moreover, the

government's actions there could not be more different than the limited (and ineffective)

government involvement alleged here.

In *Santa Clarita*, the plaintiff sought injunctive relief requiring the defendant to install

monitoring wells and investigate the extent of the contamination from the defendant's site.[276] The

---

[269] *Id.* ¶¶1–3, 46–57.

[270] *Id.* ¶52.

[271] *Id.* ¶55 & Table 1.

[272] *Id.* ¶56 & Table 2.

[273] *See* Beef Northwest MTD at 28–29; POM/Threemile MTD at 23.

[274] POM/Threemile MTD at 23.

[275] 99 F.4th at 475–76.

[276] *Id.* at 474–75.

Ninth Circuit affirmed the district court's finding that there was no imminent and substantial endangerment because the relevant state agency had "entered a remedial action order against" the defendant, which had "engaged in removal of [contaminants] from the subsurface soil."[277] The state agency ultimately "approved the completion of the remediation . . . indicating that *prior harms had been satisfactorily remedied.*"[278] In other words, the agency had already implemented the very remedy the plaintiff sought *and* determined that the contamination had been "satisfactorily remedied."[279]

Here, Plaintiffs allege that the Umatilla GMA's groundwater is still very much contaminated.[280] And far from ensuring that the contamination has been "satisfactorily remedied," the government agencies involved have failed to stop the contamination of the alluvial aquifer.[281] Plaintiffs allege that nitrate contamination continues to pose a threat to thousands of people's health, the government's efforts to "study" the issue notwithstanding.

      c.    *The Complaint alleges an imminent and substantial endangerment to the environment.*

Beef Northwest says Plaintiffs have not alleged an imminent and substantial endangerment to the environment, arguing that "Plaintiffs have not alleged facts to show that action by this Court is necessary to prevent impacts outside the Groundwater Management Area."[282] But there is no reason Plaintiffs have to plead facts about impacts *outside* the Umatilla GMA. They plead that

---

[277] *Id.* at 476.

[278] *Id.* (emphasis added).

[279] *Id.*

[280] Complaint ¶¶46–52, 55.

[281] *See id.* ¶¶46–52.

[282] Beef Northwest MTD at 29.

nitrate contamination in the groundwater *inside* the GMA is bad and getting worse due to Defendants' activities.[283]

Beef Northwest's argument seems to be that because the Lower Umatilla Basin has already been designated a groundwater management area, there is no need for action by the Court.[284] Or, put another way, that nitrates pose no threat to the environment in the Umatilla GMA because the alluvial aquifer is *already* contaminated. That argument assumes that once nitrate levels in an aquifer reach a certain point, the addition of more nitrates does not harm the environment, a factual premise that is inappropriate for consideration on a motion to dismiss. Worse, it would give polluters a free pass to keep polluting as long as they had already done enough damage to the environment in an area. Such a principle is clearly incompatible with Congress's intent in passing RCRA, which was to "ensure the proper treatment, storage, and disposal" of hazardous waste "so as to minimize the *present and future* threat to human health and the environment."[285]

## D.     PLAINTIFFS HAVE ADEQUATELY PLEADED THEIR STATE LAW TORT CLAIMS.

### 1.     Plaintiffs adequately pleaded a negligence claim.

To state a claim for negligence, a complaint must allege "that the defendant's conduct 'created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff.'"[286] Both the foreseeability of risk of harm

---

[283] *See, e.g.*, Complaint ¶¶46–50, 59–93.

[284] Beef Northwest MTD at 29.

[285] *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)) (emphasis added).

[286] *Martin v. Hannu*, 2024 WL 1097625, at *2 (D. Or. Feb. 26, 2024) (quoting *Sloan ex rel. Estate of Sloan v. Providence Health Sys. Or.*, 437 P.3d 1097, 1102 (Or. 2019)).

to a plaintiff and the reasonableness of a defendant's conduct are fact questions that should "be determined by a factfinder."[287]

Here, Plaintiffs clearly allege that Defendants' excessive application of high-nitrogen substances like industrial wastewater and cattle manure (a) would foreseeably lead to the contamination of the alluvial aquifer underlying Plaintiffs' properties, (b) was unreasonable, and (c) did in fact contaminate the aquifer and thereby cause Plaintiffs' injuries. As such, they have properly pleaded a claim of negligence.

　　　a.　　*Plaintiffs alleged that their injuries were reasonably foreseeable.*

Two Defendants, the Port of Morrow and Threemile, assert that Plaintiffs have failed to plead reasonable foreseeability because "[w]hether any particular discharge in the Umatilla GMA poses a risk of contamination to any particular well necessarily requires consideration of whether the discharge and well are situated geographically and hydrologically," and Plaintiffs have not specifically alleged where their properties sit in relation to Defendants' properties.[288] This assertion is wrong for multiple reasons.

*First*, the question of whether a specific Defendant's discharges put a specific Plaintiff's water at risk is a question of fact better suited for a motion for summary judgment than a motion to dismiss.

*Second*, "Oregon law does not require a plaintiff 'to precisely forecast a specific harm to a particular person.'"[289] Instead, the foreseeability inquiry "refers to the generalized risks of the *type*

---

[287] *Pickens v. United States*, 750 F.Supp.2d 1243, 1252 (D. Or. 2010) (quoting *Donaca v. Curry Cnty.*, 734 P.2d 1339, 1344 (1987)).

[288] POM/Threemile MTD at 26.

[289] *Martin v. Hannu*, 2024 WL 1097625, at *2 (quoting *Piazza v. Kellim*, 360 Or. 58, 80 (2016)).

*of* incidents and injuries that occurred."[290] Plaintiffs have certainly met this bar: Plaintiffs allege that each of the Defendants is located in the Umatilla GMA.[291] They also allege each Defendant stores or discharges high-nitrogen substances onto land in the Umatilla GMA,[292] including industrial wastewater, fertilizer, and manure, and those substances percolate into groundwater and spread rapidly throughout the aquifer.[293] Plaintiffs also allege that they draw their drinking water from the aquifer via private wells or public water systems.[294] At the pleadings stage, this is more than enough to support the inference that a "generalized risk" of nitrate contamination arising from Defendants' conduct was foreseeable.

Another court in this district reached a similar conclusion in *Port of Portland v. Monsanto Company*. There, the Port of Portland brought a negligence claim against Monsanto for manufacturing products containing toxic compounds called PCBs.[295] The Port alleged that PCBs had made their way to Portland and contaminated the Port's water, saddling the Port with investigation and remediation costs.[296] The Port's complaint did not directly plead that it was foreseeable to Monsanto that PCBs would make their way to specific waters maintained by the

---

[290] *Id.* (quoting *Fazzolari v. Portland Sch. Dist. No. 1J*, 734 P.2d 1326, 1338 (1987)) (emphasis added).

[291] Complaint ¶¶34-38.

[292] Complaint ¶¶66-73 & Fig. 2. Beef Northwest asserts that Plaintiffs failed to allege that its conduct caused foreseeable harm because they "rely on general statements about CAFOs and do not allege that BNW manages its operations consistent with what Plaintiffs describe as typical CAFO practices." Beef Northwest MTD at 30. Not so. The Complaint alleges that "[m]anaging and disposing of large quantities of nitrogen-laden animal waste is an unavoidable part of a CAFO's everyday operating procedures, *including for BNW*" and goes on to describe what those procedures are. Complaint ¶67 (emphasis added). It also alleges that "CAFOs, *including BNW Feeders*, may cause nitrate contamination when animal waste is spilled or otherwise leaks during handling." *Id.* (emphasis added).

[293] Complaint ¶64.

[294] *Id.* ¶¶12-13, 20-21, 27, 46, 54.

