IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

MICHAEL PEARSON, JAMES SUTER, SILVIA
SUTER, and JULIA STRANGE, on behalf of
themselves and all others similarly situated,

           Plaintiffs,

   v.

PORT OF MORROW; LAMB WESTON HOLDINGS,
INC.; MADISON RANCHES, INC.; THREEMILE
CANYON FARMS, LLC; BEEF NORTHWEST
FEEDERS, LLC; and JOHN DOES 1-10,

           Defendants.

Case No. 2:24-cv-00362-HL

**FINDINGS AND
RECOMMENDATION**

Robert Dwyer
Michael A Bliven
Bliven Law Firm, P.C.
704 South Main
Kalispell, MT 59901

Abigail Pershing
Meredith Simons
Steve W. Berman
Hagens Berman Sobol Shapiro LLP
301 N. Lake Ave.
Ste #920
Pasadena, CA 91101

John Heenan
Heenan & Cook, PLLC
1631 Zimmerman Trail, Ste 1
Billings, MT 59102

      Attorneys for Plaintiffs

Amy Edwards
Ariel Stavitsky
Misha Isaak
Jacob C. Goldberg
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205

      Attorneys for Defendants Port of Morrow and
      Threemile Canyon Farms, LLC

Kevin H. Kono
David Ubaldi
Michael Scott Broadwell
P. Andrew McStay, Jr.
Davis Wright Tremaine, LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205

      Attorneys for Defendant Beef Northwest Feeders, LLC

Jennifer L. Gates
Pearl Legal Group PC
529 SW Third Avenue
Suite 600
Portland, OR 97204

Steven F. Cade
Sussman Shank, LLP
1000 SW Broadway
Suite 1400
Portland, OR 97205

PAGE 2 – FINDINGS AND RECOMMENDATION

James H. Bolin
Kyle Miller
Bulter Snow
1020 Highland Colony Parkway
Ste 1400
Ridgeland, MS 39157

       Attorneys for Defendant Madison Ranches, Inc.

Bruno J. Jagelski
Yturri Rose, LLP
89 SW Third Avenue
P.O. Box S
Ontario, OR 97914

Amanda L. Groves
Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071

Drew Helen Washington
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809

       Attorneys for Defendant Lamb Weston Holdings, Inc.

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................7

FACTUAL BACKGROUND ................................................................................8

    I.    Nitrate contamination in the Lower Umatilla Basin. ................................8

    II.    The parties. ............................................................................................11

        A.    Plaintiffs. .....................................................................................11

        B.    Defendants. .................................................................................12

DEFENDANTS' REQUESTS FOR JUDICIAL NOTICE .................................14

    I.    Standard of review ................................................................................15

    II.    Madison Ranches' request for notice. ...................................................16

    III.    Threemile's request for notice. .............................................................17

DEFENDANTS' MOTIONS TO DISMISS ........................................................17

    I.    Primary jurisdiction and *Burford* abstention.......................................17

        A.    Standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(1). ............18

        B.    Primary jurisdiction. ...................................................................19

            1.    Legal standards. ...................................................................19

            2.    Analysis................................................................................21

                a.    The need to resolve the issue. .............................................21

                b.    Placed by Congress with an administrative body with regulatory authority...........................................................21

                c.    Pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme. ..................................24

                d.    That requires expertise and uniformity in administration..25

                e.    Efficiency. ..........................................................................27

        C.    *Burford* abstention. ...................................................................28

            1.    Legal standards. ...................................................................28

            2.    Analysis................................................................................29

                 a.    Concentrating suits in a particular court. ...........................30

                b.    Intertwined federal issues. .................................................31

                 c.    Disruption of state efforts. .................................................32

    II.    "Shotgun" pleading. ...........................................................................33

        A.    Legal standards. ........................................................................33

    B.    Analysis.................................................................................................34
III.    Failure to state a claim for relief. ..................................................................36
    A.    Standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6). ...........36
    B.    Plaintiffs' RCRA claims. ........................................................................37
        1.    Plaintiffs' allegations. ...................................................................38
        2.    Permitted CAFO discharges under the Clean Water Act (CWA)..39
        3.    Anti-duplication provision. .............................................................42
        4.    Irrigation return flows. ...................................................................43
            a.    Statutory analysis. ...............................................................44
            b.    Application to Plaintiffs' claims. ........................................47
        5.    Applying excessive nitrogen-heavy material to "discard" and
              "dispose" of it. .............................................................................47
            a.    Statutory analysis.................................................................48
            b.    Application to Plaintiffs' claims. ........................................49
        6.    Handling, storing, transporting, or disposal of solid waste............52
        7.    Imminent and substantial endangerment to health or the
              environment. ..................................................................................53
    C.    Plaintiffs' negligence claims...................................................................55
        1.    Legal standards. .............................................................................55
        2.    Analysis..........................................................................................57
    D.    Plaintiffs' negligence per se claims. .......................................................59
        1.    Legal standards. .............................................................................59
        2.    Statutory framework. .....................................................................60
        3.    Analysis..........................................................................................61
            a.    ORS 468B.025(1)(a) and negligence per se. .......................61
            b.    ORS 468B.025(1)(b) and negligence per se. .......................63
            c.    ORS 468B.025(2) and negligence per se............................64
    E.    Plaintiffs' trespass claims. ......................................................................64
        1.    Legal standards. .............................................................................64
        2.    Analysis..........................................................................................65
    F.    Plaintiffs' private and public nuisance claims. .......................................66
        1.    Legal standards. .............................................................................66
        2.    Analysis..........................................................................................67

|  |  | a. | Substantial and unreasonable interference. | 67 |
|  |  | b. | Special injury. | 69 |
|  | G. | Plaintiffs' inverse condemnation claim. |  | 70 |
|  |  | 1. | Legal standards. | 70 |
|  |  | 2. | Analysis. | 71 |
|  | H. | The Oregon Tort Claims Act (OTCA). |  | 72 |
|  |  | 1. | Legal standards. | 73 |
|  |  | 2. | Analysis. | 74 |
|  | I. | Plaintiffs' request for medical monitoring. |  | 76 |
|  |  | 1. | Medical monitoring under RCRA. | 76 |
|  |  | 2. | Medical monitoring under state tort claims. | 78 |
| IV. | Dismissal of any claims without prejudice. |  |  | 79 |
| RECOMMENDATION | | | | 79 |
| SCHEDULING ORDER | | | | 80 |

_____
HALLMAN, United States Magistrate Judge:

This action concerns nitrate contamination in groundwater of the Lower Umatilla Basin. Plaintiffs – Michael Pearson, James Suter, Silvia Suter, and Julia Strange – bring this class action Complaint against Defendants – Port of Morrow, Lamb Weston Holdings, Inc., Madison Ranches, Inc., Threemile Canyon Farms, LLC, and Beef Northwest Feeders, LLC – alleging that Defendants' use and disposal of nitrates in the area violates the Resource Conservation and Recovery Act (RCRA) and Oregon state law. This matter now comes before the Court on Defendants' Motions to Dismiss, ECF 51, 54, 56, 59, and Defendants' Requests for Judicial Notice, ECF 52, 53, 58, 82, 84. Defendants move to dismiss Plaintiffs' claims in their entirety under Fed. R. Civ. P. 12(b)(1) based on the primary jurisdiction doctrine and *Burford* abstention; Defendants also move against each of Plaintiffs' individual claims for failure to state a claim for relief under Fed. R. Civ. P. 12(b)(6); and Defendants move to dismiss under Fed. R. Civ. P. 8 because the Complaint is a "shotgun" pleading. The Court heard oral argument on these Motions on October 29, 2024. ECF 93.

Defendants' motions should be GRANTED in part and DENIED in part. Defendants' request for judicial notice should be GRANTED. Defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6) should be GRANTED as follows: Plaintiffs' first claim, brought under RCRA, should be DISMISSED without prejudice as to Defendant Farms; Plaintiffs' third claim, alleging negligence per se, should be DISMISSED without prejudice; Plaintiff Strange's sixth claim, alleging public nuisance, should be DISMISSED without prejudice; and Plaintiffs' requested relief of medical monitoring should be DISMISSED without prejudice. Defendants' remaining motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 8 should be DENIED.

PAGE 7 – FINDINGS AND RECOMMENDATION

**FACTUAL BACKGROUND**

The Court recites the facts from Plaintiffs' Complaint, as well as matters appropriate for judicial notice, and assumes that they are true for the purposes of reviewing the pending Rule 12(b)(6) motions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). To the extent that Defendants' motions rely on evidence outside the Complaint for the purposes of their Rule 12(b)(1) motions, that evidence is separately addressed in the discussion section.

**I.    Nitrate contamination in the Lower Umatilla Basin.**

Groundwater in the Lower Umatilla Basin has been contaminated with nitrates for decades. Pl.'s First Am. Comp. ("FAC," hereinafter referred to as "the Complaint") ¶¶ 46–47, ECF 17. That contamination is due to human activities—including farming, concentrated animal feeding operations (CAFOs), and industrial wastewater—combined with the area's soil and hydrogeologic characteristics. *Id.* at ¶¶ 5, 60–73. When nitrogen-containing materials, such as nitrogen fertilizer or nitrogen-laden animal waste, are applied to the land, excess nitrogen can leach into the soil and convert into nitrates that contaminate groundwater. *Id.* at ¶¶ 61, 67. The area's coarse-grained, highly permeable soil "facilitates rapid percolation to the water table," particularly when combined with the area's irrigation practices. *Id.* at ¶ 64. Thus, excess nitrates can enter the water table "in a matter of days." *Id.*

The health impacts of nitrate-contaminated groundwater are significant. *See id.* at ¶¶ 42–45. "[H]igh doses of nitrates can prevent red blood cells from carrying adequate levels of oxygen throughout the body, resulting in cyanosis and asphyxia." *Id.* at ¶ 43. "Low blood-oxygen levels are particularly dangerous for infants," who may develop infant methemoglobinemia ("Blue Baby Syndrome"), which is a potentially fatal condition. *Id.* Nitrate-heavy water also poses

health risks to older children and adults, including reproductive complications and an increased risk of cancer, kidney and spleen disorders, and respiratory disorders. *Id.* at ¶ 44.

Both the Environmental Protection Agency (EPA) and the Oregon Department of Environmental Quality (DEQ) set standards for nitrate contamination in groundwater. *Id.* at ¶ 4. The federal safety threshold is "10 milligrams per liter ('mg/L')." *Id.* at ¶¶ 4, 42. The EPA has determined that "water is unsafe for human consumption when it contains nitrates at a concentration" above that level. *Id.* at ¶ 43. Oregon has a lower threshold of 7 mg/L. *Id.* at ¶ 42. Nitrate contamination at levels above 7 mg/L "triggers Oregon's DEQ to designate a Groundwater Management Area, which works to reduce groundwater contamination in the affected area." *Id.* at ¶ 42.

Since the 1990s, testing in the Lower Umatilla Basin has revealed nitrate levels that far exceed the federal and state thresholds. *Id.* at ¶ 47. Nitrate contamination has worsened since the 1990s, with testing revealing an increasing percentage of wells with nitrate levels exceeding the state and federal safety thresholds. *Id.* at ¶¶ 49–50. The contamination is particularly acute in "areas dominated by irrigated agriculture," where testing has showed nitrate levels seven times greater than what is considered safe. *Id.* at ¶ 47. According to DEQ, approximately 70% of nitrate contamination in the area is due to agricultural activity. *Id.* at ¶ 60.

As a result of the high levels of nitrates, DEQ designated the Lower Umatilla Basin as a "Groundwater Management Area" (referred to here as "LUBGWMA") in 1990.[1] *Id.* at ¶¶ 3, 48. LUBGWMA "encompasses approximately 562 square miles of land in northern Morrow and

---

[1] The parties agree that the Complaint incorrectly alleges that DEQ declared the Lower Umatilla Basin a Groundwater Management Area in 2001, FAC ¶ 48, when that designation actually occurred in 1990, Def. Beef Northwest Feeders, LLC Mot. to Dismiss ("BNW Mot. to Dismiss") 3 n.2, ECF 51; Pls.' Opp. to Mots. To Dismiss 6, ECF 68.

Umatilla counties and includes the cities of Boardman, Hermiston, Irrigon, Stanfield, and Echo." *Id.* at ¶ 3. Over 45,000 people, including 10,000 children, live in the area. *Id.* As part of the designation, DEQ established the LUBGWMA Committee and charged it with "taking the necessary measures to address the contamination." *Id.* at ¶¶ 48, 50. The Committee's first steps were data collection and analyzing test results from monitoring wells. *Id.* When comparing data with earlier testing, the Committee found that nitrate contamination had worsened. *Id.* DEQ's study in 2003 resulted in a similar finding: "nitrate concentrations in the area had increased between 1992 and 2003." *Id.* at ¶ 49.

Recent studies show that nitrate contamination continues to be an issue. *Id.* at ¶ 50. Surveys of wells showed that "nearly half (48%) of the 255 wells tested between 2015 and 2016 exceeded the 10 mg/L federal limit and nearly two thirds (60%) exceeded the 7 mg/L state trigger level." *Id.* Another survey of private domestic wells found that "42% of the region's domestic wells contained nitrate levels exceeding the safe drinking water standard." *Id.*

Since January 10, 2022, state and local officials have encouraged residents in LUBGWMA who rely on private wells to have them tested for nitrates. *Id.* at ¶ 51. By April 2024, about half of such wells had been tested. *Id.* Of those tested, "at least 450" wells—18 percent of wells in Umatilla County and 30 percent of wells in Morrow County—have nitrate levels above 10 mg/L. *Id.* at ¶ 52. In response, Oregon has installed filtration systems in approximately forty homes and is providing bottled water to 400 homes that have nitrate levels "so high that filtration systems are not sufficient to bring nitrate concentrations to within safe levels." *Id.* at ¶ 53.

Public water systems in LUBGWMA have also been affected. *Id.* at ¶ 54. Fifty-eight out of fifty-nine public water systems rely exclusively on groundwater, and the fifty-ninth relies on

groundwater and surface water. *Id.* DEQ has determined that ten public water systems in LUBGWMA "are at 'substantial nitrate risk,' defined as either having a nitrate-N measurement at or above 10 mg/L or by having the 90th percentile of the nitrate-N measurements greater than 5 mg/L." *Id.* at ¶ 55. Nitrate-contaminated public water affects residents who rely on such systems every day and residents who "drink public water at restaurants or at friends' or families' homes." *Id.* at ¶ 56.

## II.    The parties.

### A.    Plaintiffs.

Plaintiffs are four residents of LUBGWMA who allege that they have been harmed by nitrate contamination caused by Defendants. *Id.* at ¶¶ 12–33.

Plaintiff Michael Pearson is a resident of Morrow County who owns a home that depends on a private well. *Id.* at ¶¶ 12–13. Testing showed that his well was contaminated with nitrates and—even after installation of a reverse osmosis filtration system—the water still contained nitrate levels that exceed state and federal standards. *Id.* at ¶¶ 15–17. Plaintiff Pearson now uses bottled water. *Id.* at ¶ 18.

Plaintiffs James and Silvia Suter are residents of Morrow County who also rely on a private well. *Id.* at ¶¶ 20–21. When the well was first installed in 1999, it had a safe nitrate concentration level. *Id.* at ¶ 22. But recent testing revealed nitrate contamination of 37.7 mg/L, far above state and federal safety thresholds. *Id.* at ¶ 23. Because a new, deeper well would cost $24,000, the Suters rely on bottled water. *Id.* at ¶¶ 24–25.

Plaintiff Jeannie Strange is a resident of Umatilla County who rents a home that "is supplied with water via the Hermiston Water Department." *Id.* at ¶¶ 26–27. When Plaintiff Strange's fish died after changing the water in its tank, she tested her tap water, and the at-home

test kit "indicat[ed] dangerously high levels of nitrates." *Id.* at ¶¶ 28–29. Plaintiff Strange and her family now rely on bottled water. *Id.* at ¶ 31.

All Plaintiffs allege that—despite their reliance on bottled water—they are exposed to nitrate-contaminated water when drinking public water at restaurants or at the homes of friends whose properties rely on public or well water. *Id.* at ¶¶ 19, 25, 33.[2]

### B.    Defendants.

Plaintiffs bring this action against five named Defendants due to their alleged role in contaminating groundwater in LUBGWMA. *Id.* at ¶ 5.[3]

Defendant Port of Morrow is an Oregon public entity that operates an industrial wastewater treatment and disposal system in Morrow County that is the largest industrial wastewater land application system in Oregon, owns three farms, and operates and maintains drinking water infrastructure that it uses to provide clean water to tenants. *Id.* at ¶ 34.

