YTURRI ROSE, LLP
Bruno Jagelski, OSB No. 903049
bjagelski@yturrirose.com
89 S.W. 3rd Avenue
P.O. Box S
Ontario, OR  97914
Telephone: (541) 889-5368
Facsimile: (541) 889-2432

WINSTON & STRAWN LLP
Amanda Groves (*pro hac vice*)
AGroves@winston.com
Jeff Wilkerson (*pro hac vice*)
JWilkerson@winston.com
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071
Telephone: (213) 615-1851
Facsimile: (213) 615-1750

*Attorneys for Defendant*
*Lamb Weston Holdings, Inc.*

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| MICHAEL PEARSON, et al., | Case No.: 2:24-CV-00362-HL |
| Plaintiffs, | **LAMB WESTON HOLDINGS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]** |
| v. | |
| PORT OF MORROW, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

FACTUAL BACKGROUND .................................................................................... 2

I.     NITRATE ISSUES IN THE BASIN AND ONGOING GOVERNMENT
      AGENCY ACTION ........................................................................................ 3

      A.    History of Nitrates in the Basin ............................................................ 3

      B.    Defendants' Properties and Lamb Weston's Permit ............................ 5

      C.    The DEQ Proceeding Against Lamb Weston ...................................... 7

      D.    The Nitrate Reduction Plan ................................................................ 10

II.    PLAINTIFFS' SUIT ..................................................................................... 11

THE MAGISTRATE'S FINDINGS AND RECOMMENDATION ............................ 13

STANDARD OF REVIEW ................................................................................... 13

ARGUMENT ....................................................................................................... 14

I.     THIS COURT SHOULD CORRECT THE ERRORS IN THE F&R'S PRIMARY
      JURISDICTION ANALYSIS AND DISMISS OR STAY THIS CASE—AT THE
      VERY LEAST AS TO LAMB WESTON—UNDER THAT DOCTRINE. ................... 14

      A.    No one disputes the need to address the issues this case presents. ........ 15

      B.    The issues in this case are within the jurisdiction of an agency with
          regulatory authority pursuant to a statute that subjects an industry to
          comprehensive regulatory authority. ................................................... 15

      C.    The Oregon DEQ's expertise is best suited to implement the relief Plaintiffs
          seek, and this case risks imposing inconsistent obligations on Lamb Weston
          and disrupting ongoing remedial efforts. .............................................. 19

      D.    Applying primary jurisdiction here is the most efficient course—and
          efficiency is the "deciding factor." ...................................................... 22

      E.    The F&R does not consider the pending agency proceedings against Lamb
          Weston, which warrant applying primary jurisdiction *at least* as to Lamb
          Weston .............................................................................................. 24

LAMB WESTON HOLDINGS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATION [DOC. 98]

II.      LAMB WESTON'S PROCESS WATER IS NOT "SOLID WASTE" UNDER RCRA BECAUSE IT IS NOT "DISCARDED," AND THERE WAS NO REASONABLE BASIS FOR THE F&R'S DISTINCTION BETWEEN SUCH PROCESS WATER AND NITROGEN FERTILIZER. .................................................. 26

III.    PLAINTIFFS' CONCLUSORY CAUSATION ALLEGATIONS ARE INSUFFICIENT, AND THE F&R'S CONCLUSION TO THE CONTRARY WAS ERRONEOUS ............................................................................................................... 32

CONCLUSION ...................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Mining Cong. v. U.S. E.P.A.*,
 824 F.2d 1177 (D.C. Cir. 1987) ........................................................................27

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .............................................................................33, 35

*Astiana v. Hain Celestial Grp., Inc.*,
 783 F.3d 753 (9th Cir. 2015) ........................................................................14, 23

*Baykeeper v. NL Indus., Inc.*,
 660 F.3d 686 (3d Cir. 2011) ........................................................................18, 19

*Bennett v. City of Centreville*,
 710 F. Supp. 3d 626 (S.D. Ill. 2024) ........................................................................18, 26

*California River Watch v. City of Vacaville*,
 39 F.4th 624 (9th Cir. 2022) ........................................................................28

*Cereghino v. Boeing Co.*,
 826 F. Supp. 1243 (D. Or. 1993) ........................................................................33

*City of Bethany v. Rockwell Automation, Inc.*,
 2017 WL 3741556 (W.D. Okla. Aug. 30, 2017) ........................................................................20, 21

*Clark v. Time Warner Cable*,
 523 F.3d 1110 (9th Cir. 2008) ........................................................................14, 17, 18, 19

*Conservation L. Found., Inc. v. Exxon Mobil Corp.*,
 3 F.4th 61 (1st Cir. 2021) ........................................................................18

*Davies v. Nat'l Co-op. Refinery Ass'n*,
 963 F. Supp. 990 (D. Kan. 1997) ........................................................................24

*Ecological Rts. Found. v. Pac. Gas & Elec. Co.*,
 713 F.3d 502 (9th Cir. 2013) ........................................................................28

*Ecological Rts. Found. v. Pac. Gas & Elec. Co.*,
 874 F.3d 1083 (9th Cir. 2017) ........................................................................29

*Ellis v. Tribune Television Co.*,
 443 F.3d 71 (2d Cir. 2006) ........................................................................18

LAMB WESTON HOLDINGS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATION [DOC. 98]

*Friends of Milwaukee's Rivers v. Milwaukee Metro Sewerage Dist.*,
382 F.3d 743 (7th Cir. 2004) ...................................................20

*Friends of Santa Fe Cnty. v. LAC Mins., Inc.*,
892 F. Supp. 1333 (D.N.M. 1995) ...........................................23

*Gwaltney of Smithfield v. Chesapeake Bay Found.*,
484 U.S. 49 (1987)....................................................................23

*Hernandez v. Cnty. of Los Angeles*,
No. 2:21-CV-07858-PA-JC, 2022 WL 17216582 (C.D. Cal. Sept. 14, 2022) .................33, 35

*Hettle v. Constr. Contractors Bd.*,
260 Or. App. 135, 316 P.3d 344 (2013) ..................................33

*Krause v. City of Omaha*,
2015 WL 5008657 (D. Neb. Aug. 19, 2015), *aff'd*, 637 F. App'x 257 (8th Cir. 2016) ........................................................................................28

*Legacy Health v. Hoyle*,
2023 WL 34692 (D. Or. Jan. 3, 2023) .......................................3

*McCormick v. Halliburton Co.*,
2012 WL 1119493 (W.D. Okla. Apr. 3, 2012) ....................20, 21, 23, 26

*No Spray Coal., Inc. v. City of New York*,
252 F.3d 148 (2d Cir. 2001)......................................................28

*Oklahoma v. Tyson Foods, Inc.*,
2010 WL 653032 (N.D. Okla. Feb. 17, 2010) .........................29

*PMC, Inc. v. Sherwin-Williams Co.*,
151 F.3d 610 (7th Cir. 1998) ...............................................18, 19

*Port of Portland v. Monsanto Co.*,
2017 WL 9098079 (D. Or. 2017).............................................33

*Read v. Corning Inc.*,
351 F. Supp. 3d 342 (W.D.N.Y. 2018) ....................................22

*Reiter v. Cooper*,
507 U.S. 258 (1993)..............................................................14, 17

*Robinson v. United States*,
586 F.3d 683 (9th Cir. 2009) .......................................................3

*Robles v. Domino's Pizza, LLC*,
913 F.3d 898 (9th Cir. 2019) .....................................................19

LAMB WESTON HOLDINGS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATION [DOC. 98]

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) ........................................................32

*Sierra Club v. Chesapeake Operating*,
248 F. Supp. 3d 1194 (W.D. Okla. 2017) ....................................22, 24

*Solberg v. Johnson*,
306 Or. 484, 760 P.2d 867 (1988), *abrogated on other grounds by Deckard v.
Bunch*, 358 Or. 754, 370 P.3d 478 (2016) ...............................33

*Stratford Holding, LLC v. Foot Locker Retail Inc.*,
2013 WL 5550461 (W.D. Okla. Oct. 8, 2013) ...............................21

*United States v. Gen. Dynamics Corp.*,
828 F.2d 1356 (9th Cir. 1987) ....................................................17

*United States v. Remsing*,
874 F.2d 614 (9th Cir. 1989) ......................................................14

*United States v. Reyna-Tapia*,
328 F.3d 1114 (9th Cir. 2003) ....................................................13

*United States v. Silverman*,
861 F.2d 571 (9th Cir. 1988) ......................................................14

*United States v. W. Pac. R. Co.*,
352 U.S. 59 (1956)...............................................................14, 18

*White Plains Hous. Auth. v. BP Prods. N. Am. Inc.*,
2022 WL 17822560 (S.D.N.Y. Dec. 19, 2022) ..........................18, 19

**Statutes**

28 U.S.C. § 636........................................................................3, 13, 14

42 U.S.C. §§ 6901–6992.....................................................................27

42 U.S.C. § 6903...............................................................................27

**Other Authorities**

Fed. R. Civ. P. 12..................................................................................3

Fed. R. Civ. P. 72................................................................................14

H.R. Rep. No. 94–1491 (1976), reprinted in 1976 U.S.C.C.A.N. ...............28

LAMB WESTON HOLDINGS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATION [DOC. 98]

*Letter from EPA to DEQ, ODA, and OHA* (July 7, 2020),
https://gaftp.epa.gov/region10/sites/lower-
umatilla/03_EPA_ltr_to_OR_agencies.pdf ...........................................................................11

LAMB WESTON HOLDINGS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE'S
FINDINGS AND RECOMMENDATION [DOC. 98]

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

This is a putative class action alleging violations of the Resource Conservation Recovery Act ("RCRA") and certain state-law claims related to alleged groundwater contamination of plaintiffs' properties. Plaintiffs named Lamb Weston Holdings, Inc. ("Lamb Weston") as one of several Defendants, including multiple farms, a concentrated animal feeding operation ("CAFO"), and the Port of Morrow (the "Port"). The case stems from a complex, multi-source environmental challenge with nitrate contamination of groundwater in the Lower Umatilla Basin. For decades, multiple government regulatory agencies and industry groups have been working to solve the problem. And as to Lamb Weston in particular, there are ongoing regulatory proceedings; an active, cooperative effort with the Oregon Department of Environmental Quality ("DEQ") to assess the sources of and nitrate impacts to the groundwater beneath Lamb Weston's permitted land application sites; and an approved Compliance Plan to achieve consistent compliance with Lamb Weston's permits.

