# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MICHAEL PEARSON**, **JAMES SUTER**, **SILVIA SUTER**, and **JULIA STRANGE**, on behalf of themselves and all others similarly situated, | Case No. 2:24-cv-362-HL |
| | **OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **PORT OF MORROW**; **LAMB WESTON HOLDINGS, INC**; **MADISON RANCHES, INC**; **THREEMILE CANYON FARMS, LLC**; **and BEEF NORTHWEST FEEDERS, LLC**, | |
| Defendants. | |

Robert F. Dwyer, III, BLIVEN LAW FIRM PC, 202 North Main Street, Suite 1, Boardman, OR 97818; Michael A. Bliven, BLIVEN LAW FIRM PC, 704 South Main, Kalispell, MT 59901; Steve W. Berman and Meredith S. Simons, HAGENS BERMAN SOBOL SHAPIRO LLP, 1301 Second Avenue, Suite 2000, Seattle, WA 98134; Abigail D. Pershing, HAGENS BERMAN SOBOL SHAPIRO LLP, 301 North Lake Avenue, Suite 920, Pasadena, CA 91101; and John Heenan, HEENAN & COOK PLLC, 1631 Zimmerman Trail, Billings, MT 59102. Of Attorneys for Plaintiffs.

Amy Edwards, Misha Isaak, Ariel Stavitsky, and Jacob C. Goldberg, STOEL RIVES LLP, 706 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Of Attorneys for Defendants Port of Morrow and Threemile Canyon Farms, LLC.

Bruno J. Jagelski, YTURRI ROSE LLP, 89 SW Third Avenue, PO Box S, Ontario, OR 97914; and Amanda L. Groves and Jeff Wilkerson, WINSTON & STRAWN LLP, 333 South Grand Avenue, 38th Floor, Los Angeles, CA 90071. Of Attorneys for Defendant Lamb Weston Holdings, Inc.

Jennifer L. Gates, PEARL LEGAL GROUP PC, 529 SW Third Avenue, Suite 600, Portland, OR 97204; Jeffrey C. Misley and Steven F. Cade, SUSSMAN SHANK LLP, 1000 SW Broadway, Suite 1400, Portland, OR 97205; and Kyle V. Miller and James H. Bolin, BUTLER SNOW LLP, 1020 Highland Colony Parkway, Suite 1400, Ridgeland, MS 39157. Of Attorneys for Defendant Madison Ranches, Inc.

Kevin H. Kono, DAVIS WRIGHT TREMAINE LLP, 560 SW Tenth Avenue, Suite 700, Portland, OR 97205; and David Ubaldi and M. Scott Broadwell, DAVIS WRIGHT TREMAINE LLP, 929 108th Avenue NE, Bellevue, WA 98004. Of Attorneys for Defendant Beef Northwest Feeders, LLC.

**Michael H. Simon, District Judge.**

Plaintiffs in this putative class action, on behalf of residents of Oregon's Lower Umatilla Basin, have sued: (1) the Port of Morrow ("the Port"), which operates an industrial wastewater treatment and disposal system in Morrow County; (2) Lamb Weston Holdings, Inc. ("Lamb Weston"), which both owns approximately 1,180 acres of farmland used to grow and process potatoes and operates an industrial wastewater treatment and disposal system, all in Umatilla County; (3) Madison Ranches, Inc. ("Madison"), which owns approximately 21,300 acres of farmland in Umatilla and Morrow Counties used to grow and process several agricultural products; (4) Threemile Canyon Farms, LLC ("Threemile"), which owns approximately 88,000 acres in Morrow County, devoted in part to range land and other open spaces and in part to irrigated farmland used to grow and process several agricultural products, and maintains a concentrated animal feeding operation ("CAFO") in Oregon; and (5) Beef Northwest Feeders, LLC ("BNW"), which maintains a CAFO in Oregon.[1] In this Opinion and Order, the Court refers to the Port and Lamb Weston collectively as the "Wastewater Defendants"; to Lamb Weston,

---

[1] Michael Pearson, a named Plaintiff in this action, and three other persons, who are not parties in this lawsuit but who are represented by many of the same counsel who represent Plaintiffs in this matter, recently filed a related putative class action against Portland General Electric Co. and Columbia River Processing, LLC, alleging many of the same claims that are at issue here. *See Pearson, et al. v. Portland General Electric Co., et al.*, Case No. 2:25-cv-2249-HL (D. Or.).

Madison, and Threemile collectively as the "Farm Defendants"; and to Threemile and BNW collectively as the "CAFO Defendants."

In their First Amended Complaint ("FAC"), Plaintiffs assert a federal claim under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), and several Oregon state claims alleging negligence, negligence *per se*, trespass, private nuisance, public nuisance, and inverse condemnation. ECF 17. Among other things, Plaintiffs seek declaratory, injunctive, and compensatory relief to address alleged nitrate contamination in their drinking water. Defendants have moved to dismiss this lawsuit under Rules 8, 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure, with related motions requesting judicial notice. On February 24, 2025, U.S. Magistrate Judge Andrew Hallman issued Findings and Recommendations ("F&R") in this case. ECF 98. Judge Hallman recommends that the Court grant Defendants' motions for judicial notice (ECF 52, 53, 58, 82, and 84), grant in part Defendants' motions under Rule 12(b)(6) (ECF 51, 54, 56, and 59), and deny Defendants' motions under Rules 8 and 12(b)(1). All Defendants filed objections to the F&R, and Plaintiffs responded. The Court has reviewed *de novo* all matters to which Defendants have objected and has reviewed everything else for clear error. As explained below, the Court adopts in part and rejects in part Judge Hallman's recommendations and grants in part and denies in part Defendants' motions.

## STANDARDS

Under the Federal Magistrates Act ("Act"), the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party objects to a magistrate judge's findings and recommendations, "the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3). A "general"

objection, however, does not meet the "specific written objection[]" requirement of Rule 72(b) of the Federal Rules of Civil Procedure. *See, e.g.*, *Velez-Padro v. Thermo King de Puerto Rico, Inc.*, 465 F.3d 31, 32 (1st Cir. 2006) ("Conclusory objections that do not direct the reviewing court to the issues in controversy do not comply with Rule 72(b)").

For those portions of a magistrate judge's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed."); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the court must review de novo magistrate judge's findings and recommendations if objection is made, "but not otherwise"). Although in the absence of any objection no review is required, the Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154. Indeed, the Advisory Committee Notes to Rule 72(b) recommend that "[w]hen no timely objection is filed," the Court review a magistrate judge's findings and recommendations for "clear error on the face of the record."

## BACKGROUND[2]

### A.  Nitrate Contamination in the Lower Umatilla Basin

Oregon's Morrow and Umatilla Counties sit along the Columbia River just south of the Oregon-Washington border. FAC (ECF 17) ¶¶ 1, 3 & fig. 1. Groundwater in the Lower Umatilla Basin, which supplies water to the region's residents, has been heavily polluted with nitrates since the mid-1990s. *Id.* ¶¶ 46-47. Nitrate-contaminated water can cause many health issues. *Id.*

---

[2] In resolving the pending motions, the Court accepts as true all well-pleaded allegations in the FAC.

¶ 43. For example, it can cause birth defects and Blue Baby Syndrome. *Id.* ¶¶ 43, 44. If ingested by a pregnant woman, excess nitrates can cause reproductive complications, like spontaneous miscarriage. *Id.* ¶ 44. Nitrates are also linked to cancer, kidney and spleen disorders, and respiratory diseases. *Id.* High nitrate doses also can prevent red blood cells from carrying enough oxygen throughout the body, leaving individuals more susceptible to asphyxia. *Id.* ¶ 43. For these reasons, the United States Environmental Protection Agency ("EPA") has declared water unsafe for human consumption when it contains a nitrate concentration of 10 mg/L or greater. *Id.* ¶ 42. Relatedly, the Oregon Department of Environmental Quality ("DEQ") has designated an area as a Groundwater Management Area ("GMA") if water there reaches a nitrate concentration of 7 mg/L or greater. *Id.*

The hydrogeologic conditions in the Lower Umatilla Basin make the area highly susceptible to nitrate contamination. *See id.* ¶¶ 64-65. The soil is coarse-grained and highly permeable, which facilitates rapid percolation of nitrates from the surface to the water table. *Id.* ¶ 64. In addition, farming exacerbates these hydrogeologic conditions. *See id.* For example, although the area receives relatively little rainfall, irrigation from farming increases soil moisture content, thereby promoting rapid water movement and nitrate leaching. *Id.* With these environmental qualities, 88 percent of the Lower Umatilla Basin has a high or moderately high nitrate leaching potential under irrigated conditions. *Id.* fig. 4. The Oregon DEQ also has noted the vulnerability to contamination of the shallow aquifer located there. *Id.* ¶ 65.

In the mid-1990s, nearly 30 percent of groundwater samples from monitoring wells in the Lower Umatilla Basin showed nitrate levels that exceeded Oregon's GMA threshold of 7 mg/L, and 23 percent showed levels that exceeded the EPA's safe consumption limit of 10 mg/L. *Id.* ¶ 47. In 2001, DEQ established the Lower Umatilla Basin Groundwater Management Area (the

"LUBGWMA") and empaneled a committee to track and address the nitrate contamination found there. *Id.* ¶¶ 48-50. In 2003, the committee tested 135 monitoring wells for nitrates and found that 58 percent tested above 7 mg/L and 37 percent exceeded 10 mg/L. *Id.* ¶ 49. The committee also compared its findings to prior testing and learned that of the 135 wells the committee tested in 2003, 125 had been previously tested in 1992, and 82 had higher nitrate contamination in 2003. *Id.* Testing in 2015 and 2016 further show that nitrate contamination in the area is worsening. *Id.* ¶ 50. The committee found that more than 40 percent of private domestic wells and nearly 50 percent of monitoring wells tested by the committee contained nitrate levels exceeding the safe drinking water standard. *See id.*

On January 10, 2022, state and local officials encouraged Morrow and Umatilla County residents who rely on private wells to have their wells tested for nitrates. *Id.* ¶ 51. By April 5, 2024, about half the residential wells in the LUBGWMA had been tested. *Id.* ¶ 52. Approximately 18 percent of the wells tested in Umatilla County and 30 percent of the wells tested in Morrow County (more than 450 residential wells in total) have nitrate contamination above the EPA's 10 mg/L safe consumption threshold. *Id.* At the approximately 450 homes with nitrate levels exceeding safe consumption levels, the State of Oregon has either installed filtration systems or is providing the household with bottled water. *Id.* ¶ 53. Public water systems also have been affected, and many public water systems in Morrow and Umatilla Counties have tested above the 10 mg/L threshold at least once. *Id.* ¶¶ 54-58, tbls. 1 and 2, fig. 3.

