Michael A. Bliven
Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
mike@blivenlawfirm.com

Robert F. Dwyer, III
Oregon State Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman, OR 97818
Telephone: (406) 755-6828
rdwyer@blivenlawfirm.com

John Heenan (*pro hac vice*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
john@lawmontana.com

Steve W. Berman (*pro hac vice*)
Meredith S. Simons (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98134
Telephone: (206) 623-7292
steve@hbsslaw.com
merediths@hbsslaw.com

Abigail D. Pershing (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| MICHAEL PEARSON, ROSA CAVASOS, JEFFREY FLEMING, JON HALEY, JAMES SUTER, SILVIA SUTER, and JACKIE BLODGETT on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PORT OF MORROW; LAMB WESTON HOLDINGS, INC.; MADISON RANCHES, INC.; THREEMILE CANYON FARMS, LLC; PORTLAND GENERAL ELECTRIC COMPANY; and COLUMBIA RIVER PROCESSING, LLC,<br><br>Defendants. | Case No. 2:24-CV-362-SI<br><br>**CORRECTED SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

*Pearson, et al. v. Port of Morrow, et al.*
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. PARTIES ................................................................................................................... 5

    A. Plaintiffs ........................................................................................................ 5

        1. Michael Pearson ................................................................................ 5

        2. Rosa Cavasos .................................................................................... 7

        3. Jeffrey Fleming ................................................................................. 8

        4. Jon Haley .......................................................................................... 9

        5. James Suter and Silvia Suter .......................................................... 9

        6. Jackie Blodgett ................................................................................ 10

    B. Defendants .................................................................................................. 11

        1. Port of Morrow ............................................................................... 11

        2. Lamb Weston Holdings, Inc. ......................................................... 12

        3. Madison Ranches, Inc. ................................................................... 12

        4. Threemile Canyon Farms, LLC ..................................................... 12

        5. Portland General Electric Company ............................................... 13

        6. Columbia River Processing, LLC .................................................. 13

III. JURISDICTION AND VENUE .............................................................................. 13

II. STATEMENT OF FACTS ....................................................................................... 15

    A. High levels of nitrate damage human health and the environment. .................... 15

        1. Exposure to high levels of nitrates is dangerous to human health. ............. 15

        2. High levels of nitrates damage the environment. ........................................ 16

    B. The EPA and the Oregon DEQ have established nitrate-related
        guidelines. ................................................................................................... 18

C.    The LUBGWMA is highly contaminated with nitrates. ...................................... 19

D.    Defendants discard large quantities of nitrogen-heavy waste onto
land in the LUBGWMA ................................................................................... 22

    1.    The Port of Morrow ............................................................................. 23

        a.    The Port accepts high-nitrogen wastewater from its tenants and
dumps this wastewater onto land in the LUBGWMA. .................. 23

        b.    The Port regularly violates its wastewater discharge permits. ....... 27

    2.    Lamb Weston ....................................................................................... 33

    3.    Madison Ranches ................................................................................. 35

    4.    Threemile ............................................................................................. 37

    5.    PGE ...................................................................................................... 39

    6.    Columbia River Processing .................................................................. 40

E.    Defendants' discarded waste causes widespread nitrate
contamination in LUBWGMA groundwater. ................................................... 42

    1.    Nitrogen in Defendants' wastes convert to nitrates in the soil, and these
nitrates percolate rapidly down to LUBGWMA groundwater. ............ 42

    2.    Nitrates from Defendants' discarded waste spread underground and
contaminate vast swaths of LUBGWMA groundwater. ...................... 43

F.    Plaintiffs and Class members draw their water from areas
downgradient of Defendants' dumping sites. .................................................. 44

    1.    Plaintiffs Pearson, Cavasos, Fleming, and Haley draw their water from
areas downgradient of the Port's dumping sites. ................................. 45

    2.    Plaintiff Blodgett draws her water from areas downgradient of Madison
Ranches's dumping sites. ..................................................................... 46

    3.    Plaintiffs Silvia and James Suter draw their water from areas
downgradient of Threemile's dumping sites. ....................................... 46

G.    Defendants' dumping has harmed Plaintiffs and Class members. ...................... 47

    1.    Defendants have harmed Plaintiffs and Class members who rely on water
from private wells. ............................................................................... 47

2. Defendants have harmed Plaintiffs and Class members who rely on water from public wells. ................................................................48

H. Mitigating the harm Defendants have caused will require significant resources................................................................49

1. Mitigating harm to well-reliant Plaintiffs and Class members. .................49

a. Ensuring access to clean tap water.................................................49

b. Medical monitoring.......................................................................50

2. Mitigating harm to Plaintiffs and Class members who rely on public water. ................................................................50

III. CIVIL CONSPIRACY ALLEGATIONS.......................................................50

IV. CLASS ALLEGATIONS .................................................................53

A. All requirements of Fed. R. Civ. P. 23(a) are met. ...............................54

B. All requirements of Fed. R. Civ. P. 23(b)(3) are met. .........................55

COUNT I: RESOURCE CONSERVATION AND RECOVERY ACT, 42 U.S.C. § 6972(a)(1)(B) ................................................................57

COUNT II: NEGLIGENCE................................................................59

COUNT III: NEGLIGENCE *PER SE* FOR VIOLATION OF ORS 468B.025(1)(b)................................................................61

COUNT IV: NEGLIGENCE *PER SE* FOR VIOLATION OF ORS 468B.025(2) ....................63

COUNT V: TRESPASS .................................................................64

COUNT VI: PRIVATE NUISANCE .................................................................65

COUNT VII: INVERSE CONDEMNATION.................................................................66

PRAYER FOR RELIEF .................................................................67

JURY DEMAND .................................................................68

Plaintiffs Michael Pearson, Rosa Cavasos, Jeffrey Fleming, Jon Haley, James Suter, Silvia Suter, and Jackie Blodgett (hereinafter "Plaintiffs"), on behalf of themselves and all others similarly situated, allege as follows:

## I.    INTRODUCTION

1.      The State of Oregon has rightly declared that pollution of any of the waters of the State is contrary to public policy. Easy and cheap access to clean drinking water is part of the fabric of life in the United States; people living here expect to get clean water when they turn on the kitchen tap. But for tens of thousands of people who live in Oregon's Morrow and Umatilla counties, including Plaintiffs and other Class members, accessing potable water is not so simple because their water is dangerously polluted.

2.      For those in the area who draw their water from private wells, the tap water in their homes is so polluted with nitrates that it is unsafe to drink. At high concentrations, nitrates cause cell damage and lead to birth defects and cancer. Infants are particularly susceptible to methemoglobinemia (or "Blue Baby Syndrome"), a condition caused by nitrate consumption that prevents blood from carrying oxygen and can be fatal. To protect their health, Plaintiffs and Class members whose homes are supplied by private wells must forego the ease of turning on the tap when they need water, and instead rely on bottled water for all drinking, cooking, and other household purposes.

3.      Others in the community, who have access to public water that is treated to remove nitrates, are largely spared the health concerns that threaten their well-reliant neighbors. But this access to safe water comes at a significant cost. Compared to people who live in areas with low nitrate contamination, people in Morrow and Umatilla counties face inflated water bills to cover public water departments' expenditures on removing excess nitrates from their water.

*Pearson, et al. v. Port of Morrow, et al.*     - 1 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

4.      Defendants Port of Morrow; Lamb Weston Holdings, Inc. ("Lamb Weston"); Madison Ranches, Inc. ("Madison Ranches"); Threemile Canyon Farms, LLC ("Threemile"); Portland General Electric Company ("PGE"); and Columbia River Processing, LLC, also known as Tillamook ("Tillamook") have participated in a civil conspiracy that is responsible for contributing to nitrate contamination in Morrow and Umatilla counties.

5.      Defendants the Port of Morrow and Lamb Weston run the only two industrial wastewater treatment and disposal facilities in the area, and each regularly dumps nitrogen-heavy wastewater in excess of permitted levels. Defendants PGE and Tillamook generate hundreds of millions of gallons of high-nitrate wastewater every year that they send to the Port of Morrow, even though both are aware that the Port is likely to improperly discard that wastewater. Defendants Madison Ranches and Threemile each engage in widespread irrigated agricultural operations that contribute to nitrate pollution. Threemile also operates confined animal feeding operations ("CAFOs") that supply Tillamook with milk, and it discards the waste generated by those CAFOs in ways that pollute groundwater. And Madison Ranches allows the Port of Morrow and Lamb Weston to use its land as a dumping ground for waste, further contributing to nitrate pollution in the region.

6.      In other words, each Defendant has agreed with at least one other Defendant to engage in commercial or agricultural activity that pollutes groundwater via land application of high-nitrogen or high-nitrate waste. And each Defendant was aware of the harmful impact of their activity in creating, maintaining and/or exacerbating the pollution problem and have nevertheless continued their conduct. The Defendants' operations have both individually and collectively polluted groundwater in Morrow and Umatilla Counties.

7.      Nitrogen from Defendants' waste products converts into nitrates and leaches into groundwater. The groundwater, along with the nitrates it carries, moves downgradient from areas of high water pressure to low water pressure. The private and public wells on which Plaintiffs and Class members rely are all downgradient of land where Defendants' high-nitrogen waste is land-applied. As such, the nitrogen and nitrates in that wastewater eventually make their way to Plaintiffs' and Class members' wells.

8.      Groundwater in the Lower Umatilla Basin, including the groundwater on which Plaintiffs and Class members rely, is so polluted with nitrates that the Oregon Department of Environmental Quality ("DEQ") has declared it a "Groundwater Management Area." The Lower Umatilla Basin Groundwater Management Area (the "LUBGWMA") encompasses approximately 562 square miles of land in northern Morrow and Umatilla counties. Many LUBGWMA residents, including many Class members, are Latino or indigenous. And many live below the federal poverty line.

**Image 1. Lower Umatilla Basin Groundwater Management Area**



Source: Oregon Dept. of Environmental Quality          Alan Kenaga/Capital Press

*Pearson, et al. v. Port of Morrow, et al.*     - 3 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

9.      The Oregon DEQ applies a "Groundwater Management Area" designation to a region only when nitrate concentrations in groundwater samples approach or exceed the federal safe drinking water standard. The federal safety threshold, established by the Environmental Protection Agency ("EPA"), is set at 10 milligrams per liter ("mg/L"); Oregon's own threshold for establishing a Groundwater Management Area is 7 mg/L. Nitrate levels in the LUBGWMA blow past these safety limits: water samples taken from area wells have revealed nitrate concentrations of over 40 mg/L, more than four times the federal safety threshold and more than five times Oregon's Groundwater Management Area trigger threshold.

10.     Plaintiffs seek to hold Defendants accountable for their role in causing this pollution. Allowing Defendants to continue contaminating the water in the LUBGWMA is an environmental and social injustice. Plaintiffs and other Class members should not be required to tolerate continued exposure to contaminated water or to bear the cost of obtaining non-polluted water.

11.     Plaintiffs bring a citizen suit against the Port of Morrow, Lamb Weston, Madison Ranches, Threemile, PGE, and Tillamook under the Resource Conservation and Recovery Act, seeking to prevent Defendants from polluting the LUBGWMA with nitrates and seeking injunctive relief that would enable residents of the affected areas to access clean water.

12.     In addition to their federal claim, Plaintiffs bring claims of negligence, negligence *per se*, trespass, and private nuisance against Defendants under Oregon law.

13.     As a remedy under RCRA and their state law claims, Plaintiffs also seek a medical monitoring program for people in the area to help scientists and the medical community promote early detection and advances in the treatment of diseases caused by exposure to excess nitrates.

14. Finally, with respect to the Port of Morrow only, Plaintiffs bring an inverse condemnation claim against the Port.

15. Plaintiffs bring these claims on behalf of themselves and a class comprised of everyone who owns or rents property downgradient of Threemile's, Lamb Weston's, and the Port of Morrow's land application sites, as depicted in Image 13 below (also attached as **Exhibit A**).

16. Plaintiffs have amended their complaint to allege that Defendants are engaged in a civil conspiracy that has polluted groundwater in the LUBGWMA, to allege additional facts supporting their RCRA claims against Madison Ranches and Threemile, to establish their compliance with the Oregon Tort Claims Act, to support their request for medical monitoring, and to incorporate claims against PGE and Tillamook that were previously asserted in a separate action.

## II.     PARTIES

### A.     Plaintiffs

#### 1.     Michael Pearson

17. Plaintiff Michael Pearson is a resident of Morrow County, Oregon.

18. Mr. Pearson owns a home located at 70159 Summit Lane, Boardman, Oregon, 97818, which he purchased in 1997. His home draws its water from the Umatilla Basin through a private well. Mr. Pearson and his family depend on their home's well to provide water for drinking, cooking, bathing, and other domestic purposes.

19. In June 2022, Mr. Pearson learned that the Morrow County Commission had declared a local state of emergency over groundwater nitrate pollution that compromised drinking water for many Morrow County residents.

20. Concerned for his family's safety, Mr. Pearson decided to have his well tested for nitrates. A non-profit organization, Oregon Rural Action, performed a test of Mr. Pearson's well.

Test results showed nitrate levels of 46.8 mg/L—over four times the safe limit of 10 mg/L established by EPA, and more than six times the Oregon GMA trigger threshold of 7 mg/L.

21.     In an effort to protect his family from further exposure to unsafe levels of nitrates, Mr. Pearson installed a reverse osmosis filtration system in his well. Local taxpayers paid for Mr. Pearson's filtration system, which was provided to him by Morrow County.

22.     However, the filtration system was unable to bring nitrate levels in his well down to safe levels. After installing the filtration system, Mr. Pearson again had water from his kitchen tested. The results from this testing revealed that the treated water had a nitrate concentration of 16.4 mg/L—still more than one-and-a-half times the EPA's safety threshold, and more than twice Oregon's GMA trigger threshold. Since then, Mr. Pearson has re-tested his well, which continues to test above safe levels.

23.     To ensure his family has access to clean water, Mr. Pearson has now resorted to using bottled water. Every two weeks, Mr. Pearson and his wife use between six and eight five-gallon water bottles for drinking and cooking. Relying on bottled water is inconvenient for Mr. Pearson and his family. For example, when brewing a pot of coffee, Mr. Pearson cannot simply turn on the tap to fill a pot. Instead, he must lift and carry a five-gallon bottle of water weighing 41 pounds from storage, bring the bottle to his kitchen, open the bottle, and pour it into the coffee pot. When Mr. Pearson is not home, his wife struggles to lift the heavy bottles by herself.

24.     What's more, the delivery of water has not been on schedule and has been inadequate. Because the delivery driver does not keep a schedule, empty bottles that Mr. Pearson exchanges for full bottles blow off Mr. Pearson's porch and into his yard. Sometimes, these empty bottles also blow into the road. Mr. Pearson had to call the original delivery company that delivered his water on several occasions because they did not bring water as scheduled or did not bring

enough water to satisfy his family's regular household use. Mr. Pearson has since switched to a different delivery company, which has been an improvement, but has not resolved all issues.

25.    Defendants' actions, which have contaminated Mr. Pearson's well with nitrates, have directly and proximately caused all the expenses and inconveniences that Mr. Pearson and his family have endured and continue to endure. This contamination has diminished the value of Mr. Pearson's property, caused him monetary damages, unreasonably interfered with his quiet enjoyment of the property, damaged his cells, and unreasonably exposed Mr. Pearson and his family to an increased risk of disease.

**2.    Rosa Cavasos**

26.    Plaintiff Rosa Maria "Rosie" Cavasos is a resident of the city of Boardman, Morrow County, Oregon.

27.    Ms. Cavasos owns a home located at 412 SW Goldfinch Lane, Boardman, Oregon, 97818. She purchased this home in July of 2024. She lives at this home with her 34-year-old son, Conrad.

28.    Ms. Cavasos's home is supplied with water via the city of Boardman's Water Department. Ms. Cavasos depends on Boardman public water to provide water for drinking, cooking, bathing, and other domestic purposes. Ms. Cavasos pays a monthly water bill for the water she receives from the city of Boardman.

29.    Ms. Cavasos did not learn that the public water she relies on sometimes exceeds safe nitrate levels until significantly after the water emergency was declared in Boardman, when she attended a number of community meetings.

30.    Out of concern that her water may be unsafe, Ms. Cavasos purchases bottled water from Walmart and Safeway to ensure she has access to clean, safe drinking water. Ms. Cavasos

uses this water for cooking and making coffee, but she finds that using bottled water for these purposes is inconvenient and expensive. Her household uses two cases (either a 24-pack or a 36-pack) of 16oz bottles per week. She sometimes purchases even more bottles of water for a holiday like Thanksgiving. Ms. Cavasos spends at least $30 per month on bottled water.

31.     Defendants' actions, which have contaminated Ms. Cavasos's tap water with nitrates, have directly and proximately caused all the expenses and inconveniences that Ms. Cavasos and her family have endured and continue to endure. This contamination has caused Ms. Cavasos monetary damages and unreasonably interfered with the quiet enjoyment of her home.

### 3.     Jeffrey Fleming

32.     Plaintiff Jeffrey Fleming is a resident of Morrow County, Oregon.

33.     Plaintiff Fleming owns a home located at 250 West Nevada Street in Irrigon, Oregon, 97844. He lives at the home with his wife and children.

34.     Plaintiff Fleming's home is not connected to any public water system and he and his family rely on their private well to provide water for drinking, cooking, bathing, and other domestic purposes.

35.     In 2024, Plaintiff Fleming's well tested at a nitrate concentration of 15 mg/L—5 mg/L above the EPA's safety threshold for safe drinking water.

36.     Plaintiff Fleming was surprised to learn that his water was contaminated with nitrates and subsequently began purchasing bottled water to drink rather than drinking the well water, before ultimately applying for and being approved to receive bottled water from Morrow County. Although he no longer has to pay for the bottled water, he does have to store it, which is less convenient than relying on his formerly drinkable well water. Plaintiff Fleming further had a

reverse osmosis system installed below his kitchen sink but doubts that this is sufficient to ensure safe water for him and his family.

37. Nitrate contamination has interfered with Plaintiff Fleming's quiet enjoyment of his property, caused him to pay out of pocket costs for his reverse osmosis system, damaged his cells, and unreasonably exposed him and his family to an increased risk of disease.

**4. Jon Haley**

38. Plaintiff Jon Haley is a resident of Morrow County, Oregon.

39. Plaintiff Haley rents a home located in Irrigon, Oregon. His home is supplied with water via Irrigon's city water system. Haley depends on Irrigon's city water to provide water for drinking, cooking, bathing, and other domestic purposes.

40. Plaintiff Haley was surprised to learn that his water was sometimes contaminated with nitrates and has since purchased bottled water to drink rather than drinking the supplied city water.

41. Using bottled water is inconvenient and expensive. Plaintiff Haley spends at least $50 per month on bottled water, and he must regularly purchase water, bring it home, and store it, rather than just turning on his tap and knowing he is accessing clean water.

42. Defendants' actions, which have contaminated Plaintiff Haley's water with nitrates, have interfered with Plaintiff Haley's quiet enjoyment of his property and caused him monetary damages.

**5. James Suter and Silvia Suter**

43. Plaintiffs James and Silvia Suter are residents of Morrow County, Oregon.

44. Mr. and Mrs. Suter own a home located at 74777 Toms Camp Road, Boardman, Oregon, 97818. Mr. Suter purchased the home in 1999. The Suters' home is not connected to any

public water system. The Suters rely on their home's private well to provide water for drinking, cooking, bathing, and other domestic purposes.

45. Mr. Suter had his private well drilled after moving into the home in 1999. In 1999, the water in Mr. Suter's well tested at a nitrate concentration of less than 7 mg/L.

46. After reports surfaced of water contamination in the area, a neighbor recommended that the Suters have their well tested for nitrates. The Suters followed their neighbor's advice and had their well tested for nitrates. The test revealed that the Suters' well water is polluted with nitrates at a concentration of 37.7 mg/L—almost four times higher than the federal safety threshold, and more than five times higher than Oregon's GMA trigger threshold.

47. Seeking safe water, the Suters have investigated drilling a deeper well to access water from another, hopefully less contaminated, aquifer. Mr. Suter contacted Waterwell Developing & Surveys, LLC to get a quote on the cost to drill a well deep enough to access water not contaminated with nitrates. In an estimate date August 15, 2024, the company told Mr. Suter that his well would need to be at least 300 feet deep. Drilling such a well would cost $24,000.

48. Mr. and Mrs. Suter currently rely on bottled water for drinking and cooking. They use between three and four 5-gallon bottles of water each week.

49. Nitrate contamination has interfered with Mr. and Mrs. Suter's quiet enjoyment of their property, diminished the value of their property, caused them monetary damages, damaged their cells, and unreasonably exposed them and their family to an increased risk of disease.

**6.    Jackie Blodgett**

50. Plaintiff Blodgett is a resident of Umatilla County, Oregon.

51. Plaintiff Blodgett, along with her mother, owns a home at 30010 Cora Robb Lane in Hermiston, Oregon, 97838.

52.     Plaintiff Blodgett's home is not connected to any public water system and she and her mother rely on their private well to provide water for drinking, cooking, bathing, and other domestic purposes.

53.     In 2024, Plaintiff Blodgett's well tested at a nitrate concentration in excess of the federal limit of 10 mg/L.

54.     Plaintiff Blodgett was surprised to learn that her water was contaminated with nitrates and subsequently began purchasing bottled water to drink rather than drinking the well water for a short period of time before applying and being approved to receive bottled water from Umatilla County. Although she no longer has to pay for the bottled water, storing and using bottled water is less convenient than her former access to drinkable well water.

55.     Nitrate contamination has interfered with Ms. Blodgett's quiet enjoyment of her property, diminished the value of her property, caused her monetary damages, damaged her cells, and unreasonably exposed her and her family to an increased risk of disease.

**B.     Defendants**

**1.     Port of Morrow**

56.     Defendant Port of Morrow ("the Port") is an Oregon public entity engaged in governmental and commercial activities. The Port operates an industrial wastewater treatment and disposal system in Morrow County; this system is the largest industrial wastewater land application system in the state of Oregon. The Port reports annual revenues of more than $6 million from its wastewater discharge contracts. The Port also owns three farms: Portview ("Farm 1"), Southport ("Farm 2"), and Eastport ("Farm 3"). Aside from its wastewater treatment and disposal system, the Port also operates and maintains drinking water infrastructure. It uses this infrastructure to provide clean water to its tenants.

### 2.    Lamb Weston Holdings, Inc.

57.    Defendant Lamb Weston Holdings, Inc. ("Lamb Weston") is a corporation incorporated in Delaware with its principal place of business in Idaho. Lamb Weston conducts business in Oregon and maintains an agent for service of process in Oregon. Lamb Weston owns approximately 1,180 acres of farmland in Umatilla County, which it uses to produce and process potatoes for commercial use. Lamb Weston also operates an industrial wastewater treatment and disposal system in Umatilla County.

### 3.    Madison Ranches, Inc.

58.    Defendant Madison Ranches, Inc. ("Madison Ranches") is a corporation incorporated in the state of Oregon with its principal place of business in Oregon. Madison Ranches owns approximately 21,300 acres of farmland in Umatilla and Morrow Counties, which it uses to produce onions, corn, and other agricultural products. Madison Ranches also uses its land as a disposal site for waste include wastewater and "biosolids" (i.e., byproducts of human sewage).

### 4.    Threemile Canyon Farms, LLC

59.    Defendant Threemile Canyon Farms, LLC ("Threemile") is a corporation incorporated in Oregon with its principal place of business in Oregon. Threemile runs the largest dairy in Oregon at a sprawling site west of Boardman, Oregon. Threemile houses almost 70,000 cattle and owns approximately 93,000 acres of land, 39,500 of which are irrigated farmland. Threemile produces milk for use by Columbia River Processing, a Tillamook County Creamery Association ("Tillamook") subsidiary that operates a large dairy production facility at the Port of Morrow. Millions of gallons of milk from Threemile's dairy cattle are shipped to Tillamook's facility at the Port of Morrow every day.

### 5.      Portland General Electric Company

60.      Defendant Portland General Electric Company ("PGE") is a power company incorporated in Oregon with its principal place of business in Oregon. PGE operates a power generation facility at the Port of Morrow known as PGE Coyote Springs. PGE had annual revenues $2.8 billion in 2024.

### 6.      Columbia River Processing, LLC

61.      Defendant Columbia River Processing, LLC is a dairy products manufacturer with its principal place of business in Oregon. Columbia River Processing is also known as "Tillamook" because it is a wholly owned subsidiary of Tillamook County Creamery Association, also a dairy products manufacturer with its principal place of business in Oregon. Columbia River Processing does not operate independently of Tillamook; it is the corporate entity through which Tillamook operates a cheese production facility at the Port of Morrow.

## III.     JURISDICTION AND VENUE

62.      This Court has jurisdiction over this action under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331 ("RCRA"). This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a). Plaintiffs' state law claims derive from the same common nucleus of operative fact as their RCRA claims, *i.e.*, their federal and state claims all arise from the fact that Defendants' conduct has contaminated the groundwater upgradient of Plaintiffs' water sources.

63.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 6972(a) because the events giving rise to the claims in this Complaint occurred in Oregon.

64.      In addition, Defendants in this case, as well as the EPA and Oregon DEQ, were provided with notice of intent to file this action more than 90 days prior to the filing of this

Complaint, as required by 42 U.S.C. § 6972(b)(2)(A). Notice was delivered to the Port of Morrow, Madison Ranches, and DEQ on November 3, 2023. Notice was delivered to the EPA Regional Administrator on November 6, 2023. Notice was delivered to Lamb Weston on November 7, 2023. Notice was delivered to Threemile on November 27, 2023. Notice was delivered to PGE on March 18, 2024, and to Tillamook on March 20, 2024. Further, the Oregon Department of Agriculture ("DOA"), the Oregon Health Authority ("OHA"), and the Lower Umatilla Basin Groundwater Management Area Committee ("GMA Committee") were served with notice of intent to file this action more than 60 days prior to the filing of this Complaint.

65.     The jurisdictional requirements of the Oregon Tort Claims Act ("OTCA") have also been met. Plaintiffs served an OTCA notice on the Port of Morrow and the State of Oregon on December 8, 2022, less than 180 days after discovering that they had suffered harm and that the Port's actions were the cause of that harm. Plaintiffs were not aware their water was at risk of nitrate contamination until after the Morrow County Commission declared a local state of emergency on June 9, 2022. Even then, Plaintiffs (who are not hydrogeologic experts) could not reasonably have been expected to immediately know that the Port was responsible for this contamination; the Port itself continues to deny its contribution to nitrates in Plaintiffs' water to this day. Plaintiffs could not reasonably have known of the Port's contribution to their water contamination before June 11, 2022. Plaintiffs therefore gave timely and effective notice under the OTCA within 180 days of learning that the Port has contributed to nitrate contamination in their water.

*Pearson, et al. v. Port of Morrow, et al.*     - 14 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

## II.    STATEMENT OF FACTS

A.    **High levels of nitrate damage human health and the environment.**

1.    **Exposure to high levels of nitrates is dangerous to human health.**

66.    Ingesting water with nitrate concentrations of more than 10 mg/L causes significant health problems.

67.    High doses of nitrates prevent red blood cells from carrying adequate levels of oxygen throughout the body, resulting in cyanosis and asphyxia. Low blood-oxygen levels are particularly dangerous for infants, leading to the development of Blue Baby Syndrome (infant methemoglobinemia), which can be fatal. Babies with this syndrome may turn a blue or grey color as their bodies become starved of oxygen. The condition can progress rapidly to cause coma or death if not treated promptly. Formula-fed infants are especially susceptible to Blue Baby Syndrome if the water used to make their formula is high in nitrates.

68.    Nitrate-heavy water is also harmful to older children and adults. Exposure to excess nitrates causes reproductive complications, kidney and spleen disorders, and respiratory diseases. Ingesting high levels of nitrate also causes various cancers, especially colon, kidney, stomach, thyroid, and ovarian cancer.

69.    The harm from excess nitrates is not limited to people who have developed acute illnesses. Everyone who ingests high-nitrate water is impacted at the cellular level, even if they do not show obvious outward signs of disease. This is because the body converts approximately 5 to 10 percent of ingested nitrates into nitrites, and these nitrites form carcinogenic compounds known as nitrosamines.

70.    At low levels of nitrate consumption, the body uses dietary antioxidants to prevent nitrates from reacting with secondary amines to form nitrosamines. But when people ingest high

*Pearson, et al. v. Port of Morrow, et al.*    - 15 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

levels of nitrates—including by drinking water that has a concentration of greater than 10 mg/L—

the high concentration of nitrates interferes with the body's ability to prevent nitrosamine

formation. Nitrosamines destabilize DNA and increase its breakage rate, leading to base

mispairings and ultimately to cancer development. Each time a nitrosamine encounters (or "hits")

a cell, it causes active DNA damage to that cell. Accumulation of this damage leads to cancer cell

formation, as demonstrated in the diagram below.

*Image 2. Example of cancer development after multiple hits from nitrosamine exposure.*



71.    Thus, everyone who has consumed water with nitrates in excess of 10 mg/L has

been impacted at a cellular level.

**2.    High levels of nitrates damage the environment.**

72.    In addition to harming human health, excess nitrogen and nitrates in the

environment lead to a cascade of ecological issues. When nitrogen reaches a body of water, it

stimulates the growth of algae. At moderate levels, algae serve as food for aquatic organisms, but

at high levels, excess algae block sunlight and lead to depletion of oxygen levels in water.

73.    This phenomenon, known as eutrophication, has negative consequences for

biodiversity, fisheries, and recreational activity. When excess algae die and decompose, hypoxic

conditions arise, creating zones where oxygen levels are too low to support marine life. In extreme cases, hypoxia results in large-scale marine death. Beyond these issues, exposure to nitrate directly harms aquatic animals by causing reduced growth, slower maturation, and decreased reproductive success.

74.     Terrestrial life also suffers from excess nitrate and nitrogen that permeate the environment. Excess nitrogen disrupts the nutrient balance in soils, creating conditions that are more favorable for nitrogen-loving plants compared to other species. Over time, this leads to a reduction in plant diversity and encourages the growth of species that thrive in nitrogen-rich environments—some of which may be invasive species—at the expense of native flora. And, although nitrogen can stimulate the growth of certain plants, this growth is often shallow and weak, rendering those plants more susceptible to disease, pests, and environmental stress. Alterations in plant communities subsequently affect herbivores and higher trophic levels that depend on these plants.

75.     The Columbia River is beginning to experience these negative effects as a result of excess nitrate. A study of the Hanford reach of the river, just upriver from the LUBGWMA, indicates that nitrates applied to land near the river play an important role in transferring nitrates into the water at concentrations high enough to "negatively interfere with the shoreline aquatic habitat."[1]

76.     On information and belief, the nitrates that Defendants are contributing to the LUBGWMA, which eventually make their way to the Columbia river, are having similar negative impacts.

---

[1] Abigail Conner et al., *Groundwater Inflows to the Columbia River Along the Hanford Reach and Associated Nitrate Concentrations*, 3 FRONTIERS IN WATER 1 (Apr. 2021).

*Pearson, et al. v. Port of Morrow, et al.*     - 17 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

**B.    The EPA and the Oregon DEQ have established nitrate-related guidelines.**

77.    Given the known human health and environmental consequences of nitrate pollution, both the federal government and the State of Oregon have established nitrate-related guidelines.

78.    At the federal level, the EPA has declared water unsafe for human consumption when it contains nitrates at a concentration of 10 mg/L or greater. For nitrite (which can form in stagnant nitrate-containing and oxygen-poor water), the limits are even stricter: no more than 1 mg/L is safe for human consumption.[2]

79.    At the state level, the Environmental Quality Commission—a five-member panel appointed by the governor of Oregon to serve as the Oregon DEQ policy and rulemaking board—has also addressed the issue of nitrate contamination and established water quality standards. In 2014, the Environmental Quality Commission adopted revisions to Oregon's water quality standards designed to reduce or prevent toxic pollutants in Oregon waterways, set out in Table 40 of Oregon Administrative Rule 340-041-8033. Table 40 sets a "human health criteria" limit of 10,000 µg/L for nitrate (equivalent to 10 mg/L); this limit is meant "to protect Oregonians from potential adverse health impacts associated with long-term exposure to toxic substances."[3] The

---

[2] World Health Organization, *Guidelines for Drinking Water Quality*, https://www.who.int/docs/default-source/wash-documents/wash-chemicals/nitrate-nitrite-chemical-fact-sheet.pdf?sfvrsn%3D8f174e95_4 (last visited Jan. 16, 2026).

[3] State of Oregon Dept. of Enviro. Quality, *TABLE 30: Aquatic Life Water Quality Criteria for Toxic Pollutants*, https://www.oregon.gov/deq/FilterRulemakingDocs/tables303140.pdf (last visited Jan. 16, 2026).

EPA approved Table 40 in an August 4, 2015 letter to Wendy Wiles, the administrator for DEQ's Environmental Solutions Division.[4]

80.    In addition to this 10 mg/L standard, Oregon also requires that DEQ designate any area with groundwater nitrate concentrations of 7 mg/L or above (70% of the EPA Maximum Contaminant Level) as a "Groundwater Management Area." The state, through DEQ, directs additional resources to lowering nitrate concentrations in groundwater management areas.

**C.    The LUBGWMA is highly contaminated with nitrates.**

81.    Groundwater in the LUBGWMA, on which Plaintiffs and other Class members rely for their water, has been plagued with high nitrate concentrations for decades. In the mid-1990s, groundwater samples from monitoring wells in the area showed nearly 30% of groundwater samples exceeded Oregon's GMA trigger threshold of 7 mg/L.

82.    Thirty years later, Defendants' activities have made the nitrate problem worse. In a study led by a committee charged with addressing contamination in the LUBGWMA, nearly half (48%) of the 255 wells tested between 2015 and 2016 exceeded the 10 mg/L federal limit and nearly two thirds (60%) exceeded the 7 mg/L state trigger level. In a separate survey examining only private domestic wells, the same committee found that 42% of the region's domestic wells contained nitrate levels exceeding the safe drinking water standard.

83.    Since January 10, 2022, state and local officials have encouraged Morrow and Umatilla County residents who rely on private wells to have their wells tested for nitrates.

---

[4] Letter from Daniel Opalski to Wendy Wiles (Aug. 4, 2015) at 11, https://www.epa.gov/system/files/documents/2021-11/epa_approval_revised_oregon_wqs_08042015.pdf.

84.     As of December 31, 2025, 2,095 of the approximately 4,500 residential wells in the LUBGWMA have been tested. In total, at least 648 (or 31 percent) of the residential wells in the area have tested positive for nitrate concentrations above 10 mg/L, and 233 of those wells (approximately 11 percent of all tested wells) have nitrate concentrations of more than 25 mg/L—more than twice the EPA's maximum contaminant level. The problem is particularly severe in Morrow County, where 44 percent of the wells have nitrate levels above 10 mg/L. The Oregon Health Authority publishes these figures and reminds residents that "[n]itrate levels above 10 mg/L are unsafe to drink or cook with."[5]

85.     Another 421 wells in the LUBGWMA have nitrate concentrations of 5 to 9.99 mg/L, meaning those wells are at risk of becoming unsafe to use for drinking or cooking if nitrate levels continue to rise.[6]

---

[5] Oregon Health Authority, *Nitrate Testing, Treatment, and Water Delivery for the Lower Umatilla Basin*, https://www.oregon.gov/oha/PH/HEALTHYENVIRONMENTS/DRINKINGWATER/SOURCE WATER/DOMESTICWELLSAFETY/pages/data.aspx (last visited Jan. 16, 2026).

[6] *Id.*

*Pearson, et al. v. Port of Morrow, et al.*    - 20 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

*Image 3. Results of nitrate testing in private wells as of October 31, 2025.*



86.    The State of Oregon has installed filtration systems at approximately 275 homes with wells that have tested above the EPA's 10 mg/L limit. At many of the remaining homes, nitrate levels are so high that filtration systems are not sufficient to bring nitrate concentrations within safe levels. The state is providing those homes with bottled water. In total, 318 households in Morrow County and 288 households in Umatilla County are receiving water delivery.[7]

87.    In addition to contamination of private wells, the Oregon DEQ has determined that multiple public water systems in the Umatilla GMA are at "substantial nitrate risk." DEQ deems a public water system at "substantial nitrate risk" if the system either (1) has a nitrate-N measurement at or above 10 mg/L, or (2) has a 90th percentile of nitrate-N measurements greater than 5 mg/L:

---

[7] *Id.*

*Pearson, et al. v. Port of Morrow, et al.*    - 21 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

*Table 1. LUBGWMA Public Water Systems at "Substantial Nitrate Risk"*

| Public Water System Name | Population | Location | County |
|---|---|---|---|
| Boardman, City of | 3,500 | Boardman, OR 97818 | Morrow |
| Country Garden Estates MHP | 175 | Irrigon, OR 97844 | Morrow |
| Irrigon, City of | 1,885 | Irrigon, OR 97844 | Morrow |
| River Point Farms LLC | 250 | Hermiston, OR 97838 | Umatilla |

*Source: Petition to the EPA submitted on behalf of Food & Water Watch et al., January 16, 2020*

88.     As of 2019, multiple public water systems, including systems in Boardman and Irrigon, had tested above the 10 mg/L maximum contamination limit ("MCL") or the 7 mg/L trigger level ("TL") for nitrate at least once.

*Table 2. LUBGWMA Nitrate Exceedances, 2002 to 2019*

| Public Water System Name | Population | Highest Recorded Nitrate Level | Contamination Frequency | County |
|---|---|---|---|---|
| Boardman, City of | 3,921 | 7.5 mg/L | 1 sample > TL | Morrow |
| Country Garden Estates MHP | 175 | 9.8 mg/L | 4 samples > TL | Morrow |
| Herreras Park | 20 | 8.9 mg/L | 6 samples > TL | Morrow |
| Irrigon, City of | 2,019 | 18 mg/L | 26 samples > MCL 42 samples > TL | Morrow |
| ODF/WL Irrigon Fish Hatchery | 18 | 40.9 mg/L | 21 samples > MCL 48 samples > TL | Morrow |
| River Point Farms LLC | 250 | 28.5 mg/L | 16 samples > MCL 23 samples > TL | Umatilla |

*Source: Petition to the EPA submitted on behalf of Food & Water Watch et al., January 16, 2020*

**D.     Defendants discard large quantities of nitrogen-heavy waste onto land in the LUBGWMA.**

89.     Each of the Defendants is responsible for introducing large quantities of nitrogen-heavy waste onto land in the LUBGWMA.

*Pearson, et al. v. Port of Morrow, et al.*     - 22 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

1.      **The Port of Morrow**

     a.      **The Port accepts high-nitrogen wastewater from its tenants and dumps this wastewater onto land in the LUBGWMA.**

90.     The Port of Morrow operates a sprawling port and industrial park on the banks of the Columbia River in Morrow County. The Port is home to a variety of tenants and industries, including power plants, food processing facilities, shipping companies, and warehouse facilities.

91.     The Port's operations include an industrial wastewater treatment and disposal system. The Port contracts with its industrial-park tenants, including Lamb Weston, PGE, and Tillamook, to collect and dispose of millions of gallons of nitrate-heavy wastewater every year.

92.     Without first fully removing the nitrates from this wastewater, the Port "recycles" the wastewater by pumping it to local farms, where it is sprayed onto the land. The Port pumps this wastewater out to its various dumping grounds through large pipes, many of which are over five feet in diameter.

*Images 4, 5, 6. Pipes the Port uses to transport nitrogen-heavy wastewater.*





93.    The map below illustrates the extent of the Port's Boardman Industrial Park operations and the location of the Port's dumping grounds. The Port's Industrial Park property is outlined in light blue. The dark blue lines on the map indicate the location of the pipes that the Port uses to transport nitrogen-heavy wastewater from the Industrial Park out to various farms. As noted above, the Port itself owns three farms: Portview ("Farm 1"), Southport ("Farm 2"), and Eastport ("Farm 3"). The Port dumps nitrogen-heavy wastewater on each of these farms. The Port also contracts with Mader-Rust Farms and Madison Ranches to dump water on two additional LUBGWMA areas, known respectively as Farm 4 and Farm 5. Each of the five farms where the Port dumps its wastewater is outlined below in purple.

*Image 7. Map of Port's pipe system carrying nitrogen-heavy wastewater to local farms.*



94.    Until at least February 2025, the Port pumped high-nitrate wastewater to these farms year-round, including during the winter, when most fields lie fallow and no crops benefit from the water. Water land-applied in the winter is applied solely for purposes of disposal.

**b.    The Port regularly violates its wastewater discharge permits.**

95.    Given concerns regarding nitrate pollution, the Port's wastewater disposal is governed by permits that cap the total amount of nitrogen- and nitrate-heavy wastewater that may be discharged onto nearby farmland. The Port's current DEQ permit is Water Pollution Control Facilities Permit No. 102325, as modified by a November 2022 amendment. This permit, issued pursuant to ORS 468B.050 as a "water quality permit" and effective until November 30, 2027, allows it to store and discharge up to 3.6 billion gallons of industrial wastewater per year, of which no more than ten million gallons may be discharged per day. The permit also restricts the Port's discharge to a bounded geographic area of 10,140 acres across five farms in Morrow County: Madison Ranches, Mader-Rust Farm, and three farms owned by the Port itself (Farms 1, 2, and 3). Furthermore, the Port's permit limits the volume of wastewater the Port can apply to fields on each farm according to those fields' capacity to absorb nitrogen (this capacity is largely a function of the crops planted on each field). Pursuant to its current permit, the Port is required to comply with these discharge limitations and to affirmatively monitor its facilities and discharges to prevent pollution.

96.    The Port of Morrow is a repeat and unrepentant violator of its discharge permit. Between 2007 and 2011, the Port violated its permit 40 times: 9 times in 2007, 14 times in 2008, and 17 times in 2009.

97.    In 2011, the Oregon DEQ issued a Notice of Permit Violation to the Port, informing it that the "violations are of particular concern to the Department because the Port's land application sites are within the Lower Umatilla Basin Groundwater Management Area, which was established because of the nitrate-nitrogen pollution."

98.     Despite this warning, the Port did not change its behavior, and in fact grew more reckless. From 2012 through 2014, the Port violated its permit 158 times: 57 times in 2012, 46 times in 2013, and 55 times in 2014.

99.     In 2015, the Oregon DEQ fined Port of Morrow $279,400.00 for its wastewater permit violations between 2012 and 2014. The Notice of Civil Penalty Assessment and Order informed the Port that its permit "allows you to dispose of wastewater by applying it to land on the condition that nitrogen is not applied in excess of the agronomic loading rate in order to prevent nitrogen from entering the groundwater."[8] The Notice further explained:

> Your land application sites are located in a Groundwater Management Area so designated by DEQ because of nitrogen contamination. DEQ issued this penalty because discharging more nitrogen than allowed by your permit in a groundwater management area poses risk of significant environmental harm. Excess nitrogen can leach below the root zone and enter groundwater. Groundwater with high nitrogen concentration is a human health concern when used as drinking water.[9]

100.     But yet again, the Port was undeterred and continued its illegal dumping. Between 2015 and 2017, the Port discarded at least 526,000 pounds of nitrogen in excess of its permit. Additionally, in 2016, the Port violated its wastewater permit by constructing a waste storage lagoon without submitting plans or receiving approval from the Oregon DEQ. The DEQ fined the Port $8,400 for this violation.

---

[8] Linda Hayes-Gorman, Or. Dep't of Env't. Quality, *Notice of Permit Violation* at 1, No. WQ/I-ER-10-263, Permit No. 102325 (Feb. 2, 2011).

[9] Leah K. Feldon, Or. Dep't of Env't. Quality, *Notice of Civil Penalty Assessment and Order* at 1, Case No. WQ/I-ER-15-105 (Nov. 4, 2015).

101.     Between 2018 and 2021, the Port violated its permit at least 1,532 times by discarding excess nitrogen totaling 331,085 pounds. Also between 2018 and 2020, the Port violated its permit at least 363 times by failing to monitor crops at harvest for nitrogen removal.

102.     On January 10, 2022, the Oregon DEQ issued the Port another fine, this time of $1,291,551.00, for its violations from 2018 through 2021. The Notice of Civil Penalty Assessment and Order informed the Port that:

> DEQ issued this penalty because groundwater adversely impacted by the Port of Morrow's wintertime land application of nitrogen containing wastewater is used as drinking water by residents of the [LUBGWMA]. High nitrate concentrations in drinking water are linked with serious health concerns for infants and pregnant or nursing women. Relative to the state average, the population in the [LUBGWMA] has a high percentage of people who meet factors related to environmental justice, as defined by the U.S. Environmental Protection Agency (EPA). This includes race, income, education, language, and age.

103.     On January 28, 2022, the Port filed a Request for Contested Hearing and Answer to Port of Morrow's January 10, 2023, Notice of Civil Penalty Assessment and Order (the "Answer"). In its Answer, the Port stated that it did "not dispute" that it violated the permit by discarding wastewater on prohibited non-growing season dates and by failing to monitor crops at harvest for nitrogen removal. The Port further admitted that "the applications of wastewater described in paragraph 11.7 of the [DEQ's January 10, 2022, Notice] to fields where soil nitrate exceeded 30 pounds per acre in the fourth and fifth foot of soil were inconsistent with condition A(13)(C)(ii) of the Permit."

104.     And still, the Port remained undeterred from committing future violations. Between November 2021 and February 2022, the Port violated its permit at least 258 additional times by discarding nitrogen onto land at Farms 1, 2, and 3 and Madison Ranches in excess of its permit. In

2022, the Port discarded at least 192,000 pounds of nitrate onto land at Farms 1, 2, and 3 and Madison Ranches in excess of its Permit. It also violated Schedule A, Condition 8 of the Permit on 18 separate occasions by discarding nitrogen-containing wastewater onto fields after the nitrogen from all sources exceeded the agronomic rate for the crop grown.

105.    On June 17, 2022, the Oregon DEQ revised its January 10, 2022, fine upwards from $1,291,551.00 to $2,100,351.00 due to the Port's additional violations in 2022 and additional cited violations between 2018 and 2021. The DEQ determined the Port's conduct rose to the level of Class 1 violations—the most severe violations the DEQ can assess.

106.    Between May of 2022 and January of 2023, the Port continuously violated its permit by failing to report a leak from one of its wastewater pipes onto land at the corner of Lewis and Clark Drive and Oscar Peterson Drive in Boardman, Oregon. The Port was aware the wastewater pipe was discarding wastewater onto land, but the Port failed to report the leak to the DEQ for several months, until January 19, 2023, even though the Port's permit required it to report wastewater leaks within 24 hours. In a letter the Port wrote to the DEQ on January 19, 2023, the Port conceded that the leak discarded 25 to 50 gallons of industrial wastewater per minute on the surrounding land.

107.    In November 2022, the Port violated Schedule B, Condition 5 of its permit by failing to conduct effluent monitoring for total suspended solids.

108.    Between November 2022 and January 2023, the Port violated its permit at least 748 times by discarding excess nitrogen onto land at Farms 1, 2, and 3, and Madison Ranches. During that same timeframe, the Port also violated its permit at least 41 times by allowing moisture and nutrients from its applied industrial wastewater to leach beyond the fifth foot of the soil column at these farms.

*Pearson, et al. v. Port of Morrow, et al.*    - 30 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

109.    Throughout 2023, the Port violated Schedule A, Condition 7 of its permit by improperly discarding wastewater via leaks in several wastewater pipelines, including: the wastewater pipeline from the South Lift Station to Pond 41; the wastewater pipeline passing through Circle 319; the wastewater feeder pipeline serving Circle 320; two separate leaks in the Sand Dune wastewater pipeline; a pump leak at the Digest #3 cell; a leak in the south lift line; an irrigation mainline break at Farm 3, Circle 330; and a leak in the south lift line near the pump station.

110.    The Port continued its rampant violations in the winter of 2023–2024. Between November 1, 2023, and January 11, 2024, the Port accrued at least 395 additional violations. And in February 2024 alone, the Port violated its permit 486 times. It applied wastewater to area fields just 543 times that month, meaning that almost every time it made a wastewater application, it dumped more water than its permit allows—and it did so during the non-growing season. And it committed these consistent violations despite having millions of gallons' worth of space available in its storage lagoons.



*Image 8. The Port discarding wastewater onto an empty field in December 2023.*



***Image 9. Pools of nitrogen-heavy wastewater caused by a leak in a Port of Morrow pipeline.***



111.    The Port has no intention of ending its ongoing violations. In 2024, the Port's executive director, Lisa Mittesldorf, indicated that the Port would continue to violate its permit because "there is no alternative short of closing processing plants."[10] Even DEQ admitted that it "expect[ed] the port will commit more violations."[11] And as recently as September 2025, DEQ fined the Port for additional permit violations, including applying wastewater on fields during the non-growing season.[12]

---

[10] Monica Samayoa, *Port of Morrow Continues to Apply Excess Nitrates on Farmland, Misses Payment Deadline*, OREGON PUBLIC BROADCASTING (Jan. 27, 2024), https://www.opb.org/article/2024/01/26/nitrate-pollution-port-of-morrow-groundwater-environment-drinking-oregon-boardman/.

[11] Monica Samayoa, *Oregon increases Port of Morrow groundwater pollution fine to $2.1 million*, OREGON PUBLIC BROADCASTING (Jan. 27, 2024), https://www.opb.org/article/2024/01/26/nitrate-pollution-port-of-morrow-groundwater-environment-drinking-oregon-boardman.

[12] Alejandro Figueroa, *Oregon DEQ again fines Port of Morrow for wastewater violations*, OREGON PUBLIC BROADCASTING (Sept. 30, 2025), https://www.opb.org/article/2025/09/30/oregon-port-of-morrow-deq-department-environmental-quality-wastewater-nitrate-nitrates.

## 2.    Lamb Weston

112.    Lamb Weston operates a major food processing facility at the Port of Morrow, where it processes potatoes for commercial use and conveys wastewater to the Port of Morrow. Lamb Weston also owns approximately 1,180 acres of land and operates an industrial wastewater treatment and disposal system in Umatilla County.

113.    Lamb Weston takes wastewater generated by its potato processing operations and "land-applies" it on its farmland. This potato-processing wastewater is high in nitrogen.

114.    Without first removing nitrogen from the wastewater, Lamb Weston "recycles" the wastewater by pumping it from its processing facility to area farms and spraying it onto the land.

115.    Lamb Weston has pumped high-nitrogen wastewater to nearby farms year-round, including during the winter, when most fields lie fallow and no crops benefit from the nitrogen.

116.    Given concerns regarding nitrate pollution, wastewater processing facilities like those operated by Lamb Weston are governed by permits that cap the total amount of nitrogen-heavy wastewater that may be discharged onto nearby farmland.

117.    Lamb Weston's current DEQ permit is Water Pollution Control Facilities Permit No. 101326. This permit, issued pursuant to ORS 468B.050, allows Lamb Weston to operate a wastewater treatment facility at 78153 Westland Road, Hermiston, Oregon 97838. Lamb Weston has constructed large wastewater ponds at this facility in which it stores millions of gallons of industrial wastewater, including its own wastewater as well as wastewater produced by other nearby industrial entities. A system of pumps and pipes then transports this wastewater from the storage ponds to two farms—one owned by Lamb Weston itself and the other owned by Madison Ranches—where Lamb Weston disposes of the wastewater via land application. Lamb Weston's

wastewater permit requires compliance with nitrogen discharge limitations and also requires Lamb Weston to affirmatively monitor its facilities and discharges to prevent pollution.

118.    Since 2015, Lamb Weston has violated its permit at least 90 times: 11 times in 2015, 20 times in 2016, 6 times in 2017, 14 times in 2018, 18 times in 2019, 18 times in 2020, and 3 times in 2021. In total, Lamb Weston dumped more than 220 tons of excess nitrates to nearby farmland. DEQ has fined Lamb Weston $127,800 for those violations.[13]

119.    DEQ has referred to Lamb Weston's decision to allow unpermitted nitrogen onto farmland in the LUBGWMA as "negligent," saying  the company "failed to take reasonable care to avoid the foreseeable risk of committing the violation."[14]

120.    Notably, Lamb Weston sought to hide its violations: despite a reporting requirement, it failed to notify DEQ of the violations for years. DEQ only discovered the violations while preparing to issue a permit renewal to the company.[15]

121.    Lamb Weston's decision to violate its permits repeatedly is particularly notable because it is aware that nitrate contamination is a significant issue in the LUBGWMA. In 2023, Lamb Weston supported the formation of a nonprofit group called Water for Eastern Oregon, which bills itself as a coalition of businesses seeking "science-based" solutions to the nitrate contamination problem in the LUBGWMA.[16]

---

[13] Alex Baumhardt, *DEQ Fines Lamb Weston in Hermiston $127,000 for Nitrogen Pollution*, OREGON CAPITAL CHRONICLE (Sept. 27, 2022), https://oregoncapitalchronicle.com/2022/09/27/deq-fines-lamb-weston-in-hermiston-127000-for-pollution.

[14] *Id.*

[15] *Id.*

[16] Taking Action, H2OEO, https://www.h2oeo.org/. (last visited Jan. 16, 2026).

*Pearson, et al. v. Port of Morrow, et al.*    - 34 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

122.    In 2024, the chairman of the group published an opinion column in the East Oregonian acknowledging that "nitrate in groundwater" was a "challenge" in the LUBGWMA, and that "testing wells" and "providing immediate assistance for people affected by nitrates" was necessary.

123.    In addition to contributing to the nitrate pollution by land-applying industrial wastewater, on information and belief Lamb Weston also contributes to nitrate contamination in the LUBGWMA through the application of excess fertilizer to its farmland.

124.    According to the DEQ, nearly 70% of nitrate contamination in the LUBGWMA groundwater is from irrigated farmland. Farms rely on nitrogen fertilizer to help increase crop yields. But there is an upper limit to the amount of nitrogen that crops can recover (this is known as the "agronomic rate"). Beyond that limit, any excess nitrogen leaches into the soil, where it converts into nitrates that contaminate groundwater. Farmers exercising reasonable care to avoid contaminating groundwater would not apply nitrogen to crops beyond the agronomic rate.

125.    In total, farms (including Lamb Weston) apply nearly 23 million pounds of nitrogen to fields in the LUBGWMA each year. DEQ estimates that 10% of nitrogen that farms apply leaches to groundwater. Relying on this 10% leaching estimate—which is significantly more conservative than other estimates—this means farms in the area, including Lamb Weston, cause almost 2.3 million pounds of nitrogen to leach into the soil every year.

### 3.    Madison Ranches

126.    Madison Ranches operates a 17,000-acre farm in Morrow and Umatilla Counties.

127.    Madison Ranches is aware that it operates in a Groundwater Management Area and that nitrate contamination of groundwater is a serious problem: Jake Madison, the president of Madison Ranches, is a member of the LUBGWMA Advisory Committee.[17]

128.    Nevertheless, Madison Ranches contributes to the nitrate problem in the LUBGWMA, both by partnering with other entities (including the Port of Morrow, Lamb Weston, and the City of Portland) to dispose of their high-nitrate waste, and by over-applying fertilizer to their farmland.

129.    In 2024, the Port of Morrow and Madison Ranches negotiated a "Water Delivery and Application Agreement,"[18] but the two entities had been partners for many years before that. Madison Ranches either land-applies high-nitrogen Port of Morrow wastewater on Farm 4, or it allows the Port to land-apply high-nitrogen Port wastewater on Farm 4. Whether Madison Ranches or the Port is in control of the spigots, Madison Ranches contributes to groundwater nitrate contamination by allowing a polluter like the Port of Morrow to use its land for wastewater disposal.

130.    Madison Ranches allows the Port of Morrow to dispose of high-nitrogen wastewater on its land year-round, including in the winter, when most fields lie fallow and no crops benefit from the nitrogen. This winter dumping is done purely for purposes of disposal. DEQ has fined the Port of Morrow repeatedly for disposing of excess nitrogen on Madison Ranches's land, including in the winter.

---

[17] LUBGWMA Advisory Committee, LUBGWMA.ORG, https://lubgwma.org/advisorycommittee (last visited Jan. 15, 2026).

[18] Port of Morrow Special Commission Meeting Minutes, November 25, 2024.

131. The Port of Morrow is not Madison Ranches's only partner in pollution. Madison Ranches also allows Lamb Weston to pump some of its high-nitrogen wastewater to Madison Ranches for disposal, including in the winter.

132. Madison Ranches does not pay the Port of Morrow or Lamb Weston for the wastewater that is dumped on its land.

133. In addition to its partnerships with the Port and Lamb Weston, Madison Ranches also disposes of "biosolids," or solid derivates of sewage sludge, from the city of Portland. Biosolids include nitrogen, and Madison Ranches land-applies these biosolids on its LUBGWMA land despite the fact that it is located in a Groundwater Management Area. Madison Ranches has land-applied Portland biosolids on its land since the early 1990s.

134. On information and belief, Madison Ranches also contributes to nitrate contamination in the LUBGWMA through the application of excess fertilizer to its farmland. As noted above, farms in the LUBGWMA apply nearly 23 million pounds of nitrogen to fields in the area each year, causing almost 2.3 million pounds of nitrogen to leach into the soil annually.

135. Madison Ranches's decision to allow its land to be used as a dumping ground for waste generated by the Port of Morrow, Lamb Wetson, and the city of Portland, as well as its use of excess nitrogen fertilizer, has caused nitrate contamination in groundwater downgradient of Madison Ranches's land application sites.

### 4. Threemile

136. Threemile maintains 39,500 acres of irrigated farmland as well as a dairy operation.

137. The Threemile dairy empire consists of at least three CAFOs: Columbia River Dairy, Threemile Heifer Facility, and Sixmile Dairy. Milk produced at these dairies is trucked to Tillamook, which buys all of Threemile's milk.

*Pearson, et al. v. Port of Morrow, et al.*    - 37 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

138.    Threemile's herd includes almost 70,000 cattle, which generate millions of gallons of liquid waste each year. Threemile collects this waste, stores it in open lagoons, and sprays (or "land-applies") it on Threemile's farmland. Threemile land-applies animal waste year-round, including during the non-growing season. Waste that is land-applied during the non-growing season is applied purely for disposal purposes.

139.    Threemile routinely disposes of high-nitrogen effluent by applying the effluent to its farmland in excess of a given crop's agronomic rate. For example, one of the crops to which Threemile applies effluent is wheatlage. The agronomic rate of nitrogen derived from effluent water for wheatlage is 245 pounds per acre. On November 8, 2023, Threemile applied 284 pounds of nitrogen per acre to a field of wheatlage known as Field 0034 in a single application.

140.    Another crop to which Threemile applies effluent is organic dry corn. The agronomic rate of any type of organic corn is no more than 260 pounds of nitrogen per acre. On April 19, 2023, Threemile deposited 267.19 pounds of nitrogen per acre in a single application on Field 0125. On another field of organic dry corn, a 29.5-acre field referred to as Field 0655, Threemile applied effluent three times in the last three months of 2023. On October 25, 2023, it applied 51.036 pounds of nitrogen per acre to the field. On November 2, 2023, it again applied 51.036 pounds of nitrogen per acre to the field. On December 14, 2023, it applied 431.847 pounds of nitrogen per acre to the field. The total nitrogen load of 533.919 pounds of nitrogen per acre that Threemile applied to Field 0655 was more than twice the agronomic rate of 260 pounds per acre.

141.    Threemile's over-fertilization of its crops contributes to nitrate contamination in the LUBGWMA through the application of excess fertilizer to its farmland.

142.    On information and belief, Threemile has also discharged manure and wastewater via leaks, spills, and overflows from storage lagoons. In 2004, Oregon Department of Agriculture inspectors found evidence of overflow from two emergency ponds at Threemile. Given Threemile's continued violations of its permit, there is reason to believe that leaks, spills, and overflows have continued through the present.

143.    Like Lamb Weston, Threemile is aware that nitrate contamination is a significant issue in the LUBGWMA because Threemile also supported the formation of the nonprofit Water for Eastern Oregon in 2023.

### 5.    PGE

144.    PGE operates a power plant known as Coyote Springs at the Port of Morrow. PGE Coyote Springs generates an estimated 900 million gallons of industrial wastewater each year from a combination of cooling tower wastewater, boiler blowdown water, and wash water.

145.    PGE's wastewater is extremely high in nitrates. From 2019 to 2022, PGE's wastewater had an average nitrate concentration of 38.9 mg/L, almost four times higher than the EPA's maximum contaminant level.

146.    Rather than properly discarding this wastewater, PGE sends it to the Port of Morrow, even though PGE knows the Port routinely violates the permit that governs its wastewater disposal.

147.    The Port's failure to comply with its permits is a regular topic of local news. For example, on June 10, 2022 (just three days after Morrow County declared a local state of emergency on June 7, 2022 because private wells in the county were showing dangerous levels of nitrate contamination), an Oregon Public Broadcasting article noted that earlier in 2022, DEQ had "fined the Port of Morrow $1.3 million for overapplying 165 tons of nitrogen-rich wastewater onto

*Pearson, et al. v. Port of Morrow, et al.*    - 39 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

agricultural fields over a four-year period and failing to monitor the nitrate contamination."[19] In response, the Port released a public statement saying it was "considering millions of dollars in upgrades to reduce pollution and [was] eager to play a role in finding workable solutions" to the nitrate contamination problem.[20]

148.    On June 17, 2022, DEQ announced that it had identified an additional 626 permit violations in the winter months of November 2020 to February 2022 and added $800,000 to the Port's fine. News outlets reported that the total $2.1 million fine was the second largest in DEQ's history, and that the Port had violated its permit more than 2,000 times between 2018 and 2022.[21]

149.    PGE must have been aware of this news. Nevertheless, despite knowing that the high-nitrate wastewater PGE transfers to the Port will be improperly managed, PGE continues partnering with the Port to discard its wastewater.

### 6.    Columbia River Processing

150.    Columbia River Processing (hereinafter "Tillamook") operates a cheese production facility at the Port of Morrow. Tillamook's facility generates an estimated 360 gallons of wastewater each year from a combination of cheese byproducts and tank wash water.[22]

---

[19] Monica Samayoa, *Morrow County Declares Emergency over High Nitrate Levels in Wells*, OREGON PUBLIC BROADCASTING (June 10, 2022), https://www.opb.org/article/2022/06/10/morrow-county-state-of-emergency-drinking-water-contamination-nitrate-levels.

[20] *Id.*

[21] Monica Samayoa, *Port of Morrow Continues to Apply Excess Nitrates on Farmland, Misses Payment Deadline*, OREGON PUBLIC BROADCASTING (June 17, 2022), https://www.klcc.org/2022-06-17/oregon-increases-port-of-morrow-groundwater-pollution-fine-to-2-1-million.

[22] Port of Morrow Operations, Monitoring, and Management Plan – Revision 2 at 2-8 (Sept. 2023).

151.    Tillamook's wastewater is very high in nitrates. From 2019 to 2022, Tillamook's wastewater had an average nitrate concentration of 24 mg/L—more than twice the EPA's maximum contaminant level.[23]

152.    In addition to producing its own wastewater at its production facility, Tillamook sources the milk used to make its cheese from Threemile Canyon Farms, a "megadairy" in Boardman that houses almost 70,000 head of cattle. Threemile land-applies high-nitrogen waste from its dairy operation to its farmland, often well in excess of the agronomic rate for nitrogen.

153.    Tillamook knows that Threemile land-applies animal waste in the LUBGWMA. In 2020, it described Threemile as a "best-in-class business partner[]" and noted that Threemile operates "a closed-loop farm" where cow manure "goes back into crops"—i.e., is land-applied.

154.    Threemile would not exist if not for Tillamook. Threemile began operation in 2001, "to supply milk to the Tillamook County Creamery Association's new Boardman cheese factory."[24] Threemile currently produces about 2.5 million pounds of milk every day, and Tillamook buys it all. Threemile has increased the number of cattle it houses as Tillamook's Boardman operation has expanded. And as Threemile and Tillamook have gotten bigger, nitrate contamination in the LUBGWMA has gotten worse.

155.    Like both Lamb Weston and Threemile, Tillamook is aware that nitrate contamination is a significant issue in the LUBGWMA because Tillamook also supported the formation of the nonprofit Water for Eastern Oregon in 2023.

---

[23] *Id.* at 2-13.

[24] Tracy Loew, *Manure Is Big Business at Oregon's Largest Dairy with Conversion to Natural Gas*, EQUILIBRIUM, (Jan. 29, 2025), https://eq-cap.com/manure-is-big-business-at-oregons-largest-dairy-with-conversion-to-natural-gas.

156.    And, like PGE, Tillamook must have been aware since at least 2022 that the wastewater it sends to the Port is improperly discarded. Nevertheless, despite knowing that its wastewater will be improperly managed, Tillamook continues partnering with Threemile to supply its milk and with the Port to discard its wastewater.

**E.    Defendants' discarded waste causes widespread nitrate contamination in LUBWGMA groundwater.**

**1.    Nitrogen in Defendants' wastes convert to nitrates in the soil, and these nitrates percolate rapidly down to LUBGWMA groundwater.**

157.    After being dumped onto land in the LUBGWMA, nitrogen in Defendants' wastes permeate the soil. A microbial process converts nitrogen in the soil into nitrates within weeks.

158.    Nitrates in the soil move with water flow. Some soils, including those that are coarse-grained and sandy—like those in the LUBGWMA—are particularly susceptible to nitrate leaching. As a result, the LUBGWMA has a high nitrate leaching potential, as illustrated on the map below.

*Image 10: Nitrate leaching potential in the LUBGWMA.*



*Pearson, et al. v. Port of Morrow, et al.*    - 42 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

159.    Nitrates in LUBGWMA soil percolate rapidly past the water table (the underground boundary between the soil surface and groundwater), reaching the groundwater in just a matter of days.

### 2.    Nitrates from Defendants' discarded waste spread underground and contaminate vast swaths of LUBGWMA groundwater.

160.    Once nitrates from Defendants' discarded wastes reach LUBGWMA groundwater, they flow, along with the groundwater itself, in accordance with the underlying hydrogeology of the area. Groundwater moves from areas of higher elevation and water pressure to areas of lower elevation and pressure along a predictable route (that is, the water moves "downgradient").

161.    The map below illustrates the reach of nitrates that result from Defendants' improper disposal of their nitrogen-heavy wastes. The locations where Defendants' nitrogen-heavy waste is land-applied are outlined in pink. The shaded areas represent the portions of the LUBGWMA that are downgradient of these dumping sites and are affected by nitrates caused by Defendants' dumping.[25]

---

[25] A larger version of this map is included as **Exhibit A**.

*Pearson, et al. v. Port of Morrow, et al.*     - 43 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

*Image 11: Class Area*



**F.    Plaintiffs and Class members draw their water from areas downgradient of Defendants' dumping sites.**

162.    Plaintiffs and other Class members rely on water drawn from groundwater downgradient of Defendants' dumping grounds. The map below superimposes Plaintiffs' home addresses onto the map showing the areas of the LUBGWMA each Defendant has contaminated.[26]

---

[26] A larger version of this map is included as **Exhibit B**.

*Image 12: Class Area with Plaintiffs' addresses superimposed.*

163.    Defendants' dumping has contaminated Plaintiffs' and Class members' water, causing substantial harm to Plaintiffs and other Class members whose water is drawn from areas downgradient of Defendants' dumping sites.

**1.      Plaintiffs Pearson, Cavasos, Fleming, and Haley draw their water from areas downgradient of the Port's dumping sites.**

164.    The Port dumps nitrogen-heavy wastewater that it collects from its tenants, including Lamb Weston, PGE, and Tillamook, onto Farms 1, 2, 3, 4, and 5.

165.    Nitrates from the Port's wastewater have percolated into groundwater and moved downgradient, affecting the water on which Plaintiffs Pearson, Cavasos, Fleming, and Haley rely.

*Pearson, et al. v. Port of Morrow, et al.*     - 45 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

166. Plaintiff Pearson's home is downgradient of Farms 1 and 2. Nitrates from Farms 1 and 2 contaminate his home's well water.

167. Plaintiff Cavasos relies on the City of Boardman's public water system for her water. Among other wells, the City of Boardman draws the water it sends to its clients, including Plaintiff Cavasos, from a site located off Marine Drive, in northeast Boardman. That well is downgradient of Farm 1 and Farm 2 and is contaminated with nitrates from these Farms.

168. Plaintiff Fleming's home is downgradient of Farm 3. Nitrates from Farm 3 contaminate his home's well water.

169. Plaintiff Haley relies on the City of Irrigon's public water system for his water. Among other wells, the City of Irrigon draws the water it sends to its clients, including Plaintiff Haley, from a well located on West 4th Street in Irrigon and from a well located between Steagal Lane and the Columbia River. Both wells are downgradient of Farm 3 and so are contaminated with nitrates from this Farm.

**2.    Plaintiff Blodgett draws her water from areas downgradient of Madison Ranches's dumping sites.**

170. Madison Ranches dumps nitrogen-heavy wastewater onto land in the LUBGWMA.

171. Nitrates from Madison Ranches's wastewater have percolated into groundwater and moved downgradient.

172. Plaintiff Blodgett's home is downgradient of Madison Ranches's dumping site. Nitrates from Madison Ranches's wastewater contaminate Plaintiff Blodgett's well water.

**3.    Plaintiffs Silvia and James Suter draw their water from areas downgradient of Threemile's dumping sites.**

173. Threemile dumps nitrogen-heavy wastes onto land in the LUBGWMA.

174. Nitrates from Threemile's nitrogen-heavy wastes have percolated into groundwater and moved downgradient.

175. Plaintiffs Silvia and James Suter's home is downgradient of Threemile's dumping sites. Nitrates from Threemile's wastes contaminate the Suters' well water.

**G. Defendants' dumping has harmed Plaintiffs and Class members.**

**1. Defendants have harmed Plaintiffs and Class members who rely on water from private wells.**

176. Defendants' actions have directly and proximately caused significant expenses and inconveniences to Plaintiffs Pearson, Fleming, James and Silvia Suter, Blodgett, and other Class members who rely on private wells downgradient of Defendants' dumping sites.

177. Plaintiffs and well-reliant Class members can no longer safely use the tap water in their homes because Defendants have contaminated this water with nitrates. Instead, they must rely on bottled water deliveries for all their daily water needs.

178. The nitrate contamination has also diminished the value of residents' property, which is less valuable because they no longer have easy access to clean water.

179. In addition, Plaintiffs and well-reliant Class members have suffered physical harm as a result of ingesting water high in nitrates. As described above, exposure to excess nitrates causes significant health problems, including cancer and birth defects. Even Class members who have not developed severe diseases, like cancer, have been harmed at a cellular level as a result of their exposure to nitrate in excess of 10 mg/L.

**2.    Defendants have harmed Plaintiffs and Class members who rely on water from public wells.**

180.    Defendants' actions have directly and proximately caused significant expenses and inconveniences to Plaintiffs Cavasos, Haley, and other Class members who rely on public water systems that draw on water downgradient of Defendants' dumping sites.

181.    Although public water is treated to remove nitrates and so is usually safe to drink, this assurance comes at a price: public water systems that draw from the affected areas must spend money to remove nitrates from groundwater before sending the water on to consumers. These nitrate removal processes are expensive. Building a mid-sized nitrate treatment plant costs $10 to $15 million,[27] and running a nitrate removal plant costs several hundred dollars per day.[28]

182.    Public water systems recoup the costs of nitrate removal by passing those costs along to consumers, including Plaintiffs Cavasos and Haley as well as other Class members who rely on public water. On average, people who live in areas with high levels of nitrate in the local water system pay more than $600 per year extra compared to people who live in areas with low nitrate concentrations, reflecting the cost of removing the nitrate from the water.[29] On information and belief, Plaintiffs Cavasos and Haley and other Class members' water bills are several hundred dollars higher per year than they would be absent nitrate contamination caused by Defendants.

---

[27] Northeast-Midwest Institute, *NEMWI Releases New Study on the Cost of Nitrate Treatment*, https://www.nemw.org/nemwi-releases-new-study-on-the-cost-of-nitrate-treatment-in-the-mississippi-river-basin (last visited Jan. 16, 2026).

[28] KCCI, FACEBOOK (July 2, 2025), https://www.facebook.com/watch/?v=10019333441476840.

[29] Emily Moon, *The Cost of Cleaning Up Nitrate Contamination Falls on America's Poorest Counties,* PACIFIC STANDARD (Oct. 2, 2018), https://psmag.com/news/the-cost-of-cleaning-up-nitrate-contamination-falls-on-americas-poorest-counties.

*Pearson, et al. v. Port of Morrow, et al.*    - 48 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

**H.      Mitigating the harm Defendants have caused will require significant resources.**

183.    Fully remediating the LUBGWMA and removing nitrate from the groundwater itself is a difficult and expensive task that may take decades to achieve. Mitigating the harm Defendants have caused—and continue to cause—to Plaintiffs and Class members should therefore focus on ensuring Defendants stop contributing additional nitrate pollution to the LUBGWMA. Mitigation should also ensure that all households have access to clean tap water, that people who have ingested high levels of nitrate-contaminated water have access to a medical monitoring program, and that people who have paid more for access to public water systems than they would have absent Defendant's disposal of their wastewater are properly compensated.

**1.      Mitigating harm to well-reliant Plaintiffs and Class members.**

**a.      Ensuring access to clean tap water.**

184.    For a majority of well-reliant households within the geographic areas affected by Defendants' nitrate pollution, the most effective means of ensuring access to clean tap water is to connect these households to a public water system. Plaintiffs estimate that connecting to a nearby public water system will cost an average of $40,000 per household. In addition, paying for access to public water will cost each household about $1,000 per year—a cost Plaintiffs and other Class members who rely on private wells would not need to pay if they were able to continue relying on well water.

185.    For households that are too far from a public water system for a hookup to be practical, the best solution is to drill deeper wells to bypass the contaminated alluvial layer and reach the clean water in the underlying basalt layer. Drilling these deeper wells will cost an average of $40,000 per well.

*Pearson, et al. v. Port of Morrow, et al.*    - 49 -
Corrected Second Amended Class Action Complaint

### b.     Medical monitoring

186.     A medical monitoring program should also be established for Class members who draw their water from private wells. A medical monitoring program that focuses on early detection and advances in treatment of diseases related to chronic nitrate exposure would benefit not only Plaintiffs and Class members, but also the broader public: such a program would improve the medical community's understanding of the effects of chronic nitrate exposure and the best treatments for concomitant illnesses.

### 2.     Mitigating harm to Plaintiffs and Class members who rely on public water.

187.     As described above, Plaintiffs and Class members who rely on public water are often assured that their water is safe to drink. Mitigating the harm these individuals have suffered will require compensation for the hundreds of dollars per year they spend, and will continue to spend, to ensure continued access to clean drinking water.

### III.     CIVIL CONSPIRACY ALLEGATIONS

188.     Defendants have participated in a civil conspiracy to engage in economic activity using methods that pollute groundwater in the LUBGWMA. All Defendants are therefore liable to all members of the class for damages suffered as a result of the conspiracy.

189.     Defendants Tillamook, PGE, Lamb Weston, the Port of Morrow, and Madison Ranches have cooperated in the objective of disposing of high-nitrate wastewater generated by the Port of Morrow's tenants.

190.     Defendants Tillamook, PGE, Lamb Weston, the Port of Morrow, and Madison Ranches have had a meeting of the minds as to that objective and the course of action by which it will be accomplished, as evidenced by Tillamook, PGE, and Lamb Weston's lease agreements with the Port of Morrow and the long-running course of conduct by which Port of Morrow tenants

Tillamook, PGE, and Lamb Weston send their high-nitrogen wastewater to the Port of Morrow, and it is subsequently dumped on land belonging to the Port of Morrow or Madison Ranches, often in the winter and/or in excess of agronomic rates.

191.    Lamb Weston and Madison Ranches also cooperate in the disposal of high-nitrogen wastewater because Lamb Weston pumps some of the wastewater it does not send to the Port of Morrow to Madison Ranches' land, where it is land-applied.

192.    Tillamook, PGE, Lamb Weston, the Port of Morrow, and Madison Ranches have taken multiple unlawful acts in furtherance of their objective, including but not limited to repeated land applications of high-nitrate wastewater on land owned by the Port of Morrow, Lamb Weston, and Madison Ranches, as detailed above.

193.    Threemile and Tillamook have cooperated in the objective of producing milk to supply Tillamook's Boardman facility, and they have had a meeting of the minds as to that objective and the course of action by which it will be accomplished, as evidenced by Tillamook's public statements that the massive amounts of high-nitrogen manure generated by Threemile's operations "go[] back to the crops" (i.e., are land-applied). Threemile has taken unlawful acts in furtherance of that objective, including but not limited to repeated land applications of high-nitrogen wastewater in excess of the agronomic rate for a given crop, as detailed above.

194.    As a result of the unlawful acts described above, Plaintiffs and the Class have suffered injuries and will continue to suffer injuries, including (for users of public water systems) increased water prices and (for users of domestic wells) a reduction in property values, the inconvenience associated with being unable to use tap water for drinking and cooking, cellular damage caused by exposure to nitrates, and an increased risk of developing life-threatening illnesses, including cancer.

*Pearson, et al. v. Port of Morrow, et al.*     - 51 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

195. Given the publicity surrounding the Port of Morrow's repeated permit violations and the effect those violations had on groundwater quality in the LUBGWMA, Tillamook, PGE, Lamb Weston, Madison Ranches, and Threemile knew that their illegal wastewater disposal constituted a breach of their duties to Plaintiffs and the Class. However, Tillamook, PGE, and Lamb Weston continued to convey hundreds of millions of gallons of high-nitrate wastewater to the Port, even after the Port had been repeatedly fined by DEQ for violating its wastewater permit. Madison Ranches continued to make its land available as a land application site for the Port and Lamb Weston. And Tillamook continued to source milk from Threemile, even as it praised Threemile for land-applying high-nitrogen animal waste to its land.

196. Defendants are aware of the injuries they are inflicting on Plaintiffs and the Class, and they have acted in concert to deflect attention from their role in nitrate pollution in the LUBGWMA and to advocate for "solutions" that will not require them to change their harmful practices.

197. In 2023, Tillamook, Threemile, Lamb Weston, and three other area corporations formed "Water for Eastern Oregon," a nonprofit organization that bills itself as seeking "a 'science-based' solution" to nitrate contamination in the LUBGWMA but largely serves as a public relations arm for local industry.[30]

198. In 2024, Michael Graham, the chairman of Water for Eastern Oregon and the director of Tillamook's Boardman plant, published an opinion column in the *East Oregonian* acknowledging that "nitrate in groundwater" was a "challenge" in the LUBGWMA, and that

---

[30] Antonio Sierra, *Oregon Agriculture Companies offer Help with Lower Umatilla Basin Nitrate Pollution, But Skeptics Remain*, OREGON PUBLIC BROADCASTING (Jan. 24, 2024), https://www.opb.org/article/2024/01/24/water-pollution-nitrate-eastern-oregon-environment-well-groundwater-umatilla-morrow-.

"providing immediate assistance for people affected by nitrates" was necessary. But he did not call for area corporations (including founding members Threemile, Tillamook, and Lamb Weston) to stop land application of high-nitrogen wastewater.

199.    In 2025, when the Oregon legislature was considering legislation that would have given state agencies more authority to curb pollution in groundwater management areas, Water for Eastern Oregon supported an amendment to the legislation that removed state agencies' ability to modify permits for wastewater reuse and CAFOs to protect groundwater quality.[31]

## IV.    CLASS ALLEGATIONS

200.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of all individuals who rent or own property that is supplied with water by wells that are located downgradient of Farms 1, 2, 3, 4 and 5; Lamb Weston; Madison Ranches; and/or Threemile, as depicted in the map below (see **Exhibit A** for a larger version):[32]

---

[31] Alex Baumhardt, *Environment, social justice groups withdraw support for governor's key groundwater protection bill*, Oregon Capital Chronicle (June 10, 2025), https://oregoncapitalchronicle.com/2025/06/10/environment-social-justice-groups-withdraw-support-for-governors-key-groundwater-protection-bill/ (last visited Jan. 15, 2026).

[32] If for any reason Plaintiffs fail to establish that each Defendant is liable to each member of the Class, *see* Section IV *infra*, Plaintiffs will seek certification of subclasses defined by geography, with Plaintiffs Pearson, Cavasos, Fleming, Haley, and Blodgett representing a class of all persons who rent or own property that is supplied with water by wells that are located downgradient of Farms 1, 2, 3, 4, or 5; Plaintiff Blodgett representing a class of all persons who rent or own property that is supplied with water by wells that are located downgradient of Madison Ranches; and Plaintiffs Mr. and Mrs. Suter representing a class of all persons who rent or own property that is supplied with water by wells that are located downgradient of Threemile.

*Image 13: Class Area*



201.    Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the district judge(s) presiding over this matter and the clerks of said judge(s).

**A.    All requirements of Fed. R. Civ. P. 23(a) are met.**

202.    A class action is warranted in this case because the members of the Class are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Class; the claims of the representative parties are typical of the claims of the Class; and the Plaintiffs named in this Complaint will fairly and adequately protect the interests of the Class.

203.    **Numerosity**: Class members are so numerous (thousands total) that joinder of all Class members in a single proceeding would be impracticable. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

204.    **Commonality**: Plaintiffs' claims are common to all members of the Class, and individual complaints otherwise may result in inconsistent or varying adjudications.

205.    **Typicality**: The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

206.    **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that Plaintiffs have no interests adverse to, or that conflict with, the Class which Plaintiffs seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

**B.    All requirements of Fed. R. Civ. P. 23(b)(3) are met.**

207.    In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), this case qualifies for class action treatment because questions of law or fact common to the Class predominate over any questions affecting only individual Class members, and because a class action suit is superior to other available methods for adjudicating the controversy.

208.    **Predominance**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, but are not limited to:

a)  Whether nitrate contaminates the groundwater on which Plaintiffs and Class members rely;

*Pearson, et al. v. Port of Morrow, et al.*    - 55 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

b) Whether Defendants' operations have caused nitrate to contaminate the groundwater on which Plaintiffs and Class members rely;

c) Whether the measures Defendants have implemented (if any) to prevent nitrate from contaminating the groundwater on which Plaintiffs and Class members rely are effective and sufficient;

d) Whether Defendants have violated the Resource Conservation and Recovery Act;

e) Whether Defendants breached a duty of reasonable care in their operations by allowing nitrates to contaminate the groundwater on which Plaintiffs and Class members rely;

f) Whether Defendants trespassed on Plaintiffs' and other Class members' property;

g) Whether Defendants created a nuisance by unreasonably interfering with Plaintiffs' and Class members' use and enjoyment of their properties;

h) Whether Plaintiffs and the Class members are entitled to equitable relief, including, but not limited to, injunctive relief and medical monitoring; and

i) Whether Plaintiffs and other Class members are entitled to damages and other monetary relief and, if so, in what amount.

209.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members, while substantial, are small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. And, even if Class members could afford individual litigation, the court system could not. Individualized litigation creates the potential for inconsistent or contradictory judgments and

increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

210. In the alternative, Plaintiffs seek class certification as to particular issues permitted under Fed. R. Civ. P. 23(c)(4). Plaintiffs seek certification as to common questions related to the impact of nitrates released by Defendants, and Defendants' responsibility for those releases.

**COUNT I:**
**RESOURCE CONSERVATION AND RECOVERY ACT,**
**42 U.S.C. § 6972(A)(1)(B)**
(By all Plaintiffs against all Defendants)

211. Plaintiffs reallege and incorporate by reference the above paragraphs.

212. 42 U.S.C. § 6972(a)(l)(B), under which Plaintiffs bring this claim, is RCRA's citizen enforcement provision. Section 6972(a)(l)(B) authorizes "any person" to seek redress in federal court for risks posed to public health and the environment by "hazardous wastes" and "solid wastes," so long as the defendant falls within one of the categories of entities that Congress declared liable under § 7002(a)(l)(B). Included in § 7002(a)(l)(B) are entities that generated; transported; owned or operated a treatment, storage, or disposal facility; or contributed to "past or present handling, storage, treatment, transportation, or disposal" of the "solid wastes" at issue.

213. Defendants' industrial waste, excess nitrogen fertilizer, and animal waste are "solid wastes" within the meaning of 42 U.S.C. § 6903(27) because the waste is discarded material resulting from Defendants' industrial operations. Defendants' industrial waste is also hazardous waste within the meaning of 42 U.S.C. §6093(5) because the waste contains high levels of nitrates, which pose a substantial hazard to the health of residents of the LUBGWMA.

214.    Defendants have generated, transported, stored, and disposed of nitrate-heavy industrial waste, excess fertilizer, and animal waste—all solid wastes and hazards as those terms are defined under RCRA, 42 U.S.C. § 6901, et seq., as well as under Oregon state solid and hazardous waste laws and regulations. Specifically:

(a) The Port of Morrow and Lamb Weston collect, store, transport, and dispose of nitrogen-heavy wastewater from their facilities and spray that wastewater onto nearby fields.

(b) Threemile generates, stores, and disposes of animal waste from the cattle it raises in its CAFOs as part of its dairy empire.

(c) Lamb Weston, Threemile, and Madison Ranches transport and dispose of high-nitrogen fertilizer by applying it to their fields.

(d) Madison Ranches transports and disposes of high-nitrogen wastewater from the Port and Lamb Weston, and also transports and disposes of biosolids from the City of Portland.

(e) Tillamook and PGE generate high-nitrogen wastewater that they send to the Port of Morrow for it to discard.

215.    The presence of hazardous substances and wastes causing nitrate concentrations above the levels and standards allowed by the Oregon DEQ constitutes an imminent and substantial endangerment to human health and the environment and threatens ground water quality in the LUBGWMA.

216.    Pursuant to 42 U.S.C. § 6972(b)(2)(A), Plaintiffs notified Defendants, the Administrator of the United States Environmental Protection Agency (the "Administrator"), and the State of Oregon of the endangerment more than 90 days in advance of filing this action.

Plaintiffs also provided a copy of this Complaint to the Administrator. To Plaintiffs' knowledge, neither the Administrator nor the state of Oregon has commenced any of the actions set forth under 42 U.S.C. § 6972(b)(2)(B), (b)(2)(C).

217.    Under 42 U.S.C. § 6972(a)(1)(B), Defendants are individually and jointly liable pursuant to 42 U.S.C. § 6972, et seq., for conducting such action as is necessary to abate the endangerment to human health and the environment because they are past and present generators, transporters, and owners or operators of facilities that contribute to the handling, storage, and/or transportation of solid or hazardous waste that now presents an imminent and substantial endangerment to health or the environment.

218.    Under 42 U.S.C. § 6972(e), Plaintiffs are entitled to recover costs incurred in bringing this action, including reasonable attorney fees and expert witness fees.

## COUNT II:
## NEGLIGENCE
(By all Plaintiffs against all Defendants)

219.    Plaintiffs reallege and incorporate by reference the above paragraphs.

220.    Defendants have breached their duty to exercise ordinary care, and that breach caused Plaintiffs' and other Class members' injuries.

221.    As to the Port of Morrow and Lamb Weston, reasonably careful wastewater treatment/recycling facility would not cause nitrogen-heavy wastewater from its facility to be sprayed onto nearby fields in quantities that cause nitrate contamination of a local aquifer upon which people rely for clean drinking water. As to Threemile, a reasonably careful CAFO and farm would not land-apply high-nitrogen waste or nitrogen fertilizer in excess of the agronomic rate. As to Lamb Weston and Madison Ranches, reasonably careful farms would not over-apply nitrogen fertilizer to their fields (or, in the case of Madison Ranches, provide a space for multiple entities

to dump their high-nitrogen waste, particularly when it knew the farm was located in a Groundwater Management Area). Finally, as to Tillamook and PGE, a reasonably careful power generation facility or food processing facility would not partner with an entity such as the Port of Morrow for wastewater disposal services given the Port's rampant and well-publicized violations of a wastewater disposal permit intended to protect public health.

222.    Defendants knew their operations were causing and continue to cause nitrate contamination in LUBGWMA groundwater, upon which Plaintiffs and the Class rely for clean drinking water.

223.    Defendants know nitrates are hazardous to human health.

224.    Despite this knowledge, Defendants continued their behavior, causing nitrate contamination of groundwater in the LUBGWMA.

225.    Defendants' decision to engage in activities that they knew or should have known would harm people living in the LUBGWMA constitutes a breach of Defendants' ordinary duty of care.

226.    Defendants' breach of their duty of care is a substantial factor in causing Plaintiffs' injuries, as described above.

227.    As a result of Defendants' breach of their duties, Plaintiffs and the Class have suffered injuries and will continue to suffer injuries. For Class members who rely on public water sources, those injuries include increased water prices. For Class members who rely on private wells, those injuries include a reduction in property values, the inconvenience associated with being unable to use tap water for drinking and cooking, cellular damage caused by exposure to nitrates, and an increased risk of developing life-threatening illnesses, including cancer.

**COUNT III:**
**NEGLIGENCE *PER SE* FOR VIOLATION OF ORS 468B.025(1)(B)**
(By all Plaintiffs against all Defendants)

228.    Plaintiffs reallege and incorporate by reference the above paragraphs.

229.    Subsection (b) of ORS 468B.025(1) prohibits discharging "any wastes into the waters of the state if the discharge reduces the quality of such waters below the water quality standards established by rule for such waters by the Environmental Quality Commission." ORS 468B.025(1)(b).

230.    As described above, in 2014, the Environmental Quality Commission adopted revisions to Oregon's water quality standards designed to reduce or prevent toxic pollutants in Oregon waterways (Table 40 of Oregon Administrative Rule 340-041-8033). Table 40 sets a "human health criteria" limit of 10,000 µg/L for nitrate (or 10 mg/L). The EPA approved Table 40 in an August 4, 2015 letter to Wendy Wiles, the administrator for DEQ's Environmental Solutions Division.[33]

231.    Defendants have, both directly and indirectly through the Port, discharged nitrate-heavy waste into the waters of the state. The nitrates in this waste then contaminate the aquifer that Plaintiffs rely on for their drinking water.

232.    Much of the groundwater in the LUBGWMA is already contaminated with nitrate concentrations at or above 10mg/L, and therefore already exceeds the standards the Environmental Quality Commission established in Table 40. As a consequence, contributing any additional

---

[33] Letter from Daniel Opalski to Wendy Wiles (Aug. 4, 2015) at 11, https://www.epa.gov/system/files/documents/2021-11/epa_approval_revised_oregon_wqs_08042015.pdf.

*Pearson, et al. v. Port of Morrow, et al.*    - 61 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

nitrates to these areas violates ORS 468B.025(1)(b) because these additional nitrates further reduce water quality below the standards set by the Environmental Quality Commission.

233.    Defendants, both directly and indirectly through the Port and/or Lamb Weston, have discharged their nitrate-heavy waste into the waters of the state, including into LUBGWMA groundwater that has already tested at or above 10mg/L. As such, Defendants have violated ORS 468B.025(1)(b).

234.    Plaintiffs have been injured as a result of Defendants' violation of ORS 468B.025(1)(b). Defendants' discharge of wastewater in violation of the statute caused Plaintiffs and the Class personal and property damage. Defendants' conduct has rendered private wells unfit for use, forcing Plaintiffs and Class members who rely on private wells to either continually expose themselves to an unacceptably high risk of severe illness or rely on expensive and/or cumbersome alternative drinking water sources. Defendants' conduct has also caused damage at a cellular level to Plaintiffs and others in the Class who have ingested water contaminated with nitrates in excess of 10mg/L. And it has caused Plaintiffs and members of the Class who rely on public water to pay increased rates to cover the cost of removing nitrates from their water.

235.    In addition to suffering an injury caused by Defendants' violation of ORS 468B.025(1)(b), Plaintiffs are also members of the class of persons that statute is meant to protect. As explained in ORS 468B.015, water pollution is "a menace to public health and welfare," and it is therefore "the public policy of the state . . . [t]o provide for the prevention, abatement and control of new or existing water pollution." Plaintiffs are members of the public whose health and welfare is at risk due to Defendants' pollution, and so are among the class of persons who enjoy protection under ORS 468B.025(1)(b).

236.    Further, the injuries Plaintiffs sustained—including harm to their health and welfare—are precisely the type of injuries the statute was enacted to prevent. *See* ORS 468B.025(1)(b) (noting the State's intention to address the "menace to public health and welfare" caused by water pollution).

**COUNT IV:**
**NEGLIGENCE *PER SE* FOR VIOLATION OF ORS 468B.025(2)**
(By all Plaintiffs against all Defendants)

237.    Plaintiffs reallege and incorporate by reference the above paragraphs.

238.    ORS 468B.025(2) states that "[n]o person shall violate the conditions of any waste discharge permit issued under ORS 468B.050 (Water quality permit)." ORS 468B.025(2).

239.    As explained above, the Port and Lamb Weston have repeatedly violated their waste discharge permits. As such, these Defendants have violated ORS 468B.025(2).

240.    Plaintiffs have been injured as a result of Defendants' violation of ORS 468B.025(2). Defendants' discharge of wastewater in violation of the statute caused Plaintiffs and the Class personal and property damage. Defendants' conduct has rendered private wells unfit for use, forcing Plaintiffs and Class members who rely on private wells to either continually expose themselves to an unacceptably high risk of severe illness or rely on expensive and/or cumbersome alternative drinking water sources. Defendants' conduct has also caused damage at a cellular level to Plaintiffs and others in the Class who have ingested water contaminated with nitrates in excess of 10mg/L. And it has caused Plaintiffs and members of the Class who rely on public water to pay increased rates to cover the cost of removing nitrates from their water.

241.    In addition to suffering an injury caused by Defendants' violation of ORS 468B.025(2), Plaintiffs are also members of the class of persons that statute is meant to protect. As explained in ORS 468B.015, water pollution is "a menace to public health and welfare," and it

*Pearson, et al. v. Port of Morrow, et al.*    - 63 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

is therefore "the public policy of the state . . . [t]o provide for the prevention, abatement and control of new or existing water pollution." Plaintiffs are members of the public whose health and welfare is at risk due to Defendants' pollution, and so are among the class of persons who enjoy protection under ORS 468B.025(2).

242. Further, the injuries Plaintiffs sustained—including harm to their health and welfare—are precisely the type of injuries the statute was enacted to prevent. *See* ORS 468B.025(2) (noting the State's intention to address the "menace to public health and welfare" caused by water pollution).

**COUNT V:**
**TRESPASS**
(By Plaintiffs Pearson, Fleming, James and Silvia Suter, and Blodgett
against all Defendants)

243. Plaintiffs reallege and incorporate by reference the above paragraphs.

244. Defendants have caused, and continue to cause, pollutants to enter onto real property owned by Plaintiffs and Class members. This trespass was intentional because Defendants knew that the entry of pollutants onto Plaintiffs' and Class members' property was certain, or substantially certain, to result from their operations. Despite this substantial certainty, Defendants still went ahead with their operations.

245. Such intrusions re-occur many times each day as additional nitrate particles enter onto Plaintiffs' and Class members' property.

246. Publicity surrounding Morrow County's emergency declaration and the Port of Morrow's repeated violations of its wastewater discharge permit, as well as Defendants' own awareness of the nitrate contamination issues in the LUBGWMA, put Defendants on notice that their operations were causing nitrates to pollute Plaintiffs' and Class members' properties. It was

therefore reasonably foreseeable that their operations would disturb Plaintiffs' and Class members' possessory interests.

247.    Defendants' trespass is without right or license and violates the exclusive property rights of Plaintiffs and Class members. The pollutants that Defendants caused to spread through groundwater in the LUBGWMA and to contaminate Plaintiffs' and Class members' water constitute an unreasonable interference with possessory use of their respective properties.

248.    Defendants' intentional trespass has resulted in actual and substantial damages to the real property owned by Plaintiffs and Class members who own private wells because their properties are now contaminated with nitrates in concentrations that are hazardous to human health.

### COUNT VI:
### PRIVATE NUISANCE
(By Plaintiffs Pearson, Fleming, James and Silvia Suter, and Blodgett against all Defendants)

249.    Plaintiffs reallege and incorporate by reference the above paragraphs.

250.    Defendants' disposal of wastewater, excess fertilizer, and animal waste has substantially and unreasonably interfered with Plaintiffs' and the Class's use and enjoyment of their land.

251.    Defendants knew or had reason to know that their actions were causing nitrate contamination in the Boardman Area, Irrigon Area, and Hermiston Area, thereby interfering with Plaintiffs' and the Class's use and enjoyment of their properties.

252.    Defendants' actions have in fact interfered with Plaintiffs' and the Class's use and enjoyment of their properties. Because groundwater in the Boardman Area, Irrigon Area, and

Hermiston Area is contaminated with nitrates, Plaintiffs are unable to rely on their wells to provide safe drinking water.

253.    The utility of dumping excess waste and the burden of reducing the amount of nitrogen and nitrates in Defendants' soil and water is slight compared with the risk that Defendants' conduct would contaminate Plaintiffs' and the Class's wells and substantially interfere with their use and enjoyment of their property.

254.    Defendants failed to exercise due care to eliminate the risk of nitrates contaminating groundwater in the LUBGWMA.

255.    Defendants' disposal of wastewater, excess fertilizer, and animal waste caused Plaintiffs and the Class personal and property damage in an amount to be proven at trial. Defendants' conduct has rendered private wells unfit for use, forcing Plaintiffs and Class members who rely on private wells to either continually expose themselves to an unacceptably high risk of severe illness or rely on expensive and/or cumbersome alternative drinking water sources. Class members have also suffered cellular damage caused by exposure to nitrates and are at an increased risk of developing life-threatening illnesses, including cancer.

**COUNT VII:**
**INVERSE CONDEMNATION**
(By Plaintiffs Pearson, Fleming, James and Silvia Suter, and Blodgett
against the Port of Morrow)

256.    Plaintiffs reallege and incorporates by reference the above paragraphs.

257.    Pursuant to Or. Const. art. 1, § 18, the state may not take private property for public use without just compensation.

*Pearson, et al. v. Port of Morrow, et al.*    - 66 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

258.    To support operations at Port of Morrow, the Port, a public entity, has dumped contaminated water in the Umatilla GMA in excess of its permits, causing contamination of Plaintiffs' wells.

259.    When the government takes property interests through its actions without first initiating condemnation proceedings, the property owner can bring an inverse condemnation action to obtain just compensation.

260.    By dumping wastewater in excess of its permits, Defendant Port of Morrow has appropriated Plaintiffs' properties for public use.

261.    Defendant Port of Morrow's excess wastewater dumping has substantially interfered with Plaintiffs' and the Class's use and enjoyment of their properties. As a result of Defendant Port of Morrow's appropriation of these properties, the beneficial uses and economic viability of the properties are destroyed or substantially reduced.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendants as follows:

A.    For a declaratory judgment that Defendants have violated and continue to be in violation of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B);

B.    For an order of the Court compelling Defendants to provide clean, potable water to all members of the Class who rely on private wells by connecting members of this Class to public water systems or by drilling wells deep enough to provide clean, potable water;

C.    For an order of the Court compelling Defendants to pay the water bills of members of well-reliant Class members who are connected to public water systems;

D.    For an order of the Court compelling Defendants to conduct and pay for medical monitoring for well-reliant Class members;

*Pearson, et al. v. Port of Morrow, et al.*    - 67 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

E.      For all general and compensatory damages proved and awarded by the jury or this Court;

F.      For punitive damages to punish and deter those Defendants subject to Or. Rev. Stat. § 31.730;

G.      For all other damages allowed by law and awarded by the jury;

H.      For Plaintiffs' litigation costs, including attorney and expert witness fees and other costs, under 42 U.S.C. § 6972(e) or as otherwise allowable by law; and

I.      For such other and further relief as the Court deems just and equitable under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all claims triable by right.

*Pearson, et al. v. Port of Morrow, et al.*    - 68 -
Corrected Second Amended Class Action Complaint
011211-11/3443782 V2

DATED:  January 23, 2026

Respectfully submitted,

By: */s/ Steve W. Berman*

Steve W. Berman (*pro hac vice*)
Meredith S. Simons (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98134
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
merediths@hbsslaw.com

Abigail D. Pershing (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

Michael A. Bliven, Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
mike@blivenlawfirm.com

Robert F. Dwyer, III, Oregon State Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman OR 97818
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
rdwyer@blivenlawfirm.com

John Heenan (*pro hac vice*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
john@lawmontana.com

*Attorneys for Plaintiffs and the Proposed Class*