IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| MICHAEL PEARSON, ROSA CAVASOS, JEFFREY FLEMING, JON HALEY, JAMES SUTER, SILVIA SUTER, and JACKIE BLODGETT, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PORT OF MORROW; LAMB WESTON HOLDINGS, INC.; MADISON RANCHES, INC.; THREEMILE CANYON FARMS, LLC; PORTLAND GENERAL ELECTRIC COMPANY; and COLUMBIA RIVER PROCESSING, LLC, <br><br> Defendants. | Case No. 2:24-cv-362-SI <br><br> **OPINION AND ORDER** |

Michael A. Bliven, BLIVEN LAW FIRM PC, 704 S. Main, Kalispell, MT 59901; Robert F. Dwyer III, BLIVEN LAW FIRM PC, 202 North Main Street, Suite 1, Boardman OR 97818; John Heenan, HEENAN & COOK, 1631 Zimmerman Trail, Billings, MT 59102; Steve W. Berman, Meredith S. Simons, and Sydney K. Thomas, HAGENS BERMAN SOBOL SHAPIRO LLP, 1301 Second Avenue, Suite 2000, Seattle, WA 98101; and Nathan Emmons, HAGENS BERMAN SOBOL SHAPIRO LLP, 455 North Cityfront Plaza Drive, Suite 2410, Chicago, IL 60611. Of Attorneys for Plaintiffs.

Amy Edwards, Misha Isaak, Jacob C. Goldberg, Kimberly Cullen, and Molly M. Hooks, STOEL RIVES LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Of Attorneys for Defendant Port of Morrow.

PAGE 1 – OPINION AND ORDER

Bruno J. Jagelski, YTURRI ROSE LLP, 89 SW Third Avenue, P.O. Box S, Ontario, OR 97914; and Amanda L. Groves, Jeffrey Wilkerson, and Nathan R. Gilbert, WINSTON & STRAWN LLP, 333 South Grand Avenue, 38th Floor, Los Angeles CA 90071. Of Attorneys for Defendant Lamb Weston Holdings, Inc.

Kyle V. Miller and James H. Bolin, BUTLER SNOW LLP, 1020 Highland Colony Parkway, Suite 1400, Ridgeland, MS 39157; Jennifer L. Gates, PEARL LEGAL GROUP PC, 529 SW Third Avenue, Suite 600, Portland OR 97204; and Jeffrey C. Misley and Steven F. Cade, SUSSMAN SHANK LLP, 1000 SW Broadway, Suite 1400, Portland, OR 97205. Of Attorneys for Defendant Madison Ranches, Inc.

Clifford S. Davidson and Drew L. Eyman, SNELL & WILMER LLP, 601 SW Second Avenue, Suite 2000, Portland, OR 97204; John F. Stoviak, SAUL EWING LLP, 1200 Liberty Ridge Drive, Suite 200, Wayne, PA 19087; James A. Morsch, SAUL EWING LLP, 161 North Clark Street, Suite 4200, Chicago, IL 60601; Kayleigh T. Keilty, SAUL EWING LLP, 1001 Fleet Street, Ninth Floor, Baltimore, MD 21202; and Erin Westbrook, SAUL EWING LLP, 33 South Sixth Street, Suite 4750, Minneapolis, MN 55402. Of Attorneys for Defendant Threemile Canyon Farms, LLC.

Joshua M.F. Sasaki, Trajan Perez, Fabio Dworschak, and Adrian Anderson, MILLER NASH LLP, 1140 SW Washington Street, Suite 700, Portland, OR 97205. Of Attorneys for Defendant Portland General Electric Company.

Sara C. Cotton, Lawson E. Fite, and Alex C. Carroll, SCHWABE, WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1800, Portland OR 97204. Of Attorneys for Defendant Columbia River Processing, LLC.

**Michael H. Simon, District Judge.**

This putative class action concerns allegedly contaminated drinking water. Plaintiffs, on behalf of all persons who own or rent real property in Oregon's Lower Umatilla Basin, have sued the Port of Morrow ("the Port"), Lamb Weston Holdings, Inc. ("Lamb Weston"), Madison Ranches, Inc. ("Madison"), Threemile Canyon Farms, LLC ("Threemile"), Portland General Electric Company ("PGE"), and Columbia River Processing, LLC ("CRP") (together, "Defendants"). Plaintiffs allege that their drinking water is contaminated with unhealthy levels of nitrates and that Defendants contributed to and are liable for that pollution. Drinking water that contains unhealthy levels of nitrates can cause birth defects, cell damage, and cancer. Accordingly, many people in the Lower Umatilla Basin now rely solely on bottled water for their

household needs. The Court previously granted in part Defendants' motions to dismiss Plaintiffs' First Amended Complaint and allowed Plaintiffs to replead. *See* ECF 118.[1]

Plaintiffs then filed a Corrected Second Amended Complaint ("SAC") on January 23, 2026. ECF 130. In their SAC, Plaintiffs assert one federal claim and six state law tort claims. Under federal law, Plaintiffs allege liability based on the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B). Under Oregon law, Plaintiffs allege negligence, negligence *per se* based on a violation of Oregon Revised Statute ("ORS") 468B.025(1)(b), negligence *per se* based on a violation of ORS 468B.025(2), trespass, private nuisance, and inverse condemnation. *Id.* Plaintiffs seek declaratory and injunctive relief as well as compensatory and punitive damages. *Id.* Now before the Court are Defendants' motions to dismiss or strike the SAC. ECF 157, 158, 159, 160, 161, 162, 163, 165. For the reasons explained below, the Court largely denies Defendants' motions and concludes that Plaintiffs have sufficiently stated their claims against each Defendant.[2] The Court has scheduled a three-week jury trial to begin May 3, 2027.

## STANDARDS

### A. Motion to Strike

A court may strike material under Rule 12(f) of the Federal Rules of Civil that is "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The purpose of

---

[1] Plaintiffs have also filed a related lawsuit against Amazon Data Services, Inc. ("Amazon Data"), alleging similar facts and allegations. *See Pearson, et al. v. Amazon Data Services, Inc.*, No. 2:26-cv-633-SI (D. Or.). In that action, Plaintiffs and Amazon Data have jointly moved for preliminary certification of a settlement class, for appointment of settlement class counsel, and for preliminary approval of settlement. That motion also is currently pending before the undersigned district judge.

[2] Notwithstanding the parties' requests for oral argument, the Court does not believe that oral argument would assist in resolving the pending motions. *See* LR 7-1(d)(1).

PAGE 3 – OPINION AND ORDER

a Rule 12(f) motion is to avoid spending time and money litigating spurious issues. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010); *see also Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994). The disposition of a motion to strike is within the discretion of the district court. *See Fed. Sav. & Loan Ins. Corp. v. Gemini Mgmt.*, 921 F.2d 241, 244 (9th Cir. 1990). "Motions to strike are disfavored and infrequently granted." *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 561 F. Supp. 2d 1187, 1189 (D. Or. 2008).

## B.  Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotations omitted).

A court must "examine the allegations of the complaint as a whole." *See Khachatryan v. Blinken*, 4 F.4th 841, 854 (9th Cir. 2021). In so doing, it must "accept as true all well-pleaded allegations of material fact." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). A court also must construe all well-pleaded factual allegations "in the light most favorable to the plaintiff," *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012), and draw all reasonable inferences from the allegations in the plaintiff's favor. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). A court need not credit legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). To be entitled to a presumption of truth, allegations "may not simply recite the elements of a cause of action, but

must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## BACKGROUND

In an earlier ruling, the Court discussed the nitrate contamination problem in the Lower Umatilla Basin Groundwater Management Area ("LUBGWMA") and the potential health effects of nitrates. *See* ECF 118 at 4-6. In their SAC, Plaintiffs added several new allegations, which the Court discusses below when relevant. To summarize generally, the geology in LUBGWMA makes the ground more susceptible to nitrates leaching into the water table, and nitrates can be highly toxic. The nitrates in LUBGWMA are created by nitrogen-rich materials, like fertilizer, manure, and nitrogen-rich wastewater, which are applied to the land by farmers and wastewater management facilities. Plaintiffs allege that Defendants created and disposed of nitrogen-rich materials in ways that predictably contaminated the groundwater in LUBGWMA and then continued those practices despite mounting evidence of harm to Plaintiffs and others.

Specifically, Plaintiffs allege that the Port operates an industrial park near the Columbia River, including a wastewater treatment facility. SAC ¶¶ 90-91. The Port's tenants include Lamb Weston, PGE, and CRP, which each produce nitrogen-rich wastewater and send the wastewater to the Port for processing. *Id.* ¶¶ 91, 112, 144-46, 150, 156. The Port "recycles" wastewater by pumping it to local farms (including its own and one of Madison's). *Id.* ¶¶ 92-94. Although nitrogen-rich wastewater may, under certain circumstances, convey the same benefits as fertilizer, the Port allegedly applies wastewater to farms in quantities that exceed the crops' agronomic loads (*i.e.*, the amount of nitrogen that crops can physically intake). *Id.* Further, the Port allegedly applies wastewater to farms during the non-growing winter season. *Id.* Plaintiffs further allege that the Port regularly violates a discharge permit issued by the Oregon

Department of Environmental Quality ("DEQ") and has been publicly fined, including for over-dumping on Madison's farm, for these violations. *See id.* ¶¶ 95-111.

Like the Port, Lamb Weston also has a DEQ permit for its own wastewater treatment facility. *Id.* ¶ 117. Lamb Weston allegedly has violated its permit at least 90 times. *See id.* ¶ 118. At Lamb Weston's wastewater treatment facility, Lamb Weston has wastewater ponds from which Lamb Weston transports its wastewater to two farms—one owned by Lamb Weston and one owned by Madison—for land application. *Id.* ¶ 117. Lamb Weston does not charge Madison for this wastewater (and neither does the Port). *Id.* ¶ 132. Lamb Weston "land-applies" its own wastewater onto its own farmland, including during the winter. *Id.* ¶¶ 113-15. Plaintiffs also allege that Lamb Weston applies excess fertilizer to its farms. *Id.* ¶ 123.

In addition to its operations as a tenant at the Port, CRP also purchases, or sources, milk from Threemile. *Id.* ¶¶ 152-54. Threemile operates concentrated animal feeding operations ("CAFOs") and collects its own cattle waste to land-apply it on farms owned and run by Threemile (including during non-growing seasons) and stores the excess waste in lagoons. *Id.* ¶ 138. Plaintiffs allege that Threemile's lagoons have leaked, spilled, and overflowed. *Id.* ¶ 142. Notwithstanding this, CRP has publicly praised Threemile for its practice of land-applying manure. *See id.* ¶¶ 153.

Under the heading "civil conspiracy," Plaintiffs allege that CRP, PGE, Lamb Weston, Madison, and the Port "have cooperated in the objective of disposing of high-nitrate wastewater generated by the Port of Morrow's tenants." *Id.* ¶ 189. Plaintiffs assert that these Defendants have agreed to this objective, as evidenced by: (1) CRP, PGE, and Lamb Weston's lease agreements with the Port; and (2) the "long-running course of conduct by which Port of Morrow tenants [CRP], PGE, and Lamb Weston send their high-nitrogen wastewater to the Port of

PAGE 6 – OPINION AND ORDER

Morrow, and it is subsequently dumped on land belonging to the Port of Morrow or Madison Ranches, often in the winter and/or in excess of agronomic rates." *Id.* ¶ 190. Plaintiffs also allege that Threemile and CRP "have cooperated in the objective of producing milk to supply [CRP's] Boardman facility, and they have had a meeting of the minds as to that objective and the course of action by which it will be accomplished, as evidenced by [CRP's] public statements that the massive amounts of high-nitrogen manure generated by Threemile's operations "go[] back to the crops" (*i.e.*, are land-applied). *Id.* ¶ 193.

## DISCUSSION[3]

### A.  Motions to Strike

Threemile has moved to strike the basin-wide class definition. The Court declines to review commonality, predominance, or numerosity at this stage of the litigation. "The Ninth Circuit has summarized its jurisprudence in this area as standing 'for the unremarkable proposition that often the pleadings alone will not resolve the question of class certification and that some discovery will be warranted.'" *Greenberg v. Amazon.com, Inc.*, 2026 WL 26011, at *2 (W.D. Wash. Jan. 5, 2026) (quoting *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009)). Such is true here. Threemile's arguments may be raised during class certification. The Court also notes that Plaintiffs' motion for class certification is due in less than two weeks with all class certification-related briefing to be completed by September 7, 2026.

In addition, all Defendants have moved to strike the "civil conspiracy" allegations, but Rule 12(f) relief similarly is unwarranted to address Defendants' concern. Allegations that

---

[3] The Court has considered and rejected all arguments raised by Defendants that are not specifically addressed in this Opinion and Order.

PAGE 7 – OPINION AND ORDER

Defendants worked collaboratively to harm Plaintiffs are not immaterial or impertinent. Instead, they describe how Plaintiffs contend they were harmed and who is responsible for that harm.[4]

Nor are the challenged allegations redundant.[5] Although Plaintiffs allege that each Defendant is a primary tortfeasor, the conspiracy allegations separately assert that each Defendant is part of a common plan or scheme to commit the alleged torts. Finally, the allegations are not scandalous because they do not "improperly cast[ ] a derogatory light on" a party. *See Choi v. 8th Bridge Cap., Inc.*, 2018 WL 3469053, at *7 (C.D. Cal. July 16, 2018) (quotations omitted). Defendants chiefly argue that Plaintiffs do not allege sufficient facts supporting a plausible claim of conspiracy, which is an argument "better suited for a Rule 12(b)(6) motion." *Whittlestone*, 618 F.3d at 974. Accordingly, the Court discusses that issue next under that framework.

## B. Motions to Dismiss

### 1. Joint Tortfeasor Liability

Plaintiffs allege that Defendants have participated in a civil conspiracy "to engage in economic activity using methods that pollute groundwater in the LUBGWMA" and that "Defendants are therefore liable to all members of the class for damages suffered as a result of the conspiracy." SAC ¶ 188. Defendants have moved to dismiss this allegation and other "civil conspiracy" allegations, arguing that Plaintiffs have failed sufficiently to allege civil conspiracy

---

[4] An "immaterial" matter is "that which has no essential or important relationship to the claim for relief or the defenses being plead." *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 967 (9th Cir. 2014) (quoting *Fantasy, Inc.*, 984 F.2d at 1527). "Impertinent" matters are those "that do not pertain, and are not necessary, to the issues in question." *Whittlestone*, 618 F.3d at 974 (quoting *Fantasy, Inc.*, 984 F.2d at 1527).

[5] "A matter is redundant if it is superfluous and can be omitted without a loss of meaning." *Hayes v. City of Portland*, 2020 WL 1154762, at *3 (D. Or. Mar. 10, 2020).

PAGE 8 – OPINION AND ORDER

under Oregon law. Defendants further argue that, without a well-pleaded conspiracy, Plaintiffs fail plausibly to allege standing and injuries traceable to certain Defendants' practices. As explained below, Plaintiffs have adequately alleged a theory of joint liability against each Defendant and, therefore, the Court rejects Defendants' justiciability arguments.

### a. Sufficiency of Joint Tortfeasor Allegations

Defendants argue that Plaintiffs' civil conspiracy allegations are improper because they fail sufficiently to allege certain elements of civil conspiracy. Defendants assert that the following elements must be alleged for a conspiracy joint tortfeasor liability theory: "(1) Two or more persons . . .; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Bonds v. Landers*, 279 Or. 169, 174 (1977); *see also Osborne v. Fadden*, 225 Or. App. 431, 437 (quoting same), *rev. den.*, 346 Or. 213 (2009). Plaintiffs respond that the purpose of their "conspiracy" allegations is merely to preserve the argument that Defendants should be held jointly liable for the state law torts alleged in the SAC and that joint tortfeasor liability can be pleaded without alleging the specific elements that Defendants assert are lacking.

The Court agrees with Plaintiffs that it is unnecessary to allege facts satisfying the specific conspiracy elements identified in *Bonds* to preserve a theory of joint tortfeasor liability at the pleadings stage.[6] This conclusion is compelled by the Oregon Supreme Court's post-*Bonds* decision in *Granewich v. Harding*, 329 Or. 47 (1999). In that case, the Oregon Supreme Court reviewed a motion to dismiss to "determine whether the complaint adequately state[d] a claim

---

[6] Because the Court concludes that the *Bonds* elements are not required to plead joint tortfeasor liability, the Court need not reach Defendants' arguments that flow from *Bonds* and its progeny. These arguments include that "[t]he primary purpose of a conspiracy must be to cause injury," *see Bonds*, 279 Or. at 175, and that co-conspirators must act with an intent to harm, *see Flint v. DJO, LLC*, 2010 WL 1999302, at *2 (D. Or. May 17, 2010).

against [some defendants] for joint tort liability for the alleged actions of the [other defendants]." 329 Or. 47, 50 (1999). Although the plaintiff in *Granewich* affixed the label "conspiracy" to his joint tortfeasor allegations, *see id.* at 53 & n.1, the court did not analyze "whether particular elements that must be pled to state a claim for relief under a 'conspiracy' theory were present." *See id.* at 55.[7] Rather, in reviewing the sufficiency of the plaintiff's joint tortfeasor allegations, the *Granewich* court asked whether the complaint gave "rise to the inference" that the named defendants would be liable under section 876 of the Restatement (Second) of Torts (1979). *Id.* at 59.[8] That section provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Id.* at 53-54 (quoting Rest. (Second) of Torts § 876).

---

[7] *Granewich* also identified several other Oregon Supreme Court cases dealing with joint tortfeasor liability that also did not "expressly examine or purport to delineate" whether the "conspiracy" elements were met. *See Granewich*, 329 Or. at 54-55 (describing *Lemons v. Kelly*, 239 Or. 354 (1964), *Sprinkle v. Lemley*, 243 Or. 521 (1966), and *Perkins v. McCullough*, 36 Or. 146 (1899)).

[8] In *Granewich*, the Oregon Supreme Court explained that "the amended complaint adequately alleges joint liability on the part of defendant lawyers as persons acting in concert with Harding's and Alexander-Hergert's alleged breach of their fiduciary duties to plaintiff, if it contains allegations that give rise to the inference either that the lawyers did a tortious act pursuant to an agreement with the others to breach their fiduciary duties or that the lawyers knowingly provided substantial assistance in the breach of the others' fiduciary duties." *Id.* at 59.

Thus, when evaluating a complaint containing joint tortfeasor allegations, *Granewich* instructs that "conspiracy" allegations may also be reviewed under any joint tortfeasor framework that is set forth in section 876. As the Oregon Supreme Court explained, the *Granewich* plaintiff "neither mentioned 'aid and assist' as a separate theory of recovery in the complaint nor argued it below." *Id.* at 53 & n.1. The court nonetheless affirmed the Oregon Court of Appeals' conclusion that the plaintiff's allegations constituted a legally cognizable claim under both conspiracy and aiding and assisting theories of joint liability, explaining that "[t]he label . . . is irrelevant" and what matters is "the specific allegations following those labels." *Id.* Additionally, *Granewich* establishes that "neither 'conspiracy' nor 'aid and assist' is a separate theory of recovery." *Id.* at 53 (citing *Bonds*, 279 Or. at 175 and *Bliss v. S. Pac. Co.*, 212 Or. 634, 642 (1958)). Rather, these theories of joint tortfeasor liability simply are "two of several ways in which a person may become jointly liable for another's tortious conduct." *Id.*

Here, Plaintiffs' allegations of joint tortfeasor liability are sufficient under Oregon law because they give rise to the plausible inference that each Defendant satisfies at least one theory of joint tortfeasor liability under section 876. Specifically, the allegations give rise to the plausible inference that CRP, Lamb Weston, Madison, and PGE acted in concert with the Port by generating and sending high-nitrate wastewater that they knew would be improperly disposed of by the Port. *See* SAC ¶¶ 189-91. The allegations also give rise to the plausible inference that CRP substantially assisted or encouraged Threemile's land applications of nitrogen-rich effluent above the agronomic rate by publicly praising the practice of giving the material "back to the crops." *Id.* ¶¶ 193-94.

Regarding Threemile, that Defendant argues that Plaintiffs have failed plausibly to allege that Threemile is liable as a joint tortfeasor because, even accepting Plaintiffs' allegations as

PAGE 11 – OPINION AND ORDER

true, Threemile did not agree to a common scheme with CRP, Lamb Weston, Madison, PGE, or the Port. Plaintiffs, however, allege that all Defendants have participated in a broader civil conspiracy "to engage in economic activity using methods that pollute groundwater in the LUBGWMA." *Id.* ¶ 188. Although that allegation by itself may not give rise to an inference of an agreement or common scheme, Plaintiffs also allege that Threemile knowingly applies nitrogen-rich material to its farmland in the excess of the agronomic load, even in the winter when fields lay fallow. *See id.* ¶¶ 138-41, 193. Further, Plaintiffs allege that Madison and the Port do the same with their nitrogen-rich water. *Id.* ¶ 190. Thus, at the pleading stage, the Court may reasonably infer the existence of an agreement when a plaintiff alleges facts suggesting that a common plan has been agreed upon. *See Lawver v. Lawvor*, 86 Or. App. 721, 726 (1987) (dismissing conspiracy allegations because the plaintiffs "[did] not plead any facts showing a meeting of minds or agreement among [the defendants] on the alleged objects of the conspiracy, and [the court] [could not] infer it from the facts that plaintiffs [did] plead"). Here, Plaintiffs' allegations that Threemile disposed of its nitrogen effluent in the precisely same tortious manner as the Port and Madison permits a reasonable inference of a common plan among these Defendants. Thus, at the pleading stage, the SAC is sufficient to allow Plaintiffs to pursue a theory of joint tortfeasor liability against Threemile.[9]

### b. Justiciability of State Tort Claims

Defendants also argue that certain Plaintiffs lack standing. The federal courts may only hear cases or controversies brought by plaintiffs who have a "personal stake in the case—in other

---

[9] Other Defendants argue that there are no plausible allegations that they acted in concert or pursuant to a common design. For substantially the same reasons as explained with respect to Threemile, Plaintiffs have plausibly alleged facts from which the Court can reasonably infer a common plan or design.

words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up). To demonstrate standing, a plaintiff must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Defendants' standing argument focuses on the second element. Lamb Weston and Madison argue, for example, that only Plaintiff Blodgett has standing to sue them because Blodgett is the only Plaintiff whose property could possibly be contaminated by nitrates from the farming operations of those specific Defendants, based on the location of their operations and Plaintiffs' properties. Plaintiffs' joint tortfeasor allegations, however, defeat these justiciability arguments at the pleadings stage because the allegations, if proven, would show that Plaintiffs' injuries were caused by all Defendants acting together as joint tortfeasors. This conclusion is supported by the *Granewich* court's holding that "a defendant personally need not have committed a tortious act as a prerequisite to liability for acting in concert with another person who did commit that tortious act." 329 Or. at 57.

Because Plaintiffs have adequately alleged joint tortfeasor liability against all Defendants, the Court rejects Defendants' standing and traceability arguments at this stage of the litigation. If, however, Plaintiffs "fail in the proof of a conspiracy" or aiding and abetting, they may only "recover damages against such of the defendants as are shown to be guilty of a tort, directly resulting in damages." *See Keller v. Comm. Credit Co.*, 149 Or. 372, 375-76 (1935) (quoting *Doremus v. Hennessy*, 62 Ill. App. 391, 402 (1896)); *see also Granewich*, 329 Or. at 58 & n.6 (explaining that, if "a conspiracy is not proven . . ., then only those who themselves committed tortious overt acts" will be liable). This principle extends to Defendants' standing and

PAGE 13 – OPINION AND ORDER

traceability concerns: if joint tortfeasor liability is not proven, only those Plaintiffs with injuries that are traceable to certain Defendants will have standing to recover from those Defendants. Until that determination, however, Plaintiffs have adequately alleged standing and that their injuries are redressable by the Defendants as joint tortfeasors. *Cf. Fidelity & Cas. Co. of N.Y. v. Chapman*, 167 Or. 661, 667 (1941) (stating, in the contribution context, that "[t]he plaintiff . . . had the right to sue any one or more of the several alleged tort-feasors.").

### 2. Plaintiffs' State Law Tort Claims

#### a. Negligence

CRP, Lamb Weston, and PGE have moved to dismiss Plaintiffs' negligence claim in its entirety. Madison and PGE have moved to dismiss the claim asserted by Plaintiffs Cavasos and Haley (the "Public Water Plaintiffs") under the economic loss doctrine.[10] PGE has also moved to dismiss Pearson's claim under the applicable statute of limitations.

To survive a motion to dismiss a negligence claim under Oregon law, a plaintiff must allege facts from which a reasonable factfinder could determine the following five elements:

> (1) that defendant's conduct caused a foreseeable risk of harm,
> (2) that the risk is to an interest of a kind that the law protects
> against negligent invasion, (3) that defendant's conduct was
> unreasonable in light of the risk, (4) that the conduct was a cause
> of plaintiff's harm, and (5) that plaintiff was within the class of
> persons and plaintiff's injury was within the general type of
> potential incidents and injuries that made defendant's conduct
> negligent.

*Moody v. Or. Comm. Credit Union*, 371 Or. 772, 784 (2023) (quoting *Solberg v. Johnson*, 306 Or. 484, 490-91 (1988)).

---

[10] Plaintiffs Cavasos and Haley rely on public water, not private wells. *See* SAC ¶¶ 26-31, 38-42. Although the cities of Boardman and Irrigon, Oregon, respectively, supply these Plaintiffs with potable drinking water, Cavasos and Haley have elected to purchase bottled water for consumption and cooking because their tap water is sometimes contaminated. *See id.*

CRP and PGE argue that sending water to the Port does not create a foreseeable risk of harm that the Port will dump water in violation of its permits. Because foreseeability "embodies a prospective judgment about a course of events; it 'therefore ordinarily depends on the facts of a concrete situation' and, if disputed, is a jury question." *Piazza v. Kellim*, 360 Or. 58, 69-70 (2016) (quoting *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 4 (1987)). Only "in an extreme case" can a court decide that the risk to the plaintiff was unforeseeable as a matter of law. *See Donaca v. Curry County*, 303 Or. 30, 38-39 (1987).[11] This is not such an extreme case. CRP and PGE allegedly were on notice that the Port might continue to dump wastewater in violation of its DEQ permit because the Port had, since 2007, repeatedly and publicly violated its permit by doing precisely that. *See* SAC ¶¶ 95-111.

CRP and Lamb Weston each argue that, because there was no other wastewater treatment facility to send its water, their conduct was reasonable. But a court may only decide reasonableness on a motion to dismiss when, based on the facts alleged, "no reasonable factfinder could decide" that the defendant's conduct was unreasonable. *See Chapman v. Mayfield*, 358 Or. 196, 205 (2015) (quoting *Fazzolari*, 303 Or. at 17). Here, a reasonable factfinder could find unreasonable the practice of *generating* a massive volume of nitrogen-laden wastewater and then sending that water to the Port with knowledge that the Port has been dumping contaminated water in violation of its DEQ permit. Similarly, a reasonable jury could find unreasonable CRP's refusal to terminate its lease and business partnership with the Port.

---

[11] "The question of whether a defendant's conduct unreasonably created a foreseeable risk . . . is a normative one; that is, determination of that question is laden with social values." *Clark v. Univ. of Or.*, 319 Or. App. 712, 720 (2022) (quotation omitted). "The community's judgment, usually given voice by a jury, determines whether the defendant's conduct met that threshold in the factual circumstances of any particular case." *Id.* (quoting *Piazza*, 360 Or. at 74).

Finally, CRP argues that Plaintiffs have failed sufficiently to allege that CRP's negligence caused Plaintiffs' harm because the Port's actions were a superseding, intervening cause. But "superseding causes" do not necessarily relieve parties from liability under Oregon law. "When a defendant's negligence is a factual cause of harm to the plaintiff, the defendant is subject to liability to the plaintiff as long as the harm that the plaintiff suffered was a reasonably foreseeable result of the defendant's negligence." *Haas v. Est. of Carter*, 370 Or. 742, 748 (2023). Further, "[t]o determine whether a defendant's negligence is *one of many* potential causes of a plaintiff's harm, courts commonly use what is referred to as a 'but-for' test." *Id.* at 749 (emphasis in original). Here, Plaintiffs sufficiently allege that CRP's conduct—shipping wastewater to the Port for it to dump—is one of several but-for causes of their injuries.

### i.    Economic Loss Doctrine

Defendants also argue that the negligence claims asserted by the Public Water Plaintiffs (Cavasos and Haley) are barred by the economic loss doctrine because they do not allege personal injury or property damage, only the price of higher water bills and the cost of purchasing bottled water. *See* SAC ¶¶ 181-87. The Court rejects this argument. The economic loss doctrine generally "bars a party that has suffered a purely economic loss from bringing a negligence action against the party that caused the loss." *Harris v. Suniga*, 344 Or. 301, 305 (2008); *see Hale v. Groce*, 304 Or. 281, 284 (1987) ("[O]ne ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property."). The doctrine is animated by the "potentially limitless economic impacts of negligent conduct." *Harris*, 344 Or. at 312. As the Oregon Supreme Court has remarked, however, that concern is rarely implicated when a lawsuit is predicated on physical damage to real or other tangible property. *Id.* "Unlike economic losses to third parties, which can be indeterminate and potentially unlimited, physical damage to property ordinarily can be ascertained, assessed, and paid. Once a

PAGE 16 – OPINION AND ORDER

party has paid damages related to the physical injury to property caused by its negligence, its liability is at an end." *Id.*

The economic loss doctrine is not implicated here because Plaintiffs' lawsuit is based on the alleged physical contamination of real property—a shared water resource. Although the Public Water Plaintiffs do not themselves have wells with contaminated groundwater, the source of their alleged injuries is the contamination of the water table, which is a physical public resource. "The allegations in the complaint are thus quite different from the kinds of damages that [the Oregon Supreme Court] has characterized as 'economic losses,'" such as reduced stock price, a monetary gift to a beneficiary, and the "indebtedness incurred or return of monies paid." *Id.* at 310.[12]

### ii. Pearson's Claim Against PGE

PGE argues that Plaintiff Pearson's negligence claim against it is untimely because (a) Pearson discovered nitrate contamination in 2022, (b) sued all other named Defendants in 2024, and (c) Oregon has a two-year statute of limitations for negligence claims. Under Oregon's "discovery rule," the limitations period for a tort claim begins when it "appear[s] probable that plaintiff's 'damage actually suffered' was caused by defendant," or when "a reasonably prudent person perceives the role which the defendant has played in the plaintiff's injury." *Adams v. Or. St. Police*, 289 Or. 233, 238 (1980) (quoting *U.S. Nat'l Bank of Or. v. Davies*, 274 Or. 663, 670 (1976)). Here, nothing in the SAC suggests that Pearson learned of the role that PGE played in causing his injury or that, as a matter of law, a reasonable person in

---

[12] Citing *Or. Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329, 341 (2004), *Hale v. Groce*, 304 Or. 281, 284 (1987), and *Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149, 159 n.6 (1992).

Pearson's position would have known about PGE's involvement in causing that injury. PGE may maintain this defense going forward, but it fails at the pleading stage.

In sum, Plaintiffs state a common law negligence claim against all Defendants.

### b. Negligence *per se*

CRP, Lamb Weston, Madison, Threemile, and PGE have moved to dismiss Plaintiffs' negligence *per se* claims. "[A] negligence *per se* claim is not a separate type of negligence claim with its own elements; rather, negligence *per se* is 'simply shorthand for a negligence claim in which the standard of care is expressed by a statute or rule.'" *Moody*, 371 Or. at 781 (quoting *Abraham v. T. Henry Const., Inc.*, 350 Or. 29, 35 n.5 (2011)). Thus, to state a claim for negligence *per se*, a plaintiff must plead sufficiently all elements of negligence and identify a statute or rule that expresses the standard of care.

Plaintiffs' negligence *per se* claims are based on the Oregon Water Pollution Control law, ORS 468B.025(1)(b), (2). These sections provide:

> (1) Except as provided in ORS 468B.050 [Water quality permit] or 468B.053 [Alternatives to obtaining water quality permit], no person shall: . . . (b) Discharge any wastes into the waters of the state if the discharge reduces the quality of such waters below the water quality standards established by rule for such waters by the Environmental Quality Commission.
>
> (2) No person shall violate the conditions of any waste discharge permit issued under ORS 468B.050 [Water quality permit].

ORS 468B.025.

As U.S. Magistrate Judge Hallman found and the Court adopted, "subsection (b) of ORS 468B.025(1) appears to give advance warning that specific conduct is prohibited." *Pearson v. Port of Morrow*, 2025 WL 1640808, at *30 (D. Or. Feb. 24, 2025), *adopted in relevant part*, *Pearson v. Port of Morrow*, 2025 WL 3691202, at *20 (D. Or. Dec. 19, 2025). The reason Plaintiffs' previous claim failed under this subsection was because Plaintiffs did not allege:

PAGE 18 – OPINION AND ORDER

(1) the specific water quality standards established by rule by the Environmental Quality Commission ("EQC"); (2) how Defendants' discharges reduced the quality of water below those standards; and (3) that Defendants' discharges were not subject to the exceptions stated in the statute. *Id.* In their SAC, Plaintiffs have cured these deficiencies for their claims against Madison and Threemile.

Specifically, Plaintiffs now allege that the EQC set the water quality standards at 100,000 μg/L for nitrate (or 10 mg/L). SAC ¶ 230. They also explain that "contributing any additional nitrates" to areas in LUGBWMA that are already higher than this water quality limit necessarily "further reduce[s] water quality below the standards." *Id.* ¶ 232. Additionally, Plaintiffs allege that Madison applies wastewater to its own farm, which is a sufficient explanation for how Madison has reduced the water quality. *See id.* ¶¶ 126-29, 131. Similarly, Plaintiffs allege that Threemile's lagoons have leaked and spilled, thereby contributing to the nitrate problem. *Id.* ¶ 142.

Regarding CRP, Lamb Weston, and PGE, Plaintiffs allege that these "Defendants, both directly and indirectly through the Port and/or Lamb Weston, have discharged their nitrate-heavy waste into the waters of the state." *Id.* ¶ 231. Plaintiffs acknowledge that the Port and Lamb Weston are permitholders and thus are exempt from the prohibitions in ORS 468B.025(1)(b). *See id.* ¶¶ 95-111, 117-22. To the extent that PGE and CRP "indirectly" discharge waste by shipping water to the Port and Lamb Weston for those entities to dispose of it, PGE and CRP are not themselves "[d]ischarg[ing] any wastes into the waters of the state." *See* ORS 468B.025(1)(b). Rather, it is the Port and Lamb Weston who ultimately "discharge" water, and, as permitholders,

their dumping is governed by ORS 468B.025(2). Accordingly, Plaintiffs fail to state a negligence *per se* claim against PGE, CRP, Lamb Weston, and the Port based on ORS 468B.025(1)(b).[13]

Plaintiffs, however, have adequately alleged negligence *per se* against the Port and Lamb Weston based on ORS 468B.025(2). Thus, Plaintiffs may pursue joint tortfeasor liability for these claims, including against PGE and CRP, on the basis that sending wastewater to the Port and Lamb Weston for those entities to discharge in violation of state law constitutes "substantial assistance or encouragement" under Restatement (Second) of Torts § 876(b) or (c).

### c.  Trespass

Pearson, Fleming, the Suters, and Blodgett (the "Landowner Plaintiffs") assert a trespass claim against all Defendants. "A plaintiff claiming trespass must show that the defendant invaded the exclusive possession of his property . . . ." *Hay v. Or. Dep't of Transp.*, 301 Or. 129, 135 (1986). "[A] trespass can result from an intrusion by invisible as well as visible forces and . . .  it is the force of the instrumentality rather than its size which is significant in determining whether a trespass has been committed." *Martin v. Union Pac. R.R. Co.*, 256 Or. 563, 566 (1970). A plaintiff also must "show that the intrusion was intentional or, if unintentional, the result of defendants' negligence or ultrahazardous activity." *Gibson v. Morris*, 270 Or. App. 608, 613 (2015).

The Landowner Plaintiffs have adequately alleged that dumping activities by the Port, Madison, Threemile, and Lamb Weston were an intentional invasion of Landowner Plaintiffs'

---

[13] Although the Port did not move to dismiss this claim, the defect with Plaintiffs' ORS 468B.025(1)(b) claim applies equally to the discharges by the Port and Lamb Weston because both entities are permitholders whose conduct is governed by ORS 468B.025(2). *See Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 743 (9th Cir. 2008) ("A district court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants." (cleaned up)).

land. They allege that Defendants "knew that the entry of pollutants onto Plaintiffs' and Class members' property was certain, or substantially certain, to result from their operations" and that the "[p]ublicity surrounding Morrow County's emergency declaration and the Port of Morrow's repeated violations of its wastewater discharge permit, as well as Defendants' own awareness of the nitrate contamination issues in the LUBGWMA, put Defendants on notice that their operations were causing nitrates to pollute Plaintiffs' and Class members' properties." SAC ¶¶ 244-46.

CRP, Lamb Weston, and PGE argue that Plaintiffs do not plead facts plausibly alleging that, in sending wastewater to the Port, they knew or should have known that nitrates contained in such wastewater would ultimately make their way into Plaintiffs' respective properties. As Plaintiffs allege, however, Lamb Weston land-applies its own wastewater and applies excess fertilizer to its farms, which are practices that contribute directly to the nitrate invasion to Plaintiffs' respective properties. CRP and PGE, however, do not land-apply any material. Instead, Plaintiffs allege that CRP and PGE have "ratified" the Port's tortious dumping by contracting to send the Port water. *See Cider Riot, LLC v. Patriot Prayer USA, LLC*, 330 Or. App. 354, 381-82 (2024).[14]

Under Oregon law, "ratification cannot occur unless the principal, with knowledge of the material facts, *intends* to ratify the act." *Jensen v. Medley*, 336 Or. 222, 242 (2003) (emphasis in original). Here, Plaintiffs allege that CRP and PGE were on notice of the Port's trespasses

---

[14] In *Cider Riot*, the Oregon Court of Appeals held that the trial court erred in denying a defendant's motion to strike a trespass claim pleaded against a defendant whom plaintiffs alleged "caused others" to trespass, when there was no evidence that the defendant himself entered the property and nothing in the record "would allow the reasonable inference that [the defendant] himself directed or authorized third parties to [invade] plaintiffs' property, that he otherwise directed or authorized third parties to enter plaintiffs' property, or that he *ratified* any intrusion onto plaintiffs' property." *See* 330 Or. App. at 381-82 (emphasis added).

because of the publicity surrounding the Port's permit violations. Thus, alleges Plaintiffs, CRP and PGE were on notice that the nitrates in its wastewater would likely make their way to the water table and, by extension, Plaintiffs' properties. Plaintiffs, therefore, adequately state a claim against CRP and PGE under a "ratification" theory and, at the very least, may pursue joint tortfeasor liability for this claim on the basis that sending wastewater to the Port constitutes "substantial assistance or encouragement" of the Port's trespasses under Restatement (Second) of Torts § 876(b) or (c).

### d.  Private Nuisance

The Landowner Plaintiffs also state a claim of private nuisance against all Defendants. "[A] plaintiff claiming private nuisance must show that the defendant unreasonably and substantially interfered with the use and enjoyment of his property . . . ." *Hay*, 301 Or. at 135. The substantial and unreasonable use and enjoyment "inquiry 'depends on the individual facts of a particular case.'" *Mark v. State ex rel. Dep't of Fish & Wildlife*, 191 Or. App. 563, 573 (2004) (quoting *Jewett v. Deerhorn Enters., Inc.*, 281 Or. 469, 473 (1978)).

Lamb Weston argues that it cannot be liable in nuisance because it is required to discharge processed water in compliance with local ordinance. Although regulatory compliance is evidence that a defendant's behavior is reasonable, it "does not preclude a determination that [the] operation constitutes a nuisance." *See Penland v. Redwood Sanitary Sewer Serv. Dist.*, 156 Or. App. 311, 319 (1998); *see also Lunda v. Matthews*, 46 Or. App. 701, 707 (1980) ("Conformance with pollution standards does not preclude a suit in private nuisance."). Here, Plaintiffs allege that Lamb Weston land-applies its own wastewater and excess fertilizer and has violated its own DEQ permit. *See* SAC ¶ 113. Thus, Lamb Weston's argument that it should be insulated from liability based on its regulatory compliance is without merit.

CRP, PGE, and Lamb Weston argue that Plaintiffs fail to allege that they acted with the requisite intent for this claim. To establish nuisance liability, a "defendant's actions [must be] intentional, negligent, reckless or [constitute] an abnormally dangerous activity." *Frady v. Portland Gen. Elec. Co.*, 55 Or. App. 344, 347 (1981). For the reasons stated above in connection with trespass, Lamb Weston acted with the requisite nuisance intent by its over-application of material on its own properties. Similarly, Plaintiffs' ratification theory for CRP and PGE applies to nuisance and, as with trespass, Plaintiffs may assert aiding and abetting liability against those Defendants.

### 3. RCRA

All Defendants except the Port of Morrow have moved to dismiss Plaintiffs' RCRA claim. "RCRA is a comprehensive statute that governs the treatment, storage, and disposal of solid and hazardous waste. . . . 'so as to minimize the present and future threat to human health and the environment.'" *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)). To survive a motion to dismiss a RCRA claim, a plaintiff must plausibly allege:

> (1) that the defendant "has contributed to the past or is contributing to the present handling, treatment, transportation, or disposal" of certain material; (2) that this material constitutes "solid waste" under RCRA; and (3) that the solid waste "may present an imminent and substantial endangerment to health or the environment."

*Cal. River Watch v. Vacaville*, 39 F.4th 624, 629 (9th Cir. 2022) (brackets omitted) (quoting *Ctr. for Cmty. Action & Env't Just. v. BNSF R. Co.*, 764 F.3d 1019, 1023 (9th Cir. 2014)); *accord* 42 U.S.C. § 6972(a)(1)(B).

### a. Standards

"To establish the 'contribution' element of a RCRA claim, a plaintiff must allege that the defendant was 'actively involved in or [has] some degree of control over the waste disposal

process.'" *Eagle Star Rock Prods. LLC v. PCC Structurals, Inc.*, 756 F. Supp. 3d 1062, 1080 (D. Or. 2024) (alteration in original) (quoting *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 950 (9th Cir. 2023)). A plaintiff must also allege that the waste meets RCRA's definition of "solid waste," which is:

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of title 33 . . . .

42 U.S.C. § 6903(27).

Under this definition, a "material" can be any state of matter (including liquid) and still be "solid waste." *See id.* However, "materials must be 'discarded' to be considered solid waste." *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1045 (9th Cir. 2004); *see also Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 514-15 (9th Cir. 2013) (*Ecological Rts. Found. I*) (describing plain meaning of "discard" in textual analysis of RCRA's definition of "solid waste"); *Cal. River Watch*, 39 F.4th at 629 (same). "The determination of whether [a material] has been 'discarded' is made independently of *how* the materials are handled." *Safe Air for Everyone*, 373 F.3d at 1046 n.13 (emphasis in original). It is the relationship between the consumer and the material that determines whether the material is discarded. *See Ecological Rts. Found. I*, 713 F.3d at 515 (holding that escaping preservative is not "solid waste" because it is not "a material that the consumer . . . no longer wants.").

Thus, "whether a product has 'served its intended purpose and is no longer wanted by the consumer' is a 'key' consideration in determining whether a substance constitutes solid waste." *Cal. River Watch*, 39 F.4th at 629 (quoting *Ecological Rts. Found. I*, 713 F.3d at 515). A

PAGE 24 – OPINION AND ORDER

substance that "is released into the environment as a natural, expected consequence" of a product's intended use has not necessarily been discarded, and therefore it "is not automatically 'solid waste' under RCRA's definition of the term." *See Ecological Rts. Found. I*, 713 F.3d at 518 (emphasis added) ("[W]ood preservative that escapes from wooden utility poles as those poles age has not itself been 'discarded,' and therefore is not a 'solid waste,' under RCRA."). Because a material must be "discarded" to qualify as solid waste, *see Safe Air for Everyone*, 373 F.3d at 1041, a recycled material might not qualify as a solid waste when it is handled by a re-using consumer but later meet the definition of "solid waste" when its final user disposes of it.

### b.  Analysis

#### i.  Over-Application of Fertilizer

Plaintiffs fail plausibly to allege a RCRA claim against Lamb Weston, Threemile, and Madison for their own over-application of fertilizer to farmland because fertilizer is not a "solid waste." Plaintiffs allege that these Defendants over-fertilize their crops. *See, e.g.*, SAC ¶¶ 123, 134-35, 141. Additionally, Plaintiffs allege that "[f]arms rely on nitrogen fertilizer to help increase crop yields." *Id.* ¶ 124. As explained, however, "whether a product has 'served its intended purpose and is no longer wanted by the consumer' is a 'key' consideration in determining whether a substance constitutes solid waste." *Cal. River Watch*, 39 F.4th at 629 (quoting *Ecological Rts. Found. I*, 713 F.3d at 515). Fertilizer applied to a field of crops is serving its intended purpose and is still wanted by the consumer. Indeed, it is implausible that Lamb Weston, Threemile, and Madison would waste fertilizer that they must purchase to maximize their crop return merely to pollute. Thus, fertilizer does not meet the definition of solid waste. Whether, as Plaintiffs allege, "[f]armers exercising reasonable care to avoid contaminating groundwater would not apply nitrogen [fertilizer] to crops beyond the agronomic rate" (*see* SAC ¶ 124) is a question better answered by Oregon tort law.

PAGE 25 – OPINION AND ORDER

### ii. Over-Application of Other Nitrogen Products

Plaintiffs, however, adequately state a RCRA claim against Lamb Weston, Threemile, Madison, and the Port for over-applying wastewater and nitrogen effluent to their fields. Unlike fertilizer, wastewater and effluent are not purchased. They are created as a byproduct of Defendants' other business practices: Threemile's manure, for example, is produced as a byproduct of its CAFO operations, just as Lamb Weston's wastewater is a byproduct of its food processing facility operations. Further, Plaintiffs allege that, during the non-growing season, these byproducts are disposed of just as they are during crop season. *See, e.g.*, SAC ¶ 138. Thus, Plaintiffs plausibly allege that these Defendants "no longer want[ ]" and therefore dispose of at least *some* water or effluent produced by these operations. *See Ecological Rts. Found. I*, 713 F.3d at 515. Accordingly, wastewater and nitrogen effluent may qualify as solid waste, and that is sufficient at the pleading stage. Questions of fact likely will guide the Court's further RCRA analysis; namely, whether a Defendant has applied material in excess of the agronomic load or in the winter.

Defendants also argue that Congress expressly contemplated that consumers might re-use "industrial and agricultural waste," making it "therefore not a part of the discarded materials disposal problem." *See Safe Air for Everyone*, 373 F.3d at 1045-46 (quoting H.R. Rep. No. 94-1491, at 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 6239-41); *see also id.* ("Agricultural wastes which are returned to the soil as fertilizers or soil conditions are not considered discarded materials in the sense of this legislation." (quoting same)). *Over-application* of these products, however, is not "reusing" them in the sense that Congress discussed in the legislative history, because over-application does not pass on any benefit. Moreover, the Court's analysis is guided by the text of the statute. *See Esquivel-Quintana v. Sessions*, 581 U.S. 385, 391 (2022); *see also Barrett v. United States*, 607 U.S. 128, 140 (2026)

PAGE 26 – OPINION AND ORDER

("To ascertain [Congress's] intent, we turn to statutory text, structure, and (for those who accept its help) legislative history."). As interpreted by the Supreme Court and the Ninth Circuit, that text compels the conclusion that manure and wastewater can qualify as solid waste under RCRA when it is no longer wanted by the consumer. *See Pearson*, 2025 WL 3691202, at *14 (same).

Having sufficiently alleged that wastewater and effluent may qualify as solid waste, Plaintiffs also have plausibly alleged that the handling of these materials by Lamb Weston, Madison, Threemile, and the Port contributes to the disposal of waste. "[T]o state a claim predicated on RCRA liability for 'contributing to' the disposal of hazardous waste, a plaintiff must allege that the defendant had a measure of control over the waste at the time of its disposal or was otherwise actively involved in the waste disposal process." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 852 (9th Cir. 2011); *see also Cal. River Watch*, 39 F.4th at 632-33 (same). Here, Plaintiffs allege that Lamb Weston, Madison, and the Port each spray wastewater onto fields and that Threemile applies the effluent to its land.

### iii.  Transportation of Nitrogen-Rich Wastewater

Plaintiffs also assert a RCRA claim against CRP, Lamb Weston, Madison, PGE, and the Port for "transportation" of nitrogen-rich wastewater. To state a claim under RCRA for contributing to the transportation of waste, "the 'transportation' at issue must also be directly connected to the waste disposal process—such as shipping waste to hazardous waste treatment, storage, or disposal facilities." *Cal. River Watch*, 39 F.4th at 633. In that case, the Ninth Circuit explained that "RCRA repeatedly uses 'transportation' to describe movement in direct connection with the waste disposal process," including, for example, by discussing the standards applicable to "transporters," who must keep records and comply with a shipping manifest system. *See id.* at 630-31. Accordingly, the court concluded that a city that "incidentally carries" hexavalent chromium "through its pipes when it pumps water to its residents" does not

PAGE 27 – OPINION AND ORDER

"contribute to" the "transportation" of solid waste. *Id.* at 633. The Ninth Circuit also noted that there was no allegation that such transportation was connected to the City defendant's waste disposal process and that the City is not a "transporter" for purposes of RCRA. *Id.*

Unlike in *California River Watch*, Plaintiffs here allege that the transportation is for the purpose of disposal. CRP and PGE, for example, send their wastewater to the Port and Lamb Weston's wastewater treatment facilities for the purpose of disposing of that water. *See* SAC ¶¶ 90-91, 93, 144-46, 156. Although CRP and PGE argue that they have no control over the water when it is ultimately disposed, Plaintiffs adequately allege that these Defendants are "actively involved in the waste disposal process" by generating the waste and shipping it for the express purpose of disposal. *See Hinds*, 654 F.3d at 852. Similarly, Lamb Weston, Madison, and the Port transport wastewater to the farms where it is disposed. Accordingly, in conjunction with the disposal RCRA theories discussed above, Plaintiffs state a RCRA claim against all Defendants.[15]

### 4. Medical Monitoring

Lastly, Defendants challenge Plaintiffs' requested relief of medical monitoring as a remedy for their state and federal claims. A successful RCRA plaintiff may obtain "a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party from further violating RCRA." *Meghrig*, 516 U.S. at 484. "Federal courts

---

[15] The Court finds unpersuasive Defendants' arguments that the wastewater did not, as a matter of law, cause Plaintiffs harm or that it does not, as a matter of law, constitute an imminent and substantial endangerment. RCRA's "imminent and substantial endangerment element should be construed broadly to allow for affirmative equitable relief." *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 475 (9th Cir. 2024). These matters have been sufficiently alleged.

addressing the issue have universally held that RCRA citizen suits provide no damages remedy." *Express Car Wash Corp. v. Irinaga Bros.*, 967 F. Supp. 1188, 1193 (D. Or. 1997) (collecting cases). Medical monitoring, however, may be considered injunctive relief when it is forward-looking in nature. As Judge Hallman previously explained:

> On one end of the spectrum, establishing a fund to reimburse plaintiffs for the costs of medical screening examinations is not injunctive relief. On the other end, a court-administered fund which goes beyond payment of the costs of monitoring an individual plaintiff's health to establish pooled resources for the early detection and advances in treatment of the disease is injunctive in nature rather than predominantly money damages.

*Pearson*, 2025 WL 1640808, at *37 (cleaned up). Here, Plaintiffs seek medical monitoring "for people in the area to help scientists and the medical community promote early detection and advances in the treatment of diseases caused by exposure to excess nitrates." SAC ¶ 13. Thus, it is not money damages.

Plaintiffs also may seek medical monitoring under Oregon law. Although "negligent conduct that results only in a significantly increased risk of future injury that requires medical monitoring does not give rise to a claim," *Lowe v. Philip Morris USA, Inc.*, 344 Or. 403, 415 (2008), Plaintiffs allege present physical injuries because "[e]veryone who ingests high-nitrate water is impacted at the cellular level." SAC ¶ 69. Plaintiffs explain that "high concentration of nitrates interferes with the body's ability to prevent nitrosamine formation," and, when nitrosamines "hit" cells, they cause DNA damage to cells and can lead to cancer formation. *Id.* ¶¶ 70-1 & Image 2. Thus, Plaintiffs' request for an early detection public fund may be a proper use of medical monitoring. *See Zehr v. Haugen*, 318 Or. 647, 656-57 (1994) (when a defendant's negligence causes bodily injury, plaintiff can recover damages for past, present, and future medical expenses and injuries). At the minimum, the Court will not exclude Plaintiffs' request at the pleading stage.

## C. Summary

Plaintiffs plausibly allege joint tortfeasor liability under Oregon law. Plaintiffs also allege primary tortfeasor liability against all Defendants for negligence, trespass, and private nuisance. Plaintiffs also state a claim of inverse condemnation against the Port. Plaintiffs' negligence *per se* claim is plausibly alleged against Madison and Threemile under ORS 468B.025(1)(b), and against the Port and Lamb Weston under ORS 468B.025(2). Plaintiffs also may pursue a theory of negligence *per se* based on allegations that CRP and PGE acted as joint tortfeasors with the Port and Lamb Weston.

## CONCLUSION

The Court DENIES Defendants' Motions to Dismiss and Strike (ECF 157, 158, 160, 161, 162, 165), except as otherwise expressly stated in this Opinion and Order. The Court DENIES Threemile Farms' Motion to Strike (ECF 159).

**IT IS SO ORDERED**.

DATED this 5th day of June, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge