Michael A. Bliven, OSB No. 942510
**BLIVEN LAW FIRM, PC**
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
mike@blivenlawfirm.com

Robert F. Dwyer, III, OSB No. 984197
**BLIVEN LAW FIRM, PC**
202 North Main Street, Suite 1
Boardman, OR 97818
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
rdwyer@blivenlawfirm.com

John Heenan (*pro hac vice*)
**HEENAN & COOK, PLLC**
2224 Montana Avenue
Billings, MT 59101
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
john@lawmontana.com

Steve W. Berman (*pro hac vice*)
Jerrod C. Patterson (*pro hac vice*)
Sydney K. Thomas (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com
sydney.thomas@hbsslaw.com

Nathan Emmons (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 625-4949
Facsimile: (708) 628-4950
nathane@hbsslaw.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PENDLETON DIVISION**

MICHAEL PEARSON, JEFFREY FLEMING, JAMES SUTER, SILVIA SUTER, and JESSIE MOHEDANO, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

PORT OF MORROW; LAMB WESTON, INC.; MADISON RANCHES, INC.; THREEMILE CANYON FARMS, LLC; PORTLAND GENERAL ELECTRIC COMPANY; and COLUMBIA RIVER PROCESSING, LLC,

Defendants.

Case No. 2:24-cv-00362-SI

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF DR. LESLIE PHILLIPS (ECF NO. 282)**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 3

A. Dr. Phillips Has the Epidemiology and Screening Experience Her Assignment Requires. .......... 3

B. Dr. Phillips Tied Bradford Hill Causation Analysis to a Tiered Monitoring Protocol. .......... 3

C. Defendants' Own Expert Concedes the Population-Level Premises of Dr. Phillips's Method. .......... 4

D. The Court Has Already Recognized Medical Monitoring as a Proper Remedy for Plaintiffs' Alleged Cellular Injury .......... 5

III. LEGAL STANDARD .......... 5

IV. ARGUMENT .......... 6

A. Defendants Cannot Disqualify Dr. Phillips for Lacking a Credential Their Own Expert Lacks. .......... 7

1. Defendants Misstate Dr. Phillips's Testimony, and Their Authorities Involve Experts Who Strayed Outside Their Fields. .......... 8

2. Defendants' Rule 23(b)(2) Footnote Raises a Certification Question, Not a Rule 702 Objection. .......... 10

B. Dr. Phillips's Bradford Hill Review Is a Reliable Epidemiologic Method. .......... 10

1. Courts Approve Structured Literature Review Under Bradford Hill. .......... 10

2. Guzelian Is a Law Review Proposal, Not a Rule 702 Prerequisite. .......... 12

3. Dr. Phillips Accounted for Screening Harms in the Protocol's Design. .......... 12

4. The Panel Permits Updates to an Implementable 2026 Protocol; It Does Not Supply Missing Opinions. .......... 14

C. The 5 mg/L Threshold Is Grounded in Science, Not Litigation Say-So. ........ 14

D. Dr. Phillips Bridged Population Risk to Protocol Choices; Defendants Offer Only Competing Expert Judgment. ........ 17

1. Dr. Phillips Explained Each Step from Population Risk to Protocol. ........ 17

2. Colorectal Screening Tracks High-Risk Guidance for a Comparably Elevated-Risk Population. ........ 18

3. The Thyroid Protocol Avoids USPSTF's Ultrasound Concern and Rests on Objective Sources. ........ 19

E. The Lack of an Individual Biomarker Does Not Defeat Population-Level Medical Monitoring. ........ 20

F. Defendants' Contrary Studies Show Scientific Disagreement, Not Cherry-Picking. ........ 21

G. Residence and Tiering Are Reliable Exposure Criteria; Class Overbreadth Is a Rule 23 Issue. ........ 23

V. CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abuan v. Gen. Elec. Co.*,
3 F.3d 329 (9th Cir. 1993) ....................10

*Avila v. Willits Envtl. Remediation Tr.*,
633 F.3d 828 (9th Cir. 2011) ....................9

*Baker v. Saint-Gobain Performance Plastics Corp.*,
232 F. Supp. 3d 233 (N.D.N.Y. 2017) ....................12, 17

*Barley v. ArcBest II, Inc.*,
2026 WL 686394 (D. Or. Mar. 11, 2026) ....................9

*In re Bextra & Celebrex Maktg. Sales Practices & Prods. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ....................7, 21, 22

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ....................16

*Clausen v. M/V New Carissa*,
339 F.3d 1049 (9th Cir. 2003) ....................16, 18

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) .................... *passim*

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002) ....................16, 18

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) ....................17, 20, 22

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ....................5

*In re Hanford Nuclear Reservation Litig.*,
292 F.3d 1124 (9th Cir. 2002) ....................16, 17, 21, 23

*Hanson v. Colgate-Palmolive Co.*,
353 F. Supp. 3d 1273 (S.D. Ga. 2018) ....................7

*Hardeman v. Monsanto Co.*,
997 F.3d 941 (9th Cir. 2021) .................... *passim*

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
524 F. Supp. 3d 1007 (S.D. Cal. 2021)....................22

*Kennedy v. Collagen Corp.*,
161 F.3d 1226 (9th Cir. 1998)....................6, 20

*Lowe v. Philip Morris USA, Inc.*,
344 Or. 403 (2008)....................5

*Lytle v. Nutramax Lab'ys, Inc.*,
99 F.4th 557 (9th Cir. 2024)....................2, 6

*Magallon v. Robert Half Int'l, Inc.*,
743 F. Supp. 3d 1237 (D. Or. 2024)....................9

*McClellan v. I-Flow Corp.*,
710 F. Supp. 2d 1092 (D. Or. 2010)....................11, 16, 18

*Messick v. Novartis Pharms. Corp.*,
747 F.3d 1193 (9th Cir. 2014)....................6

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)....................7

*Pearson v. Port of Morrow*,
834 F. Supp. 3d 1127 (D. Or. 2026)....................2, 5, 16, 21

*Penland v. Redwood Sanitary Sewer Serv. Dist.*,
156 Or. App. 311 (1998)....................16

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010)....................6, 20

*Rearden, LLC v. Walt Disney Pictures*,
152 F.4th 1058 (9th Cir. 2025)....................9

*In re Respironics Recalled CPAP, Bi-Level PAP & Mech. Ventilator Prods. Litig.*,
2024 WL 626100 (W.D. Pa. Feb. 14, 2024)....................12

*Rocket Software, Inc. v. CollegeNET, Inc.*,
2025 WL 3707291 (D. Or. Dec. 22, 2025)....................9, 10

*Rosa v. City of Newburg*,
2021 WL 1348260 (D. Or. Apr. 12, 2021)....................16, 17

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018)....................2, 6

*Simms-Belaire v. Washington Cty.*,
2024 WL 279020 (D. Or. Jan. 25, 2024) ........................................................................7, 8

*Sterner v. U.S. Drug Enf't Agency*,
467 F. Supp. 2d 1017 (S.D. Cal. 2006)..............................................................................9

*Stewart Title Ins. Co. v. Credit Suisse*,
2015 WL 4250704 (D. Idaho July 13, 2015) ...............................................................9, 10

*Thomas v. Deschutes Cty.*,
732 F. Supp. 3d 1321 (D. Or. 2024) ..................................................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...........................................................................................................10

*Wendell v. GlaxoSmithKline LLC*,
858 F.3d 1227 (9th Cir. 2017) ......................................................................................2, 11

*Zehr v. Haugen*,
318 Or. 647 (1994)...............................................................................................................5

## TABLE OF ABBREVIATIONS

| Short Citation | Long Citation |
|---|---|
| Mot. | Defendants' Joint Motion to Exclude Testimony and Opinions of Dr. Leslie Phillips, ECF No. 282 |
| Phillips Rep. | Second Corrected Expert Report of Leslie Phillips, Ph.D., filed concurrently as Reply Ex. 43 |
| Phillips Rebuttal | Rebuttal Report of Leslie Phillips, Ph.D., filed concurrently as Reply Ex. 44 |
| Phillips Dep. | Excerpts of the deposition of Leslie Phillips dated Aug. 4, 2026, filed concurrently as Reply Ex. 53 |
| Ex. | Exhibits filed in Support of the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification, ECF No. 230-1 |
| Reply Ex. | Exhibits filed in Support of the Supplemental Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification (filed concurrently) |
| Kelly Rep. | Rebuttal Report of Kathryn E. Kelly, DrPH, Med, ECF No. 280-20 |
| Class Cert. Opp. | Defendants' Omnibus Response in Opposition of Plaintiffs' Motion for Class Certification, ECF No. 274 |
| Opp. to Mots. to Exclude Laton | Plaintiffs' Omnibus Opposition to Defendants' Joint Motion (ECF No. 293) and Defendant Portland General Electric Company's Motion (ECF No. 292) to Exclude the Testimony and Opinions of W. Richard Laton, Ph.D. (filed concurrently) |

## I. INTRODUCTION

Defendants ask the Court to silence the one scientist who has examined, condition by condition, what years of drinking nitrate-contaminated well water mean for the health of the families of the Lower Umatilla Basin. Dr. Leslie Phillips is a Ph.D. epidemiologist who did exactly what Rule 702 and the Ninth Circuit require. She gathered the peer-reviewed literature, applied the Bradford Hill framework, tested the evidence against confounding and alternative explanations, and built from that evidence a tiered monitoring protocol tied at every step to published epidemiology and screening guidance. Phillips Rep. ¶¶ 1, 11-12, 40-82. Defendants' motion does not identify a missing method. It identifies conclusions Defendants dislike.

The motion's own foundation undercuts it. The motion rests on the rebuttal report of Dr. Kathryn Kelly, Mot. at 1, and Dr. Kelly concedes the points that decide this motion. She agrees that Dr. Phillips "is qualified to evaluate population-level epidemiologic associations," that her background "supports work in population epidemiology and screening policy," that population-level exposure criteria may define a monitoring population, and that precise individual dose reconstruction is not required. Kelly Rep. at 9-10, 15, 20. Dr. Kelly holds a public health doctorate, is not a physician, and is "not presenting [her]self as a medical-monitoring specialist or as a treating clinician." *Id.* at 8-9. Defendants therefore ask the Court to exclude Dr. Phillips for lacking a clinical credential their own expert does not hold. What remains is a disagreement between two public health scientists about how far a mixed literature should be carried—precisely the dispute Rule 702 leaves to the factfinder.

The motion also mischaracterizes the record. Defendants tell the Court that Dr. Phillips "admits that this is the first clinical screening program she has ever designed," Mot. at 2-3; her full answer was, " In a legal context, yes. Not for screening programs, no." Phillips Dep. 224:19-22. Defendants say she "refused to identify a single study by name" supporting 5 mg/L, Mot. at 16;

she named the National Cancer Institute studies led by Dr. Mary Ward, which "converge at that 5 milligrams per liter." Phillips Dep. 31:24-32:20. Defendants cite Jones 2019 as contrary evidence; it uses the same >5 mg/L metric Dr. Phillips adopted, and the same Iowa Women's Health Study cohort showed a 2.6-fold increase in thyroid-cancer risk at that level. Phillips Rep. ¶ 63. And Defendants call her method unreliable for omitting a quantitative decision model that the U.S. Preventive Services Task Force itself does not use. Phillips Dep. 111:7-25, 115:20-25.

Defendants also ignore the posture of this motion. At class certification, "[i]nadmissibility alone is not a proper basis to reject evidence," and questions of ultimate admissibility go to weight. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004, 1006 (9th Cir. 2018); *Lytle v. Nutramax Lab'ys, Inc.*, 99 F.4th 557, 571 (9th Cir. 2024). And this Court has already held that "[e]veryone who ingests high-nitrate water is impacted at the cellular level," so that Plaintiffs' request for an early-detection fund "may be a proper use of medical monitoring." *Pearson v. Port of Morrow*, 834 F. Supp. 3d 1127, 1152-53 (D. Or. 2026). In substance, the motion asks the Court to revisit that ruling through an evidentiary challenge.

Each of Defendants' objections—to Dr. Phillips's qualifications, her treatment of screening harms, her 5 mg/L entry threshold, her protocol choices, the absence of an individual biomarker, her handling of contrary studies, and her exposure criteria—attacks conclusions, not foundation. Each fails under *Daubert* and the Ninth Circuit decisions that approve exactly this literature-review and Bradford Hill approach. *Hardeman v. Monsanto Co.*, 997 F.3d 941, 953, 963-65 (9th Cir. 2021); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1234-35 & n.4 (9th Cir. 2017). The Court should deny the motion.

## II. BACKGROUND

### A. Dr. Phillips Has the Epidemiology and Screening Experience Her Assignment Requires.

Dr. Phillips holds a Ph.D. in Epidemiology from the University of Washington, an M.S. from the Harvard T.H. Chan School of Public Health, and a B.A. from the University of Texas at Austin. Phillips Rep. ¶ 1, app. A at 56. She has worked as an epidemiologist for nearly two decades, beginning as a research scientist and epidemiologist at the National Alzheimer's Coordinating Center in 2008, with experience "evaluating environmental and occupational exposures and their relationships to disease." *Id.* ¶ 1, app. A. Her work includes population-based case-control studies of environmental exposures and cancer risk, occupational health research, and systematic review and meta-analysis. *Id.* app. A at 59. She also has screening experience: at the SEIU 775 Health Benefits Trust she created and implemented a colorectal cancer screening plan that went beyond the recommended standard of care, and she advises private clients in the cancer-detection field on appropriate screening tests. Phillips Dep. 16:11-24, 18:21-19:21; Phillips Rep. ¶ 4.

She was retained to assess the need for and design of a medical monitoring program for exposed class members, including by reviewing the clinical and epidemiologic literature, applying that evidence to class members' health risks, evaluating present harms and future risk, determining whether surveillance can reasonably identify and reduce risk, and, if scientifically justified, developing a class-wide monitoring program. Phillips Rep. ¶ 8.

### B. Dr. Phillips Tied Bradford Hill Causation Analysis to a Tiered Monitoring Protocol.

Dr. Phillips answered those questions from the published literature, evaluating whether the relationship is causal "based on Bradford Hill criteria and consideration of alternative explanations, like confounding factors." *Id.* ¶ 11; Phillips Rebuttal ¶¶ 14-16, 21. She treats those considerations not as a "rigid checklist," but as "a method for holistic evidence synthesis." Phillips

Rep. ¶12; Phillips Rebuttal ¶ 14. She organized the evidence by biological pathway and target condition, identifying four mechanisms — endogenous nitrosation and NOC-mediated carcinogenesis, competitive inhibition of thyroid iodide uptake, methemoglobin formation, and transplacental and teratogenic effects — and tying each target condition to epidemiological evidence, alternative explanations, mechanism, and early detection. Phillips Rep. ¶¶ 26-33, 40-75. The resulting protocol is tiered by mechanism, duration, and age; an independent Medical/Research Panel would confirm and update the protocols over time. *Id*. ¶¶ 18, 38-39, 76-82. Her 5 mg/L nitrate-nitrogen exposure threshold is one-half the federal maximum contaminant level and the pre-specified exposure metric used in National Cancer Institute cohort studies. Section IV.C below.

**C. Defendants' Own Expert Concedes the Population-Level Premises of Dr. Phillips's Method.**

Two features of the record frame the motion. First, Defendants' rebuttal expert, Dr. Kathryn Kelly, is an environmental toxicologist and health risk assessor who holds a Doctor of Public Health and a Master of Public Health from Columbia University; her CV also lists an M.Ed. Kelly Rep. at 8; *id.* app. B. She is not a physician, and she states that she is "not presenting [her]self as a medical-monitoring specialist or as a treating clinician." *Id*. at 9. The motion is supported by her report and cites it throughout. Mot. at 1; *see, e.g.*, *id*. at 7-11, 14-20, 22-26.

Dr. Kelly's report concedes much of the ground the motion contests. She agrees that Dr. Phillips "is qualified to evaluate population-level epidemiologic associations," that population-level exposure criteria may define a medical-monitoring population, and that precise individual dose reconstruction is not required. Kelly Rep. at 10, 15, 20. She acknowledges that Dr. Phillips considered some null and mixed findings and does not accuse her of demonstrated intentional bias. *Id*. at 26. She also agrees that a new monitoring program need not have been implemented as an

identical package, that periodic updating can be reasonable, that gastric screening can be appropriate for selected higher-risk U.S. populations, and that avoiding routine ultrasound may reduce overdiagnosis. *Id*. at 31-32, 37. Her disagreement is with how far the population evidence should be carried into specific protocols — a dispute about conclusions, not the absence of a method.

### D. The Court Has Already Recognized Medical Monitoring as a Proper Remedy for Plaintiffs' Alleged Cellular Injury.

This Court has already held that Plaintiffs allege a present physical injury supporting medical monitoring under Oregon law, because "[e]veryone who ingests high-nitrate water is impacted at the cellular level," so that "Plaintiffs' request for an early detection public fund may be a proper use of medical monitoring." *Pearson*, 834 F. Supp. at 1153 (citing *Zehr v. Haugen*, 318 Or. 647, 656-57 (1994), and distinguishing *Lowe v. Philip Morris USA, Inc.*, 344 Or. 403, 415 (2008)). Defendants ask the Court to revisit that ruling on the theory that the expert report now controls. Class Cert. Opp. at 51 n.194. This motion is the vehicle for that request.

## III. LEGAL STANDARD

Rule 702 permits opinion testimony from a witness qualified "by knowledge, skill, experience, training, or education" where the proponent demonstrates to the Court that it is more likely than not that the testimony will help the trier of fact, rests on sufficient facts or data, is the product of reliable principles and methods, and reflects a reliable application of those principles and methods. Fed. R. Evid. 702; *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047-48 (9th Cir. 2025). The 2023 amendment clarifies the proponent's preponderance burden and confirms that there is no presumption in favor of admission, but it did not convert Rule 702 into a merits test or require exclusion whenever an expert's conclusions are impeachable. *Id.* at 1048-49.

For medical and public health testimony in particular, the Ninth Circuit has been explicit. "Medicine partakes of art as well as science," *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014); "[l]ack of certainty is not, for a qualified expert, the same thing as guesswork," *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); and "ethical concerns often prevent double-blind studies calculated to establish statistical proof," so that "[w]here the foundation is sufficient, the litigant is entitled to have the jury decide upon the experts' credibility, rather than the judge," *id.* at 566 (cleaned up). "Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998).

Finally, the certification posture matters. "Inadmissibility alone is not a proper basis to reject evidence submitted in support of class certification," and "an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Sali*, 909 F.3d at 1004, 1006; *accord Lytle*, 99 F.4th at 571. Defendants' motion does not engage this standard at all; it applies trial-stage gatekeeping to evidence offered in support of certification.

## IV. ARGUMENT

*Daubert* asks whether an expert used reliable principles and methods and applied them reliably, not whether the Court agrees with her conclusions. Each of Defendants' objections targets Dr. Phillips's credentials, data selection, assumptions, or conclusions. None shows a missing or unreliable method. Dr. Phillips identifies the studies she relied on, applies a named and generally accepted framework to them, and explains why the associations warrant surveillance. Defendants' objections go to weight, not admissibility.

### A. Defendants Cannot Disqualify Dr. Phillips for Lacking a Credential Their Own Expert Lacks.

Defendants' qualifications argument reduces to the claim that only a clinician may opine on a screening program. Mot. at 6-12. It is wrong on the law and unavailable to these movants on this record.

Defendants are wrong on the law because designing a population screening program is an epidemiological and public health question, not a bedside diagnostic one. Whom to screen, at what exposure, at what interval, with what test, and whether earlier detection changes outcomes are questions of epidemiology. The Ninth Circuit has defined epidemiology as "the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations," and affirmed admission of experts who used epidemiology, toxicology, Bradford Hill criteria, and meta-analyses. *Hardeman*, 997 F.3d at 953, 963 n.13. That is Dr. Phillips's method, applied to literature that consists largely of epidemiology.

Defendants' own authority makes the point. In *In re Bextra & Celebrex Marketing Sales Practices & Products Liability Litigation*, 524 F. Supp. 2d 1166 (N.D. Cal. 2007) (*see* Mot. at 25), the court found a clinical cardiologist unqualified to weigh epidemiological evidence because he lacked specialized epidemiology training and had never participated in an observational study. *Id.* at 1176. Dr. Phillips has those credentials. *See also Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1297-98 (S.D. Ga. 2018) (epidemiologist without medical degree qualified); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791 (3d Cir. 1994) (medical-monitoring expert "could reliably testify as to a patient's future risks without examining the patients").

This Court has rejected the same argument. In *Simms-Belaire v. Washington County*, the Court held that a nurse practitioner's "long professional experience" satisfied Rule 702 and that her lack of correctional-healthcare experience went to weight, not admissibility. 2024 WL 279020,

at *5-*6 (D. Or. Jan. 25, 2024). It also found reliable her comprehensive record review combined with "extensive medical knowledge and experience." *Id*. Another judge of this District has applied *Simms-Belaire* for the same weight-not-admissibility principle. *Thomas v. Deschutes Cty.*, 732 F. Supp. 3d 1321, 1325 (D. Or. 2024).

Dr. Kelly, whose rebuttal report supplies the substance of this motion, is not a physician. She holds a Doctor of Public Health, describes herself as an environmental toxicologist and health risk assessor, and is "not presenting [her]self as a medical-monitoring specialist or as a treating clinician." Kelly Rep. at 8-9. She lists no publications within the last ten years, *id.* at 10, and she concedes that Dr. Phillips's background "supports work in population epidemiology and screening policy," *id.* If a public health doctorate and relevant experience qualify Dr. Kelly to challenge Dr. Phillips's screening plan, a doctorate in epidemiology and nearly two decades of epidemiology and screening work qualify Dr. Phillips to support it.

Defendants' focus on the topic of Dr. Phillips's 2011 dissertation, Mot. at 7-8, fares no better. A dissertation marks where an epidemiologist's career begins, not where it ends. Her report and CV document the work that followed: causal-inference analysis under the Bradford Hill considerations, systematic literature review, evaluation of screening modalities for earlier cancer detection, and population screening work for diabetes, depression, and colon cancer. Phillips Rep. ¶¶ 2-4, app. A. Rule 702 asks whether her "knowledge, skill, experience, training, or education" qualifies her, Fed. R. Evid. 702, not whether her doctoral thesis anticipated this case.

**1. Defendants Misstate Dr. Phillips's Testimony, and Their Authorities Involve Experts Who Strayed Outside Their Fields.**

Defendants' central factual premise — that Dr. Phillips "admits that this is the first medical monitoring plan she has ever designed," Mot. at 6, 9 (citing Phillips Dep. 224:19-21), and, in the introduction, "the first clinical screening program she has ever designed," *id.* at 2 — stops one line

short. The rest of her answer was: "In a legal context, yes. Not for screening programs, no." Phillips Dep. 224:19-22. She also testified that she "created" the SEIU 775 colorectal cancer screening plan and helps private cancer-detection clients determine appropriate tests. *Id.* at 16:11-24, 18:21-19:21; *see* Phillips Rep. ¶ 4; Phillips Rebuttal ¶ 5. Nor does testimony that this is her first nitrate and contaminated-drinking-water case, Phillips Dep. at 17:9-21, admit disqualification. Every expert has a first engagement on a particular exposure; Rule 702 requires "at least a minimal foundation," *Magallon v. Robert Half Int'l, Inc.*, 743 F. Supp. 3d 1237, 1243 (D. Or. 2024), not prior repetition. And as Section IV.B.4 explains, the clinician panel updates a long-running program; it is not an admission of incapacity.

*Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058 (9th Cir. 2025), does not help Defendants. It affirmed exclusion of a copyright damages-apportionment expert who "repeatedly conceded that he lacked knowledge about MOVA technology," the subject of his opinion. *Id*. at 1078. That is not this case.

*Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011), favors admission: lack of specialization goes to weight "as long as an expert stays within the reasonable confines of his subject area." The excluded physician opined on chrome-plating byproducts, a subject outside his field. *Id*. at 839. *Barley v. ArcBest II, Inc.*, 2026 WL 686394, at *7 (D. Or. Mar. 11, 2026) (Russo, M.J.), likewise involved an epidemiologist rebutting biomechanical testimony on fall dynamics. These cases show subject-matter mismatch, not that an epidemiologist may not do epidemiology.

Defendants' remaining authorities likewise involved experts without practical experience in the subject of their opinions. Mot. at 8-9 (describing *Sterner v. U.S. Drug Enf't Agency*, 467 F. Supp. 2d 1017, 1034 (S.D. Cal. 2006), and *Stewart Title Ins. Co. v. Credit Suisse*, 2015 WL

4250704, at *11 (D. Idaho July 13, 2015)); *see also id.* at 4 (citing *Rocket Software, Inc. v. CollegeNET, Inc.*, 2025 WL 3707291 (D. Or. Dec. 22, 2025)). Dr. Phillips has designed and evaluated screening programs and advises cancer-detection clients on test selection. Phillips Dep. 16:11-24, 18:21-19:21; Phillips Rep. ¶ 4.

**2. Defendants' Rule 23(b)(2) Footnote Raises a Certification Question, Not a Rule 702 Objection.**

Defendants argue in a footnote that Plaintiffs must show at certification that the program would benefit "the class as a whole." Mot. at 11-12 n.3 (citing *Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 334-35 (9th Cir. 1993), and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011)). That is a Rule 23 question, not a Rule 702 objection, and a footnote in a *Daubert* motion is not the place to resolve it.

In any event, Dr. Phillips's report clearly articulates the benefit the program provides to all class members: exposure is defined by a measured private-well concentration at or above 5 mg/L; increased risk is assessed condition by condition under Bradford Hill; necessity is addressed through tiers calibrated to mechanism, latency, and life stage; and each protocol identifies the detectable precursor or early stage and the evidence that earlier intervention improves outcomes. Phillips Rep. ¶¶ 11-12, 34, 37-39, 47, 52-54, 61, 67, 75, 79-84.

The Court should address the class-wide benefit question on the class-certification record, where Plaintiffs have fully briefed it.

**B. Dr. Phillips's Bradford Hill Review Is a Reliable Epidemiologic Method.**

**1. Courts Approve Structured Literature Review Under Bradford Hill.**

The record shows that Dr. Phillips applied the Bradford Hill framework factor by factor, except experimentation, which ethical constraints foreclose for a suspected toxicant. Phillips Dep. 26:16-27:17. She prioritized meta-analyses and systematic reviews while reviewing them herself

and asked critical-appraisal questions about confounding, population, and exposure source. *Id.* at 13:4-7, 45:3-17, 86:16-87:3, 120:10-121:9, 128:1-129:15; Phillips Rebuttal ¶¶ 14-16. She preferred drinking-water studies because of exposure specificity and considered alternative explanations and confounding for each condition. Phillips Dep. at 42:10-43:11; Phillips Rep. ¶¶ 45, 50, 59, 65, 71. This is a structured causal-inference review of the kind the Ninth Circuit has approved.

Defendants' central reliability argument is that Dr. Phillips did not conduct a formal benefit-harm analysis, calculate false-positive and false-negative rates and predictive values, and quantify baseline risk. Mot. at 12-15. They describe these as "standard protocol" and "the analyses ordinarily used to validate a screening program." *Id.* at 13.

Rule 702 asks whether the expert's method is reliable, not whether a different analysis would have been better. The Ninth Circuit approved this type of method in *Hardeman*, where experts used epidemiology, Bradford Hill, and meta-analyses, and held that choices about which studies to weight were "within the range where experts might reasonably differ." 997 F.3d at 953, 963-65 (citation omitted). It approved the same literature-and-Bradford-Hill approach in *Wendell*, 858 F.3d at 1234-35 & n.4, and Judge Aiken approved reliance on "the totality of medical evidence" and medical-literature review in *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1115-16 (D. Or. 2010).

Dr. Kelly offers her own preferred methodology. Kelly Rep. at 27. But a competing method is not a ground for exclusion, and Dr. Phillips's plan addresses the substance of Dr. Kelly's frameworks in any event. Phillips Rebuttal §§ II.A, II.E. Tellingly, the C-8 program that Dr. Kelly repeatedly holds out as a model does not itself satisfy the frameworks she would impose here. Phillips Rebuttal ¶ 61; *see* Kelly Rep. at 7.

**2. Guzelian Is a Law Review Proposal, Not a Rule 702 Prerequisite.**

Defendants rely on Guzelian et al., 79 Ind. L.J. 57, as their asserted source for mandatory benefit-harm analysis, predictive-value calculations, and baseline-risk quantification. Mot. at 10, 13–14. It cannot carry that weight.

*First*, Guzelian is a law review proposal, not a Rule 702 standard; Defendants do not show that an epidemiologist must adopt its Bayesian, decision-analytic methodology before opining on surveillance. *Second*, no court has adopted it for that purpose. The reported decisions citing the article use it only to define medical monitoring and explain why requiring manifest symptoms defeats its purpose. *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233, 241 & n.10, 252 (N.D.N.Y. 2017), *aff'd in relevant part*, 959 F.3d 70 (2d Cir. 2020); *In re Respironics Recalled CPAP*, *Bi-Level PAP & Mech. Ventilator Prods. Litig.*, 2024 WL 626100 (W.D. Pa. Feb. 14, 2024). *Third*, Dr. Phillips applied Bradford Hill and considered alternative explanations and confounding for each target condition. Phillips Rep. ¶¶ 11-12, 45, 50, 65, 71. Unlike Defendants' law review proposal, that method has the Ninth Circuit's approval. *Hardeman*, 997 F.3d at 953, 963-65.

**3. Dr. Phillips Accounted for Screening Harms in the Protocol's Design.**

Defendants' premise that Dr. Phillips ignored screening harms is inaccurate. Mot. at 13-14. She testified that screening invasiveness is "a high consideration," that "[e]verything has risks and benefits," and that she applied that principle condition by condition: low-touch thyroid screening, colorectal screening drawn from higher-risk-population guidance, and a "gated" gastric pathway in which a blood test precedes endoscopy. Phillips Dep. 67:2-68:16, 99:16-100:9. She also explained that she weighed the probability and seriousness of screening harm against the probability of elevated risk, drawing on USPSTF materials and cancer-epidemiology experience. *Id.* at 68:17-69:11; *see also* Phillips Rebuttal § II.A.

The report reflects the same judgment. It states that screening choices account for both "the magnitude of harm" and "the incremental burden" imposed. Phillips Rep. ¶ 40. The gastric protocol is "deliberately conservative," using a blood panel before endoscopy; the thyroid protocol uses palpation rather than routine ultrasound to avoid overdiagnosis; and the three-year gastric interval balances early detection against excessive workups. *Id.* ¶¶ 67, 96-97, 99, 104-05 & app. E; Phillips Dep. 114:23-115:6. Dr. Phillips's rebuttal report also explains how her protocols are consistent with the very frameworks Defendants seek to impose. Phillips Rebuttal § II.A.

Dr. Phillips acknowledged that she did not perform a quantitative risk-benefit analysis, use a false-positive rate for serial TSH testing, or calculate predictive values. Phillips Dep. 99:2-8, 100:10-18, 113:20-114:8. But the additional analyses Defendants and Dr. Kelly propose are neither standard nor necessary for medical monitoring design, and they require data that epidemiologists rarely if ever have when designing monitoring programs. Phillips Rebuttal § II.D. Dr. Phillips explained that the selected tests are established clinical tools with stable sensitivity and specificity, that predictive values vary by population, and that the USPSTF itself uses judgment rather than "a quantitative formula." Phillips Dep. at 111:7-25, 112:9-22, 113:20-114:4, 115:20-25. If the body that sets national screening guidance does not require a decision model, Rule 702 cannot require one of Dr. Phillips. Reliability may be shown by explaining how the expert reached her conclusions and pointing to "some objective source," *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318-19 (9th Cir. 1995) ("*Daubert II*")—here, the published guidance cited in the report. Phillips Rep. ¶¶ 52-53, 61, 67, 104 & app. B nos. 44, 55, 62. Dr. Kelly's decision-modeling preference is a competing method, not a basis for exclusion. Kelly Rep. at 28-29.

### 4. The Panel Permits Updates to an Implementable 2026 Protocol; It Does Not Supply Missing Opinions.

Defendants argue that the Medical/Research Panel leaves the program's essential components to "unidentified future clinicians." Mot. at 15; Kelly Rep. at 32. The record says otherwise. Dr. Phillips testified that "the modalities, the intervals, the plan itself is the right plan," "the best plan for this class . . . at this time in 2026," and "implementable as written." Phillips Dep. 79:16-80:18. The Panel exists so the program can respond "as science changes," not because the plan needs review today. *Id.* at 81:1-12, 82:2-18. The report likewise states that the protocols reflect current evidence and clinical standards. Phillips Rep. ¶¶ 18, 76-77, 120-22. Dr. Kelly agrees that "[p]eriodic updating of a scientifically supported protocol is reasonable." Kelly Rep. at 32.

## C. The 5 mg/L Threshold Is Grounded in Science, Not Litigation Say-So.

Defendants call 5 mg/L "arbitrary," describe it as a "litigation cutoff," and stress that no agency uses it as a drinking-water threshold. Mot. at 15-16. But a screening threshold need not be a regulatory threshold, and the study Defendants themselves cite shows why.

Dr. Phillips identified the 5 mg/L threshold through a comprehensive literature review and application of the Bradford Hill framework, weighing harms and benefits. Phillips Rep. ¶¶ 11-12; Phillips Rebuttal ¶¶ 21, 49-53. Consistent with standard epidemiological practice, she balanced the risks of both over- and under-inclusion. Phillips Rebuttal ¶¶ 23-24.

Dr. Phillips's 5 mg/L conclusion tracks the literature: several studies, including National Cancer Institute studies led by Dr. Mary Ward, "converge at that 5 milligrams per liter" for harmful health effects. Phillips Dep. 31:24-32:20. She distinguished regulatory limits from screening triggers, *id.* at 38:24-39:1, and Dr. Kelly herself describes that reasoning as "relevant evidence for a precautionary entry rule," Kelly Rep. at 22. Screening thresholds are distinct from biological thresholds for individual conditions and from regulatory limits. Phillips Rebuttal ¶¶ 18-28. The

screening threshold identifies the population in need of additional assessment—the need the medical monitoring program is designed to address. *Id.* ¶ 25.

Defendants' assertion that Dr. Phillips "repeatedly refused to identify a single study by name" supporting 5 mg/L, Mot. at 16 (citing Phillips Dep. 47:23-50:10), cannot be squared with the same deposition, in which she identified the National Cancer Institute studies led by Dr. Ward as converging on that level. Phillips Dep. 31:24-32:20. Nor does it help Defendants that some studies in the report found associations at higher concentrations. Mot. at 16. Those studies show that nitrate can cause the target conditions; the entry threshold is drawn from the cohort studies that measured risk at the 5 mg/L metric. An expert who relies on high-dose studies for hazard and on threshold-specific cohorts for the entry point has explained her reasoning, not concealed it.

Defendants claim Dr. Phillips did not address Jones et al., *Ingested Nitrate, Disinfection By-Products, and Risk of Colon and Rectal Cancers in the Iowa Women's Health Study Cohort*, 126 Env't Int'l 242 (2019) (*see* Mot. at 24–25). That paper used this exposure metric:

> "years of exposure above one-half the U.S. maximum contaminant level . . . >5 mg/L NO3-N."

In other words, Dr. Phillips identified the same exposure metric used in the study Defendants cite. And Jones 2019's null result for one endpoint does not dispose of the threshold. Using the same Iowa Women's Health Study cohort and the same >5 mg/L nitrate-nitrogen metric, a National Cancer Institute study led by Dr. Ward found that women whose water exceeded 5 mg/L for five or more years had a significantly increased risk of thyroid cancer (relative risk 2.6 [95% CI 1.1-6.2]), with a significant trend. *See* Phillips Rep. ¶ 63.

Further, a Danish national registry cohort found significantly increased colorectal-cancer risk at concentrations the report describes as "approximately 0.87 mg/L $NO_3$-N — far below the EPA standard." Schullehner et al., 143 Int'l J. Cancer 73 (2018); Phillips Rep. ¶ 48. Dr. Kelly does

not dispute that the cohort reports associations at lower concentrations. Kelly Rep. at 35. Defendants' emphasis on other studies is a disagreement in the literature, not a Rule 702 basis for exclusion. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1048-49 (9th Cir. 2014); *Hardeman*, 997 F.3d at 963-65.

The Ninth Circuit has rejected demands for a bright-line safe-exposure threshold. In *In re Hanford Nuclear Reservation Litigation*, 292 F.3d 1124 (9th Cir. 2002), it reversed a "doubling dose" requirement, rejecting a rule that would treat 10 rem as risky but 9.99 rem as safe. *Id.* at 1137. In *Clausen v. M/V New Carissa*, 339 F.3d 1049 (9th Cir. 2003), it held that uncertainty about the minimum harmful exposure did not make an expert's evaluation guesswork because "precise information concerning the exposure necessary to cause specific harm" is "not always available, or necessary." *Id.* at 1059. And *McClellan* held that *Daubert* does not require research "on the identical point" for every aspect of causation. 710 F. Supp. 2d at 1111 (quoting *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002)).

Defendants' fallback is that EPA has "established" 10 mg/L and that anything lower is unsupported. Mot. at 15-16. But the federal standard protects against acute infant methemoglobinemia, Phillips Rep. ¶¶ 23, 70; Kelly Rep. at 22; Phillips Rebuttal ¶¶ 18-19, and the absence of a lower regulatory line is not a finding of no effect below 10 mg/L. *Hanford* distinguishes substances with no scientific evidence of capacity to cause the injury from substances, like nitrate, whose capacity to cause harm is established. 292 F.3d at 1136. Regulatory compliance also "does not preclude" nuisance. *Pearson*, 834 F. Supp. 3d at 1149 (quoting *Penland v. Redwood Sanitary Sewer Serv. Dist.*, 156 Or. App. 311, 319 (1998)). Nor is regulatory adoption the test for reliability: this Court admitted a use-of-force expert whose reliance on sources other than local police policy did not make his opinion unreliable. *Rosa v. City of Newburg*, 2021 WL

1348260, at *4 (D. Or. Apr. 12, 2021). Indeed, EPA itself uses 50% of the nitrate MCL (5 mg/L) to trigger nitrate monitoring in certain circumstances. Phillips Rebuttal ¶ 19.

**D. Dr. Phillips Bridged Population Risk to Protocol Choices; Defendants Offer Only Competing Expert Judgment.**

Defendants next argue that Dr. Phillips departed from United States Preventive Services Task Force guidance by recommending colorectal screening at 40 rather than 45, at five- to seven-year rather than ten-year intervals, and by colonoscopy rather than fecal immunochemical testing, and that she recommends thyroid surveillance the USPSTF does not endorse for asymptomatic adults. Mot. at 17-20.

Defendants' premise is that monitoring for an exposed population must match general-population guidance. That is backwards. USPSTF guidance is calibrated to average-risk adults; exposure-prompted monitoring addresses a higher-risk population and is intended to diagnose conditions before ordinary care would. *Baker*, 232 F. Supp. 3d at 241 & n.10 (quoting Guzelian); Phillips Rebuttal § II.G. A protocol identical to ordinary care would be no remedy at all, and on Defendants' theory, no medical monitoring program could ever survive Rule 702.

Whether Dr. Phillips's departures are justified is a contested scientific question. Rule 702 does not authorize the Court to resolve that dispute by choosing Dr. Kelly's view. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1028 (9th Cir. 2022).

**1. Dr. Phillips Explained Each Step from Population Risk to Protocol.**

Defendants argue that Dr. Phillips failed to bridge population-level literature to specific recommendations. Mot. at 17. She did. She first assessed increased risk by condition under Bradford Hill, then compared that risk to populations for which established guidance already recommends departures from average-risk care: colonoscopy at age 40 for those with a first-degree relative with colorectal cancer or advanced adenoma, and endoscopic programs in higher-

incidence Korea and Japan for gastric cancer. Phillips Rep. ¶¶ 11-12, 40-75; Phillips Dep. 72:18-73:9. She adopted existing protocols rather than inventing them and adjusted modality and interval for burden, invasiveness, and overdiagnosis. Phillips Dep. 66:11-67:1, 72:18-73:8-9, 153:8-24; Phillips Rep. ¶¶ 40, 67, 96-97, 104-05.

Rule 702 does not require nitrate-specific trials validating every starting age, interval, and modality. *Daubert* does not require research "on the identical point," *McClellan*, 710 F. Supp. 2d at 1111 (quoting *Domingo*, 289 F.3d at 607), and precise exposure information is "not always available, or necessary," *Clausen*, 339 F.3d at 1059. What matters is that each step rests on objective evidence; here, each step is tied to published epidemiology or screening guidance. Dr. Kelly's demand for age-specific absolute risks and decision models is a methodological preference. Kelly Rep. at 27-29.

**2. Colorectal Screening Tracks High-Risk Guidance for a Comparably Elevated-Risk Population.**

The colorectal recommendation applies that logic. USPSTF recommends average-risk screening at 45; the U.S. Multi-Society Task Force recommends colonoscopy at 40 for people with a first-degree relative with colorectal cancer or advanced adenoma, a roughly doubled-risk population. Phillips Rep. ¶¶ 52-53. Dr. Phillips compared the exposed population to that group based on the Danish cohort, a Spanish/Italian case-control study, and co-exposure evidence relevant to endogenous nitrosation, concluding that the population's risk "falls within or above this range." *Id.* ¶ 53. She preferred colonoscopy because it screens and prevents by removing precursor lesions, with Cologuard Plus for members who decline or cannot undergo colonoscopy. Phillips Dep. 116:1-117:2; Phillips Rep. ¶ 106.

Dr. Phillips conceded that she did not rely on nitrate-specific proof that colonoscopy outperforms stool testing, that the five-to-seven-year interval derives from high-risk guidance

generally, that others calculated numbers needed to screen for ages 40 to 44, and that no professional guidance shortens intervals specifically for nitrate exposure. Phillips Dep. 117:19-119:23. *See* Mot. at 18. Those concessions describe her method: applying established high-risk screening guidance to a population she found comparably elevated. Dr. Kelly's demand for nitrate-defined modeling is a disagreement about how much quantification the analogy requires. Kelly Rep. at 40-41.

### 3. The Thyroid Protocol Avoids USPSTF's Ultrasound Concern and Rests on Objective Sources.

Defendants incorrectly assert that Dr. Phillips "provides no explanation whatsoever" for departing from USPSTF thyroid guidance "in her report or during her deposition." Mot. at 20 (citing Phillips Dep. 70:5-10). The report explains that ultrasound overdetects indolent lesions, that the USPSTF recommends against screening for that reason, and that the plan therefore uses visual inspection and palpation, reserving ultrasound for findings. Phillips Rep. ¶¶ 67, 96-97. She gave the same explanation in the lines immediately before the passage Defendants cite: USPSTF's valid overdiagnosis concern is "driven by ultrasound," so "you will not find ultrasound included." Phillips Dep. 69:12-70:4. Dr. Kelly agrees that avoiding routine ultrasound may reduce overdiagnosis; her objection is to net benefit in this population. Kelly Rep. at 37.

The motion also conflates two protocols. Tier II TSH monitoring addresses functional, reversible thyroid effects from nitrate's inhibition of iodide uptake and applies to members age one and older currently residing on a private well in the contaminated area. Phillips Rep. ¶¶ 31, 55-62, 81, 94. Thyroid-cancer surveillance is separate: age 40 and older, five or more years of residence, and co-located with Tier II visits. *Id.* ¶¶ 39, 63, 96-97 & app. D; Phillips Dep. 103:25-104:24. Dr. Phillips acknowledged that the principal dysfunction studies involved somewhat

higher concentrations, but explained mechanistically why effects would be expected at lower levels and that contrary lower-level studies would change her recommendation. *Id.* at 215:8-217:7.

Defendants' *Daubert II* point fares no better. Mot. at 19. Litigation-developed opinions are not categorically inadmissible; reliability may be shown by explaining "precisely how" the expert reached her conclusions and citing "some objective source." 43 F.3d at 1318-19. Dr. Phillips relies on peer-reviewed, pre-litigation epidemiology and published USPSTF and specialty-society guidance. Phillips Rep. ¶¶ 63, 67, 96-97 & app. B; Phillips Rebuttal § II.B.2, II.F.

### E. The Lack of an Individual Biomarker Does Not Defeat Population-Level Medical Monitoring.

Defendants argue that because there is no validated clinical test to detect nitrate-induced cellular damage in a given person, and because Dr. Phillips did not test any class member for it, her opinion is *ipse dixit*. Mot. at 21-23. They rely on her own disclosure that "no validated clinical screening test for these molecular markers exists at the individual level." Phillips Rep. ¶ 26; Phillips Rebuttal ¶¶ 64-65.

Disclosing limits in the available science is not a Rule 702 defect. The Ninth Circuit has repeatedly recognized uncertainty in medical science: "[l]ack of certainty is not, for a qualified expert, the same thing as guesswork," *Primiano*, 598 F.3d at 565, and "[n]ot knowing the mechanism" is not always fatal, *Kennedy*, 161 F.3d at 1230 (quoting *Daubert II*, 43 F.3d at 1314). A court errs by "demanding concrete physical or testimonial evidence in a field characterized by uncertainty." *Elosu*, 26 F.4th at 1028.

Defendants also overstate what the report claims. Dr. Phillips does not purport to diagnose cellular injury in individuals. The report states that the plan "does not screen individual class members for the cellular injury in the form of DNA lesions, because no validated clinical screening test for these molecular markers exists at the individual level," and "instead screens for the

downstream tissue-level consequences of cumulative cellular injury: the precancerous and early-cancer lesions" that the gastric, colorectal, and thyroid protocols detect. Phillips Rep. ¶ 26.

Defendants' argument proves too much. Monitoring is a population-level remedy assessed with population-level tools. *Hanford* recognized that generic causation asks whether the exposure can cause injury "in the general population" and that class certification permits courts to assess liability "without regard to the individual components of each plaintiff's injuries." 292 F.3d at 1133, 1135.

The argument is also, at bottom, a request to revisit the Court's prior ruling. The Court has already held that "[e]veryone who ingests high-nitrate water is impacted at the cellular level." *Pearson*, 834 F. Supp. at 1153. Defendants' insistence that Dr. Phillips must prove cellular injury member by member, Mot. at 21-22, is a challenge to that holding and to Oregon medical-monitoring law, not to the reliability of her epidemiology.

**F. Defendants' Contrary Studies Show Scientific Disagreement, Not Cherry-Picking.**

Defendants charge Dr. Phillips with omitting contrary literature — Jones 2019 and two evidence syntheses — and lacking a reproducible method for weighing studies. Mot. at 23-25. The record defeats the charge.

First, Defendants cite Jones 2019 as contrary authority while omitting that it uses the 5 mg/L nitrate-nitrogen metric and that its first author reported a significant association at the same threshold for bladder cancer three years earlier. A null result for one endpoint in one cohort is not "the great weight of the evidence." Contrast *Bextra*, 524 F. Supp. 2d at 1176.

Second, Defendants' parenthetical on the Christensen systematic review concedes that colorectal-cancer patterns across 267 studies "varied widely or w[ere] too sparse to identify patterns of association." Mot. at 24. Heterogeneous and sparse is not contrary; Dr. Kelly relies on the same review for the same point. Kelly Rep. at 25-26.

Hosseini et al. (2021), as Defendants describe it, found no association between nitrate in water and colorectal cancer; Dr. Kelly calls it "non-supportive nonlinear." Mot. at 24; Kelly Rep. at 26. That shows disagreement in a heterogeneous literature, not unreliability. Dr. Phillips relied on two other meta-analyses and the 2.7-million-person Danish cohort, Phillips Rep. ¶¶ 48-49, and testified that she found no methodological problem with Picetti's null colorectal analysis but interpreted it differently. Phillips Dep. 211:16-212:2. Under *Hardeman*, different weighting of epidemiological studies is not categorically unreliable. 997 F.3d at 963-65.

Third, this is the corroboration argument *Elosu* forecloses: "Rule 702's sufficient facts or data element requires foundation, not corroboration." 26 F.4th at 1025-27. Defendants concede the rule, Mot. at 21, and then ask the Court to depart from it.

Fourth, *In re Incretin-Based Therapies Products Liability Litigation*, 524 F. Supp. 3d 1007 (S.D. Cal. 2021), does not support exclusion. It recognized that weighing all available scientific evidence is not intrinsically unscientific; the expert there was excluded because he blindly relied on post-2015 statistical reports he could not explain. Dr. Phillips reviewed the studies herself and identified the appraisal questions she applied. Phillips Dep. 120:10-121:9, 128:1-129:15.

Fifth, Defendants' reproducibility charge rests on the observation that Dr. Phillips did not publish a separate weighting formula. Mot. at 23-24 (citing Phillips Dep. 130:4-12). But Defendants' own account of the testimony is that "anyone trained in epidemiology" could follow her method from the studies and meta-analyses cited in the report. *Id.* (citing Phillips Dep. 129:16-130:12). The report then applies the Bradford Hill considerations condition by condition, identifying the evidence, alternative explanations, and confounders for each. Phillips Rep. ¶¶ 11-12, 45, 50, 59, 65, 71. That is the transparency *Incretin* found lacking, and it is what allowed Dr. Kelly to critique each step.

**G. Residence and Tiering Are Reliable Exposure Criteria; Class Overbreadth Is a Rule 23 Issue.**

Defendants' final argument is that Dr. Phillips's eligibility criteria are "coextensive with Plaintiffs' proposed class definition" and do not account for bottled water, reverse osmosis systems, or individual consumption. Mot. at 25-27.

That Dr. Phillips's exposure criteria align with the class definition is unremarkable; she was asked to opine about the exposed population. If Defendants believe the class is overbroad, that is a Rule 23 argument, not an epidemiology defect. The Ninth Circuit in *Hanford* described exposure-defined generic-causation classes as an ordinary toxic-exposure structure. 292 F.3d at 1139.

Residence at a well-served property with a measured concentration is a recognized exposure surrogate. Phillips Rebuttal § II.J. Indeed, the Iowa Women's Health Study papers Defendants rely on assign exposure on a community basis without individual water-consumption data. Defendants cannot use those papers while treating the surrogate as disqualifying.

Dr. Phillips addressed exposure misclassification directly: private-well use is a poor surrogate only "in the abstract," not where wells in a hydrologically defined risk region have tested above 5 mg/L. Phillips Dep. 233:8-234:3. She also explained that nondifferential misclassification biases toward the null, *id.* at 234:4-18, and Dr. Kelly agrees that "precise individual dose reconstruction is not required," Kelly Rep. at 20.

The tiered design addresses the variation Defendants identify. Class membership permits enrollment and a Baseline Assessment that documents residence and water source; long-latency cancer protocols require age 40 and five years' residence; Tier II thyroid monitoring requires current private-well residence; Tier I applies only to pregnancy, planned pregnancy, and infancy; and members who move away or whose residences test below 5 mg/L for two consecutive years

are removed from ongoing eligibility. Phillips Rep. ¶¶ 38-39, 79-82, 85-88, 107, 110-11 & app. D. Dr. Phillips explained that short-term exposure has "a different risk profile" addressed by low-touch monitoring rather than cancer screening. Phillips Dep. 92:17-93:20, 93:25-94:15.

For the same reason, Defendants misread Dr. Phillips's statement that she recommends thyroid screening for "essentially the whole class." Mot. at 19-20 (citing Phillips Dep. 102:12-25). The class is defined by the exposure she studied, so the population eligible for exposure-based monitoring will naturally overlap with it. The protocols themselves are tailored to ensure appropriate use of resources. Phillips Rep. ¶¶ 39, 63, 81, 94, 96-97 & app. D.

Dr. Phillips did testify that she used residence as a proxy for ingestion, did not investigate reverse-osmosis or bottled-water use within the class, did not set a minimum exposure floor, and placed every member age one or older in Tier II regardless of individual ingestion. Phillips Dep. 93:25-95:8, 106:19-21, 187:11-189:8. But later mitigation does not erase historical exposure, and intake documents each member's water source. *Id.* at 33:17-34:3, 98:8-17, 168:6-20; Phillips Rep. ¶ 88; Phillips Rebuttal ¶ 68. Whether household mitigation reduces relief is an administration issue, not an epidemiology defect.

Defendants' own record undercuts their mitigation point. They say the class includes people who received bottled water and reverse osmosis, but their omnibus brief says bottled water is supplied only for wells at or above 10 mg/L and reverse osmosis only between 10 and 25 mg/L, while much of the class tested between 5 and 9.9 mg/L. Class Cert. Opp. at 7, 26. On Defendants' evidence, that segment received nothing.

## V. CONCLUSION

Dr. Phillips is an epidemiologist offering epidemiological opinions about an exposed population, and she explained how the epidemiology supports each element of her protocol. Defendants attack her credentials through an expert who lacks the credential they demand and who

concedes Dr. Phillips's qualifications in population epidemiology and screening policy. They fault her for not building a decision model that the USPSTF itself does not use. And they call arbitrary a threshold consistent with National Cancer Institute cohort they cite. At most, Defendants identify a disagreement between public health scientists about a mixed literature. That goes to weight, particularly at class certification, and is no basis for exclusion. Plaintiffs respectfully request that the Court deny the motion.

Date: October 26, 2026

Respectfully submitted,

By: */s/ Steve W. Berman*
Steve W. Berman (*pro hac vice*)
Jerrod C. Patterson (*pro hac vice*)
Sydney K. Thomas (*pro hac vice*)

**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com
sydney.thomas@hbsslaw.com

Nathan Emmons (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 625-4949
Facsimile: (708) 628-4950
nathane@hbsslaw.com

Michael A. Bliven, OSB No. 942510
**BLIVEN LAW FIRM, PC**
704 South Main
Kalispell, MT 59901
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
mike@blivenlawfirm.com

Robert F. Dwyer, III, OSB No. 984197
**BLIVEN LAW FIRM, PC**
202 North Main Street, Suite 1
Boardman OR 97818
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
rdwyer@blivenlawfirm.com

John Heenan (*pro hac vice*)
**HEENAN & COOK, PLLC**
2224 Montana Avenue
Billings, MT 59101
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
john@lawmontana.com

*Attorneys for Plaintiffs and the Proposed Class*