[295] 2017 WL 9098079, at *1 (D. Or. Apr. 18, 2017).

[296] *Id.*

Port of Portland and require remediation.[297] Instead, the complaint alleged that PCBs were harmful, Monsanto manufactured and distributed PCBs, and Monsanto "knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in Portland Waters."[298] The court held that these allegations were "clearly sufficient" to "satisfy the foreseeability element" of the plaintiff's negligence claim at the pleadings stage,[299] noting the plaintiff had pleaded that the defendant foresaw "PCB contamination *of the kind* that underlies each of the [plaintiff's] claims would be an inevitable consequence of [the defendant's] complained-of conduct."[300]

Here, too, Plaintiffs allege facts supporting an inference that Defendants knew or should have known that their actions were and are causing nitrate contamination "of the kind" that has harmed Plaintiffs. Plaintiffs have therefore adequately alleged that their injuries were reasonably foreseeable to Defendants.

b. *Plaintiffs allege that Defendants' conduct was unreasonable.*

Three Defendants—the Port of Morrow, Threemile, and Beef Northwest—argue that Plaintiffs have not adequately alleged that their conduct was unreasonable. The Port and Threemile make the rather stunning assertion that Plaintiffs allege "no facts to support" the inference that "the Port and Threemile have actually discharged nitrogen-containing wastes at quantities so far beyond the appropriate agronomic rate that those discharges caused contamination of the

---

[297] *See Port of Portland v. Monsanto Co.*, No. 3:17-cv-00015-MO, Dkt. No. 1, Complaint, (D. Or. Jan. 4, 2017).

[298] *Id.* ¶122.

[299] 2017 WL 9098079, at *19. The court did not hold that actual knowledge was required, and in fact confirmed that an allegation "that damages of the nature [plaintiff] now complains of were in fact foreseeable" was sufficient. *See id.* (emphasis omitted).

[300] *Id.* (emphasis added).

underlying groundwater."[301] And Beef Northwest says Plaintiffs "have not alleged *any* facts for a judge or jury to analyze" the reasonableness of its conduct, "let alone enough facts to show that BNW's conduct was unreasonable."[302]

But as to the Port of Morrow, Plaintiffs clearly allege that it discharges wastewater on farms subject to a DEQ permit that "limits the volume of wastewater the Port can apply to fields on each farm according to those fields' capacity to absorb nitrogen."[303] They allege that the Port has violated that permit thousands of times since 2007,[304] including by "discarding nitrogen-containing wastewater onto fields after the nitrogen from all sources exceeded the agronomic rate for the crop grown."[305] They allege that the Port routinely applies wastewater in the winter, when there is no need for nitrogen in the fields whatsoever.[306] And they allege that DEQ expressly warned the Port about the dangers of its behavior, telling the Port that its "wintertime land application of nitrogen containing wastewater" had "adversely impacted" groundwater that was "used as drinking water by residents" of the Umatilla GMA. But the Port continued discarding nitrogen in excess of its permits anyway.[307]

As for Threemile, Plaintiffs allege that it "regularly and intentionally over-use[s] nitrogen" fertilizer, and that DEQ estimates approximately 10% of nitrogen applied by farms like Threemile leaches into groundwater.[308]

---

[301] POM/Threemile MTD at 27.

[302] Beef Northwest MTD at 31.

[303] Complaint ¶24.

[304] *Id.* ¶¶78-91.

[305] *Id.* ¶85.

[306] *Id.* ¶¶71, 83, 91–92.

[307] *Id.* ¶¶83–93.

[308] *Id.* ¶¶62–63.

Finally, Plaintiffs allege that Beef Northwest, as a CAFO, "manag[es] and dispos[es] of large quantities of nitrogen-laden animal waste,"[309] that nitrogen converts into nitrates that contaminate groundwater,[310] and that high-nitrate groundwater poses a substantial risk to human health.[311] They allege that Beef Northwest manages animal waste "by storing it in 'lagoons'" and "applying it to nearby agricultural lands," and that nitrates leach into groundwater as a result of lagoon storage and land application.[312] They also allege that Plaintiffs are residents of the Umatilla GMA who derive their drinking water from an alluvial aquifer, and that "a reasonably careful CAFO would not allow animal waste generated by its operations to be discarded in a manner that causes nitrate contamination of a local aquifer upon which people rely for clean drinking water."[313]

Given the high likelihood that harm will result from Defendants' conduct, the severity of the possible harm, and, in the case of the Port of Morrow, DEQ's direct warnings that the Port's activities posed a risk to Plaintiffs' drinking water, the Complaint adequately alleges that Defendants' conduct was unreasonable.[314]

---

[309] *Id.* ¶67.

[310] *Id.* ¶2.

[311] *Id.* ¶¶43–44.

[312] *Id.* ¶67.

[313] *Id.* ¶123.

[314] *See Pickens*, 750 F.Supp.2d at 1257 (listing factors considered in a reasonableness analysis). Lamb Weston and Madison Ranches did not make specific arguments regarding reasonableness, but Plaintiffs allege that their conduct was unreasonable as well. *See* Complaint ¶¶60-62, 71-77 (alleging that Lamb Weston over-applies fertilizer, discharges wastewater year-round, and has repeatedly violated its DEQ permit, which is specifically designed to prevent it from discharging excess nitrogen); *id.* ¶¶60-62, 70-71, 74-76 & n.3 (alleging that Madison Ranches over-applies fertilizer and cooperates with the Port of Morrow and Lamb Weston to discharge high-nitrogen wastewater year-round, including when there are no crops on the land).

c. *Plaintiffs allege that Defendants' conduct has injured them.*

Defendants each offer a variation on the argument that Plaintiffs have failed to plead with sufficient specificity that Defendants caused Plaintiffs' injuries.[315]

The Port of Morrow and Threemile proffer a long list of facts, not alleged in the Complaint, that they apparently believe are necessary to conclude that their conduct has caused Plaintiffs' harm. Among these facts are "where the Port's wastewater is discharged," "how much wastewater is discharged," "the quantity of nitrogen in any wastewater discharges," "discharge-specific data," "information about how alleged wastewater application at the five Farms where wastewater from the Port is applied affects groundwater nitrate levels at any given location," and a "geographic or hydrogeologic description of how or why they believe these discharges made their way to Plaintiffs' properties."[316]

The Port and Threemile are simply mistaken about some of these items. Plaintiffs allege where the Port's water is discharged,[317] that the Port disposes of "millions of gallons of nitrogen-heavy wastewater" every year,[318] and that one of its leaks "discarded 25 to 50 gallons of industrial water per minute" onto land in Boardman.[319]

---

[315] *See* Lamb Weston MTD at 26 ("[T]he complaint fails to connect the necessary dots between Lamb Weston and Plaintiffs' properties."); Madison Ranches MTD at 20 ("Plaintiffs' Amended Complaint fails to contain any allegation regarding how Madison Ranches' purported conduct caused an injury to any of the four named Plaintiffs."); Beef Northwest MTD at 31 ("Plaintiffs' FAC fails to allege any conduct by BNW that could have harmed Plaintiffs or any connection between BNW's conduct and Plaintiffs.").

[316] POM/Threemile MTD at 24.

[317] Complaint ¶75 & Fig. 5.

[318] *Id.* ¶69.

[319] *Id.* ¶87.

More importantly, this level of specificity simply is not required at the pleading stage. Rule 8's pleading standard "does not require 'detailed factual allegations.'"[320] *Monsanto* is instructive here as well. In *Monsanto*, the defendant challenged the adequacy of the Port of Portland's causation allegations "on the ground that the Port failed to allege that [the defendants] directly discharged PCBs into the contaminated waters."[321] The court found that argument to be "without merit."[322] It held that "[t]he fact that the Port did not allege that old Monsanto or any defendant directly discharged PCBs into the contaminated waters is immaterial."[323] Because the Port of Portland had pleaded that PCBs were in the environment as a result of Monsanto's conduct, "[t]he Port ha[d] unambiguously alleged that old Monsanto's conduct caused at least some of the complained-of injuries."[324] The court denied the defendants' motion to dismiss the plaintiff's negligence claim "to the extent premised on inadequate allegations of causation."[325]

And here, Plaintiffs *do* allege direct discharge. The Complaint generally alleges that "[t]he nitrate contamination in Plaintiff's and the Class's water is a direct result of Defendants' actions."[326] And it specifically alleges that Threemile, Lamb Weston, and Madison Ranches "regularly and intentionally over-use nitrogen" when watering crops,[327] that Beef Northwest generates "nitrogen-laden animal waste" that is applied to nearby land and leaches directly from storage lagoons into groundwater,[328] that the Port of Morrow and Lamb Weston spray "millions

---

[320] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[321] *Port of Portland,* 2017 WL 9098079, at *17.

[322] *Id.*

[323] *Id.*

[324] *Id.*

[325] *Id.*

[326] Complaint ¶59.

[327] *Id.* ¶¶5, 60–65.

[328] *Id.* ¶¶66–68.

of gallons of nitrogen heavy wastewater" onto land in the Umatilla GMA, including in the winter, and have repeatedly violated permits designed to prevent their wastewater disposal from contaminating groundwater,[329] and that Madison Ranches owns land where nitrogen-heavy wastewater is applied in violation of the permits.[330] It alleges that when nitrogen reaches the soil of the Umatilla GMA, it percolates quickly into groundwater and spreads rapidly, contaminating the groundwater "throughout the Umatilla GMA."[331] And it alleges that each Plaintiff derives water from the Umatilla GMA, via either a private well or public water system.[332]

These are more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]."[333] Defendants may dispute that their discharges have affected Plaintiffs' water, but that is a dispute to be resolved with discovery and expert testimony, not on a motion to dismiss.

### 2.      Plaintiffs have adequately pleaded a negligence per se claim.

A negligence per se claim "is a shorthand descriptor for a negligence claim in which the standard of care is expressed by a statute or rule."[334] When a negligence claim exists "and a statute or rule defines the standard of care expected of a reasonably prudent person under the circumstances, a violation of that statute or rule establishes a presumption of negligence."[335]

Plaintiffs allege that Defendants' conduct constitutes negligence per se because they have each violated O.R.S. 468B.005 *et. seq.*, Oregon's Water Pollution Control statute. The Port of Morrow, Threemile Farms, and Madison Ranches argue that the Water Pollution Control statute

---

[329] *Id.* ¶¶69–93.

[330] *Id.* ¶¶70, 76 & n.3, 85, 89.

[331] *Id.* ¶¶64, 73.

[332] *Id.* ¶¶13, 21, 27, 46.

[333] *Iqbal*, 556 U.S. at 678.

[334] *Martin v. Hannuu*, 2024 WL 1097625, at *3 (quoting *Deckard v. Bunch*, 258 Or. 754, 761 n.6 (2016)).

[335] *Id.* (quoting *Deckard*, 258 Or. at 761 n.6).

is insufficiently specific to supply a standard of care because it does not "provide advance warning of specific conduct prohibited."[336]

In fact, the statute contains a section titled "Prohibited activities," which lays out exactly what is forbidden under the statute. According to this subsection, except as permitted by state agencies, "no person shall . . . place or cause to be placed any wastes in a location where such wastes are likely to escape or be carried into the waters of the state."[337] It also provides that "no person shall . . . [d]ischarge any wastes into the waters of the state if the discharge reduces the quality of such waters below the water quality standards established by rule for such waters by the Environmental Quality Commission."[338] Finally, it states that "[n]o person shall violate the conditions of any waste discharge permit issued under O.R.S. 468B.050," which governs DEQ waste discharge permits.[339] By its plain language, the statute prohibits anyone from placing waste, including industrial wastewater, excess fertilizer, or cattle manure,[340] in locations where they are likely to infiltrate groundwater.[341] That is exactly what Plaintiffs allege Defendants have done in this case.[342]

---

[336] POM/Threemile MTD at 28; *see* Madison Ranches MTD at 20–21.

[337] O.R.S. 468B.025(1)(a).

[338] O.R.S. 468B.025(1)(b).

[339] O.R.S. 468B.050.

[340] O.R.S. 468B.005(9) defines "wastes" as "industrial wastes, and all other liquid, gaseous, solid, radioactive or other substances which will or may cause pollution or tend to cause pollution of any waters of the state."

[341] Pursuant to the statute, "waters of the state" encompass virtually all bodies of water, including "surface or underground waters . . . which are wholly or partially within or bordering the state" of Oregon. O.R.S. 468B.005(10).f

[342] Complaint ¶¶61–62, 64, 67–68, 69–73.

Defendants argue that the statute "do[es] not provide advance warning of the specific conduct prohibited."[343] But the statue makes violation of its provisions "a public nuisance,"[344] indicating that the Oregon Legislature believes the statute is specific enough for its violation to give rise to civil liability.

*Martin v. Hannu*, which the Port of Morrow and Threemile Farms rely on to support their argument, is inapt.[345] In *Martin*, a plaintiff sued defendants for injuries arising from a car accident. The plaintiff alleged the defendants had violated multiple Federal Motor Carrier Safety Regulations, which pertain to discontinuing operation of a vehicle in hazardous conditions.[346] One regulation provided that "[i]f conditions become sufficiently dangerous, the operation of the motor vehicle shall be discontinued."[347] This Court held that the regulation did not define the standard of care because it required drivers to exercise their judgment about when road conditions were so dangerous that they needed to stop driving.[348] The regulation therefore did not "so fix the legal standard of conduct such that there is nothing left for a jury to resolve."[349]

The Water Pollution Control statute, by contrast, does not leave it up to individuals to decide when and to what degree they pollute. Instead, it expressly prohibits anyone from placing wastes (which indisputably encompasses industrial wastewater, excess fertilizer, and cattle manure) in locations where they are likely to be carried into the groundwater of the state.[350] Defendants may argue that they had no way of knowing that their discharges were "likely" to be

---

[343] POM/Threemile MTD at 28.

[344] O.R.S. 468B.025(3).

[345] *See* POM/Threemile MTD at 27–28.

[346] *Martin v. Hannu*, 2024 WL 1097625, at *3.

[347] *Id.* (emphasis omitted).

[348] *Id.* at *4.

[349] *Id.*

[350] O.R.S. 468B.025(1)(a).

carried into groundwater, but such an argument rings hollow given the fact that the Umatilla GMA has been a Groundwater Management Area for decades. The Complaint itself pleads that water moves rapidly from the surface of land to groundwater in the Umatilla GMA,[351] a fact of which Defendants are surely aware.

In any event, a statute's requirement that an individual exercise some degree of judgment does not render it too vague to put defendants on notice of prohibited conduct. In *Moody v. Oregon Community Credit Union*, for example, a statute prohibited insurance companies from "[r]efusing to pay claims without conducting a reasonable investigation based on all available information," and "[n]ot attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear."[352] Although the statute did not spell out what constituted a "reasonable" investigation or the definition of "promptly,"[353] the Oregon Supreme Court held that the statute was exact enough to "provide[] advance warning of the specific conduct that is prohibited."[354] Oregon's Water Pollution Control statue similarly puts industrial wastewater dischargers, farms, and CAFOs on notice that they may not apply wastes in locations where they are likely to be carried into groundwater or discharge wastes that reduce water quality below state standards.

Finally, The Water Pollution Control statute expressly prohibits "violat[ing] the conditions of any waste discharge permit issued under O.R.S. 468B.050."[355] The Port of Morrow and Lamb Weston each discharge wastewater under DEQ permits issued pursuant to O.R.S. 468B.050.[356] The Port and Lamb Weston cannot argue that they are unaware of the Water Pollution Control

---

[351] Complaint ¶64.
[352] 542 P.3d 24, 41 (Or. 2023).
[353] *See* ORS 746.230(1).
[354] *Moody,* 542 P.3d at 41.
[355] ORS 468B.025(2).
[356] *See* Complaint ¶¶75–76.

requirements; the permits to which they are subject clearly define prohibited behavior pursuant to that statute.[357] These Defendants' violation of their permits is a violation of the standard of care.

### 3.    Plaintiffs have adequately pleaded a trespass claim.

A trespass is "an intrusion upon the land of another which invades the possessor's interest in the exclusive possession of his land."[358] A trespass may be caused by intentional, negligent, or reckless conduct.[359]

The Port of Morrow, Threemile, and Beef Northwest argue that Plaintiffs have not adequately alleged that their actions caused nitrates to invade Plaintiffs' properties. They fault Plaintiffs for not providing scientific proof of their allegations, but Plaintiffs are not required to provide that at this stage of the proceedings.[360] Plaintiffs allege that there is an alluvial aquifer underlying the Umatilla GMA,[361] that hydrogeologic conditions in the area cause nitrates to move quickly from the soil into the aquifer,[362] and that Defendants have discharged excessive nitrogen on the soil in this area, causing the contamination of the alluvial aquifer with nitrates. They explain how each Defendant's conduct has introduced nitrates into the aquifer.[363] Plaintiffs also allege that they each own or rent property in the Umatilla GMA,[364] that their properties rely on either private wells or municipal water for drinking water, and that all of those water sources depend on the alluvial aquifer underlying the Umatilla GMA.[365] These allegations are more than enough to

---

[357] *See id.*

[358] *Martin v. Union Pac. R.R. Co.*, 474 P.2d 739, 740 (Or. 1970).

[359] *Id.*

[360] *See Iqbal*, 556 U.S. at 678.

[361] Complaint ¶¶2, 93, 96.

[362] *Id.* ¶¶64–65.

[363] *Id.* ¶¶60–65 (Threemile, Madison Ranches, and Lamb Weston), ¶¶66–68 (Beef Northwest), ¶¶69–93 (the Port of Morrow and Lamb Weston).

[364] *Id.* ¶¶3, 13, 21, 27.

[365] *Id.* ¶¶2, 13, 21, 23, 27.

support the inference that nitrogen discharged by Defendants has invaded Plaintiffs' properties in the form of nitrates.

The Port of Morrow and Threemile argue that Plaintiffs have not alleged an interference with any "possessory interest" in their property.[366] But the right to "exclusive possession" of a property, free from any unauthorized invasion, is the interest at the heart of trespass law.[367] That is exactly what Plaintiffs allege here: that their properties have been invaded by nitrates as a result of Defendants' conduct.

The Port and Threemile acknowledge that Plaintiff Pearson and the Suters "assert the alleged discharges have contaminated the groundwater under their two respective properties."[368] That is another way of saying that Plaintiffs Pearson and the Suters assert that the alleged discharges have invaded their property. The unauthorized nitrate particles that Defendants have caused to invade Plaintiffs' property have interfered with their exclusive possession of their property.[369] That is all that is required to state a claim for trespass.[370]

Plaintiff Pearson and the Suters also have a possessory interest in their private wells, which are part of their property. Plaintiffs allege that these wells are intended to provide their property with drinking water, but nitrate contamination has rendered them useless for that purpose.[371] It is difficult to imagine a clearer case of trespass. And it is hardly speculative, contrary to the Port and

---

[366] POM/Threemile MTD at 29.

[367] *Martin v. Reynolds Metals Co.*, 342 P.2d 790, 794, 796–97 (Or. 1959) (*en banc*); *Martin v. Union Pac. R.R. Co.*, 474 P.2d at 740.

[368] POM/Threemile MTD at 29.

[369] *See Goldingay v. Progressive Cas. Ins. Co.*, 306 F.Supp.3d 1259, 1265 (D. Or. 2018) (holding that plaintiffs' allegation that pollution from defendants' site migrated and contaminated groundwater under plaintiffs' property stated a trespass claim).

[370] *See Reynolds Metals*, 342 P.2d at 100 (holding that the deposit of fluoride "particulates upon the plaintiff's land was within the definition of trespass").

[371] Complaint ¶¶12–25.

Threemile's assertion, that the value of a property would decline when its sole water source becomes contaminated.[372]

Plaintiff Jeannie Strange also has a possessory interest in the property she pays to rent.[373] Plaintiffs plead that Ms. Strange's property was invaded by nitrates as a result of Defendants' contamination of the Umatilla GMA's alluvial aquifer.[374]

Finally, the Port, Threemile, Madison Ranches, and BNW argue that Plaintiffs have failed to plead *intentional* trespass by Defendants.[375] This assertion is both incorrect and immaterial.

First, "intentional" in the trespass context means that "the acts setting in motion the invasion were done with the knowledge that a trespass would result," not that "the acts were done for the specific purpose of causing a trespass or injury."[376] Conduct may also be intentional when "there is a continuing intrusion known to the [defendant] that he allows to persist," even if the defendant did not know that the invasion would result when he committed the "original act setting the invasion in motion."[377]

Plaintiffs plead facts giving rise to an inference that Defendants knew their conduct would result in the contamination of the Umatilla GMA's alluvial aquifer, and therefore the properties of Umatilla GMA residents like Plaintiffs. They allege that the Lower Umatilla Basin was declared a

---

[372] *See* POM/Threemile MTD at 29, Complaint ¶19.

[373] *See Portland Gen. Elec. Co. v. Hick*, 227 P.3d 1213 (Or. App. 2010) (affirming trial court judgment finding owner liable for trespass on tenants' property); *see also Burnam v. Garon Dev. Corp.*, 690 P.2d 1090, 1094 (Or. App. 1984) (holding that tenant could "maintain an action in trespass").

[374] Complaint ¶¶26–33.

[375] POM/Threemile MTD at 29–30; Madison Ranches MTD at 21; Beef Northwest MTD at 32.

[376] *Lunda v. Matthews*, 613 P.2d 63, 66 (Or. App. 1980).

[377] *McGregor v. Barton Sand & Gravel, Inc.*, 660 P.2d 175, 180 n.5 (Or. App. 1983).

Groundwater Management Area more than 30 years ago,[378] that irrigated agriculture, CAFOs, and industrial wastewater application are known to be causing nitrate contamination of the alluvial aquifer,[379] that the hydrogeology of the Umatilla GMA lends itself to the rapid movement of nitrates through the soil and into groundwater,[380] and that Defendants nevertheless continued land-applying industrial wastewater, animal waste, and fertilizer to land in the Umatilla GMA.[381]

The allegations of intentional trespass are particularly strong with respect to the Port of Morrow. Plaintiffs allege that the Port is subject to DEQ permits specifically designed to ensure that it does not apply nitrogen to Umatilla GMA land beyond the agronomic rate, and it has repeatedly violated those permits—even *after* DEQ told the Port that "groundwater adversely impacted by the Port of Morrow's wintertime land application of nitrogen containing wastewater is used as drinking water" by residents of the Umatilla GMA.[382]

Second, negligent conduct supports a trespass claim.[383] Under Oregon's trespass law, the fact that an intrusion upon Plaintiff's property "is not alleged to have been directly or intentionally caused by [Defendant's] conduct is entirely immaterial."[384] Thus, because the Complaint alleges both negligent conduct[385] and an invasion of Plaintiffs property, it states a claim for negligent trespass.

---

[378] Complaint ¶48.

[379] *Id.* ¶5.

[380] *Id.* ¶64.

[381] *Id.* ¶¶60-73.

[382] *Id.* ¶¶75–92.

[383] *Martin v. Union Pac. R.R. Co.*, 474 P.2d at 740.

[384] *Port of Portland*, 2017 WL 9098079, at *20.

[385] *See supra,* Sec. IV.D.2.

### 4. Plaintiffs have adequately pleaded private nuisance claims.

A private nuisance is a "substantial and unreasonable" interference "with the use and enjoyment of property."[386] Plaintiffs have adequately pleaded each of these elements in their Complaint.

#### a. *Plaintiffs allege that Defendants caused an interference with Plaintiffs' properties.*

With arguments that echo their causation arguments in the negligence context, the Port of Morrow, Threemile, and Madison Ranches argue that Plaintiffs failed to plead facts showing that the Port and Threemile "actually caused interference with Plaintiffs' properties."[387] But for the reasons described above, Plaintiffs have adequately alleged that each of the Defendants caused water contamination that interfered with their properties.[388]

#### b. *Plaintiffs allege that the interference with their property is substantial and unreasonable.*

Plaintiffs allege that Defendants' actions have rendered their properties' only source of tap water useless for drinking,[389] that they have spent time and energy investigating options for decontaminating their water supply,[390] and that they are forced to rely on deliveries of bottled water that are inconvenient and unreliable.[391] This is a clear interference with Plaintiffs' property that is both substantial and unreasonable. The contamination of Plaintiffs' wells has destroyed their ability to "enjoy their home as we all do"—i.e., to turn on the tap and know that the water that comes out is safe to drink.[392]

---

[386] *Daniels v. Johnson*, 473 P.3d 1133, 1135–36 (Or. App. 2020).

[387] POM/Threemile MTD at 30; *see also* Madison Ranches MTD at 21.

[388] *See supra,* Sec. IV.D.1-3.

[389] Complaint ¶¶15, 23, 31.

[390] *Id.* ¶¶16–17, 24.

[391] *Id*. ¶¶18, 25.

[392] *See Mark v. State ex rel Dep't of Fish and Wildlife*, 84 P. 3d 155, 161 (Or. App. 2004).

The Port of Morrow says actions "taken pursuant to a state-administered program . . . cannot be considered 'unreasonable' for purposes of a private nuisance claim," so Plaintiffs cannot bring a private nuisance claim against the Port because it is subject to DEQ permitting.[393] The Port cites *Jacobson v. Crown Zellerback Corp.* for that proposition,[394] but that is not what *Jacobson* said. The *Jacobson* court held that the plaintiff could not maintain a nuisance claim against "an individual member of the public who uses [a public road] for travel in conformance with the rules laid down therefor."[395]

*Jacobson* does not support the Port's argument for two reasons. First, the defendant there was using public roads rather than private lands.[396] Here, Plaintiffs allege that the Port of Morrow is dumping high-nitrogen wastewater on private land, which is interfering with Plaintiffs' use and enjoyment of their own property. Second, and more importantly, the *Jacobson* court emphasized that the defendant there was using the public road lawfully.[397] In fact, the plaintiffs had *conceded* that the "defendant's use of the road *did not violate any recognized laws or regulations*."[398] Here, by stark contrast, Plaintiffs' claims against the Port of Morrow are premised on the Port's *violations* of a permitting regime intended to prevent it from applying access nitrogen to land in the Umatilla GMA.[399]

Finally, the Port and Threemile's unsupported assertion that they could not have had anything but "a de minimis impact" on Plaintiffs' property is a naked attempt to inject facts that

---

[393] POM/Threemile MTD at 30–31.

[394] 539 P.2d 641 (Or. 1975) (*en banc*).

[395] *Id.* at 644.

[396] *Id.*

[397] *Id.*

[398] *Id.* (emphasis added).

[399] Complaint ¶¶69–93.

are outside the four corners of the Complaint into a motion to dismiss.[400] Plaintiffs allege that the Port of Morrow applies millions of gallons of wastewater and that Threemile farms tens of thousands of acres, where it over-applies fertilizer and operates a nitrogen-generating CAFO.[401] Those allegations must be taken as true on a motion to dismiss.[402]

c.   *Plaintiffs allege that Defendants' conduct was intentional, reckless, or negligent.*

Liability for private and public nuisance can arise from intentional, reckless, or negligent conduct.[403] Intentional conduct "is not limited to activity undertaken *for the purpose* of damaging another;" it includes "any act done with the knowledge that damage to another would result."[404]

Plaintiffs plainly allege that Defendants' conduct was intentional or, at the very least, negligent. They allege that "Defendants knew or had reason to know" that their conduct was "causing nitrate contamination of the Umatilla GMA, thereby interfering with Plaintiffs' and the Class's use and enjoyment of their properties."[405] They allege that it was widely known in the agriculture industry that nitrate levels in the Umatilla GMA had been dangerously high for decades, but Defendants persisted in discharging or leaking high-nitrogen materials onto the land of the Umatilla GMA.[406]

As for the Port of Morrow, the Port baldly asserts that Plaintiffs "do not sufficiently allege" that it interfered with Plaintiffs' properties "negligently, recklessly, or intentionally."[407] But the

---

[400] POM/Threemile MTD at 31.

[401] *Id.* ¶¶37, 61 69, 75.

[402] *Hewlett–Packard*, 668 F.3d at 1140.

[403] *Frady v. Portland Gen. Elec. Co.*, 637 P.2d 1345, 1348 (Or. App. 1981).

[404] *Id.*

[405] Complaint ¶142.

[406] *See id.* ¶¶48–51, 74–75, 78, 80, 83.

[407] POM/Threemile MTD at 30.

Complaint alleges that the Port of Morrow's wastewater disposal is subject to DEQ permits specifically designed to limit wastewater disposal to accord with each disposal site's capacity to absorb nitrogen.[408] DEQ expressly informed the Port that its "land application sites are within the Lower Umatilla Basin Groundwater Management Area, which was established because of the nitrate-nitrogen pollution," that "groundwater adversely impacted by the Port of Morrow's wintertime land application of nitrogen containing wastewater is used as drinking water by residents of the Umatilla GMA," and that "[h]igh nitrate concentrations in drinking water are linked with serious health concerns."[409] Since receiving those warnings, the Port has violated its permit hundreds of times, including by dumping more nitrogen than allowed by its permit, allowing wastewater to leak from its pipes, over-applying wastewater in the winter, and applying so much water that nutrients and moisture "leach[ed] beyond the 5th foot of the soil column."[410] This is more than enough to support the inference that the Port of Morrow acted "with the knowledge that damage to another would result."[411]

**5.    Plaintiffs have adequately pleaded public nuisance claims.**

A public nuisance is "an unreasonable interference with a right which is common to members of the public generally."[412] As with private nuisance, liability for public nuisance can arise from intentional, reckless, or negligent conduct.[413] Plaintiffs must also allege that Defendants invaded a right common to members of the public and that Plaintiffs suffered a "special injury, different in kind from that suffered by the general public."[414] Plaintiffs have done so here.

---

[408] Complaint ¶75.

[409] *Id.* ¶¶78, 83.

[410] *Id.* ¶¶79–93.

[411] *Frady* 637 P.2d at 1348.

[412] *Raymond v. S. Pac. Co.*, 488 P.2d 460, 462 (Or. 1971).

[413] *Frady*, 637 P.2d at 1348.

[414] *Id.*

Plaintiffs allege that Defendants have interfered with a right common to the general public by contaminating the groundwater of the Umatilla GMA.[415] This allegation is firmly supported by Oregon's Water Pollution Control statute. As discussed above, the Water Pollution Control statute prohibits any entity from placing wastes in locations where they are likely to escape or be carried into groundwater, discharging wastes if the discharge reduces water quality below state standards, or violating a water discharge permit.[416] It also expressly provides that a violation of the statute "is a public nuisance."[417] Thus, the Oregon Legislature has determined that violations of the Water Pollution Control statute are "sufficiently hazardous to qualify as a nuisance *per se*."[418] Defendants' application of wastewater, excess fertilizer, and animal waste in locations where they are likely to enter the groundwater clearly constitute a public nuisance.[419]

Plaintiffs also allege that they have suffered an injury "different in kind from that suffered by the general public."[420] The general public—which includes people who own or rent property in the Umatilla GMA, but also people who work there, travel there, or are visitors for any other reason—suffers from exposure to nitrate-contaminated water while they are in the Umatilla GMA.[421] Plaintiffs, who bring a public nuisance claim on behalf of individuals who rent or own

---

[415] Complaint ¶¶147–150.

[416] O.R.S. 468B.025(1)–(2).

[417] O.R.S. 468B.025(3).

[418] *City of Portland v. Boeing Co.*, 179 F.Supp.2d 1190, 1195 (D. Or. 2001).

[419] *See id.* at 1195, 1205 (granting plaintiff's motion for summary judgment on liability for public nuisance claim where plaintiff showed that defendant had contaminated groundwater near the plaintiff's wells in violation of the Water Pollution Control statute).

[420] *Frady*, 637 P.2d at 1348.

[421] *See Mark v. State Dept. of Fish and Wildlife*, 974 P.2d 716, 718 (Or. App. 1999) (considering "visitors to the area" to be part of the "public" for public nuisance purposes).

property in the Umatilla GMA,[422] have suffered a different kind of harm. These individuals are not just exposed to nitrate contamination when they drink water in the Umatilla GMA—an injury common to the general public. The property that they either own or pay to rent is contaminated (or at elevated risk of contamination), which directly interferes with their use and enjoyment of their property. Named Plaintiffs each allege that because of nitrate contamination, they no longer use the tap water in their home for drinking water.[423] They have been forced to resort to bottled water, which is burdensome and inconvenient.[424] This is a different kind of harm—not just a different degree of harm—than that experienced by members of the public who do not own or rent property in the Umatilla GMA.[425]

Lamb Weston, the Port of Morrow, and Threemile argue that renters cannot state a claim for public nuisance, relying on the Oregon Court of Appeals' decision in *Frady v. Portland Gen. Elec. Co.*[426] But *Frady* supports public nuisance claims by both property owners and renters in this case. In *Frady*, plaintiffs filed nuisance and trespass claims against the owner of a combustion

---

[422] Plaintiffs' Complaint pleads public nuisance claims on behalf of "the Class and Subclasses," which encompasses residents of the Umatilla GMA who do not own or rent property there. Complaint Count IV, at 42. Plaintiffs concede that not every resident of the Umatilla GMA has experienced a "special injury" for purposes of public nuisance law, but the Renter/Owner subclass has stated a public nuisance claim for the reasons explained *infra*.

[423] Complaint ¶¶14–19, 23–25, 29–32.

[424] *Id.*

[425] The Port of Morrow and Threemile argue that Ms. Strange's public nuisance claim fails because she alleges "that she is 'exposed to contaminated water when she drinks public water at restaurants," so "her harms are no different than those of any other members of the public." POM/Threemile MTD at 32. This argument ignores Ms. Strange's clear allegation that she no longer drinks the tap water in the property she pays to rent because of nitrate contamination. Complaint ¶¶26–33. This supports her allegation that nitrate contamination caused by Defendants' conduct has "interfered with Ms. Strange's quiet enjoyment of her property" and is a different kind of harm by that experienced by members of the public who eat in restaurants in the Umatilla GMA but do not rent or own property there.

[426] 637 P.2d 1345 (1981). Lamb Weston MTD at 33–34, POM/Threemile MTD at 31-32.

turbine facility that emitted low-frequency soundwaves.[427] Some of the plaintiffs owned real property near the facility; they alleged that vibrations from the sound waves were damaging their homes, interfering with their sleep, causing emotional distress and mental strain, and interfering with their use and enjoyment of their property."[428] Other plaintiffs lived on property near the facility; they alleged only that the vibrations caused "them to suffer loss of sleep, emotional strain, and mental distress."[429]

The defendant argued that all plaintiffs had failed to plead a "special injury" supporting a public nuisance claim "because the damages they allege are the same as would be suffered by anyone in the area."[430] The court disagreed as to the property owners. It reversed the trial court's dismissal of the property owners' public nuisance claims, holding that "[w]hen a public nuisance interferes with an individual's right to use and enjoy his real property, the individual suffers special injury and may bring an action against the perpetrator of the nuisance."[431] Thus, *Frady* confirms that anyone who owns property in the Umatilla GMA can bring a public nuisance claim.

And the *Frady* court's decision on the non-property owners' public nuisance claims does not compel dismissal of the renters' public nuisance claims in this case. The non-property owners in *Frady* did not plead that the sound waves at issue interfered with their use and enjoyment of the property that they paid to rent, only that they suffered from interrupted sleep, emotional distress, and mental strain.[432] The court concluded that these injuries were "not different from those which

---

[427] 637 P.2d at 346.

[428] *Id.*

[429] *Id.*

[430] *Id.* at 348.

[431] *Id.* at 349.

[432] *Id.* at 346.

would be suffered by anyone in the vicinity of the facility."[433] Here, by contrast, property owners *and* renters plausibly alleged that the public nuisance created by Defendants' conduct "interfere[d] with their right to use and enjoy their property" by rendering their tap water useless for drinking water and forcing them to rely on bottled water.[434] They have therefore stated a claim for public nuisance under *Frady*.

### 6. Plaintiffs have adequately pleaded an inverse condemnation claim.

The Constitution of Oregon promises that "private property shall not be taken for public use . . . without just compensation."[435] A "taking," or "inverse condemnation," occurs when a public entity intentionally authorizes an invasion of private property that substantially interferes with the owner's rights of exclusive possession and use.[436] The Port does not dispute that it has caused an invasion of Plaintiffs' properties. Instead, the Port contends that Plaintiffs have inadequately pleaded inverse condemnation because their Complaint does not include facts sufficient to show: (i) the Port's taking was intentional; (ii) Plaintiffs' property was taken for public use; and (iii) any interference with the property was substantial.[437] The Port is wrong on all counts.

a. *Plaintiffs have sufficiently pleaded that the Port's taking was intentional.*

A public entity "intends" to take property if the invasion was "the necessary, inevitable, or otherwise certain consequence" of the public entity's intentional acts.[438] A plaintiff is not required to prove that the public entity "*subjectively* intended the consequential invasion of property interests or undertook action knowing . . . that the consequences would follow."[439] Instead, the fact

---

[433] *Id.* at 349.

[434] Complaint ¶¶14–18, 23–25, 29–32, 149.

[435] Ore. Const. Art. I, § 18.

[436] *Dunn v. City of Milwaukie*, 328 P.3d 1261, 1267 (Or. 2014).

[437] POM/Threemile MTD at 32.

[438] *Dunn*, 328 P.3d at 1268.

[439] *Id*. at 1273 (emphasis added).

finder "may infer the intent-to-take element of a claim for inverse condemnation from the natural and ordinary consequences of the government's act."[440]

Here, Plaintiffs allege ample facts that would allow a fact finder to infer the intent-to-take element, including: the Port discharged wastewater in excess of its permits[441]; those permits were issued to prevent excess nitrates from contaminating groundwater throughout the Umatilla GMA[442]; and residents throughout the Umatilla GMA—including Plaintiffs—rely on that groundwater for drinking, cooking, and other household purposes.[443] Nitrate contamination in Plaintiffs' wells and on their property is therefore the "natural and ordinary consequences" of the Port dumping nitrates in violation of its DEQ permit.[444] The Port's claim that it did not act to "intentionally impact any particular Plaintiff" has no merit.[445]

> b. *Plaintiffs have sufficiently pleaded that their property was taken for public use.*

To establish inverse condemnation, Plaintiffs must show that their properties were taken for a "public use."[446] "Public use" requires that the public "use" or "occupy" the property.[447]

---

[440] *Vokoun v. City of Lake Oswego*, 56 P.3d 396, 401 (Or. 2002).

[441] Complaint ¶¶78-92.

[442] *Id.* ¶¶13, 21, 27.

[443] *Id.* ¶¶12-13, 20-21, 26-27, Fig. 1. The warning letters DEQ sent to the Port explaining the consequences of its ongoing permit violations specifically noted that permit violations "adversely impact[]" groundwater "used as drinking water by residents." *Id.* ¶83.

[444] Complaint ¶33.

[445] POM/Threemile MTD ¶33; *see also Morrison v. Clackamas Cnty.*, 18 P.2d 814, 816 (Or. 1933) (finding intent where the "natural consequence" of the county's decision to build a jetty was to divert a flow of water, thereby damaging the plaintiff's property, even though the county had "no specific intention . . . to appropriate plaintiff's property").

[446] *See Vokoun*, 56 P.3d at 401.

[447] *Foeller v. Hous. Auth. of Portland*, 256 P.2d 752, 766 (Or. 1953).

Plaintiffs have, despite the Port's protests to the contrary,[448] sufficiently alleged that the Port has taken their property for public use.

In the first place, the Port does not deny that it is a public entity.[449] The Port serves the public by collecting and disposing of nitrogen-heavy wastewater from industrial operations in the area.[450] But rather than properly treat this water, the Port merely discharges it, still full of nitrates, onto land across the Umatilla GMA.[451] And, as already discussed, these nitrates make their way into the groundwater and contaminates the water in Plaintiffs' wells and in their kitchen sinks.[452] The Port has, therefore, invaded Plaintiffs' property to further its public service goal of collecting and disposing of nitrogen-heavy wastewater—in short, Plaintiffs' property has been taken for public use.

c.     <em>Plaintiffs have sufficiently pleaded substantial interference.</em>

To establish the necessary interference for an inverse condemnation claim, the plaintiff is not required to allege that the governmental defendant deprived the plaintiff of all use and enjoyment of the property at issue.[453] Instead, it sufficient for a plaintiff to allege that the physical invasion at issue amounted to a "substantial interference" with the property owner's protected interests.[454] That is precisely what Plaintiffs allege in their Complaint.

---

[448] POM/Threemile MTD at 33.

[449] Complaint ¶34.

[450] *Id.*

[451] *Id.*

[452] *Id.*

[453] *Vokoun*, 56 P.3d at 400; *see also Morrison*, 18 P.2d 814 (noting that *any* destruction, restriction, or interruption of common and necessary use and enjoyment of property constitutes taking).

[454] *Dunn*, 328 P.3d at 1267 (2014).

By contaminating Plaintiffs' water, the Port has deprived Plaintiffs of the ability to safely use water from their domestic wells and public water systems.[455] Plaintiffs have now been forced to rely on bottled water for drinking and cooking,[456] a significant inconvenience. One Plaintiff's pet fish died after being exposed to excess nitrates in its water,[457] and Plaintiffs fear that they and their families may suffer long-term health consequences as a result of their own exposure to nitrates.[458] Finally, Plaintiffs have been forced to incur costly remediation expenses,[459] and their homes have declined in value.[460]

Any of these facts alone would be sufficient to support Plaintiffs' claim that the Port has substantially interfered with their property. The Port itself acknowledges that a material decrease in the value of property is sufficient to establish the requisite "substantial" interference.[461] Taken together, Plaintiffs have absolutely sufficiently alleged that the Port's invasion of Plaintiffs' property has caused a "substantial interference" with Plaintiffs' rights as to that property. At the very least, whether the Port's operations have "substantially interfered" with Plaintiffs' use and enjoyment of their property is a question of fact that cannot be decided at the motion to dismiss stage.[462]

---

[455] Complaint ¶¶18, 25, 31.

[456] *Id.* ¶¶18, 25, 31.

[457] *Id.* ¶27.

[458] *Id.* ¶¶19, 24, 33.

[459] *Id.* ¶24.

[460] *Id.* ¶19.

[461] *Hawkins v. City of La Grande*, 843 P.2d 400 (1992).

[462] *Dunn*, 328 P.3d at 1265 n.5 (noting that the trial court and the court of appeals concluded that evidence regarding substantial interference should be submitted to a jury).

**E.      PLAINTIFFS' OREGON TORT CLAIMS ACT NOTICE TO THE PORT OF MORROW WAS TIMELY.**

Under the Oregon Tort Claims Act ("OTCA"), a plaintiff intending to bring a state tort claim against an Oregon public entity must give notice of that intent "within 180 days"[463] of discovering the alleged injury and the identity of the party responsible for that harm.[464] Plaintiffs did that here. They first learned that their water was contaminated in June of 2022 (and in the case of Jeannie Strange, in November of 2022).[465] Plaintiffs filed their notice on December 8, 2022, less than 180 days later.[466]

Plaintiffs plead facts sufficient to support a reasonable inference that they did not discover that they had suffered harm, or that the Port's actions were the cause of that harm,[467] until late June 2022. Plaintiffs Michael Pearson and James and Silvia Suter were not aware their wells were at risk of nitrate contamination until after the Morrow County Commission declared a local state of emergency.[468] Jeannie Strange was not aware of the nitrate contamination in her tap water until November 2022, when she tested her water for pollutants after her pet fish died unexpectedly.[469] And none of the Plaintiffs could reasonably have been expected to immediately know, upon discovering the nitrate contamination in their water, that the Port was responsible for this contamination. Allowing time for Plaintiffs Pearson and Suter to get their wells tested and discover

---

[463] O.R.S. 30.275(1)-(2).

[464] *Buchwalter-Drumm v. State ex rel. Dep't of Hum. Servs.*, 404 P.3d 959, 963, 968 (Or. App. 2017) (citations omitted).

[465] Complaint ¶¶14, 23, 28-30.

[466] Isaak Decl. ¶9, Ex. 8.

[467] Pursuant to the Discovery Rule, the OTCA's notice of claim period does not start running until the plaintiff has "a reasonable opportunity for discovery of the *cause* of the injury." *Dowers Farms, Inc. v. Lake Cnty.*, 607 P.2d 1361, 1367 (Or. 1980) (emphasis added). The notice of claim period also does not start running until the plaintiff discovers *who* caused the injury. *Adams v. Or. State Police*, 611 P.2d 1153, 1156 (Or. 1980).

[468] Complaint ¶¶14, 23.

[469] *Id.* ¶¶28-30.

the Port's role in the contamination, the earliest date by which the Plaintiffs "reasonably knew or should have known" of the Port's involvement could not have been before June 11, 2022.[470]

The Port claims that Plaintiffs should have been aware of the Port's role in contaminating their water much earlier than June 11, 2022, given the availability of "public studies" concerning local groundwater conditions and the Port's repeated violations of its DEQ-issued permit.[471] But elsewhere in its motion, the Port argues that "the [nitrate contamination] problem is complex,"[472] "nitrate contamination has numerous potential sources,"[473] and "the potential causes of the [nitrate] problem are varied and complex."[474] If the Port—a quasi-governmental entity with access to significant resources—considers the causation analysis "complex" and the sources of nitrates in Plaintiffs' water unclear, it cannot reasonably argue that ordinary citizens without access to such resources should have immediately intuited the Port's culpability. Until the Plaintiffs became aware that they had suffered a cognizable legal harm and discovered that the Port was responsible for that injury—which did not happen until after June 11, 2022—the OTCA notice claim period did not begin to run.

Because Plaintiffs gave notice under the OTCA within 180 days of learning that the Port had contributed to nitrate contamination in their well water, the Court should deny the Port's motion to dismiss on this ground.

---

[470] *See Buchwalter-Drumm*, 404 P.3d. at 968.

[471] POM/Threemile MTD at 34-35.

[472] *Id.* at 1.

[473] *Id.* at 1-2.

[474] *Id.* at 11.

**F.      PLAINTIFFS' REQUESTED RELIEF FOR MEDICAL MONITORING IS NOT SUBJECT TO DISMISSAL.**

In a final effort to narrow Plaintiffs' Complaint and the relief they might recover, Lamb Weston and Madison Ranches argue that Plaintiffs' request for medical monitoring must be dismissed.[475] But contrary to these Defendants' claims, Courts have regularly deemed medical monitoring an appropriate form of injunctive relief under RCRA and under various state law tort claims. There is no reason for this Court to decide differently here.

RCRA authorizes a court to "restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), [or] *to order such person to take such other action as may be necessary*."[476] Thus, in addition to seeking a prohibitory injunction, "a private citizen suing under § 6972(a)(1)(B) [may] seek a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action.'"[477]

Relying on this broad grant of authority, many courts have found medical monitoring to be an "appropriate equitable remedy" under RCRA.[478] This is especially true when, as here, the monitoring program envisioned would assist not only individuals exposed to a toxic substance, but would also benefit the wider community by increasing knowledge about the impacts of exposure to that substance.[479] For example, in *Easler v. Hoechst Celanese Corp.*,[480] the court found a

---

[475] *See* Lamb Weston MTD at 34-36; Madison Ranches MTD at 22.

[476] 42 U.S.C. § 6972(a) (emphasis added).

[477] *Meghrig*, 516 U.S. at 485.

[478] *Prantil v. Arkema France S.A.*, 2022 WL 1570022 (S.D. Tex. May 18, 2022); *see also, e.g.*, *Werlein v. United States*, 746 F.Supp. 887, 895 (D. Minn. 1990), *vacated in part*, 793 F.Supp. 898 (D. Minn. 1992); *Barth v. Firestone Tire & Rubber Co.*, 661 F.Supp. 193, 203 (N.D. Cal. 1987).

[479] *See, e.g.*, *Werlein*, 746 F.Supp. at 895, *vacated in part*, 793 F.Supp. 898 (D. Minn. 1992); *Barth*, 661 F.Supp. at 203.

[480] 2014 WL 3868022 (D.S.C. Aug. 5, 2014).

medical monitoring program that would "pool[] resources for the early detection and advances in treatment of the disease" would "comport[] with RCRA's purpose" because such relief "is injunctive in nature rather than 'predominantly money damages.'"[481] In the instant case, too, the medical monitoring program would benefit not just Plaintiffs and Class members but also the broader public by improving the scientific and medical communities' understanding of the effects of nitrate exposure and the best treatments for nitrate-related illnesses.[482]

Because Plaintiffs' medical monitoring remedy is authorized under RCRA, there is no need for the Court to consider whether the remedy is appropriate with respect to Plaintiffs' supplemental state law tort claims. But to the extent the Court believes such an analysis is warranted, significant caselaw supports Plaintiffs' request for medical monitoring in this context.[483]

Plaintiffs recognize that, in Oregon, medical monitoring relief under a negligence or negligence per se theory requires a showing of a present physical injury.[484] But Plaintiffs have pled facts sufficient to show that they, as well as the rest of the putative Class, have suffered present physical injury. Plaintiffs explain that ingesting nitrates—as all Plaintiffs have done in this

---

[481] *Gibbs v. E.I. DuPont De Nemours & Co.*, 876 F.Supp. 475, 481 (W.D.N.Y. 1995).

[482] At the very least, the question of whether the medical monitoring program Plaintiffs seek offers the kind of benefit necessary for the program to be considered injunctive relief is a factual question. As such, it should not be decided at this point in the litigation.

[483] *See, e.g.*, *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1 (D. Mass. June 24, 2010); *In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279 (N.D. Ohio Sept. 14, 2007); *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473 (D. Colo. 1998); *Barnes v. Am. Tobacco Co.*, 989 F.Supp. 661 (E.D. Pa. Oct. 17, 1997); *Craft v. Vanderbilt Univ.*, 174 F.R.D. 396 (M.D. Tenn. 1996); *Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705 (D. Ariz. 1993).

[484] *See Lowe v. Philip Morris USA Inc.,* 183 P.3d 181 (Or. 2008).

case[485]—reduces the ability of red blood cells to carry oxygen.[486] Even if this change does not result in full-blown cyanosis, asphyxia, or other diagnosed condition, a reduction in the body's ability to circulate oxygen is certainly a physical injury.

What's more, Plaintiffs request medical monitoring relief in conjunction with their claims for trespass and nuisance. With respect to these tort claims, Plaintiffs specifically allege that Defendants' disposal of waste and wastewater has caused nitrate contamination of their properties and interfered with their access to clean drinking water.[487] Plaintiffs further allege that the Defendants' polluting has increased their risk of physical harm as a result of nitrate exposure including serious illnesses such as cancer.[488] Oregon law does not restrict medical monitoring as a remedy under a trespass or nuisance theory. As such, there is no basis for the Court to dismiss Plaintiffs' request for medical monitoring in conjunction with these claims.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss. Alternatively, to the extent the Court concludes that Plaintiffs' pleadings are insufficiently specific or otherwise lack a factual basis, Plaintiffs request leave to amend their Complaint.

---

[485] *See* Complaint ¶¶13-15 (noting Mr. Pearson has depended on his home's well to provide water for drinking since 1997, and that his well tested positive for high levels of nitrate in 2022); ¶¶21-23 (noting Mr. and Mrs. Suter have depended on their home's well to provide water for drinking since 1999, and that their well tested positive for high levels of nitrate in 2022); ¶¶27-29 (noting Ms. Strange relies on Hermiston city water for drinking and that her tap water tested dangerously high for nitrates in 2022).

[486] Complaint ¶43.

[487] *Id.* ¶¶132, 133, 135, 138.

[488] *Id.* ¶¶136, 143, 147.

DATED: August 2, 2024               Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ *Steve W. Berman*
    Steve W. Berman (*pro hac vice*)
Meredith S. Simons (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98134
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
merediths@hbsslaw.com

Abigail D. Pershing (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

Michael A. Bliven, Oregon Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
mike@blivenlawfirm.com

Robert F. Dwyer, III, Oregon Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman OR 97818
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
rdwyer@blivenlawfirm.com

John Heenan (*pro hac vice*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
john@lawmontana.com

*Attorneys for Plaintiffs and the Proposed Class*

# CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under the Court's July 3, 2024 Order (ECF No. 61) because it contains 24,331 words, including headings, footnotes, quotations, and words manually counted in any visual images, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ Steve W. Berman