Defendant Lamb Weston "owns approximately 1,180 acres of farmland in Umatilla County" and "operates an industrial wastewater treatment and disposal system in Umatilla County." *Id.* at ¶ 35.

Defendant Madison Ranches "owns approximately 21,300 acres of farmland in Umatilla and Morrow Counties." *Id.* at ¶ 36.

---

[2] Plaintiffs seek to bring their claims on behalf of themselves and as a class action representing three classes: a (1) resident class of "[a]ll persons who currently reside in" LUBGWMA, (2) well-reliant subclass of "[a]ll persons who currently reside in the [LUBGWMA] and rely on private wells to supply their drinking water," and (3) renter/owner subclass of "[a]ll persons who currently rent or own property in the [LUBGWMA] that is supplied with drinking water via either private wells or via a public water system." *Id.* at ¶ 100. Here, Defendants only challenge Plaintiffs' individual claims. The sufficiency of Plaintiffs' class allegations under Rule 23 are not at issue.

[3] Plaintiffs also name John Does 1-10. The allegations against the unnamed defendants are not at issue in this motion.

Defendant Threemile Canyon Farms ("Threemile") owns 88,000 acres of land in Morrow County, of which "29,000 acres are devoted to range land and other open spaces," and "39,500 acres are irrigated farmland." *Id.* at ¶ 37. Threemile "also maintains concentrated animal feeding operations ('CAFOs')." *Id.*

Defendant Beef Northwest is a CAFO with an "active CAFO General Permit issued by the Oregon Department of Agriculture." *Id.* at ¶ 38.

Plaintiffs group Lamb Weston Holdings, Madison Ranches, and Threemile together as the "Defendant Farms." *Id.* at ¶ 5. They allege that Defendant Farms, in accordance with typical farming practices, use nitrogen fertilizer to increase crop yields. *Id.* at ¶ 61. But typical farming practices limit fertilizer application because "there is an upper limit to the amount of nitrogen that crops can recover"—known as the "agronomic rate"—and "[b]eyond that limit, any excess nitrogen leaches into the soil, where it converts into nitrates that contaminate groundwater." *Id.* Plaintiffs claim that Defendant Farms, and other farms in the area, over-use nitrogen fertilizer, causing 2.4 million pounds of nitrogen to leach into the soil each year. *Id.* at ¶¶ 62–63.

Beef Northwest also contributes to nitrate contamination as a CAFO in LUBGWMA. *Id.* at ¶¶ 66–68. "CAFOs typically manage the enormous amounts of animal waste they produce by storing it in 'lagoons' or other facilities and then applying it to nearby lands as fertilizer." *Id.* at ¶ 67. Nitrate contamination from CAFO lagoons is inevitable because they are "*designed* to leak." *Id.* (emphasis in original). CAFOs like Beef Northwest "may cause nitrate contamination when animal waste is spilled or otherwise leaks during handling." *Id.* But Plaintiffs identify CAFOs' manure land applications as the largest driver of nitrate contamination. *Id.* at ¶ 68.

The Port of Morrow and Lamb Weston, which Plaintiffs group together as "Defendant Wastewater Management Facilities," also contribute to LUBGWMA's nitrate contamination. *Id.*

PAGE 13 – FINDINGS AND RECOMMENDATION

at ¶¶ 69–73. Defendant Wastewater Management Facilities "contract with local food processors to collect and dispose of millions of gallons of nitrogen-heavy wastewater." *Id.* at ¶ 69. They treat the wastewater—without fully removing the nitrogen—and then "'recycle' it by pumping it to local farms, where it is sprayed out onto the lands." *Id.* The wastewater is pumped and applied to farms year-round, "including during winter, when most fields lie fallow and no crops benefit." *Id.* at ¶ 71. The Wastewater Management Facilities have not installed adequate digesters or other technology to sufficiently treat the wastewater to reduce nitrogen. *Id.* at ¶ 72. As a result, excess nitrogen is applied to fields and further contaminates groundwater. *Id.* at ¶ 73. They have also repeatedly violated their wastewater permits due to severe leaks in the wastewater pipelines and overapplication of nitrogen materials to fields above the agronomic rate. *Id.* at ¶¶ 74–93.

## DEFENDANTS' REQUESTS FOR JUDICIAL NOTICE

The Court first addresses Defendants' requests for judicial notice. For the purposes of their Rule 12 motions, Defendants ask this Court to take judicial notice of numerous documents, the vast majority of which are not in dispute.[4]

---

[4] Beef Northwest requests that this Court take judicial notice of (1) records detailing LUBGWMA Action Plans and the Committee's bylaws, Exs. 1–3; (2) a petition to the EPA to take action on groundwater contamination in LUBGWMA, Ex. 4; (3) letters between public agencies, Exs. 5–11; and (4) documents pertaining to civil penalties and state actions taken in LUBGWMA, Exs. 12–13. ECF 52-1–13. Lamb Weston requests that this Court take judicial notice of (1) the 2020 LUBGWMA action plan, Ex. 1; (2) a permit and operating plan held by Lamb Weston, Exs. 2–3; (3) civil penalty, enforcement orders, and compliance plans against Lamb Weston, Exs. 4–7, 13–14; copies of DEQ's public statements, Exs. 8–11; a letter from EPA to Oregon state agencies, Ex. 12. ECF 53, 55-1–13, 84. The Port of Morrow and Threemile request that this Court take judicial notice of the MAO between the Port and state agencies and the OTCA notice sent by Plaintiffs to Port of Morrow. Isaak Decl. Exs. 1, 8, ECF 57-8. The Port of Morrow, Threemile, and Madison Ranches further request that this Court take judicial notice of the 2024 Oregon Nitrate Reduction Plan. Isaak Decl. Ex. 9, ECF 83; Madison Ranches Reply in Supp. of Judicial Notice, ECF 87.

Plaintiffs object to the Court taking judicial notice of documents offered by Madison Ranches related to the term "irrigation return flow" and documents showing that Threemile operates under a CAFO permit issued by ODA. Resp. to Defs.' Req. for Judicial Notice 4–8, ECF 70. Both of these categories of documents pertain to Defendants' motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the following reasons, Defendants' motions for judicial notice should be GRANTED.

## I.    Standard of review.

Generally, when considering a Rule 12(b)(6) motion to dismiss, this Court may only consider the allegations in the pleadings; consideration of materials beyond the pleadings converts the motion to dismiss into a motion for summary judgment. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Judicial notice under Federal Rule of Evidence ("FRE") 201 is an exception to that general rule. *Wai Ola All. v. United States Dep't of the Navy*, 734 F. Supp. 3d 1034, 1044 (D. Haw. 2024). "Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja*, 899 F.3d at 999 (quoting Fed. R. Evid. 201(b)). And "[a] fact is not subject to reasonable dispute if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* Thus, a court may take judicial notice of public records without converting a motion to dismiss into one for summary judgment, but it "cannot take judicial notice of *disputed facts* contained in such public records." *Id.* (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (emphasis added)). "Matters of public record include records and reports of state agencies." *San Diego Coastkeeper v. Pick-Your-Part Auto Wrecking*, No. 22-CV-1693 TWR (DDL), 2023 WL 4879832, at *4 (S.D. Cal. July 31, 2023).

The party seeking judicial notice bears the burden of persuading the trial court that the materials are the proper subjects of judicial notice. *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011). Where Defendants have asked that this Court take judicial notice of the documents rather than identifying particular facts within the document, this Court will limit the judicially noticed fact to the existence of the documents and not the truth of the matters asserted therein. *See Capaci v. Sports Rsch. Corp.*, 445 F. Supp. 3d 607, 617 (C.D. Cal. 2020) (denying request for judicial notice where the defendant "does not identify which facts within the exhibits it asks the court to judicially notice").

## II.    Madison Ranches' request for notice.

Madison Ranches requests that the Court take judicial notice of an EPA report and a report prepared for the Department of the Interior ("DOI") that it cites in support of its proposed definition and understanding of "irrigation return flow." Mot. to Dismiss 9 nn.2–3, ECF 59.

FRE 201 does not govern judicial notice of a legislative fact. Fed. R. Evid. 201(a). "Legislative facts . . . are those which have relevance to legal reasoning and the lawmaking process." Fed. R. Evid. 201(a) advisory committee's notes. Judicial notice of legislative facts is generally unnecessary. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *see also Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) ("[J]udicial notice is generally not the appropriate means to establish the legal principles governing the case."), *holding modified by Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776 (6th Cir. 2003). When engaging in statutory interpretation for the purposes of evaluating a Rule 12(b)(6) motion, courts may consider informal agency interpretations of the language. *See, e.g.*, *Paiva v. Curda*, 162 F. Supp. 3d 1056, 1064–65 (C.D. Cal. 2016) (considering an agency policy manual's interpretation of a regulation).

This Court need not take judicial notice of the two reports submitted by Madison Ranches to consider the definitions offered therein because they are legislative facts that provide a guidepost for the Court's statutory interpretation. Madison Ranches' request should be GRANTED, at least to the extent that this Court will consider those documents without taking judicial notice of them.

### III.    Threemile's request for notice.

Threemile requests that the Court take judicial notice of documents and permits related to its CAFO operations. Isaak Decl. Exs. 2–7, ECF 57-2–7. Specifically, it seeks to establish that there is a state-created regulatory framework for CAFOs, and Threemile is subject to it. Reply in Supp. of Req. for Judicial Notice 1, ECF 80.

The Court acknowledges Plaintiffs' concerns about relying on the documents to establish Threemile's obligations as a CAFO. Resp. to Defs.' Req. for Judicial Notice 7–8. But the Complaint alleges that Threemile maintains CAFOs, FAC ¶ 37, and would therefore be subject to regulation. Therefore, this Court takes judicial notice of the documents—which it finds are public records—for the limited purpose of establishing that Threemile operates CAFOs that are subject to regulation. As explained later, the Court does not rely on the documents to determine Threemile's rights and obligations as a CAFO. Threemile's request for judicial notice should therefore be GRANTED.

### DEFENDANTS' MOTIONS TO DISMISS

### I.    Primary jurisdiction and *Burford* abstention.

All Defendants ask this Court to exercise its discretion to apply the doctrine of primary jurisdiction to dismiss or stay this case. In the alternative, Defendants urge the Court to abstain

under *Burford* and decline to exercise jurisdiction over the case. For the following reasons, Defendants motions to dismiss on jurisdictional grounds should be DENIED.

### A.    Standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(1).

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss for lack of subject-matter jurisdiction. *See Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1227 (9th Cir. 2011) ("Article III standing is a species of subject matter jurisdiction."). Once the question of jurisdiction is raised, the burden of establishing subject matter jurisdiction rests on the party asserting such jurisdiction. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942).

Because both the primary jurisdiction doctrine and *Burford* abstention involve this Court refraining from hearing a case over which it would otherwise have jurisdiction, they must be viewed with caution. As explained below, because "the primary jurisdiction doctrine is in effect, a power-allocating mechanism, a court must not employ the doctrine unless the particular division of power was intended by Congress." *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1363 n.13 (9th Cir. 1987). Similarly, "[f]ederal courts abstain out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996). In both cases, a court refraining from exercising its federal jurisdiction should be "the exception, not the rule." *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992). Indeed, "the federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given to them.'" *Id.* (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

A Rule 12(b)(1) motion may be either a facial or factual attack. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by

themselves, would otherwise invoke federal jurisdiction." *Id.* "[I]n a factual challenge, a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment . . . . It also need not presume the truthfulness of the plaintiff's allegations." *Pacificorp v. Nw. Pipeline GP*, No. CV. 10-99-PK, 2010 WL 3199950, at *6 (D. Or. June 23, 2010) (internal citation and quotation omitted), *report and recommendation adopted*, No. CIV. 10-99-PK, 2010 WL 3219533 (D. Or. Aug. 9, 2010).

      **B.**      **Primary jurisdiction.**

            **1.**      **Legal standards.**

      "The doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63 (1956). It "applies where a claim is originally cognizable in the courts[] and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 63–64; *see also Reiter v. Cooper*, 507 U.S. 258, 268 (1993).

      The doctrine originated, in part, due to the Supreme Court's recognition of the "desirable uniformity" that would result "if initially a specialized agency passed on certain types of administrative questions." *Western Pac. R.R. Co.*, 352 U.S. at 64. Later, the Court recognized and stressed the "expert and specialized knowledge of the agencies involved" as a reason to apply the primary jurisdiction doctrine. *Id.*; *see also United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 353 (1963) (Primary jurisdiction "requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency [that] administers the scheme."). Those factors support the principle "that in cases raising issues of fact

not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Western Pac. R.R. Co.*, 352 U.S. at 64. "In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Id.* Ultimately, "it is the extent to which Congress, in enacting a regulatory scheme, intends an administrative body to have the first word on issues arising in judicial proceedings that determines the scope of the primary jurisdiction doctrine." *Gen. Dynamics Corp.*, 828 F.2d at 1362.

When primary jurisdiction applies, "the judicial process is suspended pending referral of such issue to the administrative body for its views." *Western Pac. R.R. Co.*, 352 U.S. at 64. In practice, "referral" means that "the court either stays proceedings or dismisses the case without prejudice, so that the parties may seek an administrative ruling." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008). But referral "does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Reiter*, 507 U.S. at 268–69.

There is no "fixed formula" for applying the doctrine of primary jurisdiction. *Western Pac. R.R. Co.*, 352 U.S. at 64. But the Ninth Circuit has noted four factors "uniformly present" in cases where the doctrine is properly invoked, including "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Gen. Dynamics Corp.*, 828 F.2d at 1362. The Ninth Circuit has further explained that "efficiency is the deciding factor in determining whether to invoke primary jurisdiction." *Astiana v. Hain Celestial Grp.*,

*Inc.*, 783 F.3d 753, 760 (9th Cir. 2015). All the factors noted by the Ninth Circuit reflect that the primary jurisdiction doctrine "is designed to protect agencies possessing 'quasi-legislative powers' and that are 'actively involved in the administration of regulatory statutes.'" *Clark*, 523 F.3d 1115 (quoting *Gen. Dynamics Corp.*, 828 F.2d at 1365).

Ultimately, balancing the factors "and determining whether the doctrine should apply is 'committed to the sound discretion of the court.'" *Eagle Star Rock Prods. LLC v. PCC Structurals, Inc.*, No. 3:24-cv-00681-IM, 2024 WL 4751519, at *4 (D. Or. Nov. 11, 2024) (quoting *Syntek Semiconductor Co. v. Michrochip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002)). "At the motion-to-dismiss stage, 'the question is whether any set of facts could be proved which would avoid application of the doctrine.'" *Id.* (quoting *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1088 (9th Cir. 2006).

## 2.    Analysis.

Although there is no "fixed formula" for applying primary jurisdiction, this Court finds that a careful analysis of each of the *General Dynamics* factors, along with the overarching consideration of efficiency, compels the conclusion that it cannot decline to exercise jurisdiction in this case.

### a.    The need to resolve the issue.

The first factor is the need to resolve the issue. Neither party disputes that there is immediate and serious need to address nitrate contamination in LUBGWMA.

### b.    Placed by Congress with an administrative body with regulatory authority.

Although "competence of an agency to pass on an issue is a necessary condition to the application of the doctrine, competence alone is not sufficient." *Astiana*, 783 F.3d at 760; *see also United States v. Culliton*, 328 F.3d 1074, 1082 (9th Cir. 2003). Rather, "[t]he particular

agency deferred to must be one that Congress has vested with the authority to regulate an industry or activity such that *it would be inconsistent with the statutory scheme* to deny the agency's power to resolve the issues in question." *Gen. Dynamics Corp.*, 828 F.2d at 1363 (emphasis added). Additionally, "a court should not invoke primary jurisdiction when the agency is aware of but has expressed no interest in the subject matter of the litigation." *Astiana*, 783 F.3d at 761.

"RCRA 'is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste.'" *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1089 (9th Cir. 2017) (quoting *Meghrig v. KFC W. Inc.*, 516 U.S. 479, 483 (1996)). Its primary purpose is to minimize the present and future threats that wastes pose to human health and the environment. 42 U.S.C. § 6902(b); *see also Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 515 (9th Cir. 2013) ("Congress enacted RCRA to 'eliminate[] the last remaining loophole in environmental law' by regulating the 'disposal of discarded materials and hazardous wastes.'") (quoting H.R. Rep. No. 94-1491(I), at 4 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6241).

Like other environmental laws, "RCRA provides for private enforcement via citizen suit." *Ecological Rts. Found.*, 874 F.3d at 1089. It creates "a private cause of action against a person 'who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.'" *Id.* (quoting 42 U.S.C. § 6972(a)(1)(B)). Congress has noted that citizen suits "complement, rather than conflict with" agency enforcement of the law. H.R. Rep. No. 98-198, pt. 1, at 53 (1983), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5612.

"RCRA's approach to regulating solid and hazardous waste is one of cooperative federalism." *Chico Serv. Station, Inc. v. Sol P.R. Ltd.*, 633 F.3d 20, 27 (1st Cir. 2011) (identifying RCRA's underground storage tank program as emblematic of that approach). Congress placed responsibility for RCRA enforcement with the EPA. *See* 42 U.S.C. § 6928(a)(1) ("[W]henever on the basis of any information the Administrator determines that any person has violated or is in violation of [RCRA], the Administrator may issue an order assessing a civil penalty . . . ."); 42 U.S.C. § 6903(1) (specifying that "Administrator" means the Administrator of the Environmental Protection Agency). And the EPA has authorized Oregon to implement parts of RCRA, including the Hazardous Waste Disposal program. Groves Decl. Ex. 9, ECF 55-9 (showing EPA authorized DEQ to operate RCRA's hazardous waste program in lieu of EPA); Or. Rev. Stat. § ("ORS") 466.086 (authorizing DEQ to act to gain EPA authorization to carry out a hazardous waste regulatory program under RCRA).

Given that spirit of cooperative federalism, the text and context of RCRA does not demonstrate that Congress intended to place initial consideration of the issue with DEQ. Rather, the citizen suit provision makes it clear that it would be consistent with RCRA's statutory scheme for this Court to retain jurisdiction over the case rather than refer it to state agencies. *See Eagle Star Rock Prods. LLC*, 2024 WL 4751519, at *5 (reaching the same conclusion when evaluating a primary jurisdiction argument in a RCRA citizen suit action). RCRA's citizen suit provision specifies the circumstances in which judicial review is unavailable. 42 U.S.C. § 6972(b) (establishing a diligent prosecution bar wherein enforcement actions by federal or state authorities bar a person from bringing a citizen suit). Here, Plaintiffs have complied with RCRA's notice provision, 42 U.S.C. § 6972(b)(2)(A); FAC ¶ 117, and neither federal nor state authorities have commenced an action to abate the acts or conditions at issue, 42 U.S.C. §

6972(b)(2)(B)-(C). Where, as here, state agencies have not commenced any of the actions set forth under the diligent prosecution bar, 42 U.S.C. § 6972(b)(2)(C), invoking primary jurisdiction would thwart Congress's intent to provide affected citizens a forum to litigate alleged RCRA violations. Thus, this Court finds that this factor does not warrant application of the primary jurisdiction doctrine.

### c.    Pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme.

The parties dispute whether nitrate contamination in LUBGWMA is subject to a comprehensive regulatory scheme. Much of the parties' arguments focus on the recent Oregon Nitrate Reduction Plan. Indeed, it is undisputed that four Oregon state agencies—including DEQ, the Department of Agriculture (ODA), the Oregon Health Authority (OHA), and the Oregon Water Resources Department (OWRD)—collaborated with stakeholders to issue the Oregon Nitrate Reduction Plan for the Lower Umatilla Basin Groundwater Management Area. Port & Threemile Reply in Supp. of Mot. to Dismiss 3, ECF 81. Defendants characterize it as setting forth a multi-pronged, long-term approach to reduce nitrate contamination. *Id.* Plaintiffs characterize it as a continuation of LUBGWMA's "ineffective strategy in its 1997 and 2020 plans." Pls.' Mot. to Strike 5, ECF 89.

This Court need not resolve the effectiveness of this management strategy, however. Instead, this Court finds that there is no "comprehensive regulatory scheme" for the same reason that it finds that this issue was not placed with an administrative body with regulatory authority: RCRA includes a citizen suit provision that specifies when a person may and may not bring a suit. *See* 42 U.S.C. § 6972(a)-(b). The citizen suit provision is "expansive." *Cal. River Watch v. City of Vacaville*, 39 F.4th 624, 629 (9th Cir. 2022); *see also Ecological Rts. Found.*, 874 F.3d at 1089. And its "structure demonstrates that Congress did not assign *comprehensive* regulatory

authority to the EPA; rather, Congress assigned substantial enforcement responsibility to federal courts and the public." *Eagle Star Rock Prods. LLC*, 2024 WL 4751519, at *5. In sum, the Court concludes that this factor does not warrant application of the primary jurisdiction doctrine because the statute establishes that citizen suits are part of its regulatory scheme.

> ### d.      That requires expertise and uniformity in administration.

"[V]irtually every RCRA case will involve 'technical matters' . . . that fall within the purview of an expert agency." *Id.* at *5. But primary jurisdiction does not "require that all claims within an agency's purview [must] be decided by the agency," and it is not intended to "secure expert advice for courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's gambit." *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002). And primary jurisdiction is appropriate only in limited circumstances, such as cases involving "technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry." *Astiana*, 783 F.3d at 760.

Here, Defendants argue that, given the technical issues involved in fashioning remedies—such as the methods used when identifying contaminated areas—it should be left to DEQ's expertise. *See, e.g.*, Lamb Weston Mot. to Dismiss 17–19, ECF 54. But federal courts routinely decide "complicated environmental tort cases, which blend [discrete] facts with federal law, state law, and administrative regulations." *California v. Kinder Morgan Energy Partners, L.P.*, 569 F. Supp. 2d 1073, 1084 (S.D. Cal. 2008). There is ample caselaw to guide this Court's determination of Defendants' liability under RCRA and "whether the contamination at issue satisfies the imminent-and-substantial-endangerment element." *Eagle Star Rock Prods. LLC*, 2024 WL 4751519, at *5 (citing *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943,

950–55 (9th Cir. 2023) and *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 474–76 (9th Cir. 2024)). To be sure, this case could present unique challenges because of the number of named parties and the broad geographic scope, which further complicates any judicial remedy. *Cf. Radiant Servs. Corp. v. Allegheny Techs. Inc.*, No. LA CV12-04497 JAK (PLAx), 2013 WL 12377686, at *3 (C.D. Cal. Mar. 19, 2013) (declining to invoke primary jurisdiction where the action "concern[ed] the cleanup of a single property, not a plan with broad geographic reach"). But this action ultimately presents RCRA and state law claims that this Court is competent to resolve. Therefore, this Court finds that the technical aspects of this action do not favor application of the primary jurisdiction doctrine.

Defendants also raise the possibility that this Court could create uniformity problems by retaining jurisdiction and issuing "conflicting directives" that are different from those required by DEQ. *See, e.g.*, BNW Mot. to Dismiss 19. Courts have recognized uniformity concerns as a basis for applying the primary jurisdiction doctrine when state administrative proceedings were ongoing. *See, e.g.*, *Wai Ola All.*, 734 F. Supp. 3d at 1047. But courts have also recognized that, *if* there is a conflict between its ultimate disposition of the case and an agency's conclusion, then it "may resolve that conflict by considering the agency orders and permitting the agencies to comment before ordering relief." *See, e.g.*, *Eagle Star Rock Prods. LLC.*, 2024 WL 4751519, at *6 (citing *Wilson v. Amoco Corp.*, 989 F. Supp. 1159, 1170 (D. Wyo. 1998)).

This Court is mindful of the uniformity concerns raised by Defendants. And this Court notes that the litigation presents the potential for discrepancies between the named Defendants and the remaining nitrate contributors in LUBGWMA who are subject to the 2024 Nitrate Reduction Plan. Specifically, this action could subject the named parties to stricter measures than others in LUBGWMA. Nevertheless, this Court concludes that the potential for conflict or lack

of uniformity does not warrant application of the primary jurisdiction doctrine, particularly when this Court could resolve or avoid conflicts *if* they are to arise.

### e.  Efficiency.

"The primary jurisdiction doctrine is rooted in part in judicial efficiency; if an agency has particular expertise in an area, then invoking the primary jurisdiction doctrine could enhance court decision-making and efficiency by allowing the court to take advantage of [that] administrative expertise." *United States v. Philip Morris USA Inc.*, 686 F.3d 832, 838 (D.C. Cir. 2012) (internal quotation and citation omitted); *see also Astiana*, 783 F.3d at 760 n.4 (noting that the Supreme Court "has discussed judicial economy in several of its primary jurisdiction opinions"). On the other hand, primary jurisdiction should not be invoked if it "would needlessly delay the resolution of claims," or "when a referral to the agency would significantly postpone a ruling that a court is otherwise competent to make." *Astiana*, 783 F.3d at 760–61.

As discussed, Oregon state agencies have significant expertise with nitrate contamination in LUBGWMA. But this Court is unconvinced that "referring" the case to state agencies would result in a speedier resolution of Plaintiffs' claims. Although this Court does not question that the release of the updated Oregon Nitrate Reduction Plan demonstrates that Oregon has been somewhat diligent in its handling of groundwater issues in LUBGWMA, the fact remains that it is just a plan, and there is no current proceeding or enforcement action that would allow Plaintiffs to seek the relief that they could seek under RCRA in this proceeding. Thus, this Court finds that efficiency considerations do not warrant application of the primary jurisdiction doctrine.

In sum, this Court finds that neither the *General Dynamics* factors nor the overarching consideration of efficiency weighs in favor of applying the primary jurisdiction doctrine.

Therefore, the Court recommends that Defendants' motions to dismiss based on primary jurisdiction be DENIED.

### C.     *Burford* abstention.

#### 1.     Legal standards.

"Although a federal equity court does have jurisdiction of a particular proceeding, it may, in its sound discretion . . . refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest." *Burford v. Sun Oil Co.*, 319 U.S. 315, 317–18 (1943) (internal quotation omitted). The Supreme Court has created a two-prong approach to identifying situations where, when "timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (hereinafter "*NOPSI*"). First, abstention is proper "when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar.'" *Id.* (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 814). Second, abstention is proper "where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Id.*

The Ninth Circuit has explained that *Burford* abstention applies when (1) "the state has chosen to concentrate suits challenging the actions of the agency involved in a particular court," (2) "federal issues could not be separated easily from complicated state law issues with respect to which the state courts might have special competence," and (3) "federal review might disrupt state efforts to establish a coherent policy." *Blumenkron v. Multnomah Cnty.*, 91 F.4th 1303, 1312 (9th Cir. 2024) (cleaned up).

2.      **Analysis.**

Defendants all argue that *Burford* abstention is proper in this case to prevent this Court from disrupting Oregon's unified regulatory procedures controlling groundwater contamination in LUBGWMA. *See, e.g.*, Port & Threemile Mot. to Dismiss 14–17, ECF 56. This Court finds that *Burford* abstention is not warranted here because abstention risks frustrating Congressional intent to allow enforcement through RCRA citizen suits, and the requirements for abstention articulated by the Ninth Circuit are not met.

As an initial matter, two general considerations counsel against abstention here. First, as noted above, Congress included a citizen suit provision in RCRA that specifies when a case may be brought and when federal judicial review is unavailable. 42 U.S.C. § 6972 (a)-(b). Abstention is premised on principles of comity and federalism. *Ankenbrandt*, 504 U.S. at 705. And here, Congress has articulated the situations in which state action would prevent federal judicial review by including a diligent prosecution bar. 42 U.S.C. § 6972(b)(1)(B), (b)(2)(C). To abstain in situations other than those articulated in the statute "threatens an 'end run around RCRA,'" and risks substituting a court's "judgment for that of Congress about the correct balance between respect for state administrative processes and the need for consistent and timely enforcement of RCRA." *Chico Serv. Station, Inc.*, 633 F.3d at 31 (quoting *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998)).

Second, the language of the citizen suit provision has led most courts to conclude that federal courts have exclusive jurisdiction over RCRA cases. *Id.* (noting language in § 6972(a) "which states both that citizen suits 'shall be brought in the district in which the alleged violation occurred or the alleged endangerment may occur' and that '[t]he district court shall have jurisdiction' to grant relief in such suits"). This Court finds that those two considerations, before

moving to the factors set forth by the Ninth Circuit, weigh heavily against abstention in a RCRA citizen suit.

Furthermore, as discussed below, none of the factors set forth by the Ninth Circuit favor abstention.

### a.      Concentrating suits in a particular court.

The first factor, whether the state has chosen to concentrate suits challenging the actions of an agency in a particular court, does not weigh in favor of abstention. The lone Oregon case to apply *Burford* abstention to a RCRA citizen suit, *Space Age Fuels, Inc. v. Standard Oil Co. of Cal.*, Civ. No. 95-1637-JE, 1996 WL 160741 (D. Or. Feb. 29, 1996), shows that this factor is not seen here. In *Space Age Fuels, Inc.*, the plaintiff sued prior owners of a bulk fuel oil storage facility to establish their liability for cleanup costs associated with petroleum contamination. 1996 WL 160741, at *1–2. The plaintiff sued after Oregon DEQ issued enforcement actions and imposed civil penalties on it—rather than the prior owners—due to the site's contamination. *Id.* at *2. The court noted that Oregon law already provided a mechanism for "innocent" landowners like the plaintiff to petition DEQ for recovery of remediation costs. *Id.* at *4. And the court noted that, if the plaintiff was not satisfied with the results of its petition, "Oregon law provides a forum for [it] in the state circuit court." *Id.*

Here, unlike the plaintiffs in *Space Age Fuels*, Plaintiffs are not seeking to circumvent Oregon's established mechanisms for challenging a state agency enforcement action. But Defendants nevertheless argue that this factor is satisfied because Oregon law provides a mechanism for Plaintiffs to challenge enforcement of DEQ permits and adjudicate water contamination issues. Port & Threemile Mot. to Dismiss 15. Defendants also note that Oregon's

Administrative Procedure Act would allow Plaintiffs to challenge agency action or inaction in LUBGWMA. BNW Mot. to Dismiss 23.

This Court rejects Defendants' arguments. Plaintiffs are not attempting an end-run around established ways to challenge state agencies' actions. Although they characterize the state's actions to address groundwater contamination in LUBGWMA as insufficient, Plaintiffs are not seeking to change a state-issued determination. Rather, they are seeking to use RCRA's citizen suit provision as it was designed: they are pursuing enforcement of a federal claim where—according to the Complaint—the state and federal governments have declined to act. Whether Plaintiffs could challenge agency actions or inaction is separate from the federal claim that Plaintiffs bring against Defendants. Therefore, the first factor has not been met.

### b.      Intertwined federal issues.

The second factor, whether federal issues are intertwined with state law issues that state courts have special competence addressing, is also not met. *Burford* itself provides a useful point of comparison for this factor. There, the plaintiff brought a due process challenge attacking the validity of a state commission's order permitting oil drilling. *Burford*, 319 U.S. at 316–17. But "[t]he constitutional challenge was of minimal importance," and the suit primarily involved "the question [of] whether the commission had properly applied Texas' complex oil and gas conservation regulations." *NOPSI*, 491 U.S. at 360 (discussing *Burford*). The Court found that abstention was appropriate, in part, because of the state court's specialized knowledge of the regulations and industry. *Id.* In contrast, *Burford* abstention has been found to be "inappropriate where 'the federal questions . . . can readily be identified and reserved without colliding with what are essentially state claims.'" *Blumenkron*, 91 F.4th at 1314 (quoting *Santa Fe Land Improvement Co. v. City of Chula Vista*, 596 F.2d 838, 842 (9th Cir. 1979)).

PAGE 31 – FINDINGS AND RECOMMENDATION

Here, Plaintiffs are suing under RCRA's citizen suit provision, which is a federal cause of action. Unlike the constitutional claim in *Burford*, the RCRA claim is of critical importance. Indeed, it is the crux of the suit and the basis for this Court's jurisdiction. It is an expansive claim, but it does not primarily involve state law claims or the Plaintiffs challenging a state agency's application of Oregon law. Rather, its focus is on Defendants' actions and whether they violated RCRA. Although Plaintiffs cite state regulations, including referencing state standards on nitrate contamination, that does not convert the Complaint to one inextricably linked to complex state law issues. Nor do Plaintiffs' state law claims, brought under this Court's supplemental jurisdiction, convert this suit to one primarily based on state law. Therefore, the second factor is not met.

### c.    Disruption of state efforts.

The third factor, whether federal review may disrupt state efforts to establish a coherent policy, is a closer call but ultimately does not warrant abstention. The question is whether federal adjudication of the claim would "unduly intrude into state governmental processes or undermine the State's ability to maintain desired uniformity in the treatment of essentially local problems." *NOPSI*, 491 U.S. at 351. But although *Burford* "is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *Id.* at 362 (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 815–16); *see also Zablocki v. Redhail*, 434 U.S. 374, 379 n.9 (1978) ("And there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.").

As shown by Oregon's multi-decade awareness and monitoring of groundwater contamination in LUBGWMA, the state is attempting to establish a policy on how best to address the complex problem. The 2024 Nitrate Reduction Plan shows that Oregon is pursuing a unified approach to that problem. And federal review could alter that by, for example, requiring a defendant to take an action beyond that required by the state's plan. But ultimately, this Court declines to find that this factor has been met based on the mere potential for conflict between orders issued by this Court to remedy any RCRA violations and the state's ongoing actions related to nitrate contamination in LUBGWMA.

For these reasons, this Court recommends that Defendants' motions for the Court to abstain under *Burford* be DENIED.

## II.    "Shotgun" pleading.

Defendants argue that the Complaint is an impermissible "shotgun" pleading that contains generalized accusations and fails to specify "*which* Defendant engaged in *which* conduct and *which* Defendant caused *what* harm." *See, e.g.*, Lamb Weston Mot. to Dismiss 25 (emphasis in original). Although this Court agrees that the Complaint lacks clarity as to the role of each Defendant, it nevertheless recommends that this motion be DENIED.

### A.    Legal standards.

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "Each allegation must be simple, concise and direct." Fed. R. Civ. P. 8(d)(1). If the factual elements of a cause of action are scattered throughout the complaint but are not organized into a "short and plain statement of the claim," dismissal for failure to satisfy Rule 8(a) is proper. *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 640 (9th Cir. 1988).

"Pleadings that seek to overwhelm defendants with an unclear mass of allegations and make it difficult to impossible for the defendants to make informed responses to the plaintiff's allegations are considered 'shotgun' pleadings." *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 943 (D. Or. 2020) (citing *Autobidmaster, LLC v. Alpine Auto Gallery, LLC*, No. 3:14-cv-1083-AC, 2015 WL 2381611, at *15 (D. Or. May 19, 2015)). "Another type of 'shotgun' pleading is a complaint that asserts claims against 'multiple defendants without specifying which of the defendants are responsible for which acts or omissions.'" *Id.* (quoting *Nissen v. Lindquist*, No. C16-5093 BHS, 2017 WL 26843, at *2 (W.D. Wash. Jan. 3, 2017)). "Finally, a complaint may constitute impermissible 'shotgun' pleading if it fails to connect its factual allegations to the elements comprising plaintiff's claims such that it denies the parties adequate notice of the allegations supporting each cause of action." *Id.* (citations omitted). Shotgun pleadings violate Rule 8 and are subject to dismissal under Rule 12(b)(6) for failure to state a claim. *See, e.g.*, *Autobidmaster, LLC*, 2015 WL 2381611, at *15.

**B.    Analysis.**

The Complaint is—at least arguably—a shotgun pleading of the second type: one that names multiple defendants without specifying which of the defendants are responsible for which acts or omissions. Plaintiffs name five defendants in six separate causes of action, and the individual claims for relief do not specify the role of each individual defendant. At times, Plaintiffs distinguish between three classes of defendants—CAFOs, wastewater processors, and farms—and specify the alleged harm caused by each. But many of Plaintiffs' claims generally reference "Defendants' actions" without differentiating the specific conduct each defendant is

alleged to have engaged in.[5] There is no plausible basis to suggest that each defendant played the same alleged role in bringing about that harm. Moreover, even where the specific defendant can be readily identified, it is not always clear which specific act or omission alleged in the factual background gives rise to the particular claim for relief.[6] For that reason, the Complaint could be construed as a shotgun pleading.

Nevertheless, the Complaint should not be dismissed as a shotgun pleading. As discussed below, Plaintiffs have raised distinct factual allegations regarding Defendants' farming practices, CAFO operations, and wastewater treatment operations and—at least in the factual background—specified which Defendants are involved in which activities. Although Plaintiffs lump together all Defendants in their claims for relief, when those claims for relief are read in conjunction with the detailed factual background, it is generally apparent which Defendants are involved in which actions. It is therefore not "difficult to impossible" for Defendants to respond to Plaintiffs' claims, and it should not be dismissed as an impermissible "shotgun pleading" at this juncture.[7] Defendants' motion to dismiss under Rule 8(a)(2) should therefore be DENIED.

---

[5] As one example, Plaintiffs take issue with "Defendants' disposal of wastewater." FAC ¶ 141. Perhaps this allegation is directed at Defendants who participate in wastewater treatment pursuant to a permit, which includes Lamb Weston and Port of Morrow. *Id.* at ¶ 69. Or perhaps this allegation references "wastewater" more broadly to encompass other defendants. Either way, it is not clear from the Complaint which defendants are involved in this alleged wastewater disposal.

[6] As another example, it is unclear whether Plaintiffs allege that Threemile, which operates both farms and CAFOs, FAC ¶ 37, is named as one of the CAFO defendants. Threemile assumes that it is not, *see* Def. Port of Morrow and Threemile Mot. to Dismiss 25 n.8, but it is not clear from the Complaint.

[7] Plaintiffs have already been given leave to amend their complaint, ECF 93, which may include adding additional defendants and will likely include clarifying many of their claims. Plaintiffs are therefore advised that subsequent complaints should identify—with clarity and particularity—the actions of each defendant (or class of defendants, such as wastewater treatment, CAFOs, and farms), even if those actions allegedly resulted in the same general

PAGE 35 – FINDINGS AND RECOMMENDATION

III.    **Failure to state a claim for relief.**

For multiple reasons, all Defendants move to dismiss Plaintiffs' RCRA and Oregon state law claims for failure to state a claim for relief. As discussed below, Defendants' motions should be GRANTED in part and DENIED in part.

A.    **Standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6).**

Under Rule 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court may dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged" under a cognizable legal theory. *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also CallerID4u, Inc. v. MCI Commc'ns Servs. Inc.*, 880 F.3d 1048, 1061 (9th Cir. 2018). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017). The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Twombly*, 550 U.S. at 556. When a plaintiff's complaint pleads facts that are "merely consistent with" a defendant's liability, the plaintiff's complaint "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557 (brackets omitted).

---

harms. Plaintiffs should further refrain from naming "defendants" generally when the specific allegation only pertains to a specific defendant or class of defendants.

The court must accept as true the allegations in the complaint and construe them in favor of the plaintiff. *Teixeira*, 873 F.3d at 678; *see also Iqbal*, 556 U.S. at 679; *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017). The pleading standard under Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555); *see also* Fed. R. Civ. P. 8(a)(2). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (internal citations omitted); *Kwan*, 854 F.3d at 1096. A complaint also does not suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 557. "Rule 8 does not empower [the] respondent to plead the bare elements of his cause of action . . . and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687.

### B.  Plaintiffs' RCRA claims.

As discussed in detail below, Defendants' motions to dismiss argue that Plaintiffs' RCRA claims fail because: Defendant CAFOs' discharges are excluded from the definition of "solid waste"; Defendant CAFOs cannot be liable under RCRA's anti-duplication provision; Defendant Farms' discharges are subject to the irrigation return flow exception; applying nitrogen-heavy materials to land is not "discarding" it; Plaintiffs failed to plead that Defendants handled, stored, transported, or disposed of solid waste; and Plaintiffs failed to plead an imminent and substantial endangerment to health or the environment. This Court finds that Plaintiffs failed to state a claim for relief under RCRA against Defendant Farms but did state claims for relief against the remaining Defendants. Thus, the motions to dismiss the RCRA claims should be GRANTED in part and DENIED in part.

### 1.     Plaintiffs' allegations.

As noted, Plaintiffs seek to use RCRA's citizen enforcement provision, 42 U.S.C. § 6972, to establish Defendants' liability for the nitrate contamination in LUBGWMA. Under the citizen suit provision, "any person" can commence a civil action:

> against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). Plaintiffs allege that Defendants have all either generated, transported, stored, or disposed of (1) nitrogen-heavy industrial wastewater, (2) excess nitrogen fertilizer, or (3) animal waste. FAC ¶ 112–13.

Plaintiffs allege that Defendants' industrial wastewater, excess nitrogen fertilizer, and animal wastes are "solid waste" under RCRA. Solid waste is defined as:

> *any* garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other *discarded material, including solid, liquid, semisolid*, or contained gaseous *material resulting from industrial*, commercial, mining, *and agricultural operations*, and from community activities, *but does not include* solid or dissolved material in domestic sewage, or *solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33* . . .

42 U.S.C. § 6903(5) (emphasis added). Plaintiffs allege that Defendants' (1) industrial wastewater, (2) excess nitrogen fertilizer, and (3) animal waste are "solid wastes" under 42 U.S.C. § 6903(27) because they "constitute discarded materials from Defendants' industrial, commercial, and agricultural operations." FAC ¶ 113.

Plaintiffs identify three ways that Defendants' improper handling, transportation, storage, and disposal of nitrogen-laden material has eliminated its usefulness to fertilizing or irrigating crops, thereby rendering it solid waste. First, Plaintiffs allege that Defendants allowed industrial

waste, wastewater, and industrial effluent to leach from waste lagoons into soil, and that Defendants did so without regard to the land's fertilization or irrigation needs and in violation of their wastewater permits. *Id.* at ¶ 115(a). Second, Plaintiffs allege that Defendants allowed wastewater to spill onto land and into the waters of Morrow and Umatilla Counties via leaks from their wastewater pipes, also without regard to the land's fertilization or irrigation needs and in violation of their wastewater permits. *Id.* at ¶ 115(b). Third, Plaintiffs allege that Defendants over-applied wastewater, fertilizer, and animal waste to agricultural fields at rates of millions of excess gallons per year, also without regard to the land's fertilization or irrigation needs and in violation of their wastewater permits. *Id.* at ¶ 115(c). Plaintiffs allege that those wastes constitute an imminent and substantial endangerment to human health and the environment by threatening groundwater quality in LUBGWMA. *Id.* at ¶ 116.

Plaintiffs further allege that Defendants' solid wastes are also "hazardous wastes." *Id.* at 113. The term "hazardous waste" means:

> *a solid waste*, or combination of solid wastes, *which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—*
>
> (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or
>
> (B) *pose a substantial present or potential hazard to human health or the environment* when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5) (emphasis added). Specifically, Plaintiffs contend that the wastes contain high levels of nitrogen, which, when converted to nitrates, pose a substantial hazard to the health of LUBGWMA residents. FAC ¶ 113.

### 2.    Permitted CAFO discharges under the Clean Water Act (CWA).

Defendant CAFOs argue that any discharges are definitionally excluded from being considered "solid waste," *see, e.g.*, BNW Mot. to Dismiss 23–25, and that any discharges to

groundwater may have been the "functional equivalent" of a discharge to navigable waters,

BNW Reply in Supp. 13–15, ECF 85. The Court finds that CAFO discharges into groundwater

are not definitionally excluded from RCRA's coverage because such coverage is not required by

the CWA and thus not subject to the exclusion. The Court further finds that whether Defendant

CAFOs discharges are "functionally equivalent" to a direct discharge is a fact-intensive inquiry

that should not be resolved on these motions to dismiss. Defendant CAFOs' motion should

therefore be DENIED.

"Solid waste" does not include "industrial discharges which are point sources subject to

permits under section 1342 of Title 33." 42 U.S.C. § 6903(27). Section 1342 of title 33 is the

section of the Clean Water Act (CWA) establishing the National Pollutant Discharge Elimination

System (NPDES) permit program. 33 U.S.C. § 1342. The NPDES program requires a permit for

any point source that discharges pollutants to navigable waters. 33 U.S.C. § 1342. CAFOs are

"point sources" for the purposes of the NPDES program and are therefore required to have an

NPDES permit. 33 U.S.C. § 1362(14).

RCRA's industrial discharge exclusion is intended "to avoid duplicative regulation, not to

create a regulatory hole through which billions of gallons of hazardous wastes can be pumped

into the earth without any controls." *Inland Steel Co. v. EPA*, 901 F.2d 1419, 1423 (7th Cir.

1990). Thus, a party is "not automatically exempt from RCRA liability simply by having an

NPDES permit for certain discharges; '[t]hey must be *required* by the [CWA] to have a permit

for the discharges at issue.'" *San Diego Coastkeeper*, 2023 WL 4879832, at *15 (quoting *Inland

Steel Co.*, 901 F.2d at 1422) (emphasis in original); *see also Cmty. Ass'n for Restoration of Env't

Inc. v. Wash. Dairy Holdings LLC.*, NO. 1:19-CV-3110-TOR, 2019 WL 13117758, at *7 (E.D.

Wash. Oct. 24, 2019) ("Since NPDES authorizes discharges to surface water but not

groundwater, the alleged groundwater discharges at issue in this case are not necessarily excluded from RCRA liability.").

The focus of the CWA's NPDES program is regulating point source discharges into navigable waters, including navigable streams, rivers, the oceans, or coastal waters. *Cnty. Of Maui, Haw. v. Haw. Wildlife Fund*, 590 U.S. 165, 171 (2020) (discussing 33 U.S.C. § 1362(12)). Groundwater is generally not covered by the CWA, but the Supreme Court has recognized that—in certain circumstances—a discharge into groundwater may be the "functional equivalent of a direct discharge" into navigable waters and thus require an NPDES permit. *Id.* at 183. Whether a discharge of pollutants into groundwater is the functional equivalent of a direct discharge—and thus is within the scope of the CWA's NPDES permit requirements—is a multi-factor, fact-specific inquiry. *Id.* at 184–85 (identifying seven factors).

Here, both Beef Northwest and Threemile are CAFOs operating under permits issued by ODA. FAC ¶ 38; Isaak Decl. Exs. 2–7. CAFO NPDES General Permit #01-2016, which covers Beef Northwest and Threemile,[8] regulates discharges to surface water *and* groundwater. Isaak Decl. Ex. 2 (CAFO NPDES General Permit) at 6, 10. The permit explains that it is required for "concentrated animal feeding operations [CAFOs] defined at 40 C.F.R. § 122.23 that discharge to waters of the U.S." *Id.* at 6.

As CAFOs, Beef Northwest and Threemile are industrial dischargers that are point sources subject to permits under the NPDES program. They have permits in accordance with the requirements of the CWA and Oregon's implementation of the NPDES program. And those

---

[8] CAFO owners or operators who fall within the classifications set forth in General Permit #01-2016 can seek coverage under that permit or apply for an NPDES individual permit. Isaak Decl. Ex. 2 at 6. Beef Northwest and Threemile represent that they have coverage under that permit. BNW Reply in Supp. of Mot. to Dismiss 13 n.21; Port & Threemile Reply in Supp. of Mot. to Dismiss 22–23.

PAGE 41 – FINDINGS AND RECOMMENDATION

permits address discharges into groundwater. But Beef Northwest and Threemile are not required by *the CWA* to have a permit for such discharges. The focus of the CWA's NPDES program is regulating discharges into navigable waters. And the language of the permit, which notes that CAFOs must obtain a permit for discharges to waters of the U.S, reflects that focus. Because Beef Northwest and Threemile are not required by the CWA to have NPDES permits for discharges into groundwater, RCRA's industrial discharge exclusion does not apply.

Whether the CAFOs' discharges to groundwater are the functional equivalent to discharges to navigable waters—and thus covered by the CWA and, by extension, RCRA's industrial discharge exclusion—cannot be resolved on these motions to dismiss. This Court is obligated to construe the Complaint in the light most favorable to the Plaintiffs. And this Court declines to engage in the multi-factor analysis required based on the limited information provided in the pleadings. For these reasons, Defendant CAFOs' motion to dismiss based on the industrial point source exclusion should be DENIED.

### 3.    Anti-duplication provision.

Defendant CAFOs argue that they cannot be liable under RCRA due to its anti-duplication exception. *See, e.g.*, BNW Mot. to Dismiss 23–25. Defendants' anti-duplication argument cannot be resolved as part of motions to dismiss because it would require consideration of factual evidence concerning Defendants' CAFO permits and the specific conditions of Plaintiffs' requested injunctive relief. Defendant CAFOs' motion should therefore be DENIED.

The anti-duplication exception states that RCRA does not apply to "any activity or substance which is subject to" the CWA, "except to the extent that such application (or regulation) is not inconsistent with the requirements of such other statutes." 42 U.S.C. § 6905(a). "The Ninth Circuit has found that the anti-duplication provision does not bar RCRA's

application unless requirements under RCRA and the CWA are mutually repugnant or contradictory, such that the application of one implies the abrogation or abandonment of the other." *Cmty. Ass'n for Restoration of Env't Inc.*, 2019 WL 13117758, at *5 (citing *Ecological Rts. Found.*, 874 F.3d at 1095) (cleaned up). Thus, "RCRA's anti-duplication provision does not bar RCRA's application unless that application contradicts a specific mandate imposed under the CWA." *Ecological Rts. Found.*, 874 F.3d at 1095.

As an initial matter, it is not clear that Plaintiffs' requested relief under RCRA—to the extent it exceeds the CAFO permit standards—is mutually repugnant or contradictory to the requirements of the CWA. As the court noted in *Community Ass'n for Restoration of Env't Inc.*, "[i]t is possible that RCRA imposes more stringent standards on Defendants without contradicting the CAFO permit standards to which Defendants are already subject." 2019 WL 13117758, at *6. More importantly, "[t]o fully consider Defendants' anti-duplication argument, the Court would have to consider factual evidence about Defendants' current CAFO permit requirements, the specific conditions Plaintiffs request as injunctive relief, and whether the latter conflicts with the former. This kind of factual inquiry goes well beyond the allegations contained in [the] Complaint." *Id.* Because the factual inquiry necessary to consider Defendant CAFOs' anti-duplication argument is beyond the allegations contained in the Complaint, it is therefore not proper for a Rule 12(b)(6) motion. Defendant CAFOs' motions to dismiss on anti-duplication grounds should therefore be DENIED.

### 4. Irrigation return flows.

Defendant Farms argue that RCRA's "irrigation return flow" exclusion exempts any nitrate contamination resulting from their farming and irrigation activities. *See, e.g.*, Madison Ranches Mot. to Dismiss 8–12. Plaintiffs propose a different interpretation of the exception,

arguing that it is limited to return flows from discrete conveyances rather than applying to dispersed groundwater contamination like that at issue here. *See* Opp'n to Mots. to Dismiss 38–40. And Plaintiffs further argue that Defendants' winter application of wastewater does not fall within the exception because it is for the purposes of disposal rather than irrigation. *Id.* at 40; FAC ¶¶ 71, 75–76, 85, 89. This Court finds that "irrigation return flow" refers to water that returns to a source of supply—including surface water and groundwater—after it was artificially applied to land to supply moisture for plant growth, and that the exception may apply in this action. But because there is a dispute over whether the nitrogen-heavy wastewater was applied for the purposes of irrigation—or for another purpose such as disposal—this Court finds that dismissal is improper at this time. Defendant Farms' motion should therefore be DENIED.

### a.    Statutory analysis.

When construing a statutory provision, a court first "consider[s] whether its meaning is clear." *Ecological Rts. Found.*, 874 F.3d at 1094 (citing *Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 941 (9th Cir. 2017). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Geo-Energy Partners-1983 Ltd. v. Salazar*, 613 F.3d 946, 956 (9th Cir. 2010) (cleaned up). When a statutory term is ambiguous, it is the role of the court to determine its meaning "'in order to ascertain the rights of the parties.'" *Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2257 (2024) (quoting *Decatur v. Paulding*, 14 Pet. 497, 515 (1840)). And federal courts have long looked to Executive Branch interpretations of federal statutes. *Id.* (citing *Edwards' Lessee v. Darby*, 12 Wheat. 206 (1827)). "[A]lthough an agency's interpretation of a statute 'cannot bind a court,' it may be especially informative 'to the extent it rests on factual premises within the agency's expertise.'" *Id.* at 2267 (citing *Bureau of Alcohol,*

*Tobacco, & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 98 n.8 (1983). Agency expertise "has always been one of the factors which may give an Executive Branch interpretation particular 'power to persuade, if lacking power to control.'" *Id.* (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

This Court first evaluates the text of the statutory exemption. RCRA provides that "[t]he term 'solid waste' . . . does not include . . . solid or dissolved materials *in irrigation return flows* or industrial discharges which are point sources subject to permits under [the CWA's NPDES program]." 42 U.S.C. § 6903(27) (emphasis added). RCRA does not define "irrigation return flow." "In determining the plain meaning of a word, [a court] may consult dictionary definitions in an attempt to capture the common contemporary understandings of a word." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1084 (9th Cir. 2019). When RCRA was enacted, "irrigation" was defined as "the artificial watering of land . . . to supply moisture for plant growth." *Webster's Third New International Dictionary* 1196 (1971).

There is no similarly instructive dictionary definition of "return flow." But Defendant Madison Ranches argues that it—and "irrigation return flow" more generally—had a recognized meaning that predated RCRA's enactment. Mot. to Dismiss 8–9. Madison Ranches cites two reports, one from 1969 prepared for the DOI and one from 1971 prepared by the EPA, that discuss "irrigation return flow" and "return flow," respectively. *Id.* at 9. The 1969 report defines "irrigation return flow" as "[a]ny water diverted for irrigation purposes that finds its way back to a source of supply (stream or groundwater basin)[, which] includes bypass water, deep percolation losses, tail water runoff and seepage." Utah State University Foundation, *Characteristics and Pollution Problems of Irrigation Return Flow* 199 (1969). "Deep percolation losses" are defined as the "portion of irrigation water applied to the land that percolates below

the crop root zone and is not subject to consumptive use by the agricultural crops." *Id.* at 198.

And the 1971 EPA report explains that "the primary sources of return flow [are] canal seepage, bypass water, deep percolation, and tailwater or surface return flow." James P. Law, *National Irrigation Return Flow Research and Development Program* 3 (1971).[9]

      This Court finds that "irrigation return flow" may be properly understood with reference to its dictionary definition and its established usage predating RCRA's enactment. When Congress uses a technical term or term-of-art in a statute, courts generally give it its established meaning. *See Johnson v. United States*, 559 U.S. 133, 140 (2010) (noting that a court will not do so if that meaning does not fit or would produce "nonsense"). "Irrigation return flow" is a term of art that had an understood, scientific meaning before it was included in RCRA. Thus, this Court finds it appropriate to incorporate that definition into its interpretation of the exception. Therefore, this Court finds that "irrigation return flow" means water that returns to a source of supply—including surface water and groundwater—after it was artificially applied to land to supply moisture for plant growth.

---

[9] Madison Ranches and Lamb Weston also cite EPA training materials that offer a definition of "irrigation return flow." Lamb Weston Reply in Supp. of Mot. to Dismiss 21–22; ECF 78; Madison Ranches Reply in Supp. of Mot. to Dismiss 13–14, ECF 86. Those materials explain that, "[w]hen agricultural land is irrigated, excess water may return to the water basin either as surface water runoff or through groundwater percolation. Though these return flows often carry hazardous constituents (from pesticides or fertilizers) or exhibit a characteristic of hazardous waste, these wastes are excluded under §261.4(a)(3)." EPA, *RCRA, Superfund & EPCRA Call Center Training Module, Introduction to: Solid and Hazardous Waste Exclusions* 3 (2001). Standing alone, that conclusory definition would be afforded little deference. *See Skidmore*, 323 U.S. at 140 (noting that an agency's interpretations under an Act are not controlling, but they may be entitled to some weight "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier pronouncements, and all those factors which give it power to persuade"). But given the interpretation's consistency with technical understandings of "irrigation return flows" that predate RCRA and the exception's plain meaning, the guidance offers further confirmation of the Court's interpretation of the exception.

                     **b.**       **Application to Plaintiffs' claims.**

Because the "irrigation return flows" exception applies to irrigation water that returns to groundwater, the exception is applicable to Plaintiffs' claims in this action and would exclude any of Defendant Farms' irrigation activities from the RCRA analysis.

But that does not resolve Defendants' motions to dismiss those claims. Defendants argue that—to the extent that they apply nitrogen-heavy materials to their land—they do so only for the purposes of irrigation. *See, e.g.*, Madison Ranches Mot. to Dismiss 12. That assertion fails to account for Plaintiffs' allegation that Defendants Lamb Weston and Madison Ranches applied nitrogen-heavy materials for purposes other than irrigation. *See* FAC ¶¶ 61–62 (alleging Madison Ranches intentionally over-applies nitrogen), ¶ 76 (alleging Lamb Weston pumps and applies wastewater to land owned by itself and Madison Ranches to dispose of it), ¶ 84 (alleging Port of Morrow discarded excess nitrogen on Madison Ranches' land), ¶ 93 (alleging that Lamb Weston has discarded nitrogen on its land that subsequently contaminates groundwater). Because Plaintiffs have alleged that Defendant Farms applied moisture to land for purposes *other than* to supply moisture for plant growth, this Court cannot conclude, as a matter of law, that the irrigation return flow exception excludes Plaintiffs' RCRA claims against Defendant Farms. Accordingly, Defendant Farms' motion to dismiss on this basis should be DENIED.

                 **5.**       **Applying excessive nitrogen-heavy material to "discard" and "dispose" of it.**

Defendants argue that RCRA does not apply to their activities because they are not "discarding" or "disposing" of nitrate-heavy materials when they apply it to land. *See, e.g.*, Lamb Weston Mot. to Dismiss 28–30. This Court finds that Plaintiffs have adequately alleged that Defendant CAFOs and Wastewater Treatment Facilities discarded solid waste. On the other

hand, they have not alleged that Defendant Farms disposed of solid waste. Accordingly, this Motion should be GRANTED in part and DENIED in part.

a.    **Statutory analysis.**

RCRA's citizen suit provision allows a plaintiff to bring a claim against a defendant that "has contributed or is contributing to the past or present . . . *disposal*" of a solid waste. 42 U.S.C. § 6972(a)(1)(B) (emphasis added). "'Disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). Solid waste is defined to include "other *discarded* material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations." 42 U.S.C. § 6903(27) (emphasis added). "Discard" has been defined according to its ordinary meaning as to "cast aside; reject; abandon; give up." *Safe Air for Everyone*, 373 F.3d at 1041 (quoting *The New Short Oxford English Dictionary* 684 (4th ed. 1993)).

The Ninth Circuit has identified several considerations for identifying whether a material is discarded and considered solid waste, including:

> (1) whether the material is destined for beneficial reuse or recycling in a continuous process by the generating industry itself, (2) whether the materials are being actively reused, or whether they merely have the potential of being reused, and (3) whether the materials are being used by its original owner, as opposed to use by a salvager or reclaimer.

*Id.* at 1043; *but see United States v. ILCO, Inc.*, 996 F.2d 1126, 1132 (11th Cir. 1993) ("Previously discarded solid waste, although it may at some point be recycled, nonetheless remains solid waste."). The emphasis on evaluating whether a material is being recycled or

reused is due in part to Congress's declaration "that agricultural products that could be recycled or reused as fertilizers were *not* its concern" when enacting RCRA. *Safe Air for Everyone*, 373 F.3d at 1045 (discussing RCRA's legislative history). The House Report on RCRA stated that:

> Much industrial and agricultural waste is reclaimed or put to new use and is therefore not a part of the discarded materials disposal problem the committee addresses . . . . Agricultural wastes which are returned to the soil as fertilizers or soil conditioners are not considered discarded materials in the sense of this legislation.

H.R. Rep. No. 94-1491, at 3, *reprinted in* 1976 U.S.C.C.A.N. at 6239–41.

A substance that "is released into the environment as a natural, expected consequence" of a product's intended use has not necessarily been discarded, and therefore it "is not *automatically* 'solid waste' under RCRA's definition of the term." *Ecological Rts. Found.*, 713 F.3d at 518 (emphasis added) ("[W]ood preservative that escapes from wooden utility poles as those poles age has not itself been 'discarded,' and therefore is not a 'solid waste,' under RCRA."). But there may be circumstances in which such a substance can become "solid waste" under RCRA. *See id.* ("[W]e do not decide whether or under what circumstances PCP, wood preservative, or another material becomes a RCRA 'solid waste' when it accumulates in the environment as a natural, expected consequence of the material's intended use."). In sum, nitrogen materials released into the environment as a natural, expected consequence of their intended use are not necessarily discarded, and they are not automatically solid waste under RCRA's definition of the term.

### b.    Application to Plaintiffs' claims.

With respect to Defendant Wastewater Treatment Facilities, this Court rejects Defendants' argument that "both agricultural and industrial material is excluded from the definition of solid waste when put to new or beneficial use as [it] does in its operations."

Threemile Reply in Supp. of Mot. to Dismiss 21. As indicated above, the analysis is not so

simple. There is no blanket exclusion for reused materials, which is evidenced by the three

considerations the Ninth Circuit articulated in *Safe Air for Everyone*. Instead, a court must

evaluate (1) whether the materials are being reused by the generating industry, (2) whether they

are actually being reused, and (3) who is reusing the materials. *Safe Air for Everyone*, 373 F.3d

at 1045. Here, Plaintiffs allege that Port of Morrow and Lamb Weston regularly over-apply

nitrogen-heavy wastewater to fields, and that the Port discarded wastewater by allowing it to leak

from pipes. *Id.* at ¶¶ 71, 74–93. Whether this wastewater is "put to a new and beneficial use," as

Defendants claim, cannot be resolved on a motion to dismiss. And allowing wastewater to leak

from lagoons and pipes cannot be considered a natural and intended consequence of its intended

use. Accordingly, Plaintiffs have alleged that Defendant Wastewater Treatment Facilities have

disposed of solid waste.

Similarly, with respect to Defendant CAFOs, this Court rejects Defendants' arguments

that manure generated by and used in their operations cannot be solid waste under RCRA. In

*Cmty. Ass'n for Restoration of the Env't, Inc. v. D & A Dairy*, No. 13-CV-3018-TOR, 2013 WL

3188846, at *4 (E.D. Wash. June 21, 2013), the court recognized that manure could be a "solid

waste" after it has ceased being beneficial or useful when it is over-applied to fields or leaks

from a CAFO's lagoons. The court acknowledged the "returned to the soil as fertilizer"

exception but noted that it is "untenable that the over-application or leaking of manure that was

initially intended to be used as fertilizer can *never* become 'discarded' merely because it is

'unintentionally' leaked or over-applied." *Id.* The court determined that whether manure was

over-applied or allowed to leak, thereby "discarding" it and qualifying it as solid waste, could

not be resolved at the motion to dismiss stage. *Id.* at *5. The same analysis applies here.

Plaintiffs allege that Beef Northwest is a CAFO that stores animal waste in lagoons and later applies it to agricultural lands as fertilizer. FAC ¶ 67. They allege that Beef Northwest's operations cause nitrate contamination through its lagoon storage and "when animal waste is spilled or otherwise leaks during handling." *Id.* As in *Cmty. Ass'n for Restoration of the Env't, Inc*, this Court finds that whether these alleged actions constitute discarding or disposing of the material cannot be resolved as part of a motion to dismiss.

But Plaintiffs' allegations against Defendant Farms fare differently. Plaintiffs allege that Defendant Farms "regularly and intentionally over-use nitrogen to ensure maximized yield and profit potential from crops, either for rare-optimal growing conditions where extra nitrogen provides a key boost or as a risk-management approach for sub-optimal conditions when nitrogen losses occur and would otherwise reduce yields." FAC ¶ 62. A dispute as to whether Defendant Farms' alleged over-use of nitrogen was appropriate or resulted in negative environmental consequences is not the same as a dispute over whether that over-use was natural and expected. *See Ecological Rts. Found.*, 713 F.3d at 516. Plaintiffs have failed to plead any facts that would plausibly demonstrate that Defendant Farms application—even over-use—of nitrogen was unnatural or unexpected. Plaintiffs have therefore failed to state a claim that Defendant Farms discarded or disposed of nitrogen laden materials.[10]

In sum, this Court concludes that Defendants' motions to dismiss the RCRA claims on the basis that Defendant CAFOs and Defendant Wastewater Treatment Facilities did not

---

[10] Plaintiffs alleged that "[t]he Port and Lamb Weston pump nitrogen-rich wastewater to nearby farms year-round, including during the winter, when most fields lie fallow and no crops benefit from the nitrogen." FAC ¶71. This is sufficient to allege that nitrogen-rich material was discarded. However, this Court construes this allegation as being brought against Defendant Wastewater Treatment Facilities, not Defendant Farms. To the extent that the construction is incorrect, Plaintiffs will have an opportunity to replead their claims in a subsequent complaint.

"dispose of" solid waste should be DENIED, and the same motions brought by Defendant Farms should be GRANTED.

### 6.     Handling, storing, transporting, or disposal of solid waste.

Defendants argue that Plaintiffs failed to sufficiently plead that they contributed to the handling, transportation, or disposal of solid waste. *See, e.g.*, BNW Mot. to Dismiss 26. This Court disagrees and recommends that this motion be DENIED.

RCRA's citizen suit provision allows claims against a party "who has *contributed or who is contributing to* the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). "The statutory prohibition on 'contributing to' speaks in active terms about 'handling, storage, treatment, transportation, or disposal' of hazardous waste." *Hinds Investments, L.P. v. Angioli*, 654 F.3d 846, 852 (9th Cir. 2011) (quoting 42 U.S.C. § 6972(a)(1)(B)).

In choosing the "contributed" language, Congress was concerned with addressing those actively engaged in activities involving solid waste. *Id.* Thus, a plaintiff must show that a defendant has an "active role with a more direct connection to the waste." *Id.* And a "defendant's 'contribution must be causally connected to the possibility of an imminent and substantial endangerment.'" *Eagle Star Rock Prods. LLC*, 2024 WL 4751519, at *6 (quoting *Cal. Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d 930, 980 (E.D. Cal. 2003)). Qualifying "contributors" under RCRA include generators, transporters, and owners of waste treatment, storage, or disposal facilities. 42 U.S.C. § 6972(a)(1)(B).

Here, viewing the allegations in the light most favorable to Plaintiffs, they have sufficiently pleaded that Defendants have contributed to the handling, transportation, or disposal of solid or hazardous waste. Plaintiffs allege that Beef Northwest's handling and storage of

animal waste resulted in nitrate contamination in LUBGWMA, where testing of wells located on "lands subjected to CAFO manure applications" has shown high levels of nitrate contamination. *Id.* at ¶ 68. Second, as noted above, Plaintiffs allege Defendant Farms regularly and intentionally over-use nitrogen" when fertilizing their fields, which accounts for the majority of nitrate contamination in LUBGWMA. *Id.* at ¶¶ 60–62. Plaintiffs allege that the excessive application of nitrogen—above the agronomic rate—results in nitrogen leaching into the soil, converting into nitrates, and contaminating groundwater throughout LUBGWMA. *Id.* at ¶¶ 61–64. Plaintiffs allege that Defendant Wastewater Management Facilities collect, treat, transport and "dispose of millions of gallons of nitrogen heavy wastewater," which also contaminates the groundwater. *Id.* at ¶ 69.

Plaintiffs have sufficiently alleged that Defendants have active roles connecting each category of Defendant to the alleged solid waste that they argue presents an imminent and substantial endangerment. Therefore, Defendants' motions to dismiss on the basis that Plaintiffs failed to allege that Defendants contributed or are contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste should be DENIED.

### 7.    Imminent and substantial endangerment to health or the environment.

Defendants argue that Plaintiffs failed to allege facts showing an imminent and substantial endangerment to health or the environment. *See, e.g.*, Port & Threemile Mot. to Dismiss 22–23. This Court disagrees and recommend that this motion be DENIED.

Again, RCRA's citizen suit provision only allows suits involving an "imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). "'Endangerment' means a threatened or potential harm and does not require proof of actual harm." *Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d at 980 (quoting and citing *Lincon Props.*,

*Ltd. v. Higgins*, CIV. No. S-91-760DFL/GGH, 1993 WL 217429, at *12 (E.D. Cal. Jan. 21, 1993)). "An endangerment can only be 'imminent' if it threatens to occur immediately." *Meghrig*, 516 U.S. at 485 (cleaned up). It must be a threat that "is present *now*, although the impact of the threat may not be felt until later." *Id.* at 486 (quoting *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)). "For the endangerment to be substantial, 'there must be some necessity for the action.'" *Santa Clarita Valley Water Agency*, 99 F.4th at 475 (quoting *Price*, 39 F.3d at 1019). Whether an endangerment is substantial does not require quantification; the question is whether there is "some reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken." *Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d at 980 (cleaned up).

"The imminent and substantial endangerment element should be construed broadly to allow for affirmative equitable relief." *Santa Clarita Valley Water Agency*, 99 F.4th at 475; *see also Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d at 980 ("[B]ecause 'the word 'may' precedes the standard of liability[,]' Congress included expansive language intended 'to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes.'" (quoting *Lincoln Props. Ltd.*, 1993 WL 217429, at *12)). The endangerment provision does not require a plaintiff to show that "a defendant's actions violated any specific RCRA requirement or any RCRA-mandated order or permit." *Ecological Rts. Found.*, 874 F.3d at 1089. Rather, it "broadly permits relief that ameliorates present [harms] or obviates the risk of future imminent harms." *Id.* (internal quotations omitted).

The Complaint alleges that Defendants' use of nitrogen-heavy materials contributes to nitrate contamination in groundwater throughout LUBGWMA, which in turn is alleged to present an imminent and substantial endangerment to health or the environment. As discussed

above, Plaintiffs detail how the hydrogeologic conditions in LUBGWMA allow nitrates to spread widely once they reach the water table. *Id.* at ¶ 64. Plaintiffs further allege that excessive nitrate exposure through groundwater poses several health risks, including preventing red blood cells from carrying adequate levels of oxygen, causing reproductive complications, and increasing risk of cancers, kidney and spleen disorders, and respiratory diseases. *Id.* at ¶¶ 43–44. Plaintiffs allege that they will continue to be exposed to health risks from nitrates unless remedial action is taken by Defendants. *See id.* at ¶¶ 95–97 (specifying requested remedial actions). Finally, Plaintiffs allege that their water supplies are presently affected, FAC ¶¶ 18, 22, 29, although some health effects may not be felt until later.

Recognizing that the requirement of "imminent and substantial endangerment" is to be broadly construed—and that allegations are to be viewed in the light most favorable to Plaintiffs at this stage—this Court finds that these allegations sufficiently demonstrate that the solid waste at issue presents an imminent and substantial endangerment to health or the environment. Therefore, this Court recommends that Defendants' motions to dismiss on this basis be DENIED.

### C.    Plaintiffs' negligence claims.

Defendants argue that Plaintiffs' negligence claims are deficient because Plaintiffs have failed to plead facts that would demonstrate that Defendants' conduct created a foreseeable risk of harm to Plaintiffs. *See, e.g.*, Port & Threemile Mot. to Dismiss 23. This Court disagrees and recommends that this motion be DENIED.

### 1.    Legal standards.

To establish negligence under Oregon common law, a plaintiff must prove that the defendant's conduct "created a foreseeable and unreasonable risk of legally cognizable harm to

the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff." *Sloan ex rel. Est. of Sloan v. Providence Health Sys. Or.*, 364 Or. 635, 642 (2019); *Stewart v. Jefferson Plywood Co.*, 255 Or. 603, 609 (1970) (explaining that, under Oregon law, an actor is negligent if he "ought reasonably to foresee that he will expose another to an unreasonable risk of harm").

The concept of foreseeability "refers to the generalized risks of the type of incidents and injuries that occurred, rather than predictability of the actual sequence of events." *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 22 (1987). Oregon law does not require a plaintiff "to precisely forecast a specific harm to a particular person." *Piazza v. Kellim*, 360 Or. 58, 80 (2016). "A dispute in a negligence action about whether an injury was foreseeable generally presents an issue of fact and, therefore, is not a likely candidate for summary judgment. There are some cases, however, in which no reasonable factfinder could find the risk of harm to be reasonably foreseeable." *Cunningham v. Happy Palace, Inc.*, 157 Or. App. 334, 337 (1998) ("[I]n an 'extreme case' a court can decide that the risk to the plaintiff caused by the defendant's conduct was unforeseeable as a matter of law."); *Piazza*, 360 Or. at 71 (A "foreseeability determination [is] a blended factual and normative—that is, value-laden—inquiry that ordinarily is committed to juries.").

The plaintiff in a negligence action "must also prove an actual causal link between the defendant's conduct and the plaintiff's harm—that is, the plaintiff must prove 'cause in fact.'" *Towe v. Sacagawea, Inc.*, 357 Or. 74, 86 (2015). As the Oregon Court of Appeals explained, this rule "prevents jurors from speculating about causation in cases where that determination requires expertise beyond the knowledge and expertise of an ordinary lay person." *Baughman v. Pina*, 200 Or. App. 15, 18 (2005) (citing *Howerton v. Pfaff*, 246 Or. 341, 347–48 (1967)).

2.    **Analysis.**

Plaintiffs have pleaded sufficient allegations to demonstrate that Defendants' alleged actions caused a foreseeable and unreasonable risk of harm, which resulted in harm to their legally protected interests.

With respect to foreseeability of the harm, Plaintiffs have alleged that exposure to high levels of nitrates is dangerous. FAC ¶¶ 42–45. They allege that "[g]roundwater in the Lower Umatilla Basin, on which Plaintiffs . . . rely for their water, has been plagued with high nitrate concentrations for decades[.]" *Id.* at ¶ 46. Plaintiffs allege that, in 1990, DEQ declared a groundwater management area, and subsequent studies have concluded that the problem is only "getting worse." *Id.* at ¶¶ 46–52; *supra* note 1. They allege that Defendants "know that nitrates are hazardous to human health" yet "continue "to overapply wastewater, fertilizer, and animal waste to [LUBGWMA] land, causing further nitrate contamination of [LUBGWMA] groundwater." *Id.* at ¶¶ 124–25. These allegations are sufficient for a reasonable juror to conclude that, for decades, nitrate contamination has been known to impact the groundwater and health of residents who rely on that drinking water.

With respect to the reasonableness of Defendants' actions, Plaintiffs have alleged sufficient facts to demonstrate that Defendants, through their actions, contributed to harmful groundwater contamination, to wit:

Plaintiffs allege that "a reasonably careful farmer would not apply nitrogen-heavy fertilizer to their fields in such quantities that it causes nitrate contamination of a local aquifer upon which people rely for clean drinking water." *Id.* at ¶ 123. This general allegation is supported by specific allegations that excessive applications beyond the agronomic rate can

contaminate groundwater, *id.* at ¶ 61; and Defendant Farms regularly and intentionally over-use nitrogen to ensure maximum yield and potential profits, *id.* at ¶ 62.

Plaintiffs allege that "[a] reasonably careful wastewater treatment/recycling facility would not allow nitrogen-heavy wastewater from its facility to be sprayed onto nearby fields in quantities that cause nitrate contamination of a local aquifer." *Id.* at ¶ 123. This general allegation is supported by specific allegations that wastewater is pumped onto fallow fields, *id.* at ¶ 71; that the Port and Lamb Weston have failed to install adequate technology to process wastewater, *id.* at ¶ 72; and that the Port and Lamb Weston regularly violate their wastewater treatment permits, *id.* at ¶¶ 74–92.

Plaintiffs allege that "a reasonably careful CAFO would not allow animal waste generated by its operations to be discarded in a manner that causes nitrate contamination of a local aquifer." *Id.* at ¶ 123. That general allegation is supported by the specific allegation that Defendant Beef Northwest disposes of "large quantities of nitrogen-laden animal waste" by storing it in lagoons that leak into the groundwater and later applying the waste to nearby farmland. *Id.* at ¶ 67. These allegations are sufficient for a reasonable juror to conclude that Defendants' conduct unreasonably created the harm.

Finally, with respect to causation, Plaintiffs have alleged sufficient facts to demonstrate that each Defendant caused at least some of that harm. Plaintiffs allege that all Defendants— albeit through different actions and not necessarily in equal amounts—contributed to the same harm, which is nitrate contamination of a single aquifer that is particularly vulnerable to such contamination. *Id.* at ¶¶ 64–65 (discussing the hydrogeologic features of LUBGWMA and its susceptibility to nitrate contamination). Plaintiffs further allege that each Defendant caused, at least in part, the contamination through various forms of direct discharges. *Id.* at ¶¶ 60–73.

Contrary to Defendants' assertions, Plaintiffs need not plead facts demonstrating the exact harm each Defendant is responsible for. Given the nature of the harm alleged by Plaintiff, it is at least plausible that each Defendant separately contributed to the communal harm of nitrate pollution of the groundwater. Thus, Plaintiffs have adequately pleaded causation.

In sum, the Complaint plausibly alleges that Defendants' nitrate contamination created a foreseeable and unreasonable risk of harm, and that Defendants actually caused them harm. Defendants' motions to dismiss Plaintiffs' negligence claims in Count II should be DENIED.

### D.    Plaintiffs' negligence per se claims.

Defendants argue that Plaintiffs' negligence per se claims are deficient because the statutes cited are insufficient to specify the standard of care. *See, e.g.*, Port & Threemile Mot. to Dismiss 28. This Court agrees in part and recommends that this motion be GRANTED.

### 1.    Legal standards.

"[A] negligence per se claim is not a separate type of negligence claim with its own elements." *Moody v. Oregon Cmty. Credit Union*, 371 Or. 772, 781 (2023). Rather, it

> is a shorthand descriptor for a negligence claim in which the standard of care is expressed by a statute or rule. When a negligence claim otherwise exists, and a statute or rule defines the standard of care expected of a reasonably prudent person under the circumstances, a violation of that statute or rule establishes a presumption of negligence. Once a violation is proven, the burden shifts to the violator to prove that he or she acted reasonably under the circumstances. A statute that sets a standard of care addresses only one element of a negligence claim; other elements remain unaffected and must be established.

*Deckard v. Bunch*, 358 Or. 754, 761 n.6 (2016) (simplified).

"[V]iolations of statutory safety rules by themselves provide the element of negligence with respect to those risks that the rules are meant to prevent, at least unless the violator shows that his conduct in fact did not violate the rule under the circumstance." *Shahtout ex rel. Shahtout v. Emco Garbage Co.*, 298 Or. 598, 601 (1985). When a plaintiff cites a governmental rule in

PAGE 59 – FINDINGS AND RECOMMENDATION

support of a negligence per se claim, a court must consider whether—though the rule itself was

not meant to create a civil claim—it "nevertheless so fixes the legal standard of conduct that

there is no question of due care left for a factfinder to determine; in other words, that

noncompliance with the rule is negligence as a matter of law." *Moody*, 371 Or. at 782 (citing

*Shahtout*, 298 Or. at 601). Whether a plaintiff can assert a negligence per se claim "often turns

on whether a private cause of action exists under a statute, because both 'address the question of

whether the policy behind the legislative enactment will be appropriately served by using it to

impose and measure civil damage liability.'" *Eagle Star Rock Prods. LLC*, 2024 WL 4751519, at

*18. [11]

## 2.     Statutory framework.

Plaintiffs' negligence per se claim alleges that Plaintiffs "are members of the class

intended to be protected by ORS chapter 468B.005 to 468B.035, the Oregon Water Pollution

Control law, which sets a standard of conduct and due care applicable to Defendants." FAC ¶

130. Plaintiffs further allege that "Defendants violated the Oregon Water Pollution Control law

by causing pollution of Oregon groundwater, placing or caus[ing] to be placed wastes in

locations where such wastes were likely to escape or be carried into Oregon waters, and/or

discharging wastes into the waters of the state and thereby reducing the quality of such waters

below the water quality standards established by the Environmental Quality Commission." *Id*. at

¶ 131.

---

[11] Here, the statute at issue – ORS 468B.025 – *was* expressly meant to create a civil claim for
public nuisance. *See* ORS 468B.025(3). However, there is no indication that the legislature
intended a claim for public nuisance to be the *exclusive* remedy for an alleged violation of that
statute.

The Complaint tracks the language in ORS 468B.025(1), subsections (a) and (b). That statute states in full:

>(1) Except as provided in ORS 468B.050 [water quality permit] or 468B.053 [alternatives to obtaining a water quality permit], no person shall:

>(a) Cause pollution of any waters of the state or place or cause to be placed any wastes in a location where such wastes are likely to escape or be carried into the waters of the state by any means.

>(b) Discharge any wastes into the waters of the state if the discharge reduces the quality of such waters below the water quality standards established by rule for such waters by the Environmental Quality Commission.

>(2) No person shall violate the conditions of any waste discharge permit issued under ORS 468B.050.

>(3) Violation of subsection (1) or (2) of this section is a public nuisance.

>ORS 468B.025 therefore prohibits a person from:

>(1) violating the conditions of a permit issued pursuant to ORS 468B.050; (2) except as provided in ORS 468B.050 or ORS 468B.053, causing pollution of the waters of the state, or causing waste to be placed in a location where it is likely to enter the waters of the state; and (3) except as provided in ORS 468B.050 or ORS 468B.053, discharging waste into the waters of the state if the discharge reduces the quality of those waters below state water quality standards.

*Tualatin Riverkeepers v. Or. Dep't of Env't Quality*, 235 Or. App. 132, 140 (2010).

### 3.    Analysis.

#### a.    ORS 468B.025(1)(a) and negligence per se.

As an initial matter, this Court considers whether ORS 468B.025(1)(a), which broadly prohibits a person from "caus[ing] pollution," so "fixes the legal standard of conduct that there is no question of due care left for a factfinder to determine." It does not.

Although ORS 468B.025(1)(a) clearly prohibits a person from causing pollution, "pollution" is broadly defined as "alteration of the physical, chemical or biological properties of any waters of the state. . . which will or tends to . . . create a public nuisance or which will or

tends to render such waters harmful, detrimental or injurious to public health, safety or welfare."

ORS 468B.005(5). Similarly, the statute prohibits the storing of "wastes" where they are likely to

be carried into the waters of the state, ORS 468B.025(1)(a), but "wastes" only means substances

"which will or may cause pollution or tend to cause pollution of any waters of the state," ORS

468B.005(9). Thus, the statute prohibits pollution that causes a public nuisance or is harmful,

detrimental, or injurious.

These broad terms—pollution and wastes—do not "so fix[] the legal standard of conduct"

such that there is nothing left for a jury to resolve. *See Axen v. Am. Home Prods. Corp. ex rel.*

*Wyeth-Ayerst Lab'ys*, 158 Or. App. 292, 307, *opinion adhered to as modified on reconsideration*

*sub nom. Axen v. Am. Home Prods. Corp.*, 160 Or. App. 19 (1999). And they do not provide

"advance warning of the *specific* conduct that is prohibited." *Moody*, 371 Or. at 799 (emphasis

added). To the contrary, these terms broadly require an individual to avoid causing pollution in a

manner that is harmful or causes a nuisance, which is insufficient to fix the standard of care. *See*

*Kim v. Multnomah Cnty. ex rel. Multnomah Cnty. Cmty. Dep't of Cmty. Corr.*, 328 Or. 140, 153

(1998) (affirming trial court's grant of summary judgment on negligence per se claim where the

statute would only require the defendant to exercise reasonable care); *Martin v. Hannu*, No.

2:21-CV-00364-HL, 2024 WL 1097625, at *4 (D. Or. Feb. 26, 2024) (concluding that the term

"sufficiently dangerous" did not so fix the standard of care), *report and recommendation*

*adopted*, *Martin v. Singh*, No. 2:21-CV-00364-HL, 2024 WL 1093051 (D. Or. Mar. 13, 2024).

Accordingly, a violation of ORS 468B.025(1)(a) cannot, as a matter of law, give rise to a claim

for negligence per se.

b.    **ORS 468B.025(1)(b) and negligence per se.**

Unlike subsection (a), subsection (b) of ORS 468B.025(1) appears to give advance warning that specific conduct is prohibited: it prohibits discharging "any wastes into the waters of the state if the discharge reduces the quality of such waters below the water quality standards established by rule for such waters by the Environmental Quality Commission." ORS 468B.025(1)(b). Further—depending on the standards established by EQC—it is at least possible that subsection (b) could so fix the standard of care that there would be nothing left for a jury to resolve.

This Court need not resolve this issue, however, because Plaintiffs fail to allege the specific water quality standards established *by rule* by EQC, much less how each Defendants' discharge reduced the quality of the waters below those standards.[12] Plaintiffs also fail to allege that Defendants' discharges were not subject to the exceptions in ORS 468B.050, which specifically exempt discharges pursuant to a permit, or ORS 468B.053, which exempts certain unpermitted discharges.[13] Plaintiffs cannot sustain a claim of negligence per se without alleging, with particularity, how Defendants violated the statute or rule at issue. Because Plaintiffs have failed to plead such facts, Plaintiffs have failed to allege negligence per se based on a violation of ORS 468B.025(1)(b).

---

[12] The Complaint does not allege any specific standards for nitrate contamination established by EQC. Rather, Plaintiffs allege that "[n]itrate contamination at levels of 7 mg/L or above (70% of the EPA Maximum Contaminant Level) triggers Oregon's DEQ to designate a Groundwater Management Area, which works to reduce groundwater contamination in the affected area." FAC ¶ 42. That requirement, which is contained within ORS 468B.180, only imposes a duty on certain state agencies to designate a groundwater management area, which in this case is LUBGWMA.

[13] Plaintiffs allege that multiple Defendants discharged water pursuant to permits for their operations as a CAFO or wastewater treatment facility. FAC ¶¶ 6, 38. For those discharges, ORS 468B.025(1)(b) would appear to be inapplicable. *See Tualatin Riverkeepers*, 235 Or. App. at 140.

c.    **ORS 468B.025(2) and negligence per se.**

ORS 468B.025(2) provides perhaps the clearest expression of the standard of care for a negligence per se claim: "No person shall violate the conditions of any waste discharge permit issued under ORS 468B.050." Plaintiffs allege that both Port of Morrow and Lamb Weston violated such permits, FAC ¶¶ 75–76, and they assert that such violations constitute negligence per se under 468B.025(2), Opp'n to Mots. to Dismiss 60–61. Yet the Complaint does not even reference 468B.025(2), much less allege with particularity that either Port of Morrow's or Lamb Weston's alleged permit violations were a breach of the standard of care established by that statute. Plaintiffs cannot raise conclusory allegations of statutory violations in the Complaint and then work out the details in motions practice. As such, Plaintiffs have failed to allege negligence per se based on ORS 468B.025(2).

In sum, this Court concludes that ORS 468B.025(1)(a) cannot give rise to a claim for negligence per se, and that Plaintiffs have failed to allege sufficient facts to give rise to a negligence per se claim under ORS 468B.025(1)(b) or 468B.025(2). Defendants' motions to dismiss Plaintiffs' negligence per se claim should therefore be GRANTED.

**E.    Plaintiffs' trespass claims.**

Defendants argue that Plaintiffs' fail to state a claim for trespass because they do not allege an intentional intrusion. *See, e.g.*, BNW Mot. to Dismiss 32. This Court disagrees and recommends that this motion be DENIED.

**1.    Legal standards.**

Trespass is "an intrusion upon the land of another which invades the possessor's interest in the exclusive possession of [their] land." *Martin v. Union Pac. R.R. Co.*, 256 Or. 563, 565 (1970). "[A] trespass can result from an intrusion by invisible as well as visible forces and [] it is the force of the instrumentality rather than its size which is significant in determining whether a

PAGE 64 – FINDINGS AND RECOMMENDATION

trespass has been committed." *Id.* at 566 (citing and discussing *Martin v. Reynolds Metals Co.*, 221 Or. 86, 101 (1959), where the court found that a trespass claim could be brought when "fluoride compounds emitted from the defendant's plant" entered the plaintiff's land and rendered "the drinking water on the land unfit for consumption by livestock").

Trespass claims "require plaintiffs to show that the intrusion was intentional or, if unintentional, the result of defendants' negligence or ultrahazardous activity." *Gibson v. Morris*, 270 Or. App. 608, 613 (2015) (citing *Carvalho v. Wolfe*, 207 Or. App. 175, 180–81 (2006)). "In the case of continuing intrusion, conduct is intentional if the intruder knew of the continuing intrusion and allowed the intrusion to persist, regardless of whether the defendant acted intentionally when the intrusion began." *Goldingay v. Progressive Cas. Ins. Co.*, 306 F. Supp. 3d 1259, 1265 (D. Or. 2018) (citing *id.*). "The question as to what defendants knew or should have known, under the circumstances . . . [is] a question of fact for the finder of fact." *Gibson*, 270 Or. App. at 616.

2.      **Analysis.**

Here, Plaintiffs allege that Defendants intentionally trespassed on their property by causing and continuing to cause pollution in the form of nitrate contamination to enter onto the groundwater on their property. FAC ¶ 135. Each Plaintiff alleges that this contamination compromised the drinking water on property they rent or own. *Id.* at ¶ 15 (Pearson's well); *id.* at ¶ 23 (Suters' well); *id.* at ¶ 29 (Strange's reliance on public water system). Plaintiffs allege that this intrusion not only diminished the value of Pearson's property, *id.* at ¶ 19, but also rendered all Plaintiffs' drinking water unsafe and resulted in actual or potential costs to remedy the intrusion, *id.* at ¶16 (Pearson's filtration system); *id.* at ¶¶ 18, 31 (purchase of bottled water); *id.* at ¶ 24 (costs for deeper well on Suters' property). Further, as discussed above, Plaintiffs have alleged that Defendants knew that their actions were resulting in further groundwater

contamination in LUBGWMA. These facts adequately state a claim for an intentional invasion into the possessory interest in Plaintiffs' land, and Defendants' motion to dismiss Plaintiffs' trespass claims should be DENIED.

### F.    Plaintiffs' private and public nuisance claims.

Defendants assert that Plaintiffs' private and public nuisance claims fail to state a claim for relief because they have not alleged a substantial and unreasonable interference with their property or the special injury necessary for a public nuisance claim. *See, e.g.*, Port & Threemile Mot. to Dismiss 30–34. This Court first concludes that all Plaintiffs have stated a claim for private nuisance. And this Court further concludes that all Plaintiffs—except for Plaintiff Strange—have stated a claim for public nuisance. Defendants' motion should therefore be DENIED in part and GRANTED in part.

#### 1.    Legal standards.

"The doctrines of public nuisance and private nuisance have different origins and protect different interests. However, many of the governing rules are the same." *Mark v. State Dep't of Fish & Wildlife*, 158 Or. App. 355, 359–60 (1999).

"A private nuisance is an unreasonable non-trespassory interference with another's private use and enjoyment of land." *Daniels v. Johnson*, 306 Or. App. 252, 255 (2020). "A nuisance is not actionable[] unless its interference with the use and enjoyment of property is both 'substantial and unreasonable.'" *Id.* "That inquiry 'depends on the individual facts of a particular case' and requires 'clear and convincing' proof." *Mark v. State ex rel. Dep't of Fish & Wildlife*, 191 Or. App. 563, 573, 161 (2004) (quoting *Jewett v. Deerhorn Enterprises, Inc.*, 281 Or. 469, 473 (1978)). "Five 'guidelines' frame [this] inquiry: (1) the location of the claimed nuisance; (2) the character of the neighborhood; (3) the nature of the thing complained of; (4) the frequency of the intrusion; and (5) the effect upon the enjoyment of life, health and property." *Id.* (citing *Smith*

PAGE 66 – FINDINGS AND RECOMMENDATION

*v. Wallowa Cnty.*, 145 Or. App. 341, 346 (1996)). "Substantial harm is necessary to liability for private nuisance." *Smejkal v. Empire Lite-Rock, Inc.*, 274 Or. 571, 574 (1976).

Public nuisance "is an unreasonable interference with a right which is common to members of the public generally." *Raymond v. S. Pac. Co.*, 259 Or. 629, 634 (1971). "Because the primary responsibility for preventing public nuisances is with the public authorities, a private action to enforce that right requires proof that the plaintiff suffered an injury distinct from the injury that the public as a whole suffered." *Mark*, 158 Or. App. at 359–60. Thus, an individual bringing a public nuisance claim must "show special injury, different in kind than that suffered by the general public." *Frady v. Portland Gen. Elec. Co.*, 55 Or. App. 344, 348 (1981). "[S]pecial injury must be different in kind, not merely degree." *Id.* at 349.

"In order for the law to attach liability to the operation of a purported nuisance, the plaintiff must allege defendant's actions were intentional, negligent, reckless or an abnormally dangerous activity." *Frady*, 55 Or. App. at 347. "'Intentional' conduct is not limited to activity undertaken for the purpose of damaging another, but includes any act done with the knowledge that damage to another would result." *Id.*

### 2. Analysis.

As explained above, Plaintiffs have alleged at least negligent conduct on the part of Defendants that resulted in harm to their properties. With respect to their nuisance claims, they must also allege substantial and unreasonable interference with their properties and, with respect to public nuisance, special injury. The Court addresses each of these issues below.

### a. Substantial and unreasonable interference.

Plaintiffs have alleged that the groundwater pollution has rendered the well water on their properties unsafe for drinking. FAC ¶¶ 15, 23, 31. This allegation plausibly demonstrates a substantial and unreasonable interference. The nature of the thing complained of—access to safe

PAGE 67 – FINDINGS AND RECOMMENDATION

drinking water—is fundamental to the use and enjoyment of any residential property. The frequency of the intrusion is constant and ongoing. And the unavailability of clean drinking water has a profound and substantial effect upon the enjoyment of life, health, and property.[14]

Defendants Threemile and Port of Morrow advance a separate argument as to why their alleged actions are not unreasonable: "actions taken pursuant to a state-administered program, like DEQ's WCPF permitting and compliance enforcement programs, cannot be considered 'unreasonable' for purposes of a private nuisance claim brought by a property owner." Mot. to Dismiss 31. There is at least some support for Defendants' argument that actions taken in accordance with applicable governmental regulations cannot give rise to a nuisance claim. *See Jacobson v. Crown Zellerbach Corp.*, 273 Or. 15, 21 (1975) (proper use of the public road does not give rise to liability for nuisance).[15] Further, as discussed above, pollution discharges in accordance with a permit are not a nuisance, at least under ORS 468B.025. Yet even if this Court were to broadly conclude that permitted discharges cannot constitute a nuisance, in this case Plaintiffs have alleged that Threemile and Port of Morrow have *violated* the terms of their permits. A defendant who violates the terms of a permit is not protected from an action for nuisance.

For these reasons, Plaintiffs have plausibly alleged that the groundwater discharges are substantial and unreasonable.

---

[14] Indeed, if the presence of "uncontrolled and intrusive nudity" on and adjacent to a property can present a nuisance, *see Mark*, 191 Or. App. at 574, then compromising the availability of clean drinking water surely can as well.

[15] Even if this Court were to adopt this broad reading of *Jacobson*, it would only give rise to expanded claims for inverse condemnations. "When the government conducts or permits an activity for public purposes upon its land that is sufficiently invasive to amount to a taking of adjacent land, an action for inverse condemnation lies against the government." *Jacobson*, 273 Or. at 21 (citing *Thornburg v. Port of Portland*, 233 Or. 178, 193–94 (1963)).

b.    **Special injury.**

Plaintiffs acknowledge that exposure to nitrate-contaminated water is common to property renters and owners, as well as the general public who work or travel to LUBGWMA. Opp'n to Mots. 69. Plaintiffs allege that the special injury they sustained is nitrate contamination of the properties that they rent or own, which requires them to resort to bottled water. FAC ¶¶ 15, 23, 31. These allegations plausibly demonstrate a special injury with respect to the landowners who have suffered harm to their property interests, but they do not suffice for the renter.

Plaintiffs Pearson and Suters allege specific harm to their real property in the form of actual or pecuniary loss to the value of their property, which undoubtedly qualifies as a special injury. *Id.* at ¶ 16 (Pearson's filtration system); *id.* at ¶ 24 (costs for deeper well on Suters' property). Specific injuries to a "an individual's right to use and enjoy his real property" are a special injury. *Frady*, 55 Or. App. at 349.

On the other hand, Plaintiff Strange, as a renter, has not pleaded a special injury. Her only specific allegation of injury is that she is forced to purchased bottled water. FAC ¶ 31. That is the same alleged harm that would be sustained by individuals who, for example, work in LUBGWMA but do not live there. As in *Frady*, Plaintiff's "proximity may make [her] inconvenience greater, but special injury must be different in kind, not merely degree." 55 Or. App. at 349. Accordingly, Strange's public nuisance claims fail to state a claim for relief and should be dismissed.

In sum, Defendants' motions to dismiss the public nuisance claim brought by Plaintiff Strange and the proposed renter subclass should be GRANTED. But Defendants' motions to dismiss Plaintiffs' private nuisance claim and the landowners' public nuisance claim should be DENIED.

G.      **Plaintiffs' inverse condemnation claim.**

Defendant Port of Morrow argues that Plaintiffs failed to state a claim for inverse condemnation. Mot. to Dismiss 32–35. This Court disagrees and recommends that this motion be DENIED.

1.      **Legal standards.**

An inverse condemnation claim asserts that the government has taken property without formal condemnation proceedings or offering just compensation as required by the state and federal constitutions. *Walton v. Neskowin Reg'l Sanitary Auth.*, 372 Or. 331, 340–41 (2024). To state a claim for inverse condemnation, a plaintiff must allege that there has been a taking of their property by the government with the intent to take the property for public use. *Vokoun v. City of Lake Oswego*, 335 Or. 19, 27 (2002).[16]

A taking need not mean physical appropriation of the property: it also refers to any invasion of a property right, including a substantial interference with the use and enjoyment of the property. *Hall v. State ex rel. Or. Dep't of Transp.*, 355 Or. 503, 522 (2014). The test for substantial interference is whether the taking "destroys or materially decreases the value of private property." *Hawkins v. City of La Grande*, 315 Or. 57, 68 (1992). Further, such a taking is intentional if the substantial interference is "the necessary, substantially certain, or inevitable consequence of the government's intentional acts." *Dunn v. City of Milwaukie*, 355 Or. 339, 358 (2014).

---

[16] The taking may be performed either by the state itself or by the state's "lawfully constituted agencies," provided the latter are authorized to exercise the state's power of eminent domain. *Tomasek v. State*, 196 Or. 120, 147 (1952). Here, it is undisputed that the Port of Morrow is a public entity engaged in the treatment and disposal or recycling of industrial wastewater. FAC ¶ 34.

"A plaintiff asserting an inverse condemnation claim must show that the government took private property intending to put that property to public use." *Mossberg v. Univ. of Or.*, 240 Or. App. 490, 501 (2011). A taking is for public use if the intentional act giving rise to the consequence is in furtherance of a public project. *Worman v. Columbia Cnty.*, 223 Or. App. 223, 236–37 (2008). "'Public use' demands that the public's use and occupation of the property must be direct." *Mossberg*, 240 Or. App. at 500–01 (citing *Foeller v. Housing Auth. of Portland*, 198 Or. 205, 233 (1953)).

        2.      **Analysis.**

Plaintiffs allege that the Port of Morrow's activities—dumping excess wastewater—substantially interfered with their use and enjoyment of their properties by causing contamination of their wells, which reduced the beneficial uses and economic viability of the properties, and that this taking was intentionally done for public use. *Id.* at ¶¶ 153, 156.

The Port of Morrow first argues that there are no allegations that it intentionally invaded any of Plaintiffs' properties. Mot. to Dismiss 22. This Court disagrees. As noted above, Plaintiffs have alleged that all Defendants acted intentionally. For those same reasons, they have alleged sufficient facts to demonstrate that the natural and ordinary consequence of the Port's wastewater disposal "was the substantial interference with property rights." *Vokoun*, 335 Or. at 29. Plaintiffs have also alleged that the Port of Morrow knew that its disposal of wastewater was contaminating the groundwater that Plaintiffs relied upon. FAC ¶ 83. At the pleading stage, these allegations are sufficient to allege an intentional taking for public use.

Defendant Port of Morrow next argues that the Complaint contains "no allegations that any of the Plaintiffs' properties were directly taken for any public use." Mot. to Dismiss 33. Again, this Court disagrees. Plaintiffs have alleged that the Port of Morrow operates the "largest industrial wastewater land application system in the state of Oregon," FAC ¶ 34, and that the

PAGE 71 – FINDINGS AND RECOMMENDATION

Port of Morrow intentionally disposes of wastewater on behalf of contracted entities, FAC ¶ 69. It is not necessary, as the Port contends, for Plaintiffs to allege that the Port had direct use of the Plaintiffs' property. Mot. to Dismiss 33. Instead, it is sufficient for Plaintiffs to allege that the Port's wastewater disposal system that benefited the public also directly impacted the groundwater on Plaintiffs' property, resulting in a material decrease in the value of Plaintiffs' property. FAC ¶¶ 19, 24.

Finally, Defendant Port of Morrow argues that nitrate contamination of well- and city-supplied water is not substantial interference because nitrate contamination in groundwater is remediable damage. Mot. to Dismiss 33. But an interference is not insubstantial simply because it is remediable. The Port cites *Hawkins*, 315 Or. at 68, to argue that there is no taking if property is "simply damaged," and that water damage or flooding only constitutes a taking when it "destroys or materially decreases the value of private property." Mot. to Dismiss 33. But ultimately, *Hawkins* supports Plaintiffs' claims. Plaintiffs plausibly allege substantial interference by claiming that they cannot rely on well- and city-supplied water due to nitrate contamination, and that their use of their properties is harmed—and their property values materially decreased—as a result. FAC ¶¶ 19, 24. At the pleading stage, these allegations are sufficient to demonstrate substantial interference.

For these reasons, Defendant Port of Morrow's motion to dismiss Plaintiffs' inverse condemnation claim should be DENIED.

### H.    The Oregon Tort Claims Act (OTCA).

Port of Morrow argues that Plaintiffs failed to provide timely notice of their state law tort claims under the Oregon Tort Claims Act (OTCA). Mot. to Dismiss 34–35. The facts pleaded in the Complaint do not demonstrate as a matter of law that a reasonable person would have learned

of nitrate contamination and Port of Morrow's relationship to it before June 2022, and the Port's

motion should therefore be DENIED.[17]

### 1. Legal standards.

The OTCA provides that "[n]o action arising from any act . . . of a public body . . . shall

be maintained unless notice of claim is given . . . within 180 days after the alleged loss or

injury." ORS 30.275(1)-(2). Under Oregon's "discovery rule," the limitations period for a tort

claim against a public entity under the OTCA is tolled until the party bringing the action first

discovers that they have been injured, the cause of the injury, and the identity of the responsible

party. *Raethke v. Or. Health Sci. Univ.* 115 Or. App. 195, 198 (1992). "[T]he statute of

limitations begins to run when the plaintiff knows or in the exercise of reasonable care should

have known facts which would make a reasonable person aware of a substantial possibility that

each of the three elements (harm, causation, and tortious conduct) exists." *Gaston v. Parsons*,

318 Or. 247, 256 (1994).

The question of when a reasonably prudent person should have known they were injured

and by whom is "generally a question of fact determined by an objective standard." *Doe v. Lake

Oswego Sch. Dist.*, 353 Or. 321, 332 (2013). The question may be decided as a matter of law

only if the sole "conclusion a reasonable jury could reach is that the plaintiffs should have

discovered their claims . . . more than 180 days before giving notice." *Kutz v. Lee*, 291 Or. App.

470, 480–81 (2018).

---

[17] In reply, the Port of Morrow asserts that this Court can consider evidence outside the pleadings
in determining whether OTCA notice was timely because such notice is "jurisdictional." Port &
Threemile Reply in Supp. of Mot. to Dismiss 33. This Court disagrees that failure to provide
notice is a basis to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). *See Johnson v.
Smith*, 24 Or. App. 621, 626 (1976) ("Proof of notice . . . is merely a condition precedent to
recovery and is not jurisdictional in nature."). As such, this Court will not consider evidence
outside the pleadings.

The OTCA is not intended to protect those who "sleep on their rights." *Gaston*, 318 Or. at 256. Where circumstances trigger a duty to inquire, a question remains as to what would have been discovered by a reasonable person had an inquiry been made. *Foster Grp., Inc., v. City of Elgin*, 264 Or. App. 424, 432 (2014). But mere knowledge that a party has committed an act that resulted in harm is not sufficient to show that the plaintiff also knew that the conduct was tortious. *Doe*, 353 Or. at 331. "[T]he fact that news about some event was available at a particular time does not, by itself, resolve whether a reasonable person would have read or heard that news, much less what a reasonable inquiry based on that news would have uncovered." *Johnson v. Multnomah Cnty. Dep't of Cmty. Just.*, 344 Or. 111, 123 (2008). Such evidence is "insufficient to establish, as a matter of law, the level of awareness that an objectively reasonable person would have had under the circumstances." *Id.*

### 2.    Analysis.

Plaintiff Pearson alleges that he learned about the contamination in June 2022 after the Morrow County Commission's declaration of a state of emergency and subsequently testing his water. FAC ¶¶ 14–15. The Suter Plaintiffs do not specify when reports of water contamination surfaced in their neighborhood, but they claim that they discovered their water was polluted with nitrates shortly after those reports. *Id.* at ¶ 23. And Plaintiff Strange alleges that she did not learn of nitrate contamination affecting her water until November 2022. *Id.* at ¶¶ 28–29. Plaintiffs argue that, because they filed their notice on December 8, 2022, fewer than 180 days after learning of the contamination—at earliest in June 2022—they complied with the OTCA. Opp'n to Mots. to Dismiss 76.[18]

---

[18] The timing of Plaintiffs' OTCA notice is taken from the parties' briefing, as Plaintiffs do not allege compliance with the OTCA in the Complaint. "'The pleading and proof of notice sufficient to satisfy the requirements of ORS 30.275 [are] a mandatory requirement and a condition precedent to recovery under the Oregon Tort Claims Act.'" *Beaver v. Pelett*, 299 Or.

Defendant Port of Morrow asserts that the facts pleaded in the Complaint demonstrate that Plaintiffs should have known about nitrate contamination and the Port's involvement in it for decades. Mot. to Dismiss 34–35. Plaintiffs allege that groundwater contamination of LUBGWMA was known for decades. FAC ¶ 47 ("as far back as the mid-1990s," samples showed high levels of nitrate contamination); FAC ¶¶ 48–50 (public studies in 2001, 2003, 2015, and 2016 showed area groundwater problems). Plaintiffs further allege that, in January 2022, "state and local officials" encouraged "Morrow and Umatilla County residents who rely on private wells to have their wells tested for nitrates." *Id.* at ¶ 51. As for the Port of Morrow's specific involvement, the Complaint alleges numerous violations of the Port's wastewater permit going back to 2007. *Id.* at ¶¶ 78–84.

Here, the facts pleaded in the Complaint demonstrate that information about nitrate contamination—including Port of Morrow's contributions to that contamination—was available to Plaintiffs well before June 2022. *Id.* at ¶¶ 6, 55, 78. But the availability of that information is insufficient to establish, as a matter of law, the level of awareness that an objectively reasonable person would have had concerning the contamination of their own water supply. *See Johnson*, 344 Or. at 123. Moreover, the complexity of this case belies the Port of Morrow's contention that, as a matter of law, a reasonable person should have known about the Port's involvement in their injury based on the publicly available information. The Port itself contends that the problem of nitrate contamination "is complex, that nitrate contamination has numerous potential sources and is affected by varying underlying hydrogeology, and that contamination varies throughout

___

664, 671 (1985) (en banc) (quoting *Urban Renewal Agency v. Lackey*, 275 Or. 35, 40 (1976)). A complaint that fails to allege that notice was given in accordance with the OTCA is subject to dismissal. *Brinkley v. Or. Health Scis. Univ.*, 94 Or. App. 531, 537 (1988). The Port of Morrow does not raise this issue in its motion, however, and this Court declines to address it *sua sponte.*

the LUBGWMA." Mot. to Dismiss 1. Given that complexity, this Court cannot conclude that any reasonable person would have understood the hydrologic connection between the Port's wastewater program and nitrate contamination of their own water supply.

In sum, although the facts pleaded in the Complaint may demonstrate that a reasonable person should have known for years about nitrate contamination generally, there are no such facts pleaded that would demonstrate that the same reasonable person should have known that the Port of Morrow contributed to the contamination of their own property and drinking water. Defendant Port of Morrow's motion to dismiss based on failure to provide notice under the OTCA should be DENIED.

## I.    Plaintiffs' request for medical monitoring.

Defendants argue that medical monitoring is not recoverable under RCRA or Plaintiffs' state law claims, at least as Plaintiffs' claims are currently pleaded. *See, e.g.*, Lamb Weston Mot. to Dismiss 34–36; Lamb Weston Reply 26. This Court concludes that, although medical monitoring may be a permissible form of injunctive relief under RCRA and state tort claims, Plaintiffs fail to plead facts that would support such claims. As such, Defendants' motion to dismiss Plaintiffs' remedy of medical monitoring should be GRANTED.

### 1.    Medical monitoring under RCRA.

RCRA's citizen suit provision authorizes district courts "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste . . ., to order such person to take such other action as may be necessary, or both." 42 U.S.C. § 6972(a). The Supreme Court has explained that the plain reading of that remedial scheme shows that a private citizen "could seek a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' by attending to

the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.*, one that

'restrains' a responsible party from further violating RCRA." *Meghrig*, 516 U.S. at 484. But the

Court noted that the citizen suit provision "was not intended to provide a remedy for past cleanup

costs." *Id.* at 485.

When considering the remedies available under RCRA, "[f]ederal courts addressing the

issue have universally held that RCRA citizen suits provide no damages remedy." *Express Car*

*Wash Corp. v. Irinaga Bros.*, 967 F. Supp. 1188, 1193 (D. Or. 1997). But courts have grappled

with whether medical monitoring is an allowable form of injunctive relief under RCRA. *See*

*Easler v. Hoechst Celanese Corp.*, No. 7:14-00048-TMC, 2014 WL 3868022, at *5–7 (D.S.C.

Aug. 5, 2014) (discussing how courts in various districts have dealt with requests for medical

monitoring). On one end of the spectrum, establishing a fund to reimburse plaintiffs for the costs

of medical screening examinations is not injunctive relief. *Werlein v. United States*, 746 F. Supp.

887, 895 (D. Minn. 1990), *vacated in part on other grounds*, *Werlein v. United States*, 793 F.

Supp. 898 (D. Minn. 1992). On the other end, "[a] court-administered fund which goes beyond

payment of the costs of monitoring an individual plaintiff's health to establish pooled resources

for the early detection and advances in treatment of the disease is injunctive in nature rather than

'predominantly money damages.'" *Gibbs v. E.I. DuPont de Nemours & Co., Inc.*, 876 F. Supp.

475, 481 (W.D.N.Y. 1995); *see also Easler*, 2014 WL 3868022, at *5–7.

Here, the facts pleaded in Plaintiffs' Complaint demonstrate that they seek medical

monitoring for the diagnosis and treatment of illnesses related to nitrate exposure. FAC ¶¶ 9, 98–

99, 108(h). Although Plaintiffs argue in opposition that such monitoring would "benefit the

broader public by improving the . . . understanding of the effects of nitrate exposure and the best

treatments for nitrate-related illnesses," Opp'n to Mots. to Dismiss 79, the conclusory allegations

in their Complaint do not support that assertion. Thus, although this Court agrees that there are some limited circumstances in which medical monitoring may be properly recoverable as a form of injunctive relief, the facts pleaded in the Complaint do not plausibly demonstrate that medical monitoring would be an available remedy for Plaintiffs' RCRA claims.

### 2.    Medical monitoring under state tort claims.

"In Oregon, a plaintiff in a negligence action may recover the costs of diagnostic testing, and there is no reason that such a plaintiff could not also recover medical monitoring costs." *Lowe v. Philip Morris USA, Inc.*, 344 Or. 403, 416 (2008) (internal citations omitted) (Walters, J., concurring). But "[m]edical monitoring damages are not recoverable in Oregon without some present symptoms." *Hamilton v. Silven, Schmeits & Vaughan*, No. 2:09-cv-1094-SI, 2013 WL 2318809, at *10 (D. Or. May 28, 2013) (noting that the plaintiff could potentially recover "damages for medical monitoring in the underlying trespass counterclaim"); *see also Lowe*, 344 Or. at 415 (finding that allegations that smoking created a future risk of cancer—without allegations of present harms or symptoms—is insufficient to state a claim for negligence and recovery of medical monitoring costs).

Plaintiffs have failed to state a present injury that would allow for recovery of damages for medical monitoring under their state law claims. The Complaint describes in some detail the increased health risks associated with nitrate exposure. FAC ¶¶ 42–45. But it does not allege that any of the named Plaintiffs have been harmed in those ways. Although Plaintiffs assert in their opposition that their red blood cells have a reduced ability to carry oxygen, Opp'n to Mots. to Dismiss 79–80, those facts are not pleaded in the Complaint and cannot be considered on this motion to dismiss.

In sum, although medical monitoring could be an available remedy under RCRA and Plaintiffs' state tort claims, Plaintiffs have failed to plead facts that would support that remedy, and Defendants' motion to dismiss that remedy should be GRANTED.

## IV.    Dismissal of any claims without prejudice.

This Court previously granted Plaintiffs leave to file an amended complaint joining all parties 28 days after the Court enters a final order on the pending motions to dismiss. ECF 93. This Court further recommends the dismissal without prejudice of Plaintiffs' RCRA claims against Defendant Farms, Plaintiffs' negligence per se claims, Plaintiff Strange's public nuisance claim, and Plaintiffs' request for medical monitoring so that Plaintiffs' may—to the extent that they are able—address the deficiencies in those claims. Although those claims are subject to dismissal for the reasons set forth above, this Court cannot conclude that amendment would be futile. Therefore, leave to amend must be granted. *See Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991).

## RECOMMENDATION

For the reasons set forth above, Defendants' Motions for judicial notice, ECF 52, 53 58, 82, and 84, should be GRANTED. Defendants' Motions to Dismiss, ECF 51, 54, 56, and 59, should be GRANTED in part and DENIED in part. Defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6) should be GRANTED as follows: Plaintiffs' first claim, brought under RCRA, should be DISMISSED without prejudice as to Defendant Farms; Plaintiffs' third claim, alleging negligence per se, should be DISMISSED without prejudice; Plaintiff Strange's sixth claim, alleging public nuisance, should be DISMISSED without prejudice; and Plaintiffs' requested relief of medical monitoring should be DISMISSED without prejudice. Defendants'

remaining motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and motions to dismiss

pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 8 should be DENIED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any,

are due fourteen (14) days from service of the Findings and Recommendation. If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

A party's failure to timely file objections to any of these findings will be considered a

waiver of that party's right to de novo consideration of the factual issues addressed herein and

will constitute a waiver of the party's right to review of the findings of fact in any order or

judgment entered by a district judge. These Findings and Recommendation are not immediately

appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1)

of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

DATED this 24th day of February 2025.

_____
ANDREW HALLMAN
United States Magistrate Judge