Last year, Lamb Weston and other Defendants each moved to dismiss Plaintiffs' Amended Complaint ("Complaint"), including invoking the primary jurisdiction doctrine given the active and ongoing regulatory efforts. The Magistrate Judge issued his Findings and Recommendation ("F&R") on February 24, 2025, recommending granting Lamb Weston's motion in part, but denying it in other parts (including rejecting the application of the primary-jurisdiction argument). Dkt. 98.

Lamb Weston respectfully objects to the Magistrate Judge's F&R on certain issues. Specifically, this brief addresses (1) the application of primary jurisdiction, (2) the lack of allegations showing "discarding" of Lamb Weston's process water as required to state a claim under RCRA, and (3) the Complaint's insufficient allegations regarding causation as to Lamb

Weston. Lamb Weston also hereby formally joins and adopts the objections and supporting arguments in other Defendants' objections to the F&R, also to be filed today, but this brief addresses only objections and facts specific to Lamb Weston.

As to primary jurisdiction, the F&R erroneously reasoned that RCRA's citizen-suit provision precludes the application of the primary jurisdiction doctrine. But courts around the country have repeatedly rejected any such rule. And this case is an exemplar for application of primary jurisdiction given Oregon's active involvement in Lamb Weston's ongoing investigation and remediation efforts. Indeed, the F&R's analysis neglected the particulars as to Lamb Weston—saying that there is "no current … enforcement action that would allow Plaintiffs to seek the relief that they could seek under RCRA" (F&R at 27)—in fact, there is an active enforcement proceeding against Lamb Weston. As to "discarding" under RCRA, the F&R's conclusion that Plaintiffs plausibly alleged that Lamb Weston's process water was "discarded" is inconsistent both with its analysis of Lamb Weston's and other Defendants' alleged application of nitrogen fertilizer and with the weight of authority. Plaintiffs allege Lamb Weston's process water was applied for its intended and well-recognized agricultural benefits, not for purposes of disposal. Finally, as to causation, Plaintiffs' Complaint lacks any factual support for its conclusory assertions that alleged nitrate contamination affecting *their* properties was caused by *Lamb Weston*'s activities. The F&R's suggestion that this was solved by allegations of a "communal harm" was erroneous.

## FACTUAL BACKGROUND

Plaintiffs' allegations are assumed true for purposes of these Objections. The Court may also take judicial notice of certain documents and facts, particularly those related to the

involvement of government agencies, as set forth in the accompanying Request for Judicial Notice[1]

and Defendants' previously filed requests for judicial notice. Dkt. Nos. 53, 82, 84. The following

facts are therefore taken from the Complaint, as required by Rule 12, or from the sources to be

judicially noticed, as noted.[2]

## I. NITRATE ISSUES IN THE BASIN AND ONGOING GOVERNMENT AGENCY ACTION

### A. History of Nitrates in the Basin

Nitrates in groundwater are not a new phenomenon in the Lower Umatilla Basin; the

groundwater in the area has had "high nitrate concentrations for decades." *See* Compl. ¶¶ 46–47.

The geological setting (including soil composition that allows for rapid movement of excess water

on land), combined with a variety of land uses (including crop cultivation, areas dominated by

shrubs, land used for the Umatilla Depot and the Navy Bombing Range, and developed open

space), contributes to making the groundwater in the Lower Umatilla Basin particularly susceptible

to high nitrate concentrations. Dkt. 55, Decl. of Amanda L. Groves ("Groves Decl."), Ex. 1 at 13.

Due to elevated nitrate concentrations in the groundwater, the DEQ formally designated the region

a Groundwater Management Area in 1990, to be overseen by the Lower Umatilla Basin

---

[1] The Request for Judicial Notice filed concurrently with these Objections relates entirely to materials reflecting agency actions since briefing was completed on Lamb Weston's motion to dismiss—i.e., showing that the regulatory process is ongoing and has been moving forward productively since then. As the Request shows, these materials are subject to judicial notice. And this Court is permitted to consider these materials, which could not have been provided before (as they did not yet exist), under 28 U.S.C. § 636(b)(1), which provides that district courts considering objections to F&Rs may "receive further evidence."

[2] Even were they not subject to judicial notice (and they are), this Court could consider the documents for which Lamb Weston seeks judicial notice in deciding the primary-jurisdiction issues under Rule 12(b)(1). *See* F&R at 7 (primary jurisdiction addressed under Rule 12(b)(1)); *Legacy Health v. Hoyle*, 2023 WL 34692, at *3 (D. Or. Jan. 3, 2023) (courts may "consider evidence outside the pleadings" in deciding Rule 12(b)(1) motions) (citing *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009)).

Groundwater Management Area Committee ("LUBGWMA Committee"), with required involvement from city planning agencies, including the DEQ, the Oregon Health Authority ("OHA"), the Oregon Water Resources Department, the Oregon Department of Agriculture ("ODA"), and the Oregon State University's agricultural resource center. *Id*. at 1. The area is referred to as the Lower Umatilla Basin Groundwater Management Area ("LUBGWMA").

Plaintiffs acknowledge, as they must, that nitrates in the LUBGWMA come from many different sources, including industrial and commercial process water, irrigation practices, fertilization, and wastes from CAFOs. Compl. ¶¶ 60, 66, 69. They allege that some sources are unknown and other sources (including potential defendants) are not named in this lawsuit. *See id.* ¶ 63 ("Defendants, as well as others to be named in the future" apply nitrogen to fields). Nitrates are allegedly "invisible, tasteless, and odorless pollutants" (*id.* ¶ 2), and Plaintiffs acknowledge that redressing any alleged harm "will require professional assistance" through "highly specialized processes" involving "chemically or physically based technologies." *Id*. ¶¶ 94, 95.

Plaintiffs contend that nearly 70% of the alleged nitrate contamination comes from irrigated farmland. *Id.* ¶ 60. They allege that irrigating farmers apply approximately 23 million pounds of nitrogen each year in the LUBGWMA to increase crop yields—a farming practice they acknowledge is common. *See id.* ¶¶ 61, 63. The DEQ estimates the next largest sources are CAFOs (13%) and animal pastures (8%). *See* Groves Decl., Ex. 8 at 2. Food processing facilities, like Lamb Weston, that reuse process water to irrigate fields are estimated to contribute 5%[3]—the same amount as residential septic systems and "other sources." *Id.*

---

[3] According to the Oregon DEQ, food processing facilities' nitrate rates are improved over historical levels because they are currently subject to a "waste discharge permit system [that is] designed to reduce nitrate loading to the groundwater." Groves Decl., Ex. 1 at 51.

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]

Plaintiffs' Complaint categorizes Lamb Weston as both a "Defendant Farm" and a "Defendant Wastewater Treatment Facility" (Compl. ¶¶ 60, 69), but in both capacities, they allege that Lamb Weston is responsible for nitrate contamination only by virtue of applying nitrogen to cropland (nitrogen fertilizer in its capacity as a farm, and nitrogen-laden process water in its capacity as a wastewater treatment facility). *Id.* ¶¶ 60–65, 69–74, 76–77, 93.

### B. Defendants' Properties and Lamb Weston's Permit

The Complaint includes a map of Defendants' alleged property boundaries within the Lower Umatilla Basin. *Id.* ¶ 38. As that map shows, and despite Plaintiffs' allegations that various sources have contaminated the groundwater in the LUBGWMA for decades, Plaintiffs have named only five defendants, whose properties comprise only a fraction of the LUBGWMA. *See id.* ¶¶ 38, 46, 60. Lamb Weston's properties comprise a tiny fraction of Defendants' total acreage and an even tinier fraction of the broader area (well under 1% of the more than 350,000 acres in the LUBGWMA). Dkt. 83-1, Suppl. Decl. of Misha Isaak, Ex. 9 ("Nitrate Reduction Plan") at 14.

*Figure 2. Defendants' property in the Umatilla Groundwater Management Area.*



LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]

Of the 107,000 acres of farmland Plaintiffs allege that Defendants control, Lamb Weston owns 1.1% (or 1,180 of the 107,000 acres), Madison Ranches owns 19.9% (21,300 acres), and Threemile Farms owns 82.2% (approximately 88,000 acres) (the percentages total a bit more than 100% because the math in the Complaint is slightly off). *Id.* ¶¶ 35–37. And while Lamb Weston does own North Farm in Umatilla County (approximately 780 acres), which is used to grow crops, the remainder of its 1,800 acres is dedicated to food production facilities—as alleged in the Complaint, "to produce and process for commercial use." *Id.* ¶ 35.

Lamb Weston's Hermiston facility operates a process water treatment facility and has been issued a Water Pollution Control Facilities Permit ("Permit") from the DEQ. *Id.* ¶ 69; *see* fn. 2, *supra*. The Permit authorizes Lamb Weston to apply process water from its food production to its own and nearby farmland. Groves Decl., Ex. 2 at Schedule A, Condition 2(a). This process is referred to as "land application" and is for the "beneficial use" of the process water for crop production on the farms. *Id.* As Plaintiffs acknowledge, land application can benefit farms by increasing crop yields and combatting sub-optimal conditions when nitrogen losses occur. *See* Compl. ¶¶ 61–62. The Permit also of course includes various conditions on Lamb Weston's land application activities, one of which is a "nitrogen loading" limit, providing that the excess amount of nitrogen "from all sources shall not exceed the agronomic rates necessary for the receiving crops." Groves Decl., Ex. 2 at Schedule A, Condition 10. Per the Permit, the agronomic rates are determined from current Oregon State University Fertilizer Guides. *Id.* Nitrogen-loading agronomic rates are expressed in pounds of nitrogen per acre for specific crops (e.g., alfalfa, peas, grain corn) that range anywhere from 80 to 476 pounds per acre depending on the crop. *See, e.g.*, Groves Decl., Ex. 3 at Appendix C. Lamb Weston's land application practices are subject to regular reporting and monitoring under the Permit. *E.g.*, Groves Decl., Ex. 2 at Schedule B.

## C.     The DEQ Proceeding Against Lamb Weston

In September 2022, the DEQ issued a Notice of Civil Penalty Assessment and Order (the "Notice") to Lamb Weston, identifying alleged exceedances of certain agronomic rates for nitrogen application from 2015 to 2021 for specific crops. *See generally* Groves Decl., Ex. 4. The Notice calculated the total alleged exceedances over seven years at 262 tons of nitrogen, or approximately 7.6 pounds of nitrogen per acre per year over the seven-year period. *Id.* ¶ 6. Plaintiffs highlight these exceedances in their Complaint, concluding without factual support that the alleged excess nitrogen applied to Lamb Weston's land application sites is somehow what "has contaminated the Plaintiffs' and the Class's drinking water, making it unsafe to drink"—notwithstanding the 11,500 *tons* (not pounds) of nitrogen farmers applied to fields in the region during that time period. *See* Compl. ¶ 93.

While that disputed causation issue may be for a different motion at a different time, one result of the exceedances is not disputable and is directly relevant here: Lamb Weston agreed to resolve the Notice, without admitting liability but with continued oversight from the Oregon DEQ, by entering into the Mutual Agreement and Order ("MAO") in February 2024 with the Oregon DEQ. Groves Decl., Ex. 5. The MAO provides for a total civil penalty of $143,400 (*id.* ¶ 4) and various ongoing assessment and remediation activities, including requiring Lamb Weston to:

- "submit to DEQ for review and approval a plan and schedule for achieving consistent compliance with Schedule A of the Permit (the Compliance Plan)" and "revise and resubmit the Compliance Plan consistent with DEQ's comments on the plan" should DEQ reject it. *Id.* at Final Order ¶¶ 2(a)–(b).

- "begin implementation of the Compliance Plan upon receipt of DEQ's written approval." *Id.* ¶ 2(c).

- "submit for DEQ review and approval a scope of work and schedule (SOW) for completing a remedial investigation and feasibility study (RI/FS), and submit[] an RI/FS report to DEQ, for nitrate contamination in the alluvial aquifer underlying

Respondent's wastewater land application sites" and "revise and resubmit the SOW consistent with DEQ's comments" should DEQ reject it. *Id.* ¶¶ 2(d)–(e).

- "begin implementation of the SOW . . . upon receipt of DEQ's written approval." *Id.* ¶ 2(f).

- "submit an RI/FS report to DEQ for review and approval" and revise and resubmit the same "consistent with DEQ's comments." *Id.* ¶¶ 2(g)–(h).

**Scope of Work**. Consistent with the MAO, in May 2024, Lamb Weston submitted the SOW and schedule for completing the RI/FS. Groves Decl., Ex. 6. Over the next few months, Lamb Weston and the Oregon DEQ worked collaboratively and diligently to reach agreement on the SOW. On June 12, 2024, the Oregon DEQ provided comments on the initially submitted SOW, with Lamb Weston's response following just over two weeks later on June 28. Dkt. 79-1, Reply Decl. of Amanda Groves, Ex. 14. The Oregon DEQ again provided comments and, on July 30, Lamb Weston submitted a revised SOW that the agency approved on August 21, 2024. *Id.*

The approved SOW entails a robust investigation of the current land application practices, identification and investigation of contaminants of concern including nitrates in the groundwater, an evaluation of the migration of the contaminants in the groundwater, an endangerment assessment to identify potential exposure and risk to human health from consumption of nitrate-contaminated groundwater, an evaluation of potential sources of the nitrate contamination, and evaluation and selection of remedial action options to address any human exposure to nitrates in drinking water supplies in the area around the land application sites. Decl. of Jeff Wilkerson (filed concurrently) ("Wilkerson Decl."), Ex. A at 2-2–2-3, 2-8, 2-10; *see also* OAR 340-040-0040, 340-040-0050. The first step to completing the RI/FS was the preparation and submittal of three technical memoranda to collect additional data on the potential migration of nitrates through the soils and the hydrogeologic properties of the underlying aquifer, and to evaluate the current monitoring well network to identify any data gaps. Wilkerson Decl., Ex. A at 4-1. Those technical

memoranda were submitted to DEQ on November 20, 2024: a Vadose Zone Assessment to evaluate nitrate migration in the soil, a Hydrogeologic Assessment to evaluate the characteristics of the underlying aquifer, and the Monitoring Well Evaluation to identify any data gaps in the current groundwater monitoring well network. Wilkerson Decl., Exs. B–D. The DEQ provided detailed comments on the three technical memoranda in early 2025, and Lamb Weston is currently working through those to provide revised technical memoranda for the agency's approval in the next several months. Upon approval, Lamb Weston will be required to implement the additional work and collect the additional data to support the remedial investigation and inform the selected remedy. Wilkerson Decl., Ex. A, Table 3. Following completion and approval of the RI/FS, which will be subject to public review and comment, Lamb Weston will be required to implement the selected remedial action. Groves Decl., Ex. 5 ¶ 2(c).

**Compliance Plan**. In addition to completing the RI/FS, the MAO requires Lamb Weston to implement a Compliance Plan for achieving consistent compliance with the terms of its Permit. *Id.* ¶¶ 2(a)–(c). On March 5, 2025, Lamb Weston submitted a revised Compliance Plan to address DEQ's comments. Wilkerson Decl., Ex. E at 1. The Compliance Plan requires Lamb Weston to implement additional measures, including improved nitrogen tracking; establishing a nitrogen loading buffer below the applicable agronomic rate which, once reached, will prohibit any additional process water or commercial fertilizer from being applied; conducting a robust nitrogen balance over several years; improved soil sampling post-harvest to minimize the potential for excess nitrogen to be applied; and improved soil moisture monitoring. *See generally id.* Implementation of the Compliance Plan reduces the impact and risk of nitrates migrating through the soil and impacting the underlying groundwater. Just last Thursday, on March 13, the DEQ approved the Compliance Plan. *Id.* The Compliance Plan, which will remain in effect until the

MAO terminates, will reduce the potential of exceedances of the agronomic rates and the potential for excess nitrogen to leach past the crop rooting depth. *Id.* at 4–5. Even before the DEQ's approval of the Compliance Plan, Lamb Weston voluntarily began implementation of certain requirements prior to the commencement of the 2024 growing season. Wilkerson Decl., Ex. E at 5–8.

### D. The Nitrate Reduction Plan

On September 20, 2024, the State of Oregon announced the Nitrate Reduction Plan for the LUBGWMA. *See* Nitrate Reduction Plan. The purpose of the Nitrate Reduction Plan, which acknowledges that the problem is "complex" and has no "simple or quick solutions," is "to reduce groundwater nitrate concentrations to less than 7 mg/L" in the LUBGWMA. *Id.* at 9. The Nitrate Reduction Plan contemplates all sorts of "agency activities" to promote "continuous progress," as well as "annual report[s]" to "detail[] the progress of these efforts." *Id.* at 9–10.

As the State explains, successful implementation requires this "unprecedented collaborative effort that spans four state agencies working in cooperation with the U.S. Environmental Protection Agency (EPA), the Confederated Tribes of the Umatilla Indian Reservation (CTUIR), Morrow County, Umatilla County, city governments, businesses, residents and community groups." *Id.*[4] The State further notes the extended timetable that a complex

---

[4] Significantly, and as Plaintiffs allege, several other state agencies—beyond the Oregon DEQ—are also involved in monitoring and addressing the elevated concentrations of nitrates in the LUBGWMA. This includes the LUBGWMA Committee designated by the Oregon DEQ and specifically "charged with taking the necessary measures to address the [nitrate] contamination." Compl. ¶ 48. The ODA and the OHA are also involved in addressing the elevated nitrate concentrations in Umatilla and Morrow Counties. *See id.* ¶¶ 41, 48–50. The ODA has permits in place to prevent pollutant discharge in state waters and "monitors discharges to groundwater from agricultural facilities," and the OHA oversees public water systems and implementing the Safe Drinking Water Act. Groves Decl., Ex. 12, *Letter from EPA to DEQ, ODA, and OHA* (July 7, 2020), https://gaftp.epa.gov/region10/sites/lower-umatilla/03_EPA_ltr_to_OR_agencies.pdf.

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]

problem like nitrate contamination in groundwater warrants, noting that the cleanup "will take decades" because "[t]he most effective and feasible way to clean up groundwater contamination of this scale is to control the sources of pollutants so that, over time, clean water cycles into the groundwater system, diluting and eventually replacing contaminated water." *Id.*

## II.     PLAINTIFFS' SUIT

In the midst of work with the DEQ on investigation and remediation, Plaintiffs and their counsel filed this suit covering the same subject matter and seeking overlapping, duplicative, and potentially inconsistent remedies with those of the MAO and the Nitrate Reduction Plan.

Each of Plaintiffs' claims arises exclusively out of alleged nitrate contamination of groundwater in the LUBGWMA. According to Plaintiffs, "Defendant Farms" (which Plaintiffs lump Lamb Weston into with two other farms) caused the nitrate contamination by "regularly and intentionally over-us[ing] nitrogen [fertilizer] to ensure maximized yield and profit potential from crops." Compl. ¶ 62. They also allege that "Defendant Wastewater Management Facilities" (the term that Plaintiffs use to refer to the Port and Lamb Weston collectively) also caused the nitrate contamination by "fail[ing] to install adequate digesters or other technology to process the wastewater to reduce nitrogen appropriately" (*id*. ¶ 72) and discarding nitrogen "in excess of their wastewater permits" issued by the Oregon DEQ (*id*. ¶ 93). Plaintiffs do not distinguish among the Defendant Farms or allege which farm's alleged overuse caused the purported nitrate contamination, let alone how Lamb Weston's alleged overuse—particularly in light of its small fraction of the total acreage—was the cause. *See generally id*. Indeed, as discussed below in Section III of the Argument, the Complaint lacks any factual support for the allegation that nitrate contamination affecting Plaintiffs' properties was caused by Lamb Weston's activities.

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND
RECOMMENDATION [DOC. 98]

Named plaintiffs Michael Pearson, James Sutter, and Silvia Sutter are all homeowners in Morrow County who draw water from the Umatilla Basin through private wells (*id.* ¶¶ 12, 13, 20, 21). A fourth plaintiff, Jeanie Strange, rents a home in Umatilla County and receives water through the Hermiston Water Department. *Id.* ¶¶ 26–27. Plaintiffs seek to represent—but of course, since class certification has not been granted, do not *currently* represent—a class of allegedly similarly situated individuals, including a "Resident Class" of over 45,000 people comprised of "all persons who currently reside in the [LUBGWMA]." *Id.* ¶ 100. Plaintiffs also propose two subclasses, a "Well-Reliant Subclass" including "all persons who currently reside in the [LUBGWMA] and rely on private wells to supply their drinking water" and a "Renter/Owner" subclass including "all persons who currently rent or own property in the [LUBGWMA] that is supplied with drinking water via either private wells or via a public water system." *Id.*

Plaintiffs' claims against Lamb Weston include violation of RCRA (Count I), negligence (Count II), negligence per se (Count III), trespass (Count IV), private nuisance (Count V), and public nuisance (Count VI).[5] They seek an order from this Court (a) declaring that Lamb Weston has violated and continues to violate RCRA, (b) compelling Lamb Weston to conduct any assessment and remedial actions necessary, (c) compelling Lamb Weston to provide clean, potable water to Plaintiffs through "regular deliveries of sufficient bottled water"[6] and "paying for the construction of wells deep enough to provide clean, potable water," (d) compelling Lamb Weston to "conduct and pay for medical monitoring" to address alleged health concerns, and (e) general,

---

[5] Plaintiffs bring an inverse condemnation claim (Count VII) only against Defendant Port of Morrow.

[6] Plaintiffs acknowledge in the Complaint that the State has either already installed filtration systems or is providing bottled water to homes that rely on private wells. *Id.* ¶ 53. Plaintiff Jeanie Strange is the only named Plaintiff who relies on the Hermiston Water Department for her water supply.

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]

compensatory, and punitive damages; litigation costs and fees; and all other damages allowed by law. *See id*. at Prayer for Relief.

## THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION

Lamb Weston and other Defendants' motions to dismiss and accompanying requests for judicial notice were submitted to Magistrate Judge Andrew D. Hallman, who issued the F&R on February 24, 2025. Dkt. 98.

With regard to Defendants' requests for judicial notice, the F&R judicially noticed all the requested documents. *Id.* at 7. For Plaintiffs' first claim for the violation of RCRA, the F&R recommended dismissal with prejudice as to "Defendant Farms," but it otherwise denied Defendants' motions to dismiss with respect to other categories of Defendants. *Id.* The F&R also recommended dismissal of Plaintiffs' third claim for negligence per se with prejudice, Plaintiff Strange's sixth claim for public nuisance without prejudice, and Plaintiffs' request for medical monitoring without prejudice. *Id.* For all other claims, the F&R recommended denial of the motions.

Lamb Weston respectfully objects to the F&R on three grounds and respectfully requests that this Court find that (1) application of primary jurisdiction is proper, (2) Plaintiffs failed to state a claim under RCRA as to Lamb Weston's beneficial re-use of process water, and (3) Plaintiffs' Complaint should be dismissed as to Lamb Weston for failure to allege causation of injury.

## STANDARD OF REVIEW

A magistrate judge's recommendation on a dispositive issue is subject to de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc); 28 U.S.C. § 636(b)(1)(c). This Court considers the matter "anew, as if no decision had been rendered." *United States v. Silverman*, 861 F.2d 571, 576 (9th Cir. 1988). This Court thus must reach "its own

independent conclusion about those portions of the magistrate's report to which objections are made." *United States v. Remsing*, 874 F.2d 614, 618 (9th Cir. 1989). It may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(c); *see* Fed. R. Civ. P. 72(b)(3).

## ARGUMENT

### I. THIS COURT SHOULD CORRECT THE ERRORS IN THE F&R'S PRIMARY JURISDICTION ANALYSIS AND DISMISS OR STAY THIS CASE—AT THE VERY LEAST AS TO LAMB WESTON—UNDER THAT DOCTRINE.

Primary jurisdiction is a prudential doctrine that "comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 64–65 (1956). It allows the Court to "stay proceedings or to dismiss a complaint without prejudice." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008); *see also Reiter v. Cooper*, 507 U.S. 258, 268–69 (1993) (similar).

Although the application of primary jurisdiction is discretionary and has no "fixed formula," the Ninth Circuit has identified four factors to guide that discretion: "(1) [a] need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Clark*, 523 F.3d at 1115. "[E]fficiency is the deciding factor in determining whether to invoke primary jurisdiction." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (citation omitted). Here, each of the Ninth Circuit's four primary-jurisdiction factors, plus the overriding consideration of efficiency, favor application of the primary jurisdiction doctrine—

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]

particularly as to Lamb Weston, which is actively working with regulators on precisely the issues raised by this case. As shown below, to the extent the F&R concluded otherwise, it was in error.

A.   **No one disputes the need to address the issues this case presents.**

As the F&R recognized, no party "disputes that there is immediate and serious need to address … nitrate contamination in LUBGWMA." F&R at 21. The first primary-jurisdiction factor is thus met.

B.   **The issues in this case are within the jurisdiction of an agency with regulatory authority pursuant to a statute that subjects an industry to comprehensive regulatory authority.**

The second and third primary-jurisdiction factors are also met. The issues this case presents are squarely within the purview of an agency with regulatory authority—Plaintiffs ask this Court to resolve whether Lamb Weston has caused nitrate contamination in the LUBGWMA and to impose remedial measures if so. Compl. ¶¶ 62, 72, 93. And these are the same highly technical issues that the Oregon DEQ is empowered to both regulate and enforce (and, in fact, is presently investigating, addressing, and enforcing as to Lamb Weston). *See, e.g.*, OAR-340-012-0038, OAR-340-012-0041, OAR-340-012-0045, OAR-340-045-0001, OAR-340-045-0005.

Congress has placed these issues with the jurisdiction of the Oregon DEQ by statute. "The U.S. Environmental Protection Agency ["EPA"] authorizes the Oregon [DEQ] to operate the federal [RCRA] hazardous waste program in lieu of the EPA." Groves Decl., Ex. 9 at 1.

And there can be little question that the Oregon DEQ has comprehensive authority to regulate groundwater contamination. Indeed, the DEQ has "the primary authority for groundwater quality protection." Groves Decl., Ex. 10 at 2. It is charged with implementing and regulating water quality standards, OAR-340-041-0001; administering the National Pollutant Discharge Elimination System permit program, which regulates the discharges of pollutants to waterways by

issuing permits to point source discharges of wastewater, OAR-340-045-0005; and administering the Water Pollution Control Facilities permit program, which regulates the discharge of pollutants to waters of the state including groundwater, *id.*

The DEQ likewise has comprehensive enforcement power. This includes the power to "enter upon and inspect, at any reasonable time, any public or private property, premises or place for the purpose of investigating either an actual or suspected source of water pollution." Or. Rev. Stat. § 468.095 (1). It has the same entry and inspection powers to "ascertain compliance or noncompliance with any rule or standard adopted or order or permit issued." *Id.* And when it discovers sources of water pollution or permit violations, it is empowered to issue pre-enforcement notices, initiate enforcement actions, require violators to take certain actions within a specified timeframe, and assess civil penalties. *See* OAR-340-012-0038, OAR-340-012-0041, OAR-340-012-0045.

The Oregon DEQ thus has comprehensive regulatory authority as to Plaintiffs' claims that Lamb Weston is overusing nitrogen fertilizer (Compl. ¶ 62), inadequately reducing nitrogen in its wastewater processes (*id.* ¶ 72), and exceeding its Oregon DEQ permit (*id.* ¶ 93). And, as discussed above, the DEQ is actively *exercising* its enforcement authority right now as to Lamb Weston. *See supra*, Factual Background, Section I.C.

This is precisely the sort of "comprehensive regulatory scheme" contemplated by the primary jurisdiction doctrine. The Ninth Circuit's example from *General Dynamics* is instructive:

> If a canner sued a grower for delivering undersized asparagus and there existed an agency empowered to establish size guidelines for asparagus, the issue of undersized asparagus would be one placed within the competence of the agency. If, on the other hand, Congress merely provided a forum for canner/grower disputes without giving the decisionmaker the authority to implement a scheme for regulating growers, only the adjudication of the issue would be vested in that body.

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]

*United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1363 n.13 (9th Cir. 1987). The Oregon DEQ's authority falls squarely into the first category—it has authority delegated by statute to implement a comprehensive scheme relating to groundwater contamination, and it possesses the corresponding authority to enforce it.

The F&R's conclusion that the second and third primary-jurisdiction factors are not met was based on a fundamental error. The F&R incorrectly reasoned that if RCRA allows a citizen suit, then Congress necessarily has not vested authority in a regulatory agency, and that agency necessarily does not oversee a "comprehensive" regulatory scheme. F&R at 22–25. Stated otherwise, the F&R concluded that because "RCRA's citizen suit provision specifies the circumstances in which judicial review is unavailable," any lawsuit allowed by RCRA's citizen-suit provisions cannot be referred under the primary jurisdiction doctrine. *Id.* at 23.[7]

The F&R's reasoning in this regard was flawed because it conflated the primary jurisdiction doctrine with statutory standing—effectively creating a rule that primary jurisdiction can *never* be applied in RCRA cases (or, by logical extension, in any case in which the statutory scheme provides standing for a private suit). But the primary jurisdiction doctrine is not simply a standing inquiry by another name. Quite the contrary—it is a doctrine "specifically applicable to claims *properly cognizable in court* that contain some issue within the special competence of an administrative agency." *Reiter*, 507 U.S. at 268 (emphasis added). A court's invocation of the doctrine "does not indicate that it lacks jurisdiction" in the formal sense. *Clark*, 523 F.3d at 1114. Thus, whether primary jurisdiction does or can apply is simply a different inquiry than whether there is a "statutory bar[] to citizen suit." *Bennett v. City of Centreville*, 710 F. Supp. 3d 626, 631

---

[7] The F&R, in effect, overreads the "comprehensive regulatory scheme" factor to mean "exclusive regulatory scheme." But the availability of private suit does not suggest any lack of comprehensiveness in the DEQ's authority.

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND
RECOMMENDATION [DOC. 98]

(S.D. Ill. 2024); *see also id.* at 633 ("[T]he relevant issue here is not whether the Court *can* cede some of its jurisdiction here to the administrative agencies, but whether it *should*.") (emphasis added). The question is not whether the Court *can* allow the case to proceed but whether it is more appropriate and efficient to defer to regulators when the case raises "issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *W. Pacific*, 352 U.S. at 64.

It should thus come as little surprise that appellate and district courts around the country have rejected any bright-line rule that primary jurisdiction cannot apply in RCRA citizen suits. *See, e.g.*, *Conservation L. Found., Inc. v. Exxon Mobil Corp.*, 3 F.4th 61, 71 (1st Cir. 2021) (declining to adopt a rule that "the doctrine of primary jurisdiction is … inapplicable to every case brought under the citizen suit provisions of the … RCRA"); *Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 695 (3d Cir. 2011) ("Like our sister circuits, we decline to impose such a general rule."); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998) ("[T]here may be room for applying the doctrine[] … in cases in which a state has a formal administrative proceeding in progress that the citizens' suit would disrupt."); *Bennett*, 710 F. Supp. 3d at 631 ("[E]ven if a citizen suit is not statutorily barred by a formal administrative proceeding, appropriate circumstances may still exist to apply the doctrine of primary jurisdiction."); *White Plains Hous. Auth. v. BP Prods. N. Am. Inc.*, 2022 WL 17822560, at *7 (S.D.N.Y. Dec. 19, 2022) (collecting cases). Such a per se rule would be inconsistent with the flexible nature of the primary jurisdiction doctrine—the doctrine has "[n]o fixed formula," *Clark*, 523 F.3d at 1115, and the analysis should be on a "case-by-case basis," *Ellis v. Tribune Television Co.*, 443 F.3d 71, 82 (2d Cir. 2006).

Rather than applying such a categorical rule, courts have recognized that primary jurisdiction might be appropriate in cases where, for example, a "formal administrative

proceeding" is already "in process," suggesting "heightened state involvement." *Baykeeper*, 660 F.3d at 695 (quoting *PMC, Inc.*, 151 F.3d at 619); *see also White Plains*, 2022 WL 17822560, at *7 (primary jurisdiction is particularly appropriate in a RCRA case "when the state agency is in the midst of managing remediation efforts").[8] As discussed below, this is just such a case— especially as to Lamb Weston.

   **C.    The Oregon DEQ's expertise is best suited to implement the relief Plaintiffs seek, and this case risks imposing inconsistent obligations on Lamb Weston and disrupting ongoing remedial efforts.**

   This case satisfies the fourth primary-jurisdiction factor—administrative expertise—as well. Compelling Lamb Weston to "conduct any assessment and remedial action activities necessary to eliminate the endangerment, which at minimum would include remediating the soil and groundwater to those cleanup standards described by Oregon law and regulations" (Compl., Prayer for Relief (B)) is best left to the Oregon DEQ, given its specialized expertise.[9] Indeed, the Oregon DEQ is the chief regulatory agency responsible for overseeing the implementation of cleanup standards and remediation of water pollution. The recently announced Nitrate Reduction

---

[8] Contrary to what the F&R suggests, the question is not whether Congress strictly requires the agency to *first* resolve the issue but whether Congress empowered an agency to regulate a particularly complicated issue. *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 910 (9th Cir. 2019) (recognizing that the primary jurisdiction doctrine applies where an "otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch") (quoting *Clark*, 523 F.3d at 1114).

[9] The technical issues implicated involve action that the Oregon DEQ has already laid out in the MAO between it and Lamb Weston, including "hydrogeologic assessment," evaluating "infiltration rates," and estimating the "volume of contaminates [sic] in the vadose zone at the sites," utilizing "chemical mass balances" and "general groundwater chemistry" to show sources of contamination, estimating the "contribution of contaminants from the land application activities," evaluating the "need for lysimeters beneath circles to help in the characterization of leachate" coming from the sites, and identifying and evaluating "tracer chemicals." Groves Decl., Ex. 5 at 6–7.

Plan, which is meant to reduce nitrate concentrations in the LUBGWMA, illustrates the complexities of solving that problem. Successful implementation requires an "unprecedented collaborative effort that spans four state agencies working in cooperation with the U.S. Environmental Protection Agency (EPA), the Confederated Tribes of the Umatilla Indian Reservation (CTUIR), Morrow County, Umatilla County, city governments, businesses, residents and community groups." *Id.* Even the F&R acknowledged the "unique challenges" in this case "because of the number of named [and unnamed] parties and the broad geographic scope, which further complicates any judicial remedy." F&R at 26.[10]

In the face of a complex problem with complex remedies, deference to agency expertise is the most sensible choice. *See Friends of Milwaukee's Rivers v. Milwaukee Metro Sewerage Dist.*, 382 F.3d 743, 760 (7th Cir. 2004) ("[C]ourts are not in the business of designing, constructing or maintaining sewage treatment systems"); *see also, e.g.*, *McCormick v. Halliburton Co.*, 2012 WL 1119493, at *2 (W.D. Okla. Apr. 3, 2012) ("[T]he extent of the threat posed by the perchlorate in the groundwater … whether immediate remediation is required … and what type of remedy is best suited … are all matters within the specialized knowledge of the ODEQ"); *City of Bethany*, 2017 WL 3741556, at *4 ("Plaintiff's RCRA and injunction claims, if successful, would require the Court to fashion a remedy to abate the alleged contamination …. [T]his task is assigned by federal and state law to the DEQ, which is uniquely equipped with the expertise and means to evaluate, design, monitor, and effectuate the necessary remedial work").

So too is there a profound need for administrative uniformity—also part of the fourth primary-jurisdiction factor. Again, Lamb Weston and the Oregon DEQ are already working on a

---

[10] As Plaintiffs allege, this case implicates "approximately 562 square miles of land" across multiple counties and cities, impacting "over 45,000 people." Compl. ¶ 3.

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND
RECOMMENDATION [DOC. 98]

comprehensive RI/FS to investigate the sources and impact of nitrate contamination beneath Lamb Weston's property and develop remedial actions to address such impacts and any potential risk to human health or the environment. *See supra*, Factual Background, Section I.C. If this Court were to proceed with this case, it could result in a conflicting liability finding—finding Lamb Weston not liable for contamination it is already working to address, or liable where the DEQ has determined it is not. And if there were any liability finding, the Court would have to "fashion a remedy to abate the alleged contamination in a timely and effective manner." *See City of Bethany v. Rockwell Automation, Inc.*, 2017 WL 3741556, at *4 (W.D. Okla. Aug. 30, 2017). That task is better suited for the Oregon DEQ, particularly as to Lamb Weston, for which it "already has a substantial head start toward abating the alleged contamination." *Id.*; *see also McCormick*, 2012 WL 1119493, at *3 ("[W]hether immediate remediation is required … and what type of remedy is best suited … are all matters within the specialized knowledge of the ODEQ."). And any judicially ordered remedy would threaten inconsistent obligations on Lamb Weston. *See McCormick*, 2012 WL 1119493, at *2 ("[T]here would be a great potential for conflicting orders" if the Court "were to determine an investigatory and remediation plan independently of the ODEQ"); *Stratford Holding, LLC v. Foot Locker Retail Inc.*, 2013 WL 5550461, at *6 (W.D. Okla. Oct. 8, 2013) ("Providing plaintiff with the relief it seeks under RCRA could result in conflicting orders regarding the remediation and disrupt the plan the State has in place to remedy the contamination").

The F&R downplayed these concerns, suggesting that the fourth primary-jurisdiction factor is not met because the Court is "competent to resolve" these issues and can "consider" agency orders or permit "the agencies to comment before ordering relief." F&R at 26 (citation omitted). But the question is not whether the Court is *competent*—again, primary jurisdiction is not about the Court's power or ability to hear the case. Moving forward on issues that Oregon

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]

DEQ is actively addressing, and which are plainly within its special expertise, only invites "needless confusion into the process, as well as likely inefficiency and delay into the actual remediation, which is supposed to be the ultimate goal here." *Read v. Corning Inc.*, 351 F. Supp. 3d 342, 354 (W.D.N.Y. 2018). It is wasteful and duplicative to inundate this Court with evidence or the DEQ's prior opinions or rulings, or for this Court to elicit agency comment and fashion an independent remediation plan when the Oregon DEQ's remedial efforts are already full steam ahead, especially as to Lamb Weston.[11] *See Sierra Club v. Chesapeake Operating*, 248 F. Supp. 3d 1194, 1208–09 (W.D. Okla. 2017) (dismissing claim where agency had already "taken a series of actions" in response to the alleged misconduct).

**D.    Applying primary jurisdiction here is the most efficient course—and efficiency is the "deciding factor."**

Since at least September 2022, the Oregon DEQ and Lamb Weston have been working in concert to address the very issues raised in the Complaint. *Supra*, Factual Background, Section I.C. Given the DEQ's ongoing engagement with Lamb Weston on these issues, it would be decidedly inefficient for this Court to proceed on a parallel track—an unnecessary duplication of efforts that are already well underway. But while efficiency should be the "deciding factor in determining whether to invoke primary jurisdiction," *Astiana*, 783 F.3d at 760, the F&R largely neglected this concern.

---

[11] For instance, were this case to proceed on a track parallel to the DEQ's pending enforcement proceeding, the Court might find liability where the DEQ has said that Lamb Weston is not responsible. Or it might prescribe a remediation timeline that differs from the one ultimately prescribed by the DEQ. Each of these could jeopardize the deliberate and effective cleanup of a problem that the State of Oregon has recognized can only be fixed "over time" and "will take decades." Nitrate Reduction Plan at 9. These concerns are especially acute given the immense progress that the Oregon DEQ and Lamb Weston have already made toward remediation. *See infra*, Factual Background, Section I.C.

"It is axiomatic that the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency." *McCormick*, 2012 WL 1119493, at *2 (citing *Friends of Santa Fe Cnty. v. LAC Mins., Inc.*, 892 F. Supp. 1333, 1350 (D.N.M. 1995)). That makes sense—court proceedings are almost always expensive and slow-moving, but they are also duplicative when the agency has already devoted resources to the issue. Yet, as discussed below, the F&R barely mentioned the ongoing regulatory process as to Lamb Weston—lumping all Defendants together and asserting that there is "just a plan" and "no current … enforcement action that would allow Plaintiffs to seek the relief that they could seek under RCRA," F&R at 27, when in fact Lamb Weston is actively involved in regulatory proceedings on these exact same issues.

Even describing the broader, inter-agency Nitrate Reduction Plan as "just a plan" was unwarranted—it is a massive collaboration between four agencies that contemplates remedial action as far as ten years into the future. Were the Court to shoulder the efforts of that massive collaboration, it would pose "a serious drain of judicial resources." *Friends of Santa Fe Cnty.*, 892 F. Supp. at 1350. Even worse, it would distract from the State's pending and productive moves toward enforcement and remediation. As the Supreme Court has explained, "citizen suits are proper only if the Federal, State, and local agencies fail to exercise their enforcement responsibility." *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987) (citation omitted). Evidently, that is not the case here.

At bottom, this Court can neither make a liability finding (which may conflict with the DEQ's determinations) nor prescribe any relief in this case that will not implicate the concerns primary jurisdiction is meant to address. If this Court orders Lamb Weston to do precisely what Oregon DEQ is already requiring, then these proceedings will have been wasteful, duplicative, and inefficient. And if it orders something different, then it will upset the careful efforts of the DEQ

in this regard, which, as discussed immediately below, are quite advanced as to Lamb Weston and proceeding productively—with prescribed timelines, investigation, and a detailed DEQ-approved Compliance Plan. Conflicting or inconsistent legal mandates from the DEQ and this Court threaten the ongoing efforts already underway to address the issues this case raised. *Sierra Club*, 248 F. Supp. 3d at 1208–09 (dismissing claim where agency had already "taken a series of actions" in response to the alleged misconduct).

E.     **The F&R does not consider the pending agency proceedings against Lamb Weston, which warrant applying primary jurisdiction *at least* as to Lamb Weston**

At the very least, the primary jurisdiction doctrine militates in favor of a stay or dismissal *as to Lamb Weston*. The F&R's analysis of primary jurisdiction lumped together all Defendants as one. It even went so far as to state that "neither federal nor state authorities have commenced an action to abate the acts or conditions at issue." F&R at 23–24.[12] But that simply *is not true* as to Lamb Weston. Rather, there are pending DEQ proceedings against Lamb Weston, including an enforcement action with an approved Compliance Plan and an approved SOW. Those proceedings are active and moving meaningfully forward. That was true at the time of Lamb Weston's motion to dismiss, and it is even more evident today. In short, as to Lamb Weston, the justifications for applying primary jurisdiction, and the risks of proceeding, are especially strong. *See Davies v. Nat'l Coop. Refinery Ass'n*, 963 F. Supp. 990, 998 (D. Kan. 1997) ("A potential for conflicting orders would exist if this court were to determine an investigatory and remediation plan independently of the [state's environmental department]").

---

[12] Even Plaintiffs acknowledged that the pending enforcement action would provide them at least some of the relief they seek here. Opp'n to Mot. to Dismiss at 18 (arguing that "there is no DEQ enforcement action in progress against any Defendant that, even if successful, would secure to Plaintiffs *all the relief* they have requested") (emphasis added).

To reiterate, in February 2024, the Oregon DEQ and Lamb Weston entered into the MAO, which covers all of Lamb Weston's "wastewater land application practices." Groves Decl., Ex. 5. The Oregon DEQ has now approved both (i) a "Compliance Plan" for "achieving consistent compliance" with the Permit and (ii) a "scope of work and schedule (SOW) for completing a remedial investigation and feasibility study (RI/FS) … for nitrate contamination in the alluvial aquifer underlying [Lamb Weston's] wastewater land application sites." *Id.* at 5; Wilkerson Decl., Exs. A, E. As part of the SOW, now well underway, Lamb Weston submitted technical memoranda in November 2024 to collect additional data on the potential migration of nitrates through the soils and groundwater. Wilkerson Decl., Exs. B–D. The DEQ provided detailed comments in January 2025, and Lamb Weston is presently working to revise them. The SOW contemplates several actions after approval of the technical memoranda, including the installation of monitoring wells, aquifer testing, and lysimeter installation/monitoring/sampling. Wilkerson Decl., Ex. A. The SOW contemplates completion of the RI/FS by July of next year. *Id.* And, as to the Compliance Plan, the DEQ's recent approval gives way to a series of measures from Lamb Weston, including but not limited to improved nitrogen tracking, improved soil sampling, soil moisture monitoring, land application volume control/tracking, and water reduction efforts during non-growing season. Wilkerson Decl., Ex. E at 2. Even before the Compliance Plan was approved, Lamb Weston took several voluntary actions relating to nitrogen tracking, replacing parts to avoid potential leaks or failures, and the installation of monitoring wells. *Id.* at 2–3. Additional actions are forthcoming under the now-approved Compliance Plan, including the calculation and review of the "nitrogen balance for each harvested crop," a review of methods to determine soil moisture and a corresponding proposed method, and "additional water recycling and loading reduction efforts." *Id.* at 7–9. Thus, the MAO has established concrete timelines and has already achieved productive

results, with many more to come.  There is not, then, "just a plan" with respect to Lamb Weston.

Ongoing enforcement and remediation efforts—which this litigation threatens to derail through

inconsistent obligations and duplicative efforts—are "already before the agency," strongly

favoring the application of primary jurisdiction.  *See McCormick*, 2012 WL 1119493, at *2.

This Court should not allow this litigation to move forward in a manner that threatens to

conflict with the DEQ's liability determinations, to undermine Lamb Weston's efforts to implement

remedial efforts consistent with the DEQ's directives, or to impose inconsistent obligations.  At

the very least, it should apply the primary jurisdiction doctrine as to Lamb Weston.

To be clear, Lamb Weston is not suggesting that this Court need abstain completely from

monitoring the progress of its efforts.  As other courts have done, the Court could condition any

stay as to Lamb Weston on, for example, "regular status reports" to ensure "the progress and

diligence of Lamb Weston's efforts," with the understanding that any stay could be lifted if

progress does not continue.  *See Bennett*, 710 F. Supp. 3d at 634–35.  Similarly, Lamb Weston is

open and amenable to other limited forms of participation in proceedings should the Court

determine that a stay or dismissal of proceedings is not warranted as to the case as a whole.  But

this case should not proceed against Lamb Weston in its current form, which is inefficient at best,

and at worst threatens to undermine Lamb Weston's and the DEQ's significant and ongoing efforts

to address the difficult and multifaceted issues this case raises.

## II.    LAMB WESTON'S PROCESS WATER IS NOT "SOLID WASTE" UNDER RCRA BECAUSE IT IS NOT "DISCARDED," AND THERE WAS NO REASONABLE BASIS FOR THE F&R'S DISTINCTION BETWEEN SUCH PROCESS WATER AND NITROGEN FERTILIZER.

Lamb Weston respectfully objects to the F&R's holding that Plaintiffs adequately alleged

that Lamb Weston's use of process water at its land application areas constituted "discarding" solid

waste under RCRA.  F&R 49–50.  The F&R's reasoning inconsistently analyzed the application

of nitrogen through process water and nitrogen fertilizer and also conflicted with the weight of authority on the meaning of "discarding" materials applied for their intended purposes.

Plaintiffs' RCRA claims against Lamb Weston turn on allegations that Lamb Weston's use of process water and nitrogen fertilizer constitute generation, treatment, disposal, storage, or transport of "solid waste" and "hazardous waste." 42 U.S.C. §§ 6901–6992; Compl. ¶ 113. But "solid waste" and "hazardous waste" are defined terms, requiring, *inter alia*, that the material in question is "discarded." *See* 42 U.S.C. § 6903(27) (defining solid waste as "discarded material"); *id.* § 6903(5) (defining hazardous waste as a subset of solid waste); *Am. Mining Cong. v. U.S. E.P.A.*, 824 F.2d 1177, 1179 (D.C. Cir. 1987) ("'[H]azardous waste' is defined as a subset of 'solid waste.'"); F&R at 48–49 (summarizing statutory requirements).

Plaintiffs' RCRA claim against Lamb Weston concerns two kinds of alleged "discarding"— applying nitrogen fertilizer in its role as a "Defendant Farm" and land application of potato process water in its role as a "Defendant Wastewater Management Facilit[y]." S*ee, e.g.*, ¶¶ 60–65 (describing "Defendant Farms" and their "use of nitrogen fertilizer"); *id.* ¶¶ 69–93 (describing "Defendant Wastewater Management Facilities'" use of process water containing nitrogen). But for *both*, Plaintiffs allege that the application of nitrogen was related to growing crops. As to nitrogen fertilizer, they allege that "[f]armers, including Defendants, use nitrogen fertilizer to help increase crop yields." *Id.* ¶¶ 61–62. And as to process water, they allege that Lamb Weston has a "DEQ permit" to apply its potato process water, which contains nitrogen, to "local farms." *Id.* ¶¶ 69, 76, 77. They further allege that the land application of process water is extraordinarily valuable in providing both moisture and fertilization to farms, saving "hundreds of thousands of dollars or more" that would otherwise be spent on water or fertilizer. *See id.* ¶ 76 n.3. In short, for

both activities, Lamb Weston is alleged to have applied nitrogen-rich materials to farms for their associated, expected agricultural benefits.

As Lamb Weston's motion to dismiss argued, neither the nitrogen-containing process water nor the nitrogen fertilizer that Lamb Weston allegedly applies to land at farms constitutes "discarded" material. RCRA's legislative history expressly recognizes that "Agricultural wastes which are returned to the soil as fertilizers or soil conditions are not considered discarded materials in the sense of this legislation." H.R. Rep. No. 94–1491, at 3 (1976), reprinted in 1976 U.S.C.C.A.N. at 6239–41. And court after court has held that products with a "value in the marketplace" and used for an intended "beneficial use" *are not* discarded materials for purposes of RCRA. *See, e.g.*, *California River Watch v. City of Vacaville*, 39 F.4th 624, 629 (9th Cir. 2022) ("whether a product has served its intended purpose and is no longer wanted by the consumer" is a key consideration in determining whether a substance constitutes solid waste); *Krause v. City of Omaha*, 2015 WL 5008657, at *4 (D. Neb. Aug. 19, 2015), *aff'd*, 637 F. App'x 257 (8th Cir. 2016) (road salt used for snow and ice control not "discarded" under RCRA); *No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001) (pesticide sprayed onto or into the air, land, and water as part of its intended use is not "discarded" under RCRA); *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 518 (9th Cir. 2013) (PCP-based wood preservative that is released into the environment from its use as preservative on wooden poles not "discarded" under RCRA); *Oklahoma v. Tyson Foods, Inc.*, 2010 WL 653032, at *8 (N.D. Okla. Feb. 17, 2010) (poultry litter not discarded when it had "value in the marketplace as a fertilizer and soil amendment").

Under these authorities, Plaintiffs' allegations (and judicially noticeable materials) show that neither the process water nor the nitrogen fertilizer that Lamb Weston applies are "discarded"

material that could constitute solid waste. *E.g.*, Compl. ¶ 76 (use of process water saved "hundreds of thousands of dollars or more in fertilizer and water costs"); Groves Decl., Ex. 2 at 2 (permit expressly noting that process water is applied for the "beneficial use" of farms); Compl. ¶ 61 (farmers "use nitrogen fertilizer to help increase crop yields").

The F&R correctly recognized RCRA's statutory requirement that solid and hazard waste comprise "discarded" materials. F&R at 49–50. And it correctly held that Defendant Farms' application of nitrogen fertilizer on farmland—even allegations of "over use" that was not "appropriate"—did not show the requisite "discarding." *Id.* at 51. As the F&R explained, Plaintiffs did not plead "any facts that would plausibly demonstrate that Defendant Farms' application—even over-use—of nitrogen was unnatural or unexpected." F&R at 51–52; *see Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1089 (9th Cir. 2017) (product not solid waste where it is "released into the environment as a natural, expected consequence" of its intended use).

The F&R's rejection of the same conclusion as to Lamb Weston's land application of process water in its role as a so-called "Defendant Wastewater Treatment Facilit[y]," however, was erroneous for several reasons. First, the F&R improperly analyzed the allegations against Lamb Weston and the Port together because the Complaint labels both as "Defendant Wastewater Treatment Facilities." But the Port and Lamb Weston are separate entities, and the allegations against them are meaningfully different—they should not and cannot be treated as if they were of one piece. Yet, in several places, the F&R treated allegations made only as to the Port as though they apply to Lamb Weston. *See, e.g.*, F&R at 14 (asserting that the Complaint alleges that Defendant Wastewater Management Facilities had "severe leaks in wastewater pipelines," when such allegations were made only as to the Port); *id.* at 39 (stating that the Complaint alleges

"Defendants allowed industrial waste, wastewater, and industrial effluent to leach from waste lagoons into soil," when the allegations of leaching were made only as to the Port). More important, the F&R relied, at least in part, on allegations made only as to the Port in rejecting *Lamb Weston's* argument that there was no allegation of "disposal" for purposes of RCRA. Dkt. 98 at 50 ("And allowing wastewater to leak from lagoons and pipes [*not alleged as to Lamb Weston*] cannot be considered a natural and intended consequence of its intended use. Accordingly, Plaintiffs have alleged that Defendant Wastewater Treatment Facilities have disposed of solid waste."). Allegations as to other Defendants have no bearing on whether a claim was stated as to Lamb Weston.

Second, and focusing on the allegations made as to Lamb Weston, the F&R articulated no reasonable basis for treating the application of process water to farmland for its agricultural benefits differently than similar applications of nitrogen fertilizer. For both, Plaintiffs allege that Lamb Weston applied these materials for their natural and expected agricultural benefits and, for both, they argued that this did not defeat a showing of "discarding" because Lamb Weston allegedly overapplied. *See., e.g.*, Compl. ¶¶ 61, 62 ("Defendants regularly and intentionally over-use nitrogen to ensure maximized yield and profit potential from crops"); *id.* ¶ 69 (Lamb Weston "'recycle[s]' the wastewater by pumping it to local farms"); *id.* ¶ 76 n.3 (use of process water saves "hundreds of thousands of dollars or more in fertilizer and water costs"); Dkt. 68 at 31 ("Defendants 'disposed of' high-nitrogen materials when they applied them in excess of the agronomic rate"); *id.* at 32 ("When a nutrient is applied beyond the agronomic rate or onto an empty field, it has no potential to act as a fertilizer; it is being abandoned to leach into the soil and eventually the groundwater.").

Yet the F&R treated the two nitrogen uses differently. As to fertilizer, it recognized that overapplication is *not* the standard; the standard is whether the application was a natural or expected consequence of its intended use. F&R at 51. Yet for process water, it concluded that because Plaintiffs allege that Lamb Weston "regularly over-appl[ies] nitrogen-heavy wastewater to fields," whether the wastewater was "discarded" under RCRA "cannot be resolved on a motion to dismiss." F&R at 50. In simple terms, that makes no sense—if nitrogen fertilizer applied to farmland for the purposes of growing crops is not "discarded" even when allegedly overapplied, there is no rational reason or statutory basis for treating nitrogen-laden process water applied for the very same purpose differently.

The F&R suggested in a footnote that process water was "discarded" by application during the winter. F&R at 51 n.10. But such wintertime application does not render the application any less "natural and expected" or negate its "beneficial use"—indeed, Lamb Weston's current DEQ permit plainly contemplates application year-round on lands on which crops are and "will be grown" for its recognized "beneficial use" in agriculture. Dkt. 55-2 at 6 (Lamb Weston's Permit). Indeed, the Permit acknowledges the use of process water for "[n]itrogen loading after crop harvest and before re-seeding," clarifying that it "shall only be credited to the next crop." *Id.* at 3. Plaintiffs' insinuations about wintertime application therefore should not change the analysis.

Even setting aside the F&R's specific reasoning, Plaintiffs' allegations make plain that Lamb Weston's process water was used as an intended "recycled" material for the purposes of crop growth and is therefore not governed by RCRA. Compl. ¶ 69 ("the Port and Lamb Weston 'recycle' the wastewater by pumping it to local farms, where it is sprayed out onto the land"). And again, the Complaint openly acknowledges that the process water was purposefully applied for its associated agricultural benefits and had economic value to the tune of "hundreds of thousands of

dollars or more." *Id.* at 28 n.3. This is not "discarded" waste under any reasonable definition—it is a product intentionally applied for its beneficial use. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1041 (9th Cir. 2004). ("discard" interpreted using its ordinary, dictionary definition).

## III. PLAINTIFFS' CONCLUSORY CAUSATION ALLEGATIONS ARE INSUFFICIENT, AND THE F&R'S CONCLUSION TO THE CONTRARY WAS ERRONEOUS.

As Lamb Weston's motion to dismiss showed (Dkt. 54 at 10–11), Plaintiffs' Complaint lacks any factual support for the assertion that the alleged nitrate contamination affecting their properties was caused by Lamb Weston's activities. Plaintiffs make no effort to distinguish which Defendant's or Defendants' alleged use or overuse of nitrogen fertilizer or process water caused groundwater contamination at their properties. *See generally* Compl. No facts in the Complaint even suggest, for example, that nitrates in Plaintiffs' drinking water wells in Boardman are the same nitrates, or are sourced from, those in the groundwater beneath Lamb Weston's land application sites southwest of Hermiston—approximately 16 miles from the nearest Plaintiffs' drinking water well. *See id.* ¶¶ 13, 21. And, even though the Complaint shows that Lamb Weston's property is located in a confined area (and comprises a tiny fraction of the property) in the LUBGWMA, Plaintiffs do not allege even that Lamb Weston's land application sites are upgradient of their drinking wells, nor any other facts suggesting that groundwater under Lamb Weston's sites is migrating toward their wells. *See id.* Instead, they offer only bare *conclusions* that nitrate contamination by Lamb Weston has caused them harm. *See id.* ¶¶ 128, 132, 139, 146. And even these bare conclusions are typically made as to "Defendants" rather than Lamb Weston in particular, with no attempt to state which alleged conduct by which Defendant caused what harm—much less any factual support for such distinctions. *E.g.*, *id.* ¶¶ 59, 62, 63, 68, 115, 128, 143.

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]

Such "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" or "labels and conclusions" are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* And these facts must be specific to *each* Defendant—they must "support a reasonable inference that the plaintiff is entitled to relief from a *specific defendant for specific misconduct*." *Hernandez v. Cnty. of Los Angeles*, No. 2:21-CV-07858-PA-JC, 2022 WL 17216582, at *8 (C.D. Cal. Sept. 14, 2022) (emphasis added). This is true not just as a matter of the pleading requirements for all federal cases, but under the applicable substantive law—Plaintiffs must plead facts that allow a reasonable inference that they were personally injured by nitrates specifically from Lamb Weston's properties, and due to Lamb Weston's conduct. *See, e.g.*, *Hettle v. Constr. Contractors Bd.*, 260 Or. App. 135, 147, 316 P.3d 344 (2013) (Oregon negligence claims require proof that "the respondent's conduct … caused injury to the complainant"); *accord Solberg v. Johnson,* 306 Or. 484, 490, 760 P.2d 867 (1988), *abrogated on other grounds by Deckard v. Bunch*, 358 Or. 754, 370 P.3d 478 (2016); *See also Port of Portland v. Monsanto Co.*, 2017 WL 9098079, at *17 (D. Or. 2017) (nuisance claims require alleging and subsequently proving damages were caused by the defendant's conduct); *Cereghino v. Boeing Co.*, 826 F. Supp. 1243, 1247 (D. Or. 1993) (granting summary judgment to defendant on plaintiffs' intentional trespass and nuisance claims involving solvent contamination of groundwater where plaintiffs failed to produce evidence that defendant intended the solvents to migrate into groundwater or knew that the disposal of solvents would result in such contamination). They have not pleaded such facts. Accordingly, Lamb Weston respectfully objects to the F&R's conclusion that Plaintiffs have sufficiently alleged causation as to Lamb Weston. Dkt. 98 at 33–35.

To be sure, the F&R repeatedly acknowledged that the Complaint lacks clarity as to which Defendants caused what harm. Dkt. 98 at 33–34. It cited to multiple examples, including a lack of clarity about which Defendants belong to which class of Defendants (wastewater treatment, CAFOs, and farms), and Plaintiffs' failure to specify which Defendants are involved in the alleged disposal of wastewater. *Id.* at 35–36 nn. 5–7. And it recognized that Plaintiffs do not allege specific conduct that each Defendant engaged in and that "there is no plausible basis to suggest that each defendant played the same role in bringing about [Plaintiffs'] harm." *Id.* at 34–35. By acknowledging these deficiencies, the F&R effectively establishes that Plaintiffs have failed to appropriately plead causation.

Nonetheless, the F&R sidestepped this clear causation issue by suggesting that the question was only whether it was plausible that each defendant "caused, at least in part" a "communal harm." F&R at 58–59 ("[I]t is at least plausible that each Defendant separately contributed to the *communal harm* of nitrate pollution of the groundwater.") (emphasis added). But referring to a "communal harm" cannot avoid Plaintiffs' obligation to show that they were *personally* injured. Nothing in the Complaint suggests, for example, that groundwater contamination in one part of the Umatilla Valley is transported to every other part of the valley—indeed, such allegations would contravene well-established science. This is not a government-enforcement action; it is not even a certified class action—Plaintiffs must allege harm to themselves or their property. Moreover, Plaintiffs must allege not only that each Defendant caused or contributed to nitrate pollution of the groundwater, but that each such contribution in turn resulted in the alleged nitrate contamination that specifically harmed *each Plaintiff*.[13] *Hernandez*, 2022 WL 17216582, at *8. They have not

---

[13] Further, although Plaintiffs allege that Lamb Weston has violated its Permit in the past, Plaintiffs draw no plausible connection between such Permit violations and the alleged nitrate contamination of their private water wells or the Hermiston Water Department drinking water supply. Bare

done so.  In sum, Plaintiffs' thin allegations fail to plausibly show that they were injured by nitrate contamination caused by Lamb Weston specifically.  The Complaint should thus be dismissed as to Lamb Weston.

## **CONCLUSION**

For the foregoing reasons, Lamb Weston respectfully objects to the magistrate's F&R and request that this Court find that (1) application of primary jurisdiction is proper, (2) Plaintiffs failed to state a claim under RCRA as to Lamb Weston's use of process water, and (3) Plaintiffs' Complaint should be dismissed as to Lamb Weston for failure to allege causation for its claims against Lamb Weston.  Lamb Weston also joins in, and adopts by reference, the objections and supporting references filed concurrently by the other Defendants.

---

references to permit allegations thus do not plausibly state a claim against Lamb Weston.  *See Iqbal*, 556 U.S. at 678.

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION [DOC. 98]

DATED this 17th day of March 2025.

YTURRI ROSE, LLP


*s/ Bruno Jagelski*
Bruno Jagelski, OSB No. 903049
BJagelski@yturrirose.com
89 S.W. 3rd Avenue
P.O. Box S
Ontario, OR  97914
Telephone: (541) 889-5368
Facsimile: (541) 889-2432

WINSTON & STRAWN LLP
Amanda Groves (*pro hac vice*)
AGroves@winston.com
Jeff Wilkerson (*pro hac vice*)
JWilkerson@winston.com
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071
Telephone: (213) 615-1851
Facsimile: (213) 615-1750

*Attorneys for Defendant*
*Lamb Weston Holdings, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 17, 2025, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to the following:

***Counsel for Plaintiffs***

Michael A Bliven
Robert Dwyer
Bliven Law Firm, P.C.
704 South Main
Kalispell, MT 59901
Telephone: 406-755-6828
Fax: 406-755-6829
Email: mike@blivenlawfirm.com
Email: rdwyer@blivenlawfirm.com

John Heenan
Heenan & Cook, PLLC
1631 Zimmerman Trail
Ste 1
Billings, MT 59102
406-839-9091
Fax: 406-839-9092
Email: john@lawmontana.com

Steve W. Berman
Meredith Simons
Hagens Berman Sobol Shapiro LLP
1301 2nd Ave.
Suite 2000
Seattle, WA 98101
206-623-7292
Fax: 206-623-0594
Email: steve@hbsslaw.com
Email: merediths@hbsslaw.com

Abigail Pershing
Hagens Berman Sobol Shapiro LLP
301 N. Lake Ave.
Ste #920
Pasadena, CA 91101
213-330-7145
Email: abigailp@hbsslaw.com

*Counsel for Port of Morrow and Threemile Canyon Farms, LLC*

Amy Edwards
Ariel Stavitsky
Misha Isaak
Jacob C. Goldberg
Stoel Rives LLP
760 S.W. Ninth Ave.
Suite 3000
Portland, OR 97205
503-224-3380
Fax: 503-220-2480
Email: amy.edwards@stoel.com
Email: ariel.stavitsky@stoel.com
Email: misha.isaak@stoel.com
Email: jacob.goldberg@stoel.com

*Counsel for Beef Northwest Feeders, LLC*

Kevin H. Kono
Davis Wright Tremaine, LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97204
503-241-2300
Fax: 503-778-5299
Email: kevinkono@dwt.com

David Ubaldi
Davis Wright Tremaine, LLP
929 108th Avenue NE
Suite 1500
Bellevue, WA 98004-4786
425-646-6148
Fax: 425-646-6199
Email: davidubaldi@dwt.com

Michael Scott Broadwell
Davis Wright Tremaine LLP
188 W Northern Lights Blvd.
Suite 1100
Anchorage, AK 99503-3985
907-257-5329
Fax: 907-257-5399
Email: scottbroadwell@dwt.com

***Counsel for Madison Ranches, Inc.***

Jennifer L. Gates
Pearl Legal Group PC
529 SW Third Avenue
Suite 600
Portland, OR 97204
971-808-5666
Email: jgates@pearllegalgroup.com

Steven F. Cade
Sussman Shank, LLP
1000 SW Broadway
Suite 1400
Portland, OR 97205
503-227-1111
Fax: 503-248-0130
Email: scade@sussmanshank.com

James H. Bolin
Kyle Miller
Bulter Snow
1020 Highland Colony Parkway
Ste 1400
Ridgeland, MS 39157
601-985-4595
Fax: 601-985-4500
Email: jay.bolin@butlersnow.com
Email: kyle.miller@butlersnow.com

***Co-Counsel for Lamb Weston Holdings, Inc.***

Amanda L. Groves
Jeff Wilkerson
Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071
213-615-1851
Fax: 213-615-1750
Email: agroves@winston.com
Email: Jwilkerson@winston.com

*/s/ Bruno Jagelski*
Bruno Jagelski

LAMB WESTON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND
RECOMMENDATION [DOC. 98]