**B. Defendants' Contributions to Nitrate Pollution**

The DEQ attributes nearly 70 percent of the LUBGWMA's nitrate contamination to irrigated farmland. *Id.* ¶ 60.[3] As noted, the Farm Defendants (Lamb Weston, Madison, and Threemile) together control nearly 107,000 acres of irrigated agricultural land in Umatilla and Morrow Counties. *Id.* ¶¶ 5, 60. Lamb Weston owns approximately 1,180 acres in Umatilla County that it uses to grow and process potatoes. *Id.* ¶ 35. Madison owns approximately 21,300 acres in Umatilla and Morrow Counties that it uses to grow and process onion, corn, and other agricultural products. *Id.* ¶ 36. Threemile owns 39,500 acres in Morrow County that it uses to grow and process alfalfa, corn, onions, and other produce. *Id.* ¶ 37. The Farm Defendants all apply nitrogen fertilizers to their crops. *Id.* ¶ 61. But crops can only intake so much nitrogen, and any nitrogen applied beyond the "agronomic rate" (the amount of nitrogen that crops can recover) leaches into the surrounding soil. *Id.*

The Farm Defendants regularly and intentionally apply nitrogen fertilizer to their crops above the agronomic rate to ensure maximized yield and profit potential, knowing that the extra nitrogen will leach and convert to nitrates. *Id.* ¶¶ 61-62. Applying fertilizer beyond the agronomic rate is a regular practice in the industry, because the extra fertilizer can provide a key boost of nutrients during "rare-optimal" growing conditions or create an extra nitrogen buffer in case growing conditions turn sub-optimal. *Id.* The DEQ estimates that 10 percent of nitrogen that farms apply to their crops leaches into the groundwater. *Id.* ¶ 62. Together, the Farm Defendants apply nearly 23 million pounds of nitrogen to fields in the LUBGWMA every year. *Id.* ¶ 63.

---

[3] Farmers contribute to nitrate contamination by using fertilizer containing nitrogen, wastewater containing nitrogen, and nitrogen-rich manure on their farmland. *See id.* at ¶¶ 60-65, 67, 69-73.

CAFOs are also responsible for nitrate contamination in the LUBGWMA. *Id.* ¶ 66. CAFOs within the LUBGWMA house more than 148,000 animals in dairies and feedlots that excrete more than 9,000 tons of nitrogen per year. *Id.* To dispose of animal waste, which itself is rich in nitrogen, CAFOs typically use "lagoons" or other storage facilities that are designed to leak into the surrounding environment, even when properly constructed. *Id.* ¶ 67. The DEQ has found the greatest increases in nitrate contamination on lands subjected to CAFO manure land applications. *Id.* ¶ 68. As noted, the CAFO Defendants (Threemile and BNW) each maintain CAFOs. *Id.* ¶¶ 37, 38. Further, BNW has an active CAFO permit issued by the Oregon Department of Agriculture. *Id.* ¶ 38.

Finally, wastewater processing also contributes to, and does not adequately abate, nitrate pollution in the LUBGWMA. As noted, the Port operates an industrial wastewater treatment and disposal system in Morrow County. *Id.* ¶ 34. Lamb Weston operates an industrial wastewater treatment and disposal system in Umatilla County. *Id.* ¶ 35. The Wastewater Defendants (the Port and Lamb Weston) each contract with local food processors to collect and dispose of nitrogen-heavy wastewater, which they pump and transport to the Farm Defendants to be sprayed on fields. *Id.* ¶ 69.

The Wastewater Defendants transport wastewater to farms using large pipes. *Id.* ¶ 70. They pump this water to the Farm Defendants year-round, including during the winter, when most fields are fallow, and crops do not need or benefit from nitrogen. *Id.* ¶ 71. The Wastewater Defendants have not installed adequate "digesters" or other technology to process the wastewater to reduce nitrogen, nor have they paid for water filtration systems or provided any such systems to public entities affected by the nitrate pollution. *Id.* ¶ 72. To store wastewater and other

nitrogen effluent, the Wastewater Defendants also use "lagoons" or storage ponds. *See id.* ¶¶ 81, 91, 93 (Port of Morrow), 76 (Lamb Weston).

Permits cap the total amount of nitrogen-heavy wastewater that the Wastewater Defendants may discharge onto nearby farmland. *Id.* ¶¶ 74-76. The Wastewater Defendants, however, routinely violated these limits and permits,[4] with the Port incurring more than $2 million in fines from the DEQ. *Id.* ¶¶ 77-90. The Port's violations result from dumping in excess of its permitted limits and improperly discarding wastewater through leaks in several wastewater pipelines. *See id.* The Port also has stated publicly that it will continue to apply wastewater to farmland during the winter because "there is no alternative short of closing processing plants," and DEQ has stated that it "expects the port will commit more violations." *Id.* ¶ 92.

## C.  Plaintiffs

Plaintiffs are residents of the LUBGWMA. *See id.* ¶¶ 12-33. Plaintiff Michael Pearson owns a home in Morrow County with a private well that he and his family rely on for drinking and bathing. *Id.* ¶¶ 12-13. Pearson's private well draws from the Umatilla Basin. *Id.* ¶ 13. In June 2022, Pearson learned that the Morrow County Commission declared a local state of emergency over groundwater nitrate pollution. *Id.* ¶ 14. Oregon Rural Action performed a test of Pearson's well at his request, and the test results showed nitrate levels of about 47 mg/L, which is more than four times the EPA safe-consumption threshold. *Id.* ¶ 15. Morrow County paid for Pearson to install a reverse osmosis system in his well, but the filtration system only brought Pearson's water down to a nitrate concentration of about 16 mg/L. *Id.* ¶¶ 16-17. Pearson and his

---

[4] Lamb Weston allegedly violated its permit at least 90 times since 2015. FAC ¶ 77. The Port has allegedly violated its permit 40 times from 2007 and 2011, 158 times from 2012 to 2014, 1,532 times from 2018 to 2021, 258 times from 2021 to 2022, 748 times from 2022 to 2023, 395 times from 2023 to January 2024, and 486 times in February 2024 alone. *Id.* ¶¶ 78, 79, 82, 85, 91.

family rely on bottled water for drinking and cooking. *Id.* ¶ 18. Pearson and his wife use between six and eight five-gallon water bottles for those essential activities every week. *Id.* Pearson regularly calls the delivery company because it has not brought water as scheduled or has not brought enough water to satisfy his family's regular household use. *Id.* Morrow County purchases this bottled water for Pearson and coordinates its delivery.

Plaintiffs James and Silvia Suter also are homeowners in Morrow County who rely on a private well for their household water. *Id.* ¶¶ 20-21. Unlike Pearson's well, however, the Suters' well is not connected to any public water system. *Id.* ¶¶ 13, 21. In 1999, water in the Suters' well had a nitrate contamination level of less than 7 mg/L. *Id.* ¶ 22. "After reports surfaced of water contamination in the area," the Suters again tested their well water, which revealed nitrate concentrations of nearly 38 mg/L. *Id.* ¶ 23. The Suters could drill a 300-foot deep well to access clean drinking water, but drilling such a well would cost approximately $24,000. *Id.* ¶ 24. The Suters currently rely on bottled water for drinking and cooking, using between three and four five-gallon bottles every week. *Id.* ¶ 25.

Plaintiff Jeannie Strange rents a home in Umatilla County, to which water is supplied by the Hermiston Water Department. *Id.* ¶¶ 26-27. In November 2022, Strange's pet fish died the day after she changed the water in their tank using tap water. *Id.* ¶ 28. The day that her fish died, Strange used an at-home test kit to test her tap water for contaminants. *Id.* ¶ 29. The kit's nitrate test water turned bright red, indicating a dangerously high level of nitrates in the sample. *Id.* Strange, her husband, and the only water that their three children now drink is bottled water. *Id.* ¶¶ 30-31. Strange and her family use at least 12 five-gallon jugs of water and at least a case of bottled water every month. *Id.* ¶ 31. The water costs Strange at least $100 per month. *Id.* ¶ 32.

Pearson, the Suters, and Strange allege three classes under Rule 23. *Id.* ¶ 100. The alleged "Resident Class" includes all persons who currently reside in the LUBGWMA. *Id.* The alleged "Well-Reliant" Subclass includes all persons who currently reside in the LUBGWMA and rely on private wells to supply their drinking water. *Id.* The alleged "Renter/Owner" Subclass includes all persons who rent or own property in the LUBGWMA and are supplied with drinking water from either private wells or a public water system. *Id.*

## DISCUSSION[5]

### A. Motions for Judicial Notice

BNW, Lamb Weston, the Port, Threemile, and Madison request that the Court take judicial notice of various documents in support of their motions to dismiss.[6] Before Judge Hallman, Plaintiffs argued that judicial notice was inappropriate only with respect to two kinds of documents.[7] The first consists of federal agency reports that Madison relies on to define the term "irrigation return flow," ECF 70 at 2 n.3 (listing documents in ECF 59). The second consists of documents and permits related to Threemile's CAFO operations in Oregon, ECF 70 at 2 n.4 (listing documents in ECF 57 and ECF 58). Judge Hallman recommended that the Court

---

[5] Defendants raise several arguments for dismissal through four separate briefs, *see* ECF 51 (BNW), 54 (Lamb Weston), 56 (Port and Threemile), and 59 (Madison), and four separate sets of objections, *see* ECF 103 (BNW), 104 (Lamb Weston), 107 (Port and Threemile) and 109 (Madison). The Court discusses below Defendants' primary arguments. The Court has considered *de novo* but need not discuss Defendants' remaining arguments.

[6] *See* ECF 52 (BNW); ECF 53 (Lamb Weston); ECF 58 (the Port and Threemile); ECF 59 (Madison); ECF 82 (Port and Threemile); ECF 84 (Lamb Weston).

[7] *See* Plaintiffs' Response to Request for Judicial Notice (ECF 70) at 2 ("Plaintiffs do not object to the Court taking notice of those documents that pertain to permits issued by [DEQ] and to Defendants' violation thereof, because these are similar to documents that Plaintiffs reference in their Complaint.") and 2 n.2 (listing documents Plaintiffs do not object to, but reserving the "right to dispute the factual accuracy of any assertions" within the documents).

grant each motion for judicial notice. *See* F&R at 14-17. No party objected, and the Court finds no clear error.

After Judge Hallman referred his F&R to the Court, Lamb Weston filed an additional request for judicial notice relating to five documents contained in administrative proceedings with the DEQ. ECF 105. Plaintiffs oppose this motion on two grounds. First, Plaintiffs argue that the Court should not take judicial notice because none of the documents were part of the record before Judge Hallman. The Court, however, has discretion to accept new evidence submitted with a party's objections to findings and recommendation, so the fact that Lamb Weston's evidence is new does not preclude it from consideration. *See United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (concluding that a district court "has discretion, but is not required" to consider new evidence when reviewing *de novo* a magistrate judge's findings and recommendations); *see also* 28 U.S.C. § 636(b)(1) (stating that the district court judge "may also receive further evidence").

Second, Plaintiffs oppose Lamb Weston's motion to the extent that Lamb Weston seeks judicial notice of the facts contained within the new exhibits. Under Rule 201 of the Federal Rules of Evidence, a court make take judicial notice of facts that are either "generally known" or "capable of accurate and ready determination by sources whose accuracy cannot be reasonably questioned." *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (quoting Fed. R. Evid. 201(b)(1), (2)). "Accordingly, a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (cleaned up). This includes "records and reports of administrative bodies." *Interstate Nat. Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953); *see also Trees v. Serv. Emps. Int'l Union Loc. 503*, 763 F. Supp. 3d 1250,

1260-61 (D. Or. 2025) (taking judicial notice of briefing, rulings, and orders in state administrative proceeding). A court may not, however, "take judicial notice of facts presented in those documents or in court opinions for the purpose of considering those facts to be established in the case currently before them." *Dauven v. U.S. Bancorp*, 390 F. Supp. 3d 1262, 1269 (D. Or. 2019) (citing *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003)). The Court thus takes judicial notice of the requested exhibits only to determine the scope and timeframe of the Compliance Plan established between the Oregon DEQ and Lamb Weston but does not take judicial notice of any facts included in those exhibits.

## B. Motions under Rule 8

Defendants have moved to dismiss Plaintiffs' Amended Complaint under Rule 8, arguing that the Amended Complaint is an improper "shotgun pleading." *See A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 943 (D. Or. 2020) (describing "shotgun pleadings"). Judge Hallman recommended that the Court deny this motion. "All that is required" under Rule 8 of the Federal Rules of Civil Procedure "are sufficient allegations to put defendants fairly on notice of the claims against them." *McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991). In the absence of a well-pleaded allegation of joint conduct or an agency relationship, however, failing to allege specific facts relating to a specific defendant and lumping multiple defendants together is routinely rejected by courts. Allegations are thus factually deficient when a "complaint lumps defendants together and fails to adequately distinguish claims and alleged wrongs among defendants. . . . Plaintiffs must allege more than generic and conclusory allegations demonstrating that 'Defendants' collectively engaged in [misconduct] and allege with at least some degree of specificity the acts which each defendant is alleged to have engaged in which support Plaintiff's claims." *McKeon v. Cent. Valley Cmty. Sports Found.*, 2018 WL 6436256, at *4 (E.D. Cal. Dec. 7, 2018) (collecting cases). A complaint must be construed based on its

allegations, and if there are insufficient allegations about the underlying facts relating to an individual defendant, that is a deficiency in the pleading. *See Evans v. Sherman*, 2020 WL 1923176, at *3 (E.D. Cal. Apr. 21, 2020) (noting that the plaintiff "simply lumps all defendants together" and "makes it impossible for the Court to draw the necessary connection between the actions or omissions" of the various defendants).

In recommending that the Court deny Defendants' motion to dismiss under Rule 8, Judge Hallman acknowledged that Plaintiffs' Amended Complaint lacks clarity as to the role that each Defendant played in the groundwater contamination and Plaintiffs' injuries. He found, however, that the Amended Complaint sufficiently differentiates among the three groups of Defendants (the CAFO Defendants, the Wastewater Defendants, and the Farm Defendants), *see* F&R at 34-35, and adequately specifies the harm allegedly caused by each group and the allegedly wrongful actions taken by each. Accordingly, Judge Hallman recommended that the Court deny Defendants' motion to dismiss under Rule 8, and the Court agrees.

Lamb Weston also argues that Judge Hallman "sidestepped" the "clear causation issue" in Plaintiffs' Amended Complaint. That objection, however, improperly conflates Judge Hallman's analyses under Rules 8 and 12. To the extent there are problems with Plaintiffs' allegations of causation, those are properly addressed under Defendants' Rule 12(b)(6) motions. *See Soto v. Hernandez*, 2024 WL 5412053, at *7 (C.D. Cal. Dec. 30, 2024) (explaining how a complaint that "falls well within Rule 8(a)'s standards" may nonetheless "fail[ ] to show that Plaintiff is entitled to relief" under Rule 12).

### C. Abstention

Defendants request that the Court abstain from adjudicating Plaintiffs' claims and dismiss the Complaint under Rule 12(b)(1).[8] They argue that the primary jurisdiction doctrine and the *Burford* doctrine provide independent grounds supporting abstention. Judge Hallman recommended that the Court deny Defendants' motions under Rule 12(b)(1). All Defendants objected.

#### 1. Primary Jurisdiction

All Defendants request that the Court abstain under the doctrine of primary jurisdiction. Application of the doctrine of primary jurisdiction is "committed to the sound discretion of the court." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002). There are four factors that are "uniformly present in cases where the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987). "[E]fficiency is the deciding factor in whether to invoke" the doctrine. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (cleaned up).

---

[8] BNW, the Port, and Threemile contend that Rule 12(b)(1) is the proper vehicle for their motions for abstention and thus the Court may review evidence beyond Plaintiffs' allegations and need not presume the truthfulness of those allegations. The Ninth Circuit has "not squarely held whether abstention is properly raised under Rule 12(b)(6), Rule 12(b)(1), both, or neither." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 779 n.2 (9th Cir. 2014). Judge Hallman assumed that Rule 12(b)(1) was the correct vehicle under which the Court should evaluate Defendants' abstention arguments. Because no party objected to that standard, the Court will assume without deciding that Rule 12(b)(1) is the appropriate mechanism to evaluate the pending abstention arguments.

No Defendant objected to Judge Hallman's discussion regarding the first *General Dynamics* factor. Defendants, however, objected to Judge Hallman's analysis under the remaining *General Dynamics* factors and the efficiency consideration. The Court will address each in turn.

First, Defendants argue that Judge Hallman's reasoning with respect to the remaining three factors creates a bright-line rule that the primary jurisdiction doctrine can never be applied in RCRA cases or in any lawsuit under a federal statute with a citizen-suit provision and a diligent prosecution bar. Specifically, Defendants object to the following statement in Judge Hallman's F&R: "Where, as here, state agencies have not commenced any of the actions set forth under the diligent prosecution bar . . . invoking primary jurisdiction would thwart Congress's intent to provide affected citizens a forum to litigate alleged RCRA violations." F&R at 24. The Court agrees with Defendants that RCRA's statutory framework does not categorically bar application of the primary jurisdiction doctrine.

Notwithstanding that conclusion, the Court agrees with Judge Hallman's recommendation that, considering RCRA's statutory framework, the second and third *General Dynamics* factors weigh against abstention. Although not dispositive, statutory characteristics like a citizen suit provision and a diligent prosecution bar strongly suggest that Congress did not place the issue of nitrate water contamination exclusively within the "jurisdiction of an administrative body." *Gen. Dynamics*, 828 F.2d at 1362. Indeed, "[t]he primary indication" of Congressional "intent is the language of the statute." *See United States v. Aguilar*, 21 F.3d 1475, 1480 (9th Cir. 1994), *aff'd in part, rev'd in part on other grounds*, 515 U.S. 593 (1995); *see also CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014) ("Congressional intent is discerned primarily from the statutory text."). By the same token, there is no better evidence to evaluate whether the

"*statute* . . . subjects an industry or activity to a comprehensive regulatory scheme" than the statute itself. *Gen. Dynamics*, 828 F.2d at 1362 (emphasis added). Further, the Ninth Circuit has described RCRA's citizen suit provisions as "expansive." *See Cal. River Watch v. City of Vacaville*, 39 F.4th 624, 629 (9th Cir. 2022) (quoting *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1089 (9th Cir. 2017) (*Ecological Rts. Found. II*)). "This structure demonstrates that Congress did not assign *comprehensive* regulatory authority to the EPA; rather, Congress assigned substantial enforcement responsibility to federal courts and the public." *Eagle Star Rock Prods. LLC v. PCC Structurals, Inc.*, 756 F. Supp. 3d 1062, 1080 (D. Or. 2024) (emphasis in original).

Defendants also object to Judge Hallman's analysis with respect to the fourth *General Dynamics* factor—whether nitrate contamination in the LUBGWMA "requires expertise or uniformity in administration" such that abstention is prudent. Specifically, Defendants argue that any relief granted by a federal court would be duplicative of, or in conflict with, the enforcement actions taken by the Oregon DEQ. Defendants further contend that even if relief is not in tension with administrative action, a federal court could not adequately remediate all harms suffered by Plaintiffs because of the size of the LUBGWMA, the number of non-party polluters contributing to nitrate concentration, and the infeasibility of joining them.[9] Judge Hallman, however, considered these factors, and the Court agrees with his recommendation that "this action ultimately presents RCRA and state law claims that this Court is competent to resolve." F&R at 26. Just as the perfect should not be the enemy of the good, the absence of complete relief should not be the enemy of some relief.

---

[9] *But see* n.1, *supra*.

Finally, Defendants argue that abstention would lead to the most efficient resolution because the Oregon DEQ is the agency that can most effectively remediate the nitrate contamination in the LUBGWMA. Lamb Weston and the Port specifically object to Judge Hallman's statement that "there is no current proceeding or enforcement action that would allow Plaintiffs to seek the relief that they could seek under RCRA in this proceeding," F&R at 27, because Lamb Weston and the Port already have been "punished" by the Oregon DEQ several times and both parties have entered into Mutual Agreement and Final Orders ("MAOs") with the Oregon DEQ that govern the parties' conduct.[10] There are two problems with Defendants' argument. First, primary jurisdiction is "not a doctrine of futility"; that is, abstention is inappropriate "when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency." *Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Jewel Tea Co.*, 381 U.S. 676, 686 (1965) (quotation omitted). Defendants' objections would turn the primary jurisdiction doctrine into something akin to an exhaustion requirement, but Plaintiffs need not wait to bring their RCRA claims until the Oregon DEQ has completed its executive action with respect to the LUBGWMA, particularly where, as Judge Hallman noted, no agency has invoked RCRA's diligent prosecution bar.

Second, the Oregon DEQ administrative proceedings are not the most efficient means for *these* Plaintiffs to obtain the sort of relief they seek in this action. The terms of Lamb Weston's MAO, for example, require it to pay a civil penalty of $143,000 and complete a remedial investigation and feasibility study for the Oregon DEQ. Those remedies primarily flow to the

---

[10] Although the Port and Threemile filed joint objections, it does not appear that Threemile is a party to the MAO or has ever been sanctioned by the Oregon DEQ.

State and only incidentally and incrementally to Plaintiffs. Meanwhile, Plaintiffs allege that they

have suffered—and continue to suffer—tortious injury at the hands of Defendants.

A civil suit is a proper forum in which a plaintiff may recover for injuries to person or

property. Even accepting Defendants' argument that the Court is incapable of providing a

complete remedy for the nitrate contamination throughout the LUBGWMA, the Court likely can

grant injunctive relief to Plaintiffs that includes compelling Defendants to provide clean, potable

water to Plaintiffs, connecting Plaintiffs to the Port's clean water pipes, or awarding money

damages. Defendants are correct in asserting that "[e]fficiency is the deciding factor in whether

to invoke primary jurisdiction." *Astiana*, 753 F.3d at 760 (quotation omitted). But abstention

here would not be efficient. Instead, it would "significantly postpone" a final ruling on Plaintiffs'

RCRA and state law tort claims, which are decisions "that a court is otherwise competent to

make." *Id.* at 761.

Finally, application of primary jurisdiction is particularly inappropriate at this stage of the

proceedings. In evaluating Defendants' primary jurisdiction argument, the Court must identify

whether "any set of facts could be proved which would avoid application of the [primary

jurisdiction] doctrine." *See Davel Comm's, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1088 (9th

Cir. 2006). When "the allegations of the complaint do not necessarily require the doctrine's

applicability, then the primary jurisdiction doctrine may not be applied on a motion to dismiss."

*Id.* Declining jurisdiction under the primary jurisdiction doctrine is not necessary at this juncture.

### 2. *Burford* Abstention

Defendants also request that the Court abstain in light of *Burford v. Sun Oil Co.*, 319

U.S. 315 (1943). "[T]he power to dismiss recognized in *Burford* represents an 'extraordinary and

narrow exception to the duty of the District Court to adjudicate a controversy properly before

it.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (quoting *Colorado River Water*

*Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)). In the Ninth Circuit, *Burford*

abstention is only appropriate when: (1) "the state has chosen to concentrate suits challenging the

actions of the agency involved in a particular court"; (2) "federal issues could not be separated

easily from complicated state law issues with respect to which the state courts might have special

competence"; and (3) "federal review might disrupt state efforts to establish a coherent policy."

*Blumenkron v. Multnomah County*, 91 F.4th 1303, 1312 (9th Cir. 2024) (quoting *United States v.*

*Morros*, 268 F.3d 695, 705 (9th Cir. 2001)). After finding that none of those factors weigh in

favor of abstention, Judge Hallman recommended that the Court exercise jurisdiction.

The Port and Threemile objected to Judge Hallman's recommendation that the first

*Burford* factor has not been met. Defendants contend that Judge Hallman's analysis is "fatally

flawed" because it "ignores the actual *actions* of the DEQ against the Port . . . plead[ed] in

[Plaintiffs' Amended] Complaint." ECF 107 at 28-29. Defendants' objection, however, is

inaccurate. Judge Hallman explicitly recognized the Oregon DEQ actions in his analysis of the

first factor when he explained that Plaintiffs "characterize the state's actions . . . as insufficient."

*See* F&R at 31.

Defendants' objection is also irrelevant. The first requirement for *Burford* abstention is

that "the state has chosen to concentrate *suits challenging the actions of the agency involved* in a

particular court." *See Blumenkron*, 91 F.4th at 1312 (emphasis added). As Judge Hallman

explained, this is not a suit challenging the action of an agency. Plaintiffs do not seek to unwind

or alter the Oregon DEQ enforcement actions or MAO with the Port. *See* F&R at 31 ("Plaintiffs

are not seeking to change a state-issued determination."). Further, Defendants point to no state

statute or regulation that demonstrates that the "Oregon legislature has concentrated review of"

Plaintiffs' RCRA or tort claims "in a state court forum." *Contra Blumenkron*, 91 F.4th at 1313.

The Ninth Circuit's *Blumenkron* test is conjunctive, meaning that all three elements must be met for *Burford* abstention to be appropriate. *See id.* at 1312. Because the Court agrees with Judge Hallman's analysis regarding the first element, *Burford* abstention is inappropriate, and the Court need not reach the remaining two factors.[11]

### D.  Motions to Dismiss under Rule 12(b)(6)

All Defendants move to dismiss Plaintiffs' Amended Complaint under Rule 12(b)(6). The Port also moves to dismiss Plaintiffs' state law tort claims on immunity grounds, arguing that Plaintiffs have failed to comply with the Oregon Tort Claims Act ("OTCA").

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The Court must draw all

---

[11] Lamb Weston argues that "[i]f this Court orders Lamb Weston to do precisely what Oregon DEQ is already requiring, then these proceedings will have been wasteful." ECF 104 at 30. Defendants may later re-raise their abstention arguments, but for now, this argument is speculative and unavailing. *See Nelson-Baca v. Oregon ex rel. Dep't of Hum. Servs.*, 2021 WL 3702486, at *8 (D. Or. Apr. 21, 2021) ("*Burford* abstention may be raised at any time, including on appeal, and it may be raised by a court *sua sponte*." (quotation omitted)), *report and recommendation adopted*, 2021 WL 2711466 (D. Or. July 1, 2021).

reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The Court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

### 1.  RCRA

Pearson, on behalf of the Well-Reliant Subclass, asserts a federal claim against all Defendants under RCRA. *See* FAC ¶¶ 111-20. Judge Hallman recommended that the Court find that Plaintiffs state a RCRA claim against the CAFO Defendants and the Wastewater Defendants but not the Farm Defendants. The Court concludes that Plaintiffs state a claim against the Wastewater Defendants, but not the CAFO Defendants or the Farm Defendants.

#### a.  Standards

"RCRA is a comprehensive statute that governs the treatment, storage, and disposal of solid and hazardous waste . . . . 'so as to minimize the present and future threat to human health and the environment.'" *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)). To survive a motion to dismiss, a plaintiff must plausibly allege:

> (1) that the defendant "has contributed to the past or is contributing to the present handling, treatment, transportation, or disposal" of certain material; (2) that this material constitutes "solid waste" under RCRA; and (3) that the solid waste "may present an imminent and substantial endangerment to health or the environment."

*Cal. River Watch*, 39 F.4th at 629 (brackets omitted) (quoting *Ctr. for Cmty. Action & Env't Just. v. BNSF R. Co.*, 764 F.3d 1019, 1023 (9th Cir. 2014)); *accord* 42 U.S.C. § 6972(a)(1)(B). A plaintiff alleging a RCRA violation must also provide notice to the parties sixty days before filing suit. 42 U.S.C. § 6972(b)(1)(A).

"To establish the 'contribution' element of a RCRA claim, a plaintiff must allege that the defendant was 'actively involved in or [has] some degree of control over the waste disposal process.'" *Eagle Star Rock Prods.*, 756 F. Supp. 3d at 1080 (alteration in original) (quoting *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 950 (9th Cir. 2023)).[12]

RCRA defines "solid waste" as

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of title 33 . . . .

42 U.S.C. § 6903(27).

---

[12] "[T]o state a claim predicated on RCRA liability for 'contributing to' the *disposal* of hazardous waste, a plaintiff must allege that the defendant had a measure of control over the waste at the time of its disposal or was otherwise actively involved in the waste disposal process." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 852 (9th Cir. 2011) (emphasis added); *see also Cal. River Watch*, 39 F.4th at 632-33 (same). To state a claim predicated on RCRA liability for contributing to the *transportation* of waste, "the 'transportation' at issue must also be directly connected to the waste disposal process—such as shipping waste to hazardous waste treatment, storage, or disposal facilities." *Cal. River Watch*, 39 F.4th at 633.

By definition, a material can be any state of matter (including liquid) and still be "solid waste." *See id.* However, "materials must be 'discarded' to be considered solid waste." *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1045 (9th Cir. 2004); *see also Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 514-15 (9th Cir. 2013) (*Ecological Rts. Found. I*) (describing plain meaning of "discard" in textual analysis of RCRA's definition of "solid waste"); *Cal. River Watch*, 39 F.4th at 629 (same). "The determination of whether [a material] has been 'discarded' is made independently of *how* the materials are handled." *Safe Air for Everyone*, 373 F.3d at 1046 n.13 (emphasis in original). It is the relationship between the consumer and the material that determines whether the material is discarded. *See Ecological Rts. Found. I*, 713 F.3d at 515 (holding that escaping preservative is not "solid waste" because it is not "a material that the consumer . . . no longer wants."). Thus, "whether a product has 'served its intended purpose and is no longer wanted by the consumer' is a 'key' consideration in determining whether a substance constitutes solid waste." *Cal. River Watch*, 39 F.4th at 629 (quoting *Ecological Rts. Found. I*, 713 F.3d at 515). A substance that "is released into the environment as a natural, expected consequence" of a product's intended use has not necessarily been discarded, and therefore it "is not *automatically* 'solid waste' under RCRA's definition of the term." *See Ecological Rts. Found. I*, 713 F.3d at 518 (emphasis added) ("[W]ood preservative that escapes from wooden utility poles as those poles age has not itself been 'discarded,' and therefore is not a 'solid waste,' under RCRA.").

Congress expressly contemplated that consumers might re-use "industrial and agricultural waste," making it "therefore not a part of the discarded materials disposal problem" Congress sought to address. *See Safe Air for Everyone*, 373 F.3d at 1045-46 (quoting H.R. Rep. No. 94-1491, at 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 6239-41); *see also id.*

("Agricultural wastes which are returned to the soil as fertilizers or soil conditions are not considered discarded materials in the sense of this legislation." (quoting same)). Because a material must be "discarded" to qualify as solid waste, *see id.* at 1041, a material might not qualify as a solid waste when it is handled by a re-using consumer but later meet the definition of "solid waste" when its last user disposes of it.

Finally, "[t]he imminent and substantial endangerment element should be construed broadly to allow for affirmative equitable relief." *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 475 (9th Cir. 2024). "'[E]ndangerment' means a threatened or potential harm and does not require proof of actual harm." *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994) (collecting cases). Endangerment must also be "substantial or serious." *Id.* "Imminence refers to the nature of the threat rather than identification of the time when the endangerment initially arose." *Id.* (cleaned up). Thus, "'imminency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present." *Id.* Put another way, "[a]n endangerment can only be 'imminent' if it 'threaten[s] to occur immediately,' and the reference to waste which 'may present' imminent harm quite clearly excludes waste that no longer presents such a danger." *Meghrig*, 516 U.S. at 485-86 (second alteration in original) (citation omitted). "The threat of harm must be 'present *now*, although the impact of the threat may not be felt until later.'" *Whittaker*, 99 F.4th at 475 (emphasis in original) (quoting *U.S. Navy*, 39 F.3d at 1019). Finally, for an "endangerment to be substantial, 'there must be some necessity for the action.'" *Id.* (quoting *U.S. Navy*, 39 F.3d at 1019).

### b. Analysis

Plaintiffs argue that Defendants violated RCRA by: (1) over-applying fertilizer to agricultural fields; (2) over-applying animal waste to agricultural fields; (3) over-applying wastewater and allowing wastewater to spill by leaks from wastewater pipes while the water is

being pumped to local farms; and (4) allowing industrial waste, wastewater, and other industrial effluent containing nitrogen to leach from waste lagoons into the soil. *See* FAC ¶ 115.

### i.  Over-Applying Fertilizer

Judge Hallman recommends that the Court find that Plaintiffs fail to state a claim against the Farm Defendants for their application of excess fertilizer to crops. Judge Hallman explains that fertilizer is not a "discarded" material under RCRA's definition of solid waste because it is applied to crops for its beneficial use and therefore is still wanted by the consumer. *See* F&R at 47-52. No party objected, and the Court finds no clear error.

### ii.  Over-Applying Animal Waste

Judge Hallman recommends that the Court find that Plaintiffs state a claim against the CAFO Defendants for their application of excess animal waste. The Court, however, agrees with BNW that Plaintiffs fail to state a claim against the CAFO Defendants under this theory.[13] Plaintiffs make the following allegations with respect to BNW: (1) that BNW is a CAFO licensed with the Oregon Department of Agriculture that "operates a large beef feedlot in the GMA," FAC ¶¶ 38, 5; (2) that "[m]anaging and disposing of large quantities of nitrogen-laden animal waste is an unavoidable part of a CAFO's everyday operating procedures, including for BNW Feeders," *id.* ¶ 67; and (3) that "CAFOs, including BNW Feeders, may cause nitrate contamination when animal waste is spilled or otherwise leaks during handling," *id.*

---

[13] Although this argument was raised only by BNW, it applies with equal force to any RCRA claim against Threemile predicated on its CAFO. *See Abigninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 743 (9th Cir. 2005) ("A district court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants." (cleaned up)). Plaintiffs allege only that Threemile maintains a CAFO and has 29,000 acres of range space. FAC ¶ 37.

Taking these allegations together, Plaintiffs do not allege any specific practice showing that BNW has *caused* nitrate pollution. Plaintiffs allege only that BNW "*may* cause nitrate contamination" if "animal waste is spilled or otherwise leaks" while being handled. *See* FAC ¶ 67 (emphasis added). Because the Amended Complaint does not contain "facts plausibly showing" that BNW disposed of a solid waste in violation of RCRA, dismissal of this claim without prejudice is proper. *See Iqbal*, 556 U.S. at 683.[14]

---

[14] Because the Court concludes that Plaintiffs do not allege facts plausibly showing that the CAFO Defendants disposed of a solid waste, it need not reach the CAFO Defendants' arguments that their discharges are not solid wastes under RCRA's point source exception or anti-duplication provision, 42 U.S.C. §§ 6903(27), 6905(a). *See* ECF 56 at 30-31 (arguing that Threemile's manure, which is applied subject to its NPDES permit in its operations as a CAFO, is exempt from RCRA solid waste definition); ECF 51 at 32-33 (arguing that "discharges from CAFOs subject to NPDES permits are not 'solid wastes'").

Neither statutory exception precludes Plaintiffs' claims against Threemile in its capacity as a Farm Defendant. The Court adopts Judge Hallman's statutory interpretation of the exceptions, discussed only in the context of CAFO discharges. *See* F&R at 39-43. The point source exception, 42 U.S.C. § 6903(27), does not automatically exempt a *party* from "RCRA liability simply by having an NPDES permit for certain discharges; '[t]hey must be *required* by the [Clean Water Act ("CWA")] to have a permit for the discharges at issue.'" *San Diego Coastkeeper v. Pick-Your-Part Auto Wrecking*, 2023 WL 4879832, at *15 (S.D. Cal. July 31, 2023) (emphasis in original) (quoting *Inland Steel Co. v. EPA*, 901 F.2d 1419, 1422) (7th Cir. 1990)). Because Threemile's CAFO discharges—the subject of Threemile's NPDES permit—do not serve as the basis for Plaintiffs' RCRA claims, the point source exception does not apply.

In addition, RCRA's anti-duplication provision, 42 U.S.C. § 6905(a), "does not bar RCRA's application unless that application contradicts a specific mandate imposed under the CWA." *Ecological Rights Found.*, 874 F.3d at 1095. Applying that principle to RCRA suits against CAFO-permit holders, it is possible that "relief that could *exceed* the CAFO permit standards" might not "be *inconsistent* with the CAFO standards." *See Comm. Ass'n for Restoration of Env't Inc.*, 2019 WL 13117758, at *6 (E.D. Wash. Oct. 24, 2019) (emphasis in original). To evaluate that, the Court would have to consider "factual evidence about [Threemile's] current CAFO permit requirements, the specific conditions Plaintiffs request as injunctive relief, and whether the latter conflicts with the former." *Id.* Thus, Threemile's "anti-duplication argument requires significant consideration of facts outside of the complaint," which is a "kind of factual inquiry that goes well beyond the allegations contained in Plaintiffs' Complaint and is therefore not grounds for a Rule 12(b)(6) motion." *Id.*

### iii. Over-Applying Wastewater and Spilling Wastewater from Pipes

Judge Hallman recommends that the Court find that Plaintiffs state a claim against the Wastewater Defendants for their application of excess wastewater to crops and spilling wastewater from their transportation pipes. Lamb Weston argues that these allegations are only stated against the Port, but Plaintiffs plausibly allege this theory against both Wastewater Defendants.[15]

Plaintiffs plausibly allege that the Wastewater Defendants had enough control over the wastewater when it was disposed because they are the only entities licensed in the counties to process wastewater and they pumped the water to the farms. *See Eagle Star Rock Prods.*, 756 F. Supp. 3d at 1080; *Hinds*, 654 F.3d at 852. As explained further below, the Court also concludes that wastewater meets the definition of "solid waste"[16] when applied to farms by both Wastewater Defendants, because it is "discarded." *See* 42 U.S.C. § 6903(27); *Safe Air for Everyone*, 373 F.3d at 1041 ("[M]aterials must be 'discarded' to be considered solid waste.").

---

[15] Plaintiffs allege that Lamb Weston "pump[s] [wastewater] to local farms" and rents out the Port's Boardman Industrial Park property, which is connected to a pipe system. *See* FAC ¶¶ 69, 70 & fig. 5; *see also id.* ¶ 71 ("Lamb Weston pump[s] nitrogen-rich wastewater to nearby farms year-round."). Plaintiffs also allege that Lamb Weston operates a wastewater treatment facility in Hermiston, where it maintains wastewater storage ponds. *Id.* ¶ 76. Water from these ponds allegedly is transported by a "system of pumps and pipes . . . to two farms—one owned by Lamb Weston itself and the other owned by Madison Ranches." *Id.* (footnote omitted).

[16] RCRA expressly contemplates that liquids, such as wastewater, can be solid waste. *See* 42 U.S.C. § 6903(27) ("The term 'solid waste' means garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, *liquid*, semisolid, or contained gaseous material . . . ." (emphasis added)).

Plaintiffs argue that the wastewater at issue here meets the definition of "solid waste" because it is "other discarded material" resulting from "industrial" or "agricultural" activities. *See* ECF 68 at 45; *see also* 42 U.S.C. § 6903(27). They do not pursue a theory that wastewater is sludge or refuse.

Because the relationship between the consumer and the material is the central consideration in determining whether a substance is "discarded," *see Cal. River Watch*, 39 F.4th at 629, the Court discusses separately Plaintiffs' allegations about the Port and Lamb Weston's uses of wastewater.

Plaintiffs plausibly allege that the Port discards wastewater that meets the definition of "solid waste." Plaintiffs allege that the Port has constructed an intricate pipe system to transport wastewater to local farms, and that the farms that receive the wastewater save hundreds of thousands of dollars per year in fertilizer and water costs. *See id.* ¶ 76 n.3 ("Madison Ranches does not pay for the wastewater" and "Madison Farm has saved hundreds of thousands of dollars or more in fertilizer and water costs"). These allegations adequately state that the Port is discarding its wastewater when it pumps the water to local farms.

The same is true for Lamb Weston. Plaintiffs allege that Lamb Weston sends some of its water to Madison, in addition to Lamb Weston's own farms, and regularly dumps more water than its permits for "nitrogen discharge" allow. *See* FAC ¶¶ 76-77. Plaintiffs contend that, more than 90 times since 2015, Lamb Weston has dumped wastewater greater than its permit with DEQ allows. *See* FAC ¶¶ 76-77. Plaintiffs also allege that Lamb Weston dumps wastewater in winter, when fields are fallow. *Id.* ¶ 71. Taken together, these allegations sufficiently plead that at least some of the wastewater dumped by Lamb Weston is "solid waste" as defined under RCRA.

Lamb Weston objects that the F&R articulated no reasonable basis for treating the application of process water to farmland for its agricultural benefits differently than similar applications of nitrogen fertilizer. This argument fails for two reasons. First, Plaintiffs allege that Lamb Weston allegedly dumps wastewater not only on its own farm but also on Madison's farm,

even if Lamb Weston only applies fertilizer on its own farm. *See* FAC ¶ 76 & n.3 (describing

how wastewater from Lamb Weston's pipes is transported to Madison's farm). When Lamb

Weston dumps wastewater on Madison's farm, "Madison Ranches does not pay for the water."

*See id.* This suggests that Lamb Weston is discarding wastewater on Madison's farm, even if

Lamb Weston is not "discarding" fertilizer.

Second, Plaintiffs allege that it is a usual practice for farmers to over-apply nitrogen

fertilizer, *id.* ¶¶ 61-62, but there is no allegation that it is expected of wastewater processors to

dump excess nitrogen-rich water on farms. In fact, it is expected that wastewater processors do

*not* dump water in excess of regulatory limits based on their permits. *See id.* ¶ 85 (explaining that

a condition of the Port's permit is not to discard nitrogen-containing wastewater onto fields after

the nitrogen from all sources exceeds the agronomic rate for the crop grown).

Lamb Weston also objects that the wastewater it pumps to farms is not solid waste

because it is exempted from the statutory definition as a "solid or dissolved material in irrigation

return flow[ ]." 42 U.S.C. § 6903(27). To evaluate this argument, the Court adopts Judge

Hallman's definition of the phrase "irrigation return flow" and the well-reasoned interpretation

underlying it:

> RCRA does not define "irrigation return flow." "In determining the
> plain meaning of a word, [a court] may consult dictionary
> definitions in an attempt to capture the common contemporary
> understandings of a word." *Pac. Coast Fed'n of Fishermen's
> Ass'ns v. Glaser*, 945 F.3d 1076, 1084 (9th Cir. 2019). When
> RCRA was enacted, "irrigation" was defined as "the artificial
> watering of land . . . to supply moisture for plant growth."
> Webster's Third New International Dictionary 1196 (1971).
>
> There is no similarly instructive dictionary definition of "return
> flow." . . . [T]wo reports, one from 1969 prepared for the DOI and
> one from 1971 prepared by the EPA, . . . discuss "irrigation return
> flow" and "return flow," respectively. The 1969 report defines
> "irrigation return flow" as "[a]ny water diverted for irrigation
> purposes that finds its way back to a source of supply (stream or

groundwater basin)[, which] includes bypass water, deep percolation losses, tail water runoff and seepage." Utah State University Foundation, *Characteristics and Pollution Problems of Irrigation Return Flow* 199 (1969). "Deep percolation losses" are defined as the "portion of irrigation water applied to the land that percolates below the crop root zone and is not subject to consumptive use by the agricultural crops." *Id.* at 198. And the 1971 EPA report explains that "the primary sources of return flow [are] canal seepage, bypass water, deep percolation, and tailwater or surface return flow." James P. Law, *National Irrigation Return Flow Research and Development Program* 3 (1971).

This Court finds that "irrigation return flow" may be properly understood with reference to its dictionary definition and its established usage predating RCRA's enactment. When Congress uses a technical term or term-of-art in a statute, courts generally give it its established meaning. *See Johnson v. United States*, 559 U.S. 133, 140 (2010) (noting that a court will not do so if that meaning does not fit or would produce "nonsense"). "Irrigation return flow" is a term of art that had an understood, scientific meaning before it was included in RCRA. Thus, this Court finds it appropriate to incorporate that definition into its interpretation of the exception. Therefore, this Court finds that "irrigation return flow" means water that returns to a source of supply—including surface water and groundwater—after it was artificially applied to land to supply moisture for plant growth.

F&R at 45-46 (citations to briefing omitted).

Because the irrigation return flow exception exempts only water that is applied to land "to supply moisture for plant growth," *id.*, and because Plaintiffs allege that the Wastewater Defendants dump wastewater for purposes other than irrigation, the Court cannot conclude that this exception applies as a matter of law. At this preliminary stage, Plaintiffs have sufficiently alleged that wastewater qualifies as solid waste under RCRA.[17]

---

[17] Lamb Weston also argues that RCRA should be interpreted consistently with the Clean Water Act ("CWA"), which has a permitting exemption for discharges "composed entirely of return flows from irrigated agriculture." 33 U.S.C. § 1342(l)(1). The Ninth Circuit has interpreted this exemption to cover "discharges from activities related to crop production." *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083, 1087 (9th Cir. 2019)

The Port also argues that Plaintiffs' RCRA claim fails because Plaintiffs do not allege an imminent and substantial endangerment. Specifically, the Port argues that Plaintiffs fail to allege present harm, a risk of future harm, or any reasonable pathway of exposure because Plaintiffs did not explain how the gradient of the water table affects how the Port's nitrates flow to Plaintiffs' wells. This is a subject for expert testimony, and there is no requirement under Rule 12(b)(6) that a pleading that alleges causation also provide that expert analysis. Essentially, the Port argues that Plaintiffs' claim must fail at the pleading stage unless they also "prove up" in their pleading that they will be able to prove causation to a scientific certainty. Plaintiffs allege that the Port's nitrates seep into the water table, which lands in the groundwater, which later runs into Plaintiffs' wells. That is sufficient at this stage of the lawsuit.

RCRA also does not punish prudent plaintiffs. That the named Plaintiffs tested their water and now avoid drinking it does not neutralize the *threat of harm* in that water. Plaintiffs have plausibly alleged that the contaminated water presents an imminent and substantial endangerment to anyone who drinks it, based on the high nitrate concentration and the serious adverse health effects from consuming nitrates. For the residents in the LUBGWMA, the threat of harm is present now. Additionally, because "endangerment means a threatened or potential harm," Plaintiffs' failure to plead actual harm is irrelevant to the RCRA analysis. *See U.S. Navy*, 39 F.3d at 1019.

The Court also rejects the Port's suggestion that Plaintiffs must allege some special injury so as to warrant immediate action beyond what the agencies are already doing. Agency action may, under some circumstances, mitigate the imminence or substantiality of a particular

---

This argument, however, does nothing to overcome the well-pleaded allegations in the FAC that the Wastewater Defendants dump wastewater on fallow farmlands or above the agronomic load.

endangerment. In *U.S. Navy*, for example, the Ninth Circuit held that "extensive government involvement with the cleanup operations of contaminated soil at a former United States Navy junkyard—repurposed into a residential neighborhood—mitigated any risk of imminent endangerment." *See Whittaker*, 99 F.4th at 475 (describing holding of *U.S. Navy*, 39 F.3d at 1012, 1018-20). Here, agency action allegedly has only marginally improved conditions in the LUBGWMA and has not brought Plaintiffs' water quality anywhere close to safe consumption levels. After Morrow County paid for a filtration system in Pearson's well, for example, nitrate concentration in his well dropped from 46.8 mg/L to 16.4 mg/L, but that is still one-and-a-half times the EPA's 10 mg/L safe-consumption threshold. FAC ¶¶ 15-17. In addition, the Port and Lamb Weston continue to dump wastewater beyond the amounts allowed by their DEQ permits, undeterred by fines of more than $1,000,000 per violation. *See id.* ¶¶ 74-93. The Court cannot say that, as a matter of law, state or county agency action has eliminated the imminent and substantial endangerment that Plaintiffs face, particularly because this "element should be construed broadly to allow for affirmative equitable relief." *Whittaker*, 99 F.4th at 475. Accordingly, Plaintiffs state a claim under this theory against the Wastewater Defendants.

### iv. Allowing Wastewater and Effluent to Leach from Lagoons

Judge Hallman recommends that the Court find that Plaintiffs state a claim against the Wastewater Defendants for allowing wastewater and nitrogen effluent to leach from lagoons.[18] The Court agrees with Judge Hallman's analysis. Although Lamb Weston objects that the F&R improperly lumped together allegations about it and the Port, this theory is sufficiently plead as

---

[18] Judge Hallman also recommends that the Court find the allegations against BNW as a CAFO sufficient to state a claim against BNW under this theory. *See* F&R at 50-51, 53. As explained earlier, however, Plaintiffs have insufficiently alleged causation against BNW and thus have not stated a RCRA claim against BNW under any theory.

to both Wastewater Defendants. Plaintiffs allege that the Port has "leaching lagoons," and that Lamb Weston uses "wastewater ponds." FAC ¶¶ 81, 91, 93 (Port of Morrow), 76 (Lamb Weston).

Plaintiffs plausibly allege that the Wastewater Defendants' placement of nitrogen-rich effluent in lagoons contributes to the handling or disposal of that material. Because the lagoons are designed to leak, *id.* ¶ 67, Plaintiffs plausibly allege that the Wastewater Defendants had a measure of control over the waste when it was disposed of—*i.e.*, when it remained in their possession in the lagoons. *See Eagle Star Rock Prods.*, 756 F. Supp. 3d at 1080; *Hinds*, 654 F.3d at 852. For the same reason, Plaintiffs plausibly allege that leaching material is "discarded" by alleging that the Wastewater Defendants no longer want material that it stores in lagoons designed to leak into the environment.[19] *See Cal. River Watch*, 39 F.4th at 629; *see also Cmty. Ass'n for Restoration of the Env't, Inc. v. D&A Dairy*, 2013 WL 3188846, at *4 (E.D. Wash. June 21, 2013) (holding, at the motion to dismiss stage, "that it is plausible for manure to be solid waste after it has ceased to be beneficial or useful when it . . . has leaked away from the lagoons" (quotations omitted)). Further, as already explained, Plaintiffs have plausibly alleged an imminent and substantial endangerment from the nitrate contamination.

### 2. Oregon Tort Claims Act

The Port moved to dismiss all state law tort claims against it on the grounds that Plaintiffs failed to comply with the Oregon Tort Claims Act ("OTCA"). Plaintiffs do not deny the OTCA applies to their state law claims but argue that they complied with the statute by timely notifying the Port about their claims. Judge Hallman agreed and found that Plaintiffs adequate plead that a

---

[19] The Port appears to concede that its nitrogen materials are solid waste; it does not argue otherwise in its Motion to Dismiss. *See* ECF 56 at 28-30 ("*Threemile*'s Alleged Discharges Are Not Solid Waste" (emphasis added)).

reasonable person in Plaintiffs' position would not have learned of the nitrate contamination or the Port's relationship to that contamination before June 2022, making Plaintiffs' December 2022 notice timely. F&R at 72-73. Judge Hallman, therefore, recommends that the Court deny the Port's motion under the OTCA. *Id.* at 73.

Under the OTCA, "[n]o action arising from any act or omission of a public body" shall "be maintained unless notice of claim is given . . . within 180 days after the alleged loss or injury." Or. Rev. Stat. ("ORS") § 30.275. "The pleading and proof of notice sufficient to satisfy the requirements of ORS 30.275 [are] a mandatory requirement and a condition precedent to recovery under the Oregon Tort Claims Act." *Urb. Renewal Agency of City of Coos Bay v. Lackey*, 275 Or. 35, 40 (1976). "The requirements of the statute may be satisfied, however, by a substantial compliance with such requirements." *Id.* If the OTCA is applicable, the 180-day notice period begins when the "plaintiff has a reasonable opportunity to discover his injury and the identity of the party responsible for that injury." *Adams v. Or. St. Police*, 289 Or. 233, 239 (1980). Put another way, the clock starts when it "appear[s] probable that plaintiff's 'damage actually suffered' was caused by defendant," or when "a reasonably prudent person perceives the role which the defendant has played in the plaintiff's injury." *Id.* (quoting *U.S. Nat'l Bank of Or. v. Davies*, 274 Or. 663, 670 (1976)).

This "discovery rule presents a factual question for determination by a jury unless the only conclusion that a jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter." *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or. 270, 278 (2011); *see also Doe 1 v. Lake Oswego Sch. Dist.*, 353 Or. 321, 332-33 (citing *Kaseberg* in the OTCA context for the

proposition that the discovery rule presents a "question of fact determined by an objective standard").

In their Amended Complaint, Plaintiffs did not allege that they served a tort claim notice. The Port, however, concedes in their motion that Plaintiffs served a tort claim notice on December 8, 2022. ECF 56 at 44. Indeed, the Port provided the Court with a copy of that notice. ECF 57-8. The Port also argues that the Court may consider the date of that notice and other related "matters outside the pleadings to determine compliance with the OTCA" "[b]ecause the OTCA is a jurisdictional statute." ECF 56 at 44 n.12. The Court agrees. The Port then argues that because Plaintiffs *could have* learned earlier that the Port was contaminating the groundwater, Plaintiffs did not comply with the 180-day notice period required under the OTCA. Here, the Court disagrees with the Port.

None of the well-pleaded allegations establish as a matter of law that a reasonable person in Plaintiffs' position would or should have known about their injuries earlier than June 2022. The Port argues that high nitrate contamination in the LUBGWMA in the mid-1990s should have put Plaintiffs on notice of their claims. But that knowledge would not necessarily reasonably put Plaintiffs on notice that their *personal* wells or water supplies were dangerously polluted. Indeed, when the Suters moved to the LUBGWMA in 1999, water in their private well tested at a nitrate concentration of less than 7 mg/L. FAC ¶ 22.

Nor did the 180-day clock begin in January 2022, as the Port alternatively argues, when "state and local officials" allegedly encouraged "Morrow and Umatilla County residents who rely on private wells to have their wells tested for nitrates." *Id.* ¶ 51. When a plaintiff cannot see or otherwise sense her own injury but must rely on specialized equipment to determine whether she is injured, the Court cannot say as a matter of law that a plaintiff had a "reasonable

opportunity to discover" that injury. *See Adams*, 289 Or. at 239. Thus, although Plaintiffs were warned in January of 2022 to get their private wells tested, they could not actually discover whether they were injured until they obtained testing on those wells.[20] Pearson did not learn that his well was contaminated until he completed testing in June 2022. *Id.* at ¶ 14.[21] And Strange was unaware of the contamination until November 2022, when she tested her tap water for pollutants. *Id.* ¶¶ 28, 30.

Because the discovery rule is conjunctive, the 180-day clock does not start until it is probable to Plaintiffs that their "damage actually suffered was caused by" the Port. *See Adams*, 289 Or. at 239 (quotations omitted); *see also Kaseberg*, 351 Or. at 278. Indeed, the Port itself *still* argues that it could not have possibly caused the nitrate pollution in Plaintiffs' wells based on the hydrogeologic conditions in the LUBGWMA and the gradient of the water table. *See* ECF 107 at 31-32. If the Port disputes that it could have, as a matter of science, caused Plaintiffs' tort injuries, it is inappropriate to say that Plaintiffs could or should have known earlier, as a matter of law, about the Port's involvement.

Plaintiffs, however, did not allege in their Amended Complaint that they served the Port with a claims notice. Thus, the Port raises a new argument in its objections that this Court has no

---

[20] Not all Plaintiffs rely on private wells. Strange, for example, gets her water supply from a public source.

[21] Plaintiffs fail to allege the date that the Suters tested their well and discovered their nitrate contamination. *See* FAC ¶¶ 20-25. Plaintiffs represent in briefing that the Suters learned their water was contaminated in June 2022, *see* ECF 68 at 90, whereas the Complaint states that the Suters commenced their testing "[a]fter reports surfaced of water contamination in the area," FAC ¶ 23, the earliest of which date back to the mid-1990s and early 2000s, *id.* at ¶¶ 46-49. The Court need not resolve when the Suters learned about their injury. Because the plaintiff must know about *both* the injury *and* the identity of the governmental defendant, *see Adams*, 289 Or. at 239, the 180-day clock cannot begin to run until a plaintiff knows about both elements. Thus, even if the Suters knew about their well contamination before June 2022, there is still a question about when the Suters learned about the Port's involvement in the contamination.

PAGE 37 – OPINION AND ORDER

jurisdiction to hear any tort claim against the Port and must dismiss those claims under Rule 12(b)(1). The Port cites *Johnson v. Smith* for the proposition that "pleading of notice" under the OTCA "in a proper fashion *is a jurisdictional prerequisite* to bringing a claim against the state." ECF 107 at 38 (quoting 24 Or. App. 621, 626 (1976) (emphasis added by the Port)). Although the Port did not raise this jurisdictional argument in its briefing before Judge Hallman, a motion to dismiss under Rule 12(b)(1) for lack of "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). An objection that a particular court lacks subject matter jurisdiction may be raised by any party, or by the court on its own initiative, at any time. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); Fed. R. Civ. P. 12(b)(1). Thus, a court must dismiss any case over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *see also Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) (noting that when a court lacks subject-matter jurisdiction, meaning it lacks the statutory or constitutional power to adjudicate a case, the court must dismiss the complaint, even *sua sponte* if necessary).

When a claim is subject to the notice requirement of the OTCA, a plaintiff must allege compliance with the law. *See Johnson*, 24 Or. App. at 625-26 ("It is the allegation in the complaint that notice has been afforded the state pursuant to the requirements of the Act which confers jurisdiction on the court."); *see also Urb. Renewal Agency*, 275 Or. at 40. Allegations of "substantial compliance" are sufficient under Oregon law, *see id.* at 40-41, but Plaintiffs' Amended Complaint is void of any mention of its OTCA notice. With recognition that this facet of Oregon law is quite formalistic (particularly based on the Port's own presentation to the Court of Plaintiffs' tort claim notice), the Court nonetheless has a duty to evaluate its jurisdiction. The tort claims against the Port must be dismissed, albeit without prejudice. As the analysis above

demonstrates, however, Plaintiffs have in substance complied with the OTCA and will be afforded an opportunity to replead properly to allege that they timely provided the required OTCA notice to the Port.

### 3. Negligence

Judge Hallman recommends that the Court find that Plaintiffs state a claim for negligence. The Court agrees with respect to the Farm Defendants but not with respect to BNW or the Port for the reasons previously discussed. "A negligence complaint, to survive a motion to dismiss, must allege facts from which a factfinder could determine" five elements:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Moody v. Or. Comm. Credit Union*, 371 Or. 772, 784 (2023) (quoting *Solberg v. Johnson*, 306 Or. 484, 490-91 (1988)). Further, foreseeability "embodies a prospective judgment about a course of events; it 'therefore ordinarily depends on the facts of a concrete situation' and, if disputed, is a jury question." *Piazza v. Kellim*, 360 Or. 58, 69-70 (2016) (quoting *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 4 (1987)). Only "in an extreme case" can a court decide that the risk to the plaintiff was unforeseeable as a matter of law. *See Donaca v. Curry County*, 303 Or. 30, 38-39 (1987).

The Amended Complaint adequately alleges that the Farm Defendants, by intentionally over-applying nitrogen-rich fertilizers and products to their farmlands, caused a foreseeable and unreasonable risk of harm to Plaintiffs' legally protected property interest in nitrate-free water. Madison argues that Plaintiffs failed to allege harm, but under Oregon law, the "simplest legally

protected interest is in being 'free from physical harm at the hands of another,'" which "includes both bodily injury and property damage." *Moody*, 371 Or. at 784 (quoting *Philibert v. Kluser*, 360 Or. 698, 703 (2016)). Plaintiffs' alleged injury of "property damage" caused by Madison and the other Farm Defendants' nitrate pollution in the LUBGWMA is therefore sufficient to state a claim. FAC ¶ 128.

Plaintiffs also plausibly allege that the Farm Defendants knew or should have known about the risk from nitrate pollution,[22] and that the Farm Defendants' over-application of nitrogen was unreasonable in light of the risk to Plaintiffs' water quality; specifically, Plaintiffs allege that application of nitrogen-rich fertilizer in excess of the agronomic rate, or in the winter seasons, have little to no benefit to the Farm Defendants' crops, but pose serious risk to water quality in the LUBGWMA. *Id.* at ¶¶ 61-62 (fertilizer in excess of agronomic rate is not absorbed or beneficial); 71 (the Farm Defendants pump nitrogen-rich wastewater onto fallow fields). Plaintiffs plausibly allege causation, as DEQ has attributed 70 percent of nitrate contamination in the LUBGWMA to irrigated farmland and the Farm Defendants engage in irrigated agriculture operations in the LUBGWMA, contributing to this harm. *Id.* ¶¶ 5, 35-37, 60-65. Finally, Plaintiffs have plausibly alleged that their injuries are foreseeable—between EPA studies about nitrates and DEQ naming the LUBGWMA a groundwater management area in the early 2000s, a reasonable jury could conclude that the Farm Defendants would foresee that over-application of nitrogen fertilizer would contaminate the water of those people living in the LUBGWMA.

---

[22] *See* FAC ¶¶ 42 (EPA and DEQ's established nitrate safety thresholds); 48 (DEQ declared the LUBGWMA a groundwater management area in 2001); 54-55 & Table 1-2 ("nitrate exceedances" list, including "Lamb Weston," submitted to EPA); 76 (Lamb Weston's DEQ permit); 80, 83 (public DEQ penalties issued to Port of Morrow describing adverse effects of nitrogen on drinking water);124-25 (Defendants "know that nitrates are hazardous to human health").

Threemile also argues that Plaintiffs do not sufficiently allege facts to show that Threemile caused Plaintiffs' harm. Threemile suggests that Plaintiffs should have alleged facts such as the permits that Threemile maintains in connection with its irrigated agriculture, how much nitrogen in the LUBGWMA is attributable to Threemile, or the quantity of nitrogen-rich wastewater that Threemile discharges. The full extent to which Threemile's actions caused damage to Plaintiffs need not be pleaded. Instead, that can be addressed in discovery or thereafter.

Although Plaintiffs adequately state a negligence claim against the Farm Defendants, they fail to state a claim against BNW for the same reason previously discussed that they fail to state a RCRA claim against BNW. Plaintiffs make no allegations about what BNW did in the LUBGWMA, only what they may have done. In short, Plaintiffs fail to allege a facially plausible causal connection between BNW's actions and the harm that Plaintiffs have suffered. In addition, Plaintiffs have not yet adequately stated a negligence claim against the Port because of Plaintiffs' failure to allege timely notice under the OTCA.

### 4. Negligence *Per Se*

Judge Hallman recommends that the Court dismiss Plaintiffs' negligence *per se* claim without prejudice. No party objected, and the Court finds no clear error.

### 5. Trespass

Judge Hallman recommends that the Court allow Plaintiffs' trespass claim to proceed. The Court adopts this recommendation with respect to the Farm Defendants, but not with respect to BNW or the Port for the reasons previously discussed. "A plaintiff claiming trespass must show that the defendant invaded the exclusive possession of his property . . . ." *Hay v. Or. Dep't of Transp.*, 301 Or. 129, 135 (1986). However, "a trespass can result from an intrusion by invisible as well as visible forces and [] it is the force of the instrumentality rather than its size

which is significant in determining whether a trespass has been committed." *Martin v. Union Pac. R.R. Co.*, 256 Or. 563, 566 (1970). A plaintiff must also "show that the intrusion was intentional or, if unintentional, the result of defendants' negligence or ultrahazardous activity." *Gibson v. Morris*, 270 Or. App. 608, 613 (2015). "In the case of continuing intrusion, conduct is intentional if the intruder knew of the continuing intrusion and allowed the intrusion to persist, regardless of whether the defendant acted intentionally when the intrusion began." *Goldingay v. Progressive Cas. Ins. Co.*, 306 F. Supp. 3d 1259, 1265 (D. Or. 2018).

Plaintiffs sufficiently allege that the Farm Defendants intentionally trespassed on their property by continuing to cause nitrate pollution in the groundwater. As Judge Hallman recommends, each Plaintiff sufficiently alleged that the contamination compromised the drinking water on their properties and that these Defendants knew that their actions were contaminating the groundwater in the LUBGWMA. However, Plaintiffs fail to allege that BNW invaded their properties. Accordingly, the claim against BNW must be dismissed. As explained, Plaintiffs also have not yet adequately stated a nuisance claim against the Port because of the OTCA.

### 6. Private Nuisance

Judge Hallman recommends that the Court allow Plaintiffs' private nuisance claim to proceed. The Court adopts that recommendation with respect to the Farm Defendants but not with respect to BNW or the Port for the reasons previously discussed. "[A] plaintiff claiming private nuisance must show that the defendant unreasonably and substantially interfered with the use and enjoyment of his property . . . ." *Hay*, 301 Or. at 135. The substantial and unreasonable use and enjoyment "inquiry 'depends on the individual facts of a particular case' and requires 'clear and convincing' proof." *Mark v. State ex rel. Dep't of Fish & Wildlife*, 191 Or. App. 563, 573 (2004) (quoting *Jewett v. Deerhorn Enters., Inc.*, 281 Or. 469, 473 (1978)). Courts look to five guidelines to determine the severity of the nuisance: "(1) the location of the claimed

nuisance; (2) the character of the neighborhood; (3) the nature of the thing complained of; (4) the frequency of the intrusion; and (5) the effect upon the enjoyment of life, health and property." *Id.* (quoting *Smith v. Wallowa County*, 145 Or. App. 341, 346 (1996)).

Plaintiffs plausibly allege that the Farm Defendants have committed a private nuisance. As alleged, Plaintiffs cannot consume their well or tap water and must instead purchase bottled water because nitrate contamination has rendered their water unsafe. *See* FAC ¶¶ 12-33. This is a substantial interference with Plaintiffs' use and enjoyment of their properties. As Judge Hallman found, "[t]he nature of the thing complained of—access to safe drinking water—is fundamental to the use and enjoyment of any residential property," "the frequency of the intrusion is constant," and the "unavailability of clean drinking water has a profound and substantial effect upon the enjoyment of life, health, and property." F&R 67-68. The interference also is unreasonable, given that Plaintiffs allege that there is no benefit to crop to over-applying nitrogen in the manner that is polluting Plaintiffs' water. Thus, Plaintiffs have plausibly alleged nuisance. For the same reasons as explained above, Plaintiffs fail to allege a nuisance claim against BNW and the Port.[23]

### 7. Public Nuisance

Judge Hallman recommends that the Court dismiss Plaintiff Strange's public nuisance claim without prejudice. As to all other Plaintiffs, Judge Hallman recommends that the Court allow their public nuisance claims to proceed. The Court agrees that Plaintiff Strange fails to state a claim. As with the other tort claims, the Court adopts Judge Hallman's recommendations

---

[23] Because Plaintiffs fail to state a claim against the Port for nuisance, the Court does not reach the Port's argument that its actions were not unreasonable, and therefore cannot constitute a nuisance, because they were taken pursuant to the Port's DEQ license.

with respect to the Farm Defendants but not with respect to BNW or the Port for the reasons previously discussed.

"A plaintiff claiming public nuisance must show 'an unreasonable interference with a right which is common to members of the public generally.'" *Hay*, 301 Or. at 135 (quoting *Raymond v. S. Pac. Co.*, 259 Or. 629, 634 (1971)). "Because the primary responsibility for preventing public nuisances is with the public authorities, a private action to enforce that right requires proof that the plaintiff suffered an injury distinct from the injury that the public as a whole suffered." *Drayton v. City of Lincoln City*, 244 Or. App. 144, 148 (2011) (quotation omitted). Thus, an individual bringing a public nuisance claim must "show special injury, different in kind than that suffered by the general public." *Frady v. Portland Gen. Elec. Co.*, 55 Or. App. 344, 348 (1981). Greater "proximity" or "inconvenience" is insufficient—"special injury must be different in kind, not merely degree." *Id.* at 349.

The special injury that Plaintiffs allege is nitrate contamination of the properties they rent or own, which requires them to purchase bottled water. *See* FAC ¶¶ 15, 23, 31. For Plaintiffs Pearson and the Suters, this harm is a special injury, as it materialized in actual loss of value to their property. *See Frady*, 55 Or. App. at 349 (recognizing that specific injuries may be to "an individual's right to use and enjoy his real property"). Plaintiff Strange is a renter, however, whose inconvenience in being required to drink bottled water is, although greater in degree, not different in kind from the injury suffered by the public at large. The Court therefore adopts Judge Hallman's recommendation that Plaintiffs Pearson and the Suters have plead a special injury, but Plaintiff Strange has not. Thus, Defendants' motions to dismiss the public nuisance claim brought by Plaintiff Strange and the proposed renter subclass is granted.

### 8. Or. Const. art. 1, § 18, Inverse Condemnation

Regarding the Renter/Owner Subclass, Plaintiffs assert that the Port's dumping contaminated water in amounts greater than was allowed under its permits is a governmental taking in violation of the Oregon Constitution. FAC ¶¶ 151-56. The Port moved to dismiss, arguing that Plaintiffs failed to allege: (1) that any taking by the Port was intentional; (2) that any taking was for "public use"; and (3) that any interference with the Renter/Owner Subclass's property by the port was substantial. Judge Hallman recommends that the Court allow Plaintiffs' inverse condemnation claim to proceed. The Court adopts Judge Hallman's recommendation.

#### a. Standards

Article I, Section 18 of the Oregon Constitution provides: "Private property shall not be taken for public use . . . without just compensation." As the Oregon Supreme Court has explained, however, that clause "itself does little to inform the understanding of when a government action constitutes a compensable taking," and there is "no single or uniform legal test" to evaluate whether something is a taking. *Dunn v. City of Milwaukee*, 355 Or. 339, 347-48 (2014). "The most that can be said is that there must be an appropriation of private property for a public purpose that is characteristic of an exercise of eminent domain authority." *Id.* at 347 (quotations omitted). The private property at issue is not "limited to real property," but extends to "the owner's fundamental legal interests in the property, such as the right to possess, use, and dispose of property." *Id.* at 347-48; *see also Cereghino v. State ex rel. State Highway Comm'n*, 230 Or. 439, 449 (1962) ("The word 'property' in [the Oregon and United States Constitutions] is not used in its vulgar and untechnical sense . . . but to denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." (quotations omitted)). Under any takings theory, a plaintiff asserting an inverse condemnation claim must show that the government took private property "intending to put that

property to public use." *Mossberg v. Univ. of Or.*, 240 Or. App. 490, 501 (2011). Whether something is a public use "is always a question of law for judicial determination." *Id.* at 501 n.7 (quoting *Port of Umatilla v. Richmond*, 212 Or. 596, 611 (1958)). "Public use implies a possession, occupation, and enjoyment of the land by the public at large or by public agencies." *Gearin v. Marion County*, 110 Or. 390, 401 (1924) (quotation omitted).

One way that a *de facto* taking occurs is when a governmental actor "invades a private property right in a way that substantially interferes with the owner's use and enjoyment of the property, thereby reducing its value." *Hall v. State ex rel. Or. Dep't of Transp.*, 355 Or. 503, 511 (2014); *see also Dunn*, 355 Or. at 349 (collecting cases for the proposition that "the intentional physical occupation or invasion of property by government for a public purpose generally amounts to a taking, if there is a substantial interference with the property owner's protected interests"). Under this theory, the government must have an "intent to take." *Dunn*, 355 Or. at 351-52 ("[W]here a government action results in a physical invasion of property, a taking arises only if the injurious invasion was the necessary, inevitable, or otherwise certain consequence of the government's intentional act."). To prove an intent to take, the plaintiff need only "show that the government intentionally undertook its actions and that the inevitable result of those actions, in the ordinary course of events, was the invasion of the plaintiff's property that is the basis for the inverse condemnation claim." *Id.* at 358-59.

### b. Application

Plaintiffs' theory is that the Port's water pollution substantially interferes with Plaintiffs' use and enjoyment of their properties and reduces the value of Plaintiffs' properties. Under this theory, Plaintiffs who own properties in LUBGWMA have stated an inverse condemnation claim against the Port. Plaintiff Strange and the proposed renter subclass, however, have not.

The Port cannot take something that Plaintiffs do not have. *See Dunn*, 355 Or. at 347-48 (taking is infringement on "the *owner's* fundamental legal interests in the property" (emphasis added)). Because Plaintiff Strange and renters do not own the properties the Port is allegedly taking, they have not plausibly alleged that the Port's actions have reduced their property values. *See Hall*, 355 Or. at 511. The Port's motion is granted with respect to them.

On the other hand, the owner Plaintiffs have stated a claim. Those Plaintiffs have sufficiently alleged that the Port's taking was for public use. Plaintiffs allege that the Port's executive director "said that the Port will continue to apply wastewater to farmland during the winter because there is no alternative short of closing processing plants." FAC ¶ 92. Put another way, the Port dumps nitrogen-rich wastewater onto farms, which in turn contaminates Plaintiffs' water and lowers their property value, to save the government entity money. This is precisely the sort of sacrifice of "property rights . . . to public convenience or necessity without just compensation" that the Oregon Constitution prohibits. *See Tomasek v. State*, 196 Or. 120, 146 (1952) (quotation omitted). The Port argues that Plaintiffs fail to allege that the public, or the Port, had any direct use of any property owned by any of the Plaintiffs. But the Oregon Court of Appeals has rejected the premise that public use may only be defined as a "direct" and beneficial use of land by a governmental entity. *See Vokoun v. City of Lake Oswego*, 189 Or. App. 499, 504-505 (2003) (collecting cases), *cert. denied*, 336 Or. 406 (2004). In *Tomasek*, for example, the Oregon Supreme Court held that the public use element was satisfied when, in the pursuit of constructing a new bridge and relocating a stretch of highway, the State of Oregon accidentally flooded a portion of the plaintiff's property. *See* 196 Or. at 124-32. Because the *construction* was for a public purpose, and because the "direct effect of this construction was a partial destruction of plaintiff's lands, it constituted a taking for a public purpose within the meaning of the

constitution." *Id.* at 151. "It is the fact of taking, rather than the manner of taking, that is important." *Id.* The Port's argument that Plaintiffs failed to allege that the Port directly used their properties is also irrelevant to Plaintiffs' takings theory. Plaintiffs allege that, by dumping contaminated water in the LUBGWMA in excess of its permits," the Port contaminated Plaintiffs' wells and infringed on their "property *interests*." *See* FAC ¶¶ 153-55 (emphasis added). Plaintiffs need not allege that the Port made direct use of their properties when their claims revolve around a derogation of their property interests.

      The owner Plaintiffs also have sufficiently alleged that the Port's taking was intentional. Although the Port argues that "the Complaint includes no allegations that the Port took any action to intentionally impact any particular Plaintiff," and no allegations that the Port intentionally invaded any of the *Plaintiffs'* properties, those allegations are not necessary to state a takings claim under Oregon law. Rather, the plaintiff need only plausibly allege that the Port intentionally dumped wastewater, and that the "inevitable result" of that action, "in the ordinary course of events," was the contamination of Plaintiffs' water. *See Dunn*, 355 Or. at 358-59. Plaintiffs allege that the Port regularly violates its DEQ permits by dumping wastewater in excess of crops' agronomic load. FAC ¶¶ 78-92. The purpose of the Port's permit is to limit the amount of nitrogen entering the groundwater to curtail water pollution in the LUBGWMA. *See id.* ¶ 74 (describing permit). Indeed, DEQ has explicitly warned the Port that its violations would further contaminate groundwater and drinking water in the LUBGWMA. *Id.* at ¶¶ 80 ("Your land application sites are located in a Groundwater Management Area so designated by DEQ because of nitrogen contamination. DEQ issued this penalty because discharging more nitrogen than allowed by your permit in a groundwater below the root zone and enter groundwater."); 83 ("DEQ issued this penalty because groundwater adversely impacted by the Port of Morrow's

wintertime land application of nitrogen containing wastewater is used as drinking water by residents of the [LUBGWMA].""). Because nitrate contamination is a necessary and common consequence to over-applying nitrogen-rich materials (including wastewater) to soil, Plaintiffs have plausibly alleged intent.

Finally, the owner Plaintiffs have sufficiently alleged that the Port's interference has substantially interfered with Plaintiffs' use and enjoyment of their property. *See Hall*, 355 Or. at 511. Pearson, the Suters, and Strange allege that they depend on bottled water for drinking and cooking. *See* FAC ¶ 18 (Pearson), 25 (the Suters), 30-31 (Strange). Pearson and the Suters have wells with nitrate concentrations scores higher than the EPA's 10 mg/L safe consumption threshold. *Id.* ¶¶ 16-17 (Pearson, 16 mg/L), 23 (the Suters, 38 mg/L). Strange's water has "dangerously high" levels of nitrates according to an at-home test kit. *Id.* ¶ 29. Whether these interferences with Plaintiffs' use and enjoyment of their properties are "substantial . . . are questions of fact that cannot be decided on the pleadings." *See Gutierrez v. C&H Sugar, Inc.*, 2023 WL 7927771, at *5 (N.D. Cal. Nov. 15, 2023) (holding that question of how substantial and unreasonable any "alleged interferences with plaintiff's use of his property" is inappropriate to decide at motion to dismiss stage); *see also City of Bristol v. Tilcon Minerals, Inc.*, 284 Conn. 55, 84-86 (2007) (permitting takings claim to proceed to trial when issue was whether "contaminated groundwater . . . substantially interfere[d] with the present or future use of the property"; evaluating homeowners' ability to market the property, property value, and other trial evidence to determine that no taking occurred).

## E.  Medical Monitoring

Judge Hallman recommends that the Court dismiss without prejudice Plaintiffs' requested relief of medical monitoring. No party objected, and the Court finds no clear error.

**CONCLUSION**

The Court adopts in part and rejects in part Judge Hallman's F&R (ECF 98). Specifically, the Court: grants all motions for judicial notice (ECF 52, 53, 58, 82, and 84); grants BNW's motion to dismiss (ECF 51) and dismisses without prejudice all claims against BNW; grants in part the Port and Threemile's motion to dismiss (ECF 56) and dismisses without prejudice Plaintiffs' claims of negligence, negligence *per se*, trespass, private nuisance, and public nuisance, and Plaintiff Strange and the proposed renter subclass's inverse condemnation claim, and dismisses without prejudice Plaintiff Strange and the proposed renter subclass's public nuisance claim against Threemile; and grants in part Lamb Weston and Madison's motions to dismiss (ECF 54; ECF 59) and dismisses without prejudice Plaintiff Strange and the proposed renter subclass's public nuisance claim. The Court grants Plaintiffs leave to replead.

**IT IS SO ORDERED**.

DATED this  19 th day of